**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| DEMETRIA POWELL, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | No. 18 C 6675 |
| | ) | |
| v. | ) | Judge Gottschall |
| | ) | |
| THE STATE OF ILLINOIS, et al., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS

The defendants, the State of Illinois; the Illinois Department of State Police; Governor J. B. Pritzker[1]; and Brendan Kelly, Acting Director of the Illinois Department of State Police, by their attorney, Kwame Raoul, Attorney General of Illinois, submit the following memorandum of law in support of their motion to dismiss.

### BACKGROUND

Plaintiffs are African-American children and their parents or grandparents litigating on their behalf. They bring this action seeking a remedy for gun violence in Chicago and Cook County. The allegations are that the children live in neighborhoods where they are regularly exposed to the sounds of gunfire, and have had siblings or other relatives killed as a result of gun violence. In one case, the complaint alleges that the child was present at the location of his father's murder and observed his body at the crime scene. This constant exposure to gun violence, it is alleged, has resulted in severe psychological harm to the minor plaintiffs, including post-traumatic stress disorder.

---

[1] Gov. Rauner, originally named as a defendant, has been succeeded in office by Gov. J. B. Pritzker. The substitution of parties is automatic. FRCP 25(d).

Plaintiffs further allege that the epidemic of gun violence stems from inadequate law enforcement by the Defendants. The claim is that seven gun shops in the Chicago area, along with others in Indiana, sell many guns that ultimately fall into the hands of criminals and are used in criminal activity, and that the State Police could use its regulatory authority more aggressively to oversee these shops to prevent strawman purchases, increase surveillance of purchases to prevent illegal trafficking, require the shops to confiscate invalid Firearm Owner's Identification Cards (FOID cards), and increase store security to prevent the theft of guns. Doc. 1, Complaint ¶28. Plaintiffs allege that the ISP's "failure to adopt these needed regulations has caused more guns to flow onto Chicago's streets and has directly caused more African-Americans to be killed, shot and exposed to gun violence in Chicago." *Id.*

Plaintiffs' legal theories are claims under the Americans with Disabilities Act and Illinois Civil Rights Act. The complaint alleges that the exposure to gunfire and violence has left the children cognitively and psychologically disabled, and that this trauma has had an adverse impact on their educational performance.

Count I is brought under Title II of the ADA, 28 U.S.C. § 12132. Its focus is on education. The core allegation in Count I is that, by its inadequate exercise of "the State's existing regulatory authority to reduce the gun related violence that impedes the plaintiff children from participating in the State's program of public education, the defendants are failing in their duty to make a reasonable accommodation to the disabled plaintiffs and are thereby violating their rights under Title II." *Id.* at ¶58.

The focus of Count II, also brought under Title II of the ADA, is law enforcement. By the Defendants' alleged failure "to use the State's existing regulatory authority to prevent the illegal trafficking in guns that expose the plaintiff children to continued or greater limits on their major

2

life activities, the defendants are failing to make a reasonable accommodation to the special needs of the plaintiff children in the conduct of the federally assisted law enforcement programs designed to protect the people of the State." *Id.*at ¶60. Plaintiffs allege this constitutes a violation of their right "to have the defendants conduct law enforcement with due regard to their disabilities and special needs." *Id.* at ¶61.

Count III is a state law claim under the Illinois Civil Rights Act, 740 ILCS 23/5 et seq. The claim is again based on the alleged failings of the Defendants to regulate gun trafficking to reduce the level of gun violence to which the plaintiff children are exposed, and that this failure has had an "adverse effect" on African-American children, causing them to become disabled and "preventing them from obtaining a public education." *Id.* at ¶63. This Count further alleges that "under the Firearm Owners Identification Act and otherwise, the defendants have used methods of administration that permit more illegal guns in African American than white neighborhoods and such methods serve no legitimate State purpose and deny the benefit of law enforcement to the children of this State in an unfair and racially disparate manner." *Id.* at ¶64.

In each count, plaintiffs seek declaratory and injunctive relief. The injunction would essentially command ISP to reallocate its law enforcement resources and modify its law enforcement priorities: "to make a reasonable accommodation for the disabilities and special needs of the plaintiff children, requiring that such accommodations consist of rules and regulations" described earlier in the complaint at paragraph 28 (discussed at p. 2 of this memorandum) regarding more intensive regulation of gun shops. Complaint at pp. 26-27. In Count III, the injunction would require the ISP "to adopt reasonable gun trafficking regulations" such as those listed in paragraph 28, "in order to eliminate the adverse racial impact of gun violence on African-American children." *Id.* at p. 29.

Defendants acknowledge that the gun violence in Chicago is an extremely significant and difficult criminal problem that causes terrible harm to the city's residents. ISP is one law enforcement agency that, together with municipal, county, and federal law enforcement agencies and prosecutors' offices, is part of the broader law enforcement effort to address the problem of gun violence. But, defendants' role in law enforcement does not create civil liability as plaintiffs allege. Defendants assert the following grounds in their motion to dismiss. First, the plaintiffs lack standing to sue. The causal connections are too remote. There is no claim of actual injury fairly traceable to the defendants that this Court can redress. Second, the facts asserted in this complaint are not encompassed within the scope of Title II of the ADA, whose plain language would not support this claim. Third, the facts alleged fail to state a claim under the Illinois Civil Rights Act (ICRA). Finally, as an overarching point, the relief sought raises serious federalism and comity concerns. Plaintiffs seek an injunction of potentially vast scope that would dictate how a state law enforcement agency regarding how that agency deploys its limited resources to protect public safety and combat crime. Federal courts should have the greatest reluctance to exercise its injunctive powers in such matters. The ADA and Civil Rights Act are not avenues for the exercise of such power. The proper place to seek the relief that the plaintiffs request is the Illinois legislature.

**ARGUMENT**

I.      **PLAINTIFFS LACK STANDING TO SUE UNDER THE ADA AND ICRA**

Title II of the ADA,  42 U.S.C. § 12132,  provides: "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  To prevail, then, plaintiffs must show that they are (or

represent) qualified individuals with disabilities; that they have been denied the benefits of a

program, service, or activity of a public entity; and that the denial or exclusion was "by reason of

such disability." *Illinois League of Advocates for the Developmentally Disabled v. Illinois*

*Department of Human Services,* 60 F.3d 856, 878 (N. D. Ill. 2014); *Brad K. v. Board of*

*Education of City of Chicago,*787 F. Supp. 2d 734, 746-47 (N.D. Ill. 2011); *Phipps v. Sheriff of*

*Cook County,* 681 F.Supp.2d 899, 913 (N.D. Ill. 2009). The denial or exclusion must be "by

reason of such disability," a requirement that the plaintiff show "but for" causation—that the sole

reason for the exclusion was the disability. *Wisconsin Community Services v. City of Milwaukee,*

465 F.3d 737, 752 (7th Cir. 2006).

Under Article III of the Constitution, the jurisdiction of the court is limited to "Cases and

Controversies," meaning a concrete dispute between two parties. Standing is the "irreducible

constitutional minimum" required to bring a case in federal court. *Johnson v. Merrill Lynch,*

*Pierce, Fenner & Smith*, 719 F.3d 601, 606 (7th Cir. 2013), quoting *Lujan v. Defenders of*

*Wildlife,* 504 U.S. 555, 560 (1998). To have standing, a plaintiff must have sustained (1) an

injury in fact that is (2) fairly traceable to the challenged action of the defendant and not the

result of the independent action of some third party not before the court; and (3) it must be likely,

rather than speculative, that the injury will be redressed by a favorable decision. *Johnson,* 719

F.3d at 601; *Lujan,* 504 U.S. at 560-61.

As the Court noted in *Lujan*, it is one thing if the plaintiffs themselves are the object of

the government action or inaction that is the subject of the suit and the source of the complained

of injury. The "traceability" requirement is easy to meet in that situation. It is quite another if the

object of the government's regulation (or, like here, the alleged failure to regulate) is a third

party: "When, however …a plaintiff's asserted injury arises from the government's allegedly

5

unlawful regulation (or lack of regulation) of *someone else*, much more is needed." *Id.* at 562. In such cases, standing is "ordinarily substantially much more difficult to establish." *Id.*

The allegations of this complaint fall well outside the proper boundaries of legitimate standing. While there is no question the complaint adequately alleges the psychological trauma to children who hear and are frightened by the sounds of gunshots, who personally see victims of violence dead or dying at crime scenes, and who have to cope on a frequent basis with the news of friends or loved ones killed or injured from gun violence, the complaint falls far short of alleging injuries fairly traceable to the State, the Governor, and ISP and its Director. The real harm to children is caused by third parties not before the Court, whom no injunction could reach to truly remedy the problem. A gun shop may lawfully sell a gun to a person who uses the gun in a crime. A gun shop also may violate the law in selling a gun to a person or a criminal might steal the gun from the store or from a lawful purchaser. In all instances, however, the crime of the gun store or the gun user cannot be attributed to ISP.

Further, the gun used or purchased unlawfully might not have been sold in Illinois, as plaintiffs note. *Id.* at ¶19. Responsibility for an out of state purchase certainly could not be attributed to an Illinois police authority with no jurisdiction in another state. Individuals can legitimately obtain Firearm Owner's Identification Cards and concealed carry licenses. Their independent decisions to use those weapons might be criminal, but from a causation perspective the state defendants would not be the origin of the complained of injury. ISP also is not the only law enforcement organization that has a role in gun regulation. As the complaint notes, ATF is the federal authority that regulates guns. And local police departments, in the villages where gun shops are located and other police departments where guns might be used or transferred illegally,

could also be brought into this or similar cases if the allegations here were found to meet the standing requirements of Article III.

In effect, plaintiffs are urging stronger prosecutorial efforts (civil or criminal) against gun shops. This does not establish the injury in fact requirement. "A private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another." *Children's Healthcare is a Legal Duty, Inc. v. Deters,* 92 F.3d 1412, 1424 (6th Cir. 1996), quoting D*iamond v. Charles,* 476 U.S. 54, 64 (1986) (separate opinion of Batchelder, J.) "[T]he right to have the government follow the law is not by itself sufficient to confer jurisdiction on a federal court." *Children's Healthcare,* 92 F.3d at 1424.

The final part of the standing inquiry--that a favorable ruling from the court will likely redress the alleged wrong—is just as impossible to achieve. Count I is a Title II claim focusing on public education. ISP does not have a role in public education, and local public schools are not run by the State. Illinois public schools are locally controlled by locally elected school district boards. State aid is provided, but Illinois law does not create a private right of action against the State to fund schools at a particular level or provide a specific set of services. The Illinois Supreme Court has held this repeatedly. *Lewis E. v. Spagnolo*, 186 Ill.2d 198,209 (1999); *Committee for Educational Rights v. Edgar,* 174 Ill.2d 1, 29 (1996); *Blasé v. State,* 55 Ill.2d 94, 99-100 (1973).

Despite the lack of connection between ISP and public education, plaintiffs ask this Court to enter an injunction directed not at any public schools, but at ISP -- to "make a reasonable accommodation for the disabilities and special needs of the plaintiff children." It is difficult to see how the alleged harm suffered by the children in public schools could be redressed by an injunction directed not at public schools, not at addressing the special education needs of

children, and not at addressing the psychological care some children might need as a result of living near gun violence. Rather, plaintiffs seek an injunction directed against the police regarding the regulation of gun shops. It is difficult to see how greater regulation of gun shops would meaningfully serve as an "accommodation" to children already psychologically harmed, as that term is understood under the ADA.

Redressability is another fatal problem with plaintiffs' complaint, as it was in an ADA case brought against the City of Chicago and others regarding public school closures. *McDaniel v. Board of Education of City of Chicago,* 956 F.Supp.2d 887 (N.D. Ill. 2013). Plaintiffs in *McDonald* alleged the closures would disproportionately harm students with disabilities, and that the schools selected for closure were those with large African-American attendance. The Board of Education runs Chicago schools; the plaintiffs also named the City of Chicago as one of the defendants. The court (Judge Lee) dismissed the City on the grounds that an injunction against the City would not be meaningful, because it could not prevent the school closures. As the Court noted, "a plaintiff's claims for injunctive relief must be dismissed because the court cannot enjoin a defendant to act in any way that is beyond the defendant's authority in the first place." *Id.* at 893 (internal quotation marks and citations omitted).

In another case where a city was sued under the ADA for the alleged educational failings of the school board, the court stated, in rejecting the claim: "As for Title II, it cannot be read to impose strict liability on public entities that neither caused plaintiffs to be excluded nor discriminated against them." *Bacon v. City of Richmond,* 475 F.3d 633 (4th Cir. 2007). While the Illinois State Board of Education (not a party to this case) has some oversight of public education, and State aid partially funds local schools, it is nevertheless not the case that the State, the Governor, or ISP would be in a position to impose ADA "accommodations" that might be

8

applicable to local schools that are under local control. The remedy must have some relation to the conduct of a defendant. *Id.* at 638. That is the point of the redressability requirement.

Similarly, in Count II, it is difficult to imagine how this Court could require a "reasonable accommodation for the disabilities and special needs of the plaintiff children in the conduct of the federally assisted law enforcement programs designed to protect the people of the State" by ISP. Complaint, ¶60. Although plaintiffs are correct that law enforcement is designed to protect the people of the State *as a whole*, law enforcement resources are not, at a societal level, designed to "accommodate" persons with disabilities as that term is used in the ADA. Thus, no injunction from this Court directed at the State, the Governor, or ISP could reasonably be expected to redress an entire state's crime problem in order to accommodate disabilities resulting from that crime problem.

Count III, the state law claim under the Illinois Civil Rights Act, is also far too general to meet the test of standing. ISP provides law enforcement on a statewide level. It is not running a specific program whose "criteria" or "methods of administration" have a disparate racial impact. Criminal acts committed by third parties are not as a matter of legal liability attributable to the police. In a case in the Circuit Court of Cook County, the plaintiff was a community organization whose members include citizens living in largely African-American neighborhoods affected by gun violence from firearms purchased at firearms dealers located in Riverdale and Lincolnwood. *Coalition for Safe Chicago Communities v. Village of Riverdale,* 2016 WL 1077293 (Cir. Ct. Cook County). Plaintiffs sued those municipalities under ICRA, alleging a failure by them to regulate the dealers adequately. Judge Valderrama found that the complaint failed on all the standing criteria: it did not present an actual concrete injury, but only a generalized grievance, *id.* at *8; the alleged injury was not fairly traceable to defendants, *id.* at *10; and the injury was not

likely to be redressed by the grant of the requested relief, *id.* at 10. Among other reasons cited by the court was the fact that the gun dealers in these suburbs were not the sole source of firearms recovered at Chicago crime scenes. *Id.*

To summarize: Under *Lujan*, plaintiffs must allege an injury "fairly traceable" to defendants' conduct, and not resulting from the acts of "someone else," as *Lujan* put it--third parties. And plaintiffs must show that meaningful redress by the Court of the asserted injury is "likely." Those "irreducible minimum" requirements to maintaining a federal case cannot be met here. This case should be dismissed for lack of standing.

## II.    PLAINTIFFS HAVE NOT BEEN EXCLUDED FROM ANY GOVERNMENT SERVICES, PROGRAMS, OR ACTIVITIES BY REASON OF THEIR DISABILITY

Title II of the ADA addresses disability discrimination by governmental units and agencies. The class of people protected are "qualified individuals with a disability." 42 U.S. C. § 12131(2). Such a person, with the reasonable assistance of assistive technologies and reasonable modifications to architectural, communication, or transportation barriers, or the provision of auxiliary aids or services, is "qualified" when he or she "meets the essential eligibility requirements for the receipt of services or the participation in programs provided by a public entity." *Id.*

Under Section 12132, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C.§ 12132. When a statute does not expressly define its terms, federal courts should look to the words' plain meaning. *Huzar v. Groupon,* 2018 WL 3619388 at *3 (N.D. Ill. 2018); *see also Smith v. United States*, 505 U.S. 223, 228 (1993). Here, on the face of the statute, there is an

10

obvious and inescapable disconnect between the facts alleged in the complaint and the coverage of section 12132.

The paradigm case under the ADA is straightforward. The government agency runs a program—e.g., a park district class, a welfare program, or a prison vocational program. A person with a physical or mental disability wants to participate, and could qualify but is rejected because of the disability. There is no need to pause on the issues of standing or coverage. The person has suffered an injury; the injury is directly traceable to the government entity running the program, service, or activity that has allegedly denied the disabled person equal access, and a court has tools readily available to redress that injury. There is also no manifest disconnect with the terms of the statute: the dispute clearly concerns a "service," "program," or "activity."

By contrast, the facts of this case fit nowhere within the plain meaning of Title II. The decisions by a law enforcement agency, like ISP, regarding how to allocate its resources to protect public safety—e.g., to what extent it should address drug interdiction, domestic violence, Internet fraud, or gun violence—are not "programs, activities, or services" which a "qualified individual with a disability" would be "excluded from" or "denied the benefits of." General law enforcement decisions concerning prosecutorial and investigative priorities are not "programs" which create possible causes of action under Title II. Title II does arguably cover some activities of police departments. For example, some courts have held that arrests are a form of service or activity covered by the ADA. Others disagree. *See Haberle v.Troxell,* 885 F.3d 170, 178-79 (3rd Cir. 2018). But an arrest is very different from the kind of police decision making involved in this case. It is much easier to see the causal connections and scope of the statutory coverage in a case where the police department is engaging directly with a person, transporting the mentally or physically disabled person in a vehicle, and is responsible for his well-being during the person's

time in police's custody. Here, plaintiffs allege no direct interaction with the State Police whatsoever.

With respect to the plaintiffs' claim that ISP is harming plaintiffs' right to a public education by virtue of its approach to its regulation of gun shops, the disconnect is even larger. The ADA does not impose liability on public entity A for a program or activity totally within the jurisdiction and control of public entity B. Again, the plain meaning of the statute is that no qualified person shall be denied services *by a public entity,* or be subjected to discrimination *by any such entity.* There is no claim the public schools are denying the plaintiffs any services or discriminating against them in any way, and certainly not at the behest of the state defendants. And of course, the public schools are not defendants in this case. This is a case where the court can begin and end its analysis with the statutory language.

"A qualified individual with a disability" means a person who, "with or without modifications to rules, policies, or practices," "meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S. C. 12131(2). Again, it is difficult to conceptualize how the plaintiffs (or any other discrete group of people) "meet the essential eligibility requirements" of criminal law enforcement activities. There are no "eligibility requirements," because this is not a "program" anybody is eligible for. *See Ashby v. Warrick County School Corporation,* 908 F.3d 225, 232 (7th Cir. 2018) ("the question whether a particular event is a service, program, or activity *of* a public entity turns on what the public entity itself is doing, providing, or making available"); *Mary Jo C. v. New York State and Local Retirement System,* 707 F.3d 144, 153 (2nd Cir. 2013) (Title II requires that covered entities make reasonable accommodations in order to provide qualified

individuals with an equal opportunity to receive benefits from or participate in programs *run by such entities*).

Although "services, programs, and activities" are broad terms, and were meant to be, courts construing the reach of Title II have recognized that its scope "is not limitless." *Noel v. New York City Taxi and Limousine Commission,* 687 F.3d 63, 69 (2nd Cir. 2012) A number of cases demonstrate this, in factual circumstances where the targeted state agency has significantly greater connection to a private entity or another governmental entity alleged to be doing something wrong. In these cases, courts have ruled the ADA is not applicable to the government entity once or twice removed. The state's licensure of private entities is one area where this issue arises. In *Noel*, plaintiffs alleged that taxi services in New York City failed to give meaningful access to persons with disabilities. Plaintiffs asserted that the city agency that licenses and regulates taxi companies was liable under the ADA because of its pervasive regulation of the taxi industry. The Court of Appeals rejected the argument, noting that "an activity does not become a 'program or activity' of a public entity merely because it is licensed by the public entity." *Id.* at 70 (citation omitted). The government entity's licensing standards themselves are covered by the ADA, but the private licensee's conduct itself is not. *Id.* See also *Tyler v. City of Manhattan*, 849 F. Supp. 1429, 1441-42 (D. Kan. 1994) (business holding liquor licenses; city licensure not a service, program or activity of the public entity); *Reeves v. Queen City Transportation, Inc.,* 10 F.Supp.2d 1181 (D. Col. 1998) (government licensee of limousine company not liable under Title II for discriminatory acts of the private company).

In *Noel,* like here, plaintiffs argued that the government regulator could have done more. Even though the government could have done more by requiring more accessible taxi licenses, something the ADA does not compel, the licensing authority does not bar taxi owners from

13

doing more on their own: "No doubt, more such taxis would be on the streets if the [NYC agency] required more of them to be accessible. But the [licensing agency's] failure to use its regulatory authority does not amount to discrimination within the meaning of the ADA or its regulations." 687 F.3d at 73. The connection between ISP and the Governor to gun shops on the one hand, or public schools on the other, is far more tenuous than the relationship between a licensing agency and the businesses it licenses.

Normally, a claim of discrimination will involve some comparative element.  In an ADA case, the claim is that the otherwise qualified person with the disability, despite the possibility of a reasonable accommodation, cannot access the program or service available to qualified people without the disability. It is not an ADA claim if the rules hurt the disabled person "solely by virtue of what they have in common with other people." *Henrietta D. v. Bloomberg,* 331 F.3d 261, 276 (2nd Cir. 2003). "In other words, there must be something different about the way the plaintiff is treated 'by reason of…disability.'" *Id.* "We have long recognized that the basic analytical framework of the ADA includes such a comparative component." *Id.* Here, there is no comparative component. The allegation is not that ISP is regulating gun shops in some areas and not in others based on someone's disability. The problem of gun violence in Chicago is pervasive and cannot be attributed to any action or inaction of the state defendants taken "by reason of" someone's disability.

The Department of Justice has issued extensive regulations under the ADA. Given the statutory text itself, it is not necessary to look to the regulations or the DOJ's interpretations for guidance on the meaning of "services, programs, or activities." But we would briefly point out several regulations that clearly indicate that the emphasis is on discrimination—treating the disabled person worse than someone who is not disabled, with respect to a specific service or

activity. For example, the regulations state that the public entity "may not deny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service." 28 C.F.R. § 35.130(b)(1)(i). There is no allegation the State or ISP is "denying" anything to a person with a disability. Plaintiffs allege law enforcement efforts are inadequate with respect to gun control, a quite different assertion that is much more general and applicable to everyone. The DOJ regulations also state that the governmental entity may not "afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others." *Id.* at (b)(1)(ii). Again, even assuming that discretionary law enforcement decisions by ISP are a "program" or "benefit" or "service," there is no claim here that the law enforcement effort is not "equal" or that the State is taking discriminatory actions with respect to a plaintiff's public education that is not "equal" based on the plaintiff's disability.

Even assuming the allegations of this case fall under the terms of 42 U.S.C. §12132, disability discrimination can be established in one of three ways: (1) the defendant intentionally acted on the basis of disability, (2) the defendant refused to provide a reasonable modification, or (3) the defendant's rule disproportionately impacts disabled people. *A.H. v. Illinois High School Athletic Association,* 881 F.3d 587, 593 (7th Cir. 2018). The complaint alleges none of these elements that would plausibly meet the pleading standards of *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). Here, there is no claim that ISP has *intentionally acted* on the basis of disability; refused to provide a reasonable modification, because there is no program or activity alleged within the contemplation of the ADA that could be modified; and likewise there is no "rule" discriminating against (disproportionately impacting) disabled people. ISP has taken no action distinguishing between disabled and non-disabled people in any manner, regarding any "service," "program,"

15

or "activity." Moreover, the Seventh Circuit has held that plaintiffs must establish but-for causation—that but for the plaintiffs' disability, the plaintiffs would have been able to access the services or benefits desired. *A.H., id.,* quoting *Wisconsin Community Services, Inc. v. City of Milwaukee,* 465 F.3d 737, 752 (7th Cir. 2006). There is no causal link between the plaintiffs' disability and how a state police organization operates across the entire state regarding the entire criminal code of Illinois.

### III.    AN EXPANSIVE READING OF THE ADA WOULD CONTRAVENE THE ELEVENTH AMENDMENT

There remains a question concerning the Eleventh Amendment. Two of the defendants in this case are the State itself and a state agency, the Department of State Police. The other two, the Governor and Director of the Department of State Police, are in theory at least not subject to the Eleventh Amendment bar under *Ex parte Young*, 209 U.S. 123 (1908). Congress clearly intended to abrogate the Eleventh Amendment for Title II ADA claims against the State. 28 U.S.C. § 12202. However, it still has to be determined if that abrogation was permissible under section 5 of the Fourteenth Amendment, because Congress cannot use its section 5 powers to impose new liabilities on states beyond the scope of the Fourteenth Amendment. *Tennessee v. Lane,* 541 U.S. 509, 518-20 (2004). *See also City of Boerne v. Flores,* 521 U.S. 519 (1997). Congress may not impose remedies that are disproportionate to the injury. For Title II claims, the validity of the Congressional override of the Eleventh Amendment has to be evaluated on a claim-by-claim basis.

In *United States v. Georgia,* 546 U.S. 151 (2006), the Supreme Court established a three-part test to determine if Congress validly abrogated a state's sovereign immunity from suit in a particular Title II claim. A court must determine on a claim-by-claim basis (1) which aspect of the State's alleged conduct violated Title II; (2) to what extent such misconduct also violated the

16

Fourteenth Amendment; (3) insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid. *Id.* at 159. *See also Mary Jo C. v. New York State and Local Retirement System,* 707 F.3d at 152 ; *Babcock v. Michigan,* 812 F.3d 531, 533-34 (6th Cir. 2016). If the plaintiff cannot state a valid Title II claim, the court does not need to reach the sovereign immunity issue. *Mary Jo C.*, 707 F.3d at 152.

This Court should not have to reach the constitutional question, because the challenged actions (or inactions) alleged against the State defendants do not violate the ADA. But even in the event the Court were to read the ADA as expansively as plaintiffs suggest, such an expansive reading would raise serious constitutional questions, by imposing liability on the State not just far beyond any conceivable meaning of the Fourteenth Amendment, but indeed *contrary to* the Fourteenth Amendment. It is well established that the State and state actors are not constitutionally liable, absent special circumstances or where the State itself created the danger, for private violence inflicted by private parties. There is no constitutional duty to prevent such violence. *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989); *Hernandez v. City of Goshen, Indiana* 324 F.3d 535, 538 (7th Cir. 2003) (police departments have no duty to protect private persons from injuring each other, at least where the police department has not itself created the danger); *Windle v. City of Marion, Indiana*, 321 F.3d 658, 662 (7th Cir. 2003) (same).

Plaintiffs put forward an incredibly expansive reading of the ADA that could subject the State to wide-ranging liability for failing to prevent crimes. It would involve federal courts in micromanaging how law enforcement agencies do their jobs, and would raise serious federalism concerns. And such a broad reading of Title II could not be confined to law enforcement. There

are many state laws that provide social services, nutrition assistance, medical care, educational resources, and public health programs, such as abating lead poisoning in low-income areas. Such generalized claims alleging "the State could have done more" would become the new norm in a dramatic expansion of ADA liability. These are claims the language of Title II cannot bear, and to allow such claims to proceed would in all likelihood be unconstitutional.

IV.     **THE COMPLAINT FAILS TO STATE A CLAIM UNDER THE ILLINOIS CIVIL RIGHTS ACT**

Count III is a claim under the Illinois Civil Rights Act (ICRA), 740 ILCS 23/5(a)(2). Modeled on Title VI of the federal Civil Rights Act, it prohibits the State from utilizing "criteria or methods of administration that have the effect of subjecting individuals to discrimination because of their race, color, national origin, or gender." In Count III, plaintiffs allege that "the defendants' failure to issue reasonable gun trafficking regulations to reduce the level of gun violence to which the plaintiff children are exposed, under the authority granted to the Illinois Department of State Police, has had an adverse effect upon African-American children…." Complaint, ¶63. Plaintiffs further allege that "Under the Firearms Owners Identification Act and otherwise, the defendants have used methods of administration that permit more illegal guns in African American than white neighborhoods and such lax methods have subjected the plaintiff children to discrimination on the basis of their race." Plaintiffs further allege that such lax methods "serve no legitimate State purpose and deny the benefit of law enforcement to the children of this State in an unfair and racially disparate manner."  Complaint, ¶64.

Essentially, plaintiffs are alleging that criminal and civil regulatory laws are not being enforced vigorously enough, and that more regulations are needed. As noted with respect to the ADA claims, there is no specific program or activity in which ISP or any state agency is directly engaged with the plaintiffs. All law enforcement agencies set priorities for the use of their finite

resources. Enforcement of laws depends on resources (tax dollars) available to fund those efforts. Appropriations vary yearly under the state budget. These very general and always-present considerations are not a "criteria" or "method of administration" action under ICRA.

After the U.S. Supreme Court limited the scope of disparate impact claims brought under Title VI of the Federal Civil Rights Act in *Alexander v. Sandoval,* 532 U.S. 275 (2001), the Illinois legislature passed ICRA, which in effect preserved the Title VI cause of action in Illinois law, but was not intended to create new rights beyond what had been previously recognized in federal law. *Illinois Native American Bar Association v. University of Illinois,* 368 Ill.App.3d 321, 327 (2006); *Weiler v. Village of Oak Lawn,* 86 F.Supp.3d 874, 889 (N.D. Ill. 2015). In federal civil rights law, mere statistical disparities in the operation of laws on protected classes of persons are not enough to state a claim. As the Court noted in an employment discrimination case brought under Title VII, plaintiffs are responsible for "isolating and identifying the specific employment practices that are allegedly responsible for any observed statistical disparities." *Watson v. Fort Worth Bank and Trust,* 487 U.S. 977, 994 (1988). In an ICRA claim, plaintiffs would be responsible for isolating specific "criteria and methods of administration" that are allegedly discriminatory. It would not be enough to merely plead, as they have, that law enforcement could do more to get guns off the street. And once a specific practice has been identified, and echoing the earlier discussion of the standing problem, the Court has held that "causation must be proved." *Id.*

In this case, plaintiffs have failed to allege a claim under ICRA, for many of the same reasons they have not under the ADA. The causal links are too tenuous between any alleged failing by the State or ISP and particular events of gun violence, trauma, and the difficulties in education that children living in high crime areas experience. In the very similar case of

*Coalition for Safe Chicago Communities v. Village of Riverdale,* discussed earlier on the standing issue, the Court also dismissed the ICRA claim on the merits against the two municipalities where the two gun shops were located. Judge Valderrama found that the plaintiffs failed to allege a specific, identifiable criteria or method of administration utilized by the municipalities. 2016 WL 1077293 at *13. In essence, the court concluded, without quoting *Watson* directly*,* that plaintiffs failed to "isolate and identify" the specific practice allegedly causing a discriminatory impact. The court also concluded that the alleged lack of policies and practices by the municipalities was insufficient to state an ICRA claim. *Id.*

Again, if plaintiffs' interpretation of ICRA were accepted, ICRA would be exposing state agencies to vast areas of liability, clearly beyond the scope of the federal laws on which it is based, and certainly beyond anything the General Assembly intended. For every fiscal year state budget, claims could be made challenging budget cuts to certain programs that any group of plaintiffs might believe, by however uncertain a causal connection, harmed their educational prospects or had the potential to increase crime, even if the elected branches of government disagreed in good faith or nevertheless felt compelled to make those cuts because of budgetary realities. ICRA simply cannot be read so broadly.

**CONCLUSION**

For the foregoing reasons, defendants request that their motion to dismiss be granted. In the alternative, if the federal claims are dismissed, the Court can decline to exercise jurisdiction over the state law claim. 28 U.S.C. § 1367 (c)(3).

Respectfully submitted,

KWAME RAOUL
Attorney General of Illinois        By:     */s/ Thomas A.Ioppolo*
                                               Thomas A. Ioppolo
                                               Assistant Attorney General
                                               100 W. Randolph Street, 13th Floor
                                               Chicago, Illinois 60601
                                               312-814-7198 / 312-814-6131
                                               tioppolo@atg.state.il.us