IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DEMETRIA POWELL, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | No. 18 C 06675 |
| | ) | |
| v. | ) | Judge Gottschall |
| | ) | |
| THE STATE OF ILLINOIS, et al. | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO THE DEFENDANTS' MOTION
TO DISMISS**

## I.     INTRODUCTION

**The Facts Alleged.** The State of Illinois has ample authority, under state law, to limit the number of illegal guns sold and used on the streets of Chicago (¶¶ 23-25 of the complaint). The plaintiffs have alleged and their experts will testify that implementing basic gun trafficking rules will not only limit the number of guns on the street but also limit the number of African-American people shot, and most importantly reduce the debilitating level of gun violence that has traumatized and disabled African-American children, who are the plaintiffs here (¶ 26).

These rules are specified in ¶ 28 and include, among other things, having a meaningful plan in place to recover the Firearm Owners Identification ("FOID") cards that have been suspended or revoked----- and the guns that these revoked owners possess. Today 70% of revoked FOID cards are not returned and those illegal gun owners use their weapons, as occurred recently in Aurora, to shoot, kill and traumatize people (¶28(E))[1]. The rules include requiring gun

---

[1] See, https://chicago.suntimes.com/crime/aurora-shooting-victims-identified-gary-martin/; http://www.chicagotribune.com/news/loca/breaking/ct-met-aurora-shooting-gun-license-

dealers to have security plans to prevent the theft and loss of at least 1,200 guns annually (¶ 20), virtually all of which are destined for Chicago's streets (¶28(G)); prohibiting dealers from selling guns "off the books", which accounts for 5.5% of all "crime guns"[2] used in Chicago annually (¶28(I)); filming the point of sale transactions (¶20(B)), prohibiting the sale of guns to persons known to be purchasing in order to transfer the gun to an illegal user (¶28(C)) and training store employees to identify such persons (¶28(E)), to cut down on "straw purchasers"; and prohibiting the sale of further guns to FOID card owners who have previously purchased guns that end up being used as "crime guns" in Chicago, to curb the secondary market for guns (¶28(D)).

By law, the State of Illinois has claimed preemption over the area of gun trafficking, ***430 ILCS 65/13.1*** (¶23). But it has adopted a policy-----made a choice-----to do virtually nothing meaningful to control the sale and trafficking of illegal guns in Illinois. As a result, 40.4% of the "crime guns" recovered on Chicago streets every year, from 2009 through 2016, were purchased from Illinois gun dealers, and mostly from the seven gun dealers in suburban Chicago identified in ¶ 19. An alarming number of these guns were sold and used in crimes within one year (¶19). Plaintiffs' experts, relying upon City of Chicago police and University of Chicago Crime Lab data, as well as peer-reviewed studies from across the country, will testify that the basic rules set forth in ¶ 28 will make a major difference.

Make no mistake, the State of Illinois' decision not to meaningfully control gun trafficking causes direct injury to African-Americans in particular. From January 1, 2015 through

---

illinois-state-police-20190218-story.html; and https://chicago.suntimes.com/crime/aurora-shooting-gun-control-foid-card-gary-martin/.

[2] "Crime guns", according to the Chicago police, are firearms that were illegally possessed, used or suspected to have been used in furtherance of a crime in Chicago (¶18).

July 31, 2018, 7,971 people were shot in Chicago—one every 2.5 hours (¶16). 2,231 people were murdered in the same period (Id.) According to the University of Chicago's Crime Lab, 80% of the Chicago homicide victims were African-American, though African-Americans comprise only one-third of the city's population (¶17). The national homicide rate is 5 per 100,000 people. In the five Chicago African-American neighborhoods where Chicago's violence is concentrated (Austin, Englewood, West Englewood, New City and Grand Crossing)[3], the homicide rates are between 87.3 and 179.5 per 100,000 people, while white neighborhoods are largely immune from the effects of gun violence (¶17). The plaintiffs have alleged that these African-American neighborhoods are where the guns of revoked FOID card holders, the lost and stolen guns, and the guns illegally sold on the secondary market are used.

Three African-American children seek the protection of this Court, on behalf of themselves and a class of similarly situated children. They are all from the Austin neighborhood. They were not shot and killed, but they represent the tens of thousands of African-American children exposed on a nearly daily basis to gun violence. Their family members, neighbors and school friends have been killed. Shootings regularly occur on their blocks and outside their schools. They hear gun fire virtually every night. Their stories are told in ¶¶37-55. The plaintiffs allege and their experts will testify that exposure to unremitting gun violence has left these children disabled under the ADA and traumatized, with diagnoses of post-traumatic stress disorder and cognitive deficits that will hamper them for the rest of their lives. Current peer-reviewed research showing a direct causation between exposure to gun violence and cognitive

---

[3] These five African-American communities have only 9% of Chicago's population but one-third of the city's homicides occur in these neighborhoods (¶ 17).

impairment is identified and described in ¶¶29-36.

**The Claims Alleged.** Counts I and II are federal claims under the Americans with Disabilities Act (the "ADA"). The ADA requires a plaintiff to plead that: 1) he or she is a qualified individual with a disability; 2) he or she was denied the benefits of the services, programs, or activities of a public entity or otherwise subjected to discrimination by such entity; and 3) the denial or discrimination was on account of the plaintiff's disability. ***Lacy v Cook County, 897 F.3d 847, 853 (7th Cir. 2018).*** The plaintiff may establish the second and third elements of her ADA claim in one of three ways: 1) that the defendant intentionally acted on the basis of the plaintiff's disability; 2) that the defendant refused to make a reasonable modification in its policies to accommodate the plaintiff's disability; *or* 3) the defendant's rule or policy disproportionately impacts disabled people. ***Wisconsin Cmty. Services v City of Milwaukee, 465 F.#d 737, 753 (7th Cir. 2006).***

Here, plaintiffs satisfy the first element of an ADA claim, in that they allege they are disabled by exposure to gun violence under the ADA's definition of disability, found at ***42 U.S.C. §12101(1)(A)*** as they have been diagnosed with PTSD and gun violence has limited their ability to care for themselves, sleep, learn, read, concentrate, think and communicate. Count I is a failure to accommodate claim, while Count II is a disparate impact claim.

In Count I, the plaintiffs allege that they have been denied the benefits of public education because of the cognitive deficits inflicted by gun violence, and the continued exacerbation of those disabilities by additional violence. By reason of their disability, these children need a stable environment, not just at school but in their communities, more than non-disabled children. School programs fall squarely within the ambit of the ADA, ***see, e.g. Swan ex rel. I.O. v Bd. of***

4

*Educ. of Chicago, 2013 U.S. Dist. LEXIS 104408 (N.D.Ill. 2013),* and these allegations thus
satisfy the second element of the ADA *P.P. v Compton Unified Sch. District, 135 F.Supp. 3d
1098 (C.D. Calif., 2015)* (sustaining a Title II ADA claim alleging a failure to accommodate
traumatized students in the Compton public schools). The proper party defendant is the State of
Illinois, as *Article X, §1* of the Illinois Constitution makes the state responsible for all public
education in Illinois, *see, Committee for Educational Rights v Edgar, 174 Ill.2d 1, 14-32 (1996)*
and thus also responsible for the legal obligation of providing an accommodation to the disabled
plaintiff children. Plaintiffs allege that the state has failed to provide such an accommodation for
these disabled children by abdicating its responsibility to contain gun violence, when the state
(through the State Police) has ample authority to do so.

In Count II, the disabled plaintiffs allege that by failing to make any meaningful attempt
to regulate the sale and use of illegal weapons in Illinois, and failing to reduce the consequent
level of gun violence to which these children are exposed, the State of Illinois' deliberate policy
has had a disparate impact on them by virtue of their disability. While gun violence affects many
in Chicago, it has a disproportionate effect upon those who are traumatized and disabled by the
violence. The more exposure a child (particularly a young child) has to gun violence, the more
enduring and permanent are her disorders (§§29-35), and a meaningful program aimed at
combating gun violence would benefit these disabled children more than any other children.

In Count III, the disabled African-American plaintiff children allege that the State of
Illinois' facially neutral and anemic program to staunch the sale and use of illegal guns has an
adverse impact on them as African-Americans. Virtually all of the gun violence in Chicago is
concentrated in five African-American neighborhoods, while white communities are immune

5

from the trauma being inflicted (§§ 16-18). Thus, they claim that the State of Illinois has "utilize[d] criteria or methods of administration that have the effect of subjecting individuals to discrimination because of their race...in violation of the Illinois Civil Rights Act ("ICRA"), *740 ILCS 23/5(a)(2)* (which imposes liability for adverse impact race claims where, as here, the state cannot demonstrate that its current gun trafficking policies are driven by a legitimate, non-discriminatory policy objective and are necessary to attain that objective), just as was the case in *Central Austin Neighborhood Ass'n v City of Chicago, 2013 IL App (1st) 123041 (2013).*

## II.    THE PLAINTIFFS HAVE STANDING TO BRING THIS CASE

The defendants claim these traumatized African-American children have no standing to bring this case, and make three arguments, none of which have merit.[4] *Lujan v Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)* tells us that the "irreducible constitutional minimum of standing" requires: 1) a concrete injury in fact; 2) a causal connection between the injury in fact and the conduct complained of; and 3) likelihood that the injury in fact will be redressed by a favorable decision, *Id., at 560-61*[5].

First, defendants argue that the injury to these children is not "fairly traceable" to the State of Illinois, i.e there is no causal connection between the plaintiffs' injuries and the state's

---

[4] In resolving standing at the motion to dismiss stage, the Court may only look to the allegations of plaintiffs' complaint, and must construe them in a light most favorable to plaintiffs. *See, Warth v Seldin, 422 U.S. 490, 501 (1975); see also, Lujan, at 561; and P.P. v Compton Unified School Dist., 135 F.Supp.3d 1098, 1111-12 (C.D. Calif. 2015)* (ADA claim brought by traumatized children where court emphasized that minimal allegations of injury and failure to accommodate are sufficient at the federal pleading stage).

[5] The Seventh Circuit has noted that "the Article III standing requirements are rather undemanding", *Family & Children's Ctr., Inc. v Sch. City of Mishawka, 13 F.3d 1052, 1058 (7th Cir. 1994).*

conduct. They claim that: "A gun shop may lawfully sell a gun to a person who uses the gun in a crime. A gun shop may violate the law in selling a gun to a person or a criminal might steal the gun from the store or from a lawful purchaser. In all instances, however, the crime of the gun store or the gun user cannot be attributed to ISP [the Illinois State Police]...Their independent decisions to use those weapons might be criminal, but from a causation perspective the state defendants would not be the origin of the complained of injury" (Defts. Br., at 6). This argument is factually and legally wrong.

The defendants' only citation is to *Johnson v Merrill Lynch, Pierce, Fenner & Smith, 719 F.3d 601 (7th Cir. 2013)*. There a pension plan administrator (Johnson) sued Merrill, Lynch for failing to distribute pension monies it was holding to a plan participant (Ms. Sherrod). The funds had been frozen by order of a Michigan state judge, as part of a contract dispute between Sherrod and another party. Both Johnson and Merrill Lynch agreed the plan was not subject to the freeze order under the anti-alienation provision of ERISA. The court found Johnson had no standing to sue Merrill Lynch, as the injury (Sherrod's inability to access her pension) was due to the Michigan state court's order and not any decision or policy of Merrill Lynch.

Our case is entirely different than *Johnson*. Taking the recent Aurora shooting as an example, if the State of Illinois had in place a meaningful policy to recover revoked FOID cards and secure the weapons the FOID card holder possessed, the Aurora shooter would not have had possession of a gun with which to shoot his co-workers. The injury there (the death and trauma the shooter caused) was directly traceable to the State of Illinois' policy of failing to recover revoked FOID cards. The same can be said of shootings that occur in Chicago by those using "lost" or stolen guns because the State of Illinois does not require dealers to adopt reasonable

security plans, or who obtained their guns through "straw purchasers" that have not been identified because the State has refused to adopt policies that preclude such "straw purchases".

Government policy (including regulation) that permits a third-party (here gun dealers or criminals) to cause injury may be challenged by those who have been injured. So, in *Johnson v United States EEOC, 1995 U.S. Dist. LEXIS 8601 (N.D. Ill. 1995)*, workers over the age of 40 challenged an EEOC policy that exempted bona fide apprenticeship programs from the strictures of the Age Discrimination in Employment Act ("ADEA"). The workers had been denied entry into the apprenticeship programs because of their age. When the EEOC argued the plaintiffs lacked standing because the apprenticeship programs had denied them entry and not the EEOC, that the EEOC had not required the imposition of maximum age requirements, and the apprenticeship programs had an independent duty to comply with the ADEA, the Court rejected its arguments. Relying on *Simon v Eastern Kentucky Welfare Rights Orgn., 426 U.S. 26, 45, n. 25 (1976)* (where the Court explored the causation component of standing), the Court found:

> ...the [*Simon*] Court explicitly distinguished a situation where an agency regulation carves out an exception to a statute and allows a third party to engage in an activity that would be barred absent the agency action...In that case, the alleged injury would be "directly traceable" to the agency action because the injurious third-party action "would have been illegal without that [agency] action", *426 U.S. at 45, n. 25*...Such is the case here. In the absence of the EEOC exemption, apprenticeship programs would fall within the explicit language of the ADEA and be exposed to possible liability. Based on the allegations in the amended complaint, the court finds it unlikely that apprenticeship programs would maintain age restrictions in the absence of the EEOC exemption"

*1995 U.S. Dist. LEXIS, at p. 21*

*Accord: American Medical Assn. v Mathews, 429 F.Supp. 1179, 1189-91 (N.D. Ill. 1977)* (physicians had standing to challenge HHS regulation that limited reimbursement to the least

expensive drugs (called "MAC drugs") on grounds it interfered with their practice of medicine in violation of the Social Security Act, as the alleged interference was directly traceable to an HHS reimbursement rule discouraging hospitals from making non-MAC drugs available).[6] Our case is like these. The state has failed to regulate the sale and use of illegal guns and so the injuries inflicted by gun shops and criminals are "traceable" to the state's carve out or absence of regulations restraining their activity, and those injured have standing to sue the State of Illinois.

Second, while defendants seem to initially suggest that plaintiffs have adequately alleged an injury in fact (for all three Counts of their complaint) based on the detailed allegations of their traumatization and their consequent disability (see, Deft's Br., at 6), they later argue that plaintiffs merely seek "stronger prosecutorial efforts (civil or criminal) against gun shops" and this does not "establish the injury in fact requirement" (Deft's Br., at 7), citing ***Children's Healthcare is a Legal Duty, Inc. v Deters, 92 F.3d 1412, 1424 (6th Cir. 1996).*** Plaintiffs, however, do not seek more prosecution of gun shops but rather rules for them to follow. Once in place, there is no reason to believe that the gun shops would not follow these rules. ***Deters***, in any event, is completely inapposite. It is an Eleventh Amendment case that does not bear on this lawsuit or the issue of standing (including what constitutes "injury in fact"). There, a father constitutionally challenged his ex-wife's decision not to treat their child medically but rather rely only on spiritual treatment, which was permitted by an Ohio statute. He sued the Ohio Attorney General because he had authority to enforce Ohio law but the AG had not threatened to

---

[6] ***See also, Rowe v State Bank of Lombard, 125 Ill.2d 203, 224 (1988)*** (citing W. Prosser & W. Keeton, Torts, §33, at 201 (5th ed. 1984) and applying its rule that if a defendant's acts or omissions create a condition conducive to a forseeable intervening criminal act, the criminal act does not break the chain of causation).

commence any kind of action, so *Ex Parte Young, 209 U.S. 123 (1908)*'s exception to the Eleventh Amendment was not applicable and the suit was barred. Plaintiffs here, however, claim "concrete and particularized" injuries from their exposure to gun violence which are "actual" and not "conjectural", as required by *Lujan, 504 U.S. at 560*, and plaintiffs' alleged injuries do not, as in *Deters*, raise Eleventh Amendment issues.[7]

Third, the defendants contend the plaintiffs' injuries are not likely redressible by a decision of this Court, *Lujan's* third requirement of standing.[8] Defendants seize on the plaintiffs' impediments in school and say an injunction against the Illinois State Police is unwarranted as the State Police have no responsibility for providing ADA accommodations at the schools, which are under local control anyway (Deft.'s Br., at 7-10). This argument badly mis-characterizes both the complaint and the law.

In Count I, plaintiffs seek a reasonable accommodation for their disabilities, so that they can obtain the full benefit of public education. The State of Illinois is constitutionally responsible for all public education in our state (§56). *Article X, § 1* of the Illinois Constitution.[9] The State of

---

[7] Even if plaintiffs' traumatic injuries were not enough to constitute "injury in fact" under *Lujan* (which they are), they have statutory injury, for purposes of standing. Their rights under the ADA and ICRA have been infringed. The Supreme Court has found that: "Congress may enact statutes creating legal rights, the invasion of which creates standing, even though no injury exists without the statute", *Linda R.S. v Richard D., 410 U.S. 614, 617 n. 3 (1973)*.

[8] The requirement that the plaintiffs' injuries be redressible is closely related to the "causal connection" requirement of standing and involves essentially the same analysis. *See, Duke Power Co. v Carolina Environmental Study Grp, 438 U.S. 59, 74 (1978).* So, if there is causation (as is the case here), redressibility ordinarily follows.

[9] The defendants' citation to *Lewis E. v Spagnolo, 186 Ill.2d 198 (1999); Committee for Educational Rights v Edgar, 174 Ill.2d 1 (1996);* and *Blase v State, 55 Ill.2d 94 (1973)* are inapposite. They hold that school districts and school children have no private cause of action under *Article X, § 1* to litigate the content of a "high quality" education or the propriety of the

Illinois has also claimed preemption over the regulation of gun trafficking in Illinois, *see, 430 ILCS 65/13.1*. While the defendants focus only on the Illinois State Police ("ISP"), the plaintiffs need not have even named the Illinois State Police in this case at all, as the ISP is merely an instrumentality of the State of Illinois. The State of Illinois itself is a proper party defendant both for purposes of ADA liability, *42 U.S.C. §12131(1)(A)*, and under the Illinois Civil Rights Act ("ICRA"), *see, Thorncreek Apts. III, LLC v Village of Park Forest, 970 F.Supp.2d 828, 845 (N.D.Ill., 2013)* (ICRA provides a cause of action against the State). The plaintiffs have alleged, with specificity, that gun violence has caused the plaintiffs' disabilities and their compromised status at school and the State of Illinois, though responsible for accommodating disabled students, has failed to provide the only reasonable accommodation available--- a program to combat gun violence in the plaintiffs' neighborhoods—which only the State can do.

Defendants' redressibility argument ignores plaintiffs other two claims altogether. Plaintiffs allege that they have been traumatized by unending gun violence, which has caused deficits in their ability to care for themselves, their sleep, their reading and learning abilities, as well as their capacity to concentrate, think and communicate (¶¶ 1, 31, 32-36, 37-55). To be sure, this has rendered them disabled under the ADA and has precluded them from obtaining the full benefit of public education (Count I) but they have also been adversely impacted as disabled children by the State's failure to meaningfully address gun trafficking (Count II) and have been adversely impacted on the basis of their race, separate from any educational deficits or notion of accommodation (Count III). Under these counts, the plaintiffs seek declaratory and injunctive

---

way the legislature funds schools. Plaintiffs here make no such claims. These cases do, however, clearly describe the paramount role the state plays in administering education in our state.

relief that will require the state to develop a plan to reduce the flow of illegal guns into Chicago and dissipate the gun violence such weapons cause, so that this violence does not have a discriminatory effect upon these children.[10] The relief sought therefore corresponds to the injuries identified, and focuses on restraining the cause of the plaintiffs' injuries----the essentially unregulated trafficking in guns by Illinois gun dealers. As such, the remedy sought would, in *Lujan's* words, likely redress the injury alleged.[11]

### III. PLAINTIFFS HAVE STATED A CLAIM UNDER THE ADA

In Counts I and II, plaintiffs claim the State has violated Title II of the ADA (*42 U.S.C. §12132)*, which prohibits discrimination against the disabled in public services provided by state

---

[10] The relief plaintiffs seek is narrowly tailored to the injury they have suffered. They do not seek "to redress [the] entire state's crime problem in order to accommodate disabilities resulting from hat crime problem", as defendants suggest (Deft.'s Br., at 9).

[11] Given the nature of plaintiffs' claims, defendants cases are inapposite. *McDaniel v Board of Education of City of Chicago, 956 F.Supp.2d 887 (N.D.Ill. 2013)* dismissed the City of Chicago from a case challenging the closing of schools because the City was not responsible for the decision to close the schools. Defendants use it to say the court cannot enjoin a defendant to act in any way that is beyond the defendant's authority in the first place (Deft.'s Br., at 8), but here the State of Illinois, through its Department of State Police has ample authority to adopt meaningful gun trafficking rules (see, ¶¶ 23-26), and the defendants do not dispute this point. They cite *Bacon v City of Richmond, 475 F.#d 633 (4th Cir. 2007)* to say the remedy must have some relation to the conduct of a defendant (Deft.'s Br., at 9). In *Bacon,* the Richmond, Virginia school board agreed to retrofit its schools to comply with ADA accessibility requirements and the court then ordered the City of Richmond to provide appropriations to the school board to fund these renovations. The Court of Appeals found this order against the city to be improper, as the city had not been held liable in the case. No such problem exists here. The State of Illinois has created the problem and plaintiffs seek relief only from the State of Illinois to remedy the problem. In *Coalition for Safe Chicago Communities v Village of Riverdale (Circ. Ct. of Cook County, Feb. 25, 2016)* the plaintiffs alleged standing just by virtue of living in high violence areas, without the kind of concrete, individualized and heartbreaking injury the children allege here. Indeed, it is hard to believe who could sue under the ADA, if not these children, who have medically identifiable injuries that will impede their education and affect their entire lives, far more than is the case for the non-disabled children living in the same neighborhoods.

and local government. The history, purposes and three elements of a Title II claim are nicely described in *Lacy v Cook County, 897 F.3d 847, 852-54 (7th Cir. 2018)* and *Wisconsin Cmty. Servs. v City of Milwaukee, 465 F.3d 737, 750-53 (7th Cir. 2006)*, and need not be repeated here. Plaintiffs have previously described their claims at pp. 4-6 above. We will address defendants' particular objections to the ADA claims here.

Plaintiffs must first allege they are "qualified individuals with a disability". *42 U.S.C. §12131(2)* defines this as "an individual with a disability [under *42 U.S.C. §12102*] who, with or without reasonable modifications to rules, policies, or practices ... meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity". The defendants do not appear to dispute the plaintiffs' disability. And, the plaintiffs clearly meet the essential eligibility requirements for the public services in question; namely, the educational services (Count I) (they are all in public schools) and the State's program to regulate and contain the illegal use of guns (Count II) (they all live in neighborhoods where gun violence has reached epidemic proportions) (§§ 4-6, 16-18, 23-25, 37-55, 58-61).

Second, the plaintiffs must allege that they were denied "the benefits of the services, programs, or activities of a public entity" or subjected to discrimination by such entity. Third, as the defendants emphasize (Deft's Br., at 5, 12-15), the plaintiffs must allege that the denial or the discrimination was by reason of the plaintiff's disability. Here, in Count I, the plaintiffs have pleaded in detail that their disability (in terms of cognitive and related deficits caused by exposure to gun violence) has robbed them of the benefits of a public education, and the state's failure to accommodate that disability in the manner alleged in § 28, has violated the statute. These injuries are set forth in §§ 30-36, and with respect to the individual plaintiffs in §§ 37-55.

13

The defendants' brief does not appear to quarrel with the sufficiency of these allegations in terms of stating a Title II ADA claim, other than to say that the local public schools are not parties to this case and that the Court may "not impose liability on public entity A [the State Police] for a program or activity totally within the jurisdiction and control of entity B [the local public schools]" (Deft.'s Br., at 12). As explained above (at pp. 10-11), however, we do not have two separate entities here-----the State of Illinois is responsible both for education and the regulation of illegal guns.

The defendants focus on the Illinois State Police (and Count II of the complaint), insisting that its decision on how to allocate its resources are not "services, programs or activities" under the ADA (Deft.'s Br., at 11), that the State Police do not have "essential eligibility requirements" under the ADA because it does not operate "programs" (Deft.'s Br., at 12), and that the problem of gun violence in Chicago affects everyone, so that there is no discrimination against the disabled (Deft.'s Br., at 14-16).

In fact, the State of Illinois, through the State Police, does operate "services, programs and activities", within the meaning of the ADA, and its gun trafficking regulations (or decision not to adopt such regulations) are one of them. Title II of the ADA does not define "services, programs, or activities", but the Justice Department's implementing regulations define such "services, programs or activities" as "anything a public entity does", thus making the reach of this term extraordinarily broad. *Oconomowoc Residential Programs, Inc. v City of Milwaukee, 300 F.3d. 775, 782-83 (7th Cir. 2002);* and *Ashby v Warrick Cty. Sch. Corp., 908 F.3d 225, 231 (7th Cir. 2018).* Indeed, the phrase "services, programs, or activities" has been interpreted to be "a catch-all phrase that prohibits all discrimination by a public entity", *Innovative Health Sys., Inc.*

14

***v City of White Plains, 117 F.3d 37, 45 (2nd Cir. 1997).*** As such, state and local regulatory

programs, like the State's gun trafficking rules, are "services, programs and activities". ***See,***

***Oconomowoc, 300 F.3d at 782*** ("the ADA clearly encompasses zoning decisions [another public

regulatory system] by local government entities)[12]; and ***H.R. Rep. No. 100-711, at 24 (1988),***

***reprinted in 1988 U.S.C.C.A.N. 2173, 2185*** (in amending the ADA, Congress provided that the

ADA "would also apply to state or local land use ***and health and safety laws, regulations,***

***practices or decisions*** which discriminate against individuals with handicaps" (emphasis

supplied), quoted in ***Oconomowoc, 300 F.3d at 782.*** [13]

   As for the defendants' argument that there must be "a comparative component" in ADA

———————————————

[12] Defendants cite ***Noel v New York City Taxi & Limo Comm'n, 687 F.3d 63 (2nd Cir. 2012)*** to argue that an activity does not become a "program or activity" under the ADA merely because it is licensed by the public entity. In ***Noel,*** the plaintiffs sought handicap-accessible taxis, but Title III of ADA exempts the taxi industry from any obligation to maintain handicap accessible cars. As a result, the plaintiffs sued the Commission that regulates taxis in New York, claiming it should have required the taxi companies to have a minimum number of handicap-accessible taxis. The Court found that there was no "program or activity" under the ADA in effect. "Since the taxi industry itself is exempt [from the ADA], there is no underlying violation of the ADA for the [Commission] to redress by regulation", ***at 73.***Here, there is no such exemption at play. Moreover, the State of Illinois does not "license" public education; it is itself constitutionally responsible for that program. The same is true in terms of the state's responsibility to control gun trafficking, by gun dealers, private sellers, revoked FOID card holders and others. It is the state's exclusive program, by law, and its failure to discharge its responsibilities has had an adverse impact on the plaintiff children, both because of their disabilities and their race.

[13] This is why law enforcement policies, including how police officers make arrests, are "services, programs and activities" under Title II of the ADA. Defendants cite ***Haberle v Troxell, 885 F.3d 171 (3rd Cir. 2018)*** to suggest that this issue is in dispute. It is not. ***Haberle*** explicitly did not address the question, ***at 180***, deciding the case on other grounds, but cited ***Gohier v Enright, 186 F.3d 1216, 12210 (10th Cir. 1999)*** for the proposition that "a broad rule categorically excluding arrests from the scope of Title II...is not the law", ***at 181. Accord: Tucker v Tennessee, 539 F.#d 526 (6th Cir. 2008); Sheehan v City and County of San Francisco, 743 F.3d 1211 (9th Cir. 2014); Gorman v Bartch, 152 F.3d 907 (8th Cir. 1998).***

litigation where the disabled person is treated worse than someone who is not disabled (Deft.'s

Br., at 14), the Seventh Circuit has made it clear that while discrimination, i.e. state actions "due

to" the plaintiff's disability, may be established by proof of intentional discrimination or by proof

that a rule or policy disproportionately impacts disabled people, it can also be established by

showing that the defendant refused to provide a reasonable accommodation for the plaintiff's

disability. ***Washington v Indiana High Sch. Ass'n, Inc. 181 F.#d 840, 847 (7th Cir. 1999)***;

***Wisconsin Cmty. Servs v City of Milwaukee, 465 F.3d 737, 751 (7th Cir. 2006)*** ("as our cases

already hold, failure to accommodate is an ***independent*** basis for liability under the

ADA–collecting cases); ***Lacy v Cook County, 897 F.3d 847, 853 (7th Cir. 2018)*** (same); ***see

also, Illinois League of Advocates for the Developmentally Disabled v Illinois Dep't of Human

Services, 60 F.Supp.3d 856, 880-84 (N.D.Ill. 2014).*** Here, plaintiffs have alleged in Count I that

the state has failed reasonably to accommodate the plaintiffs' disabilities by refusing to adopt

meaningful gun trafficking rules and as a result of this failure, the plaintiffs continue to

experience gun violence and an exacerbation of their disabilities rather than an accommodation

(§§ 21-28, 58-59, 60-61). To be sure, the accommodation proposed must be reasonable, ***28

C.F.R. §35.130(b)(7)***; ***Wisconsin Cmty. Servs. v City of Milwaukee, 465 F.3d 737, 750-53 (7th

Cir. 2006)***, which is a "highly fact-specific inquiry and requires balancing the needs of both

parties" , ***Id., at 752***. Plaintiffs, however, have pleaded what would constitute a reasonable

accommodation (§§ 27-28). Surely, these allegations are sufficient to withstand a motion to

dismiss[14]. In Count II, there is a "comparative component" in that the plaintiffs plead a disparate

---

[14] The burden is on the plaintiffs to show that the accommodation they seek is reasonable
on its face. Once they have made this ***prima facie*** showing, the defendant must come forward to
demonstrate unreasonableness or undue hardship in the particular circumstances. ***Oconomowoc,***

impact claim and have alleged, in detail, the adverse effect of defendants' gun trafficking polices on African-Americans (§§ 16-18, 29-36).

## IV.     PLAINTIFFS' COMPLAINT DOES NOT VIOLATE THE ELEVENTH AMENDMENT

The defendants concede that in adopting Title II of the ADA, Congress expressly intended to abrogate the Eleventh Amendment's constraints on state liability, *42 U.S.C. §12202*, but contend that if the Court sustains the plaintiffs' claims under Counts I and II, then this abrogation would be unconstitutional, as the Fourteenth Amendment was never meant to impose liability on states "for failing to prevent crimes" (Deft.'s Br., at 17).

This is not an issue the Court should address at this early stage of the litigation. Courts have determined that "a plaintiff's Title II claim must be resolved on its merits prior to consideration of any claims of sovereign immunity", *Meyer v Schrubbe, 2013 U.S. Dist. LEXIS 134323 (E.D. Wisc. 2013), at pp. 8-9*, which relies upon *Hale v King, 642 F.3d 492, 504 n. 38 (5th Cir. 2011); Bowers v NCAA, 475 F.3d 524, 533 (3rd Cir. 2007);* and *Buchanan v Maine, 469 F.#d 158, 172-73 (1st Cir. 2006).*

If the Court finds it necessary to consider this argument, it is easily resolved by the fact that plaintiffs here do not seek money damages, but only declaratory and injunctive relief. The Eleventh Amendment, and cases like *United States v Georgia, 546 U.S. 151 (2006)* which the defendants cite*;* and *Tennessee v Lane, 541 U.S. 509 (2004)* are damages cases. So, even if Congress' abrogation of the Eleventh Amendment for Title II claims was invalid, the relief here against the individual defendants, including the Governor, would be proper under *Ex parte*

─────────────────────

*300 F3d at 783.*

*Young, 209 U.S. 123 (1908)* and its progeny.

In any event, the defendants have mis-characterized plaintiffs' claims. They do not seek

to impose liability on the State for "failing to prevent crimes" or for failing to prevent "private

violence inflicted by private parties" (Deft.'s Br., at 17)[15]. Rather, as described earlier (at pp. 1-6)

plaintiffs seek an order requiring the State to implement a reasonable program aimed at the

lawless gun trafficking currently plaguing Chicago's African-American community, and thereby

remedying the disability and race discrimination that are core Fourteenth Amendment concerns.

## V.    PLAINTIFFS HAVE STATED A CLAIM UNDER THE ILLINOIS CIVIL RIGHTS ACT

The defendants argue that plaintiffs' ICRA claim does not identify specific "criteria or

methods of administration" that have the effect of subjecting children to discrimination based on

their race (Deft.'s Br., at 18-20). They say "there is no specific program or activity in which [the

State] is directly engaged with the plaintiffs" (Id., at 18), and plaintiffs are intruding on the

province of state lawmakers who are charged with setting law enforcement priorities within the

constraints of the budget making process, and foisting a political question on this Court (Id.).

*Central Austin Neighborhood Ass'n v City of Chicago, 2013 IL App (1ˢᵗ) 123041 (2013)*

disposes of this argument. There, residents of the Austin neighborhood of Chicago sought relief

---

[15] Defendants cases on this point are far afield. ***Deshaney v Winnebago County Dept. of Social Services, 489 U.S. 189 (1989)*** declined to make state child protection workers guarantors of a child's safety under the Due Process Clause, after his father beat him nearly to death in their home. ***Hernandez v City of Goshen, 324 F.3d 535 (7ᵗʰ Cir. 2003)*** and ***Windle v City of Marion, 321 F.3d 658 (7ᵗʰ Cir. 2003)*** made the same point in declining to impose liability on a city police department for failing to prevent a co-worker from shooting his colleagues (***Hernandez)*** and for failing to prevent a middle school teacher from molesting a student (***Windle***). A meaningful program aimed at regulating gun trafficking does not make the State of Illinois a guarantor of anyone's safety but, like many other governmental regulatory programs that are subject to Title II of the ADA, e.g. zoning, it provides a reasonable accommodation for the plaintiffs' disabilities.

under the same provision of ICRA plaintiffs utilize here. They alleged that residents of African-American and Hispanic neighborhoods waited longer than residents of white neighborhoods for the police to arrive in response to 911 calls. This was because there was more violent crime in the African-American and Hispanic neighborhoods and thus beat officers were unavailable to respond to 911 calls more often in these neighborhoods, thus causing the delay. The plaintiffs sought an order requiring the City to provide the court with a plan detailing how the police department would provide equal services in response to 911 calls across all neighborhoods. As here, the defendants claimed this amounted to interference with areas committed to the city's political discretion. The Appellate Court found the case justiciable and sustained the claim, finding that the City's deployment policy to be "a method of administering responses to 911 calls" and therefore "criteria or methods of administration" that have an adverse impact based on race under *740 ILCS 23/5*, *Id., at pp. 21, 28. See also, Gallagher v Magner, 619 F.3d 823 (8th Cir. 2010)* (sustaining a claim that city building code enforcement practices unnecessarily reduced the supply of affordable housing which had a disparate effect on African-Americans)[16].

Here, plaintiffs have pleaded the adverse racial impact caused by the State's gun trafficking policies (§§16-18), and have identified the specific "methods of administration" that have caused this devastating effect on African-American children (§§ 19-28). While defendants argue that the "causal links are too tenuous between any alleged failing by the State or ISP and

---

[16] *Accord: Davis v Board of School Commissioners of Mobile County, 402 U.S. 33 (1971)* (involving sufficiency of a local school plan aimed at eliminating disparate affect of school boundaries on African-Americans); and *Committee Concerning Community Improvement v City of Modesto, 583 F.3d 690 (9th Cir. 2009)* (challenge to municipal finance plan that caused disparate impact on African-Americans in terms of the provision of sidewalks, street lights and sewers).

particular events of gun violence, trauma and the difficulties in education that children living in high crime areas experience" (Deft.'s Br., at 19), that is not the case. We are at the notice pleading stage and plaintiffs' allegations are detailed and sourced to expert studies. If construed in plaintiffs' favor, as they must be, these allegations are sufficient.[17]

## VI.    CONCLUSION

For the reasons set out above, the plaintiffs pray that the Court deny the defendants' motion to dismiss.

/s/ Thomas E. Johnson
One of the Attorneys for Plaintiffs

THOMAS GEOGHEGAN
MICHAEL P. PERSOON
Despres, Schwartz & Geoghegan
77 W. Washington Street, Suite 711
Chicago, IL 60602
(312) 372-2511

THOMAS E. JOHNSON
Johnson, Jones, Snelling, Gilbert & Davis
36 S. Wabash Avenue, Suite 1310
Chicago, IL 60603
(312) 578-8100

Attorneys for the Plaintiffs

---

[17] Defendants cite to *Coalition for Safe Chicago Communities v Village of Riverdale, 2015 CHA 10390 (Feb. 25, 2016)*, in which the Court dismissed an ICRA claim by African-Americans brought against two of the villages in which gun shops are located who, in turn, sell weapons that are recovered as "crime guns" in Chicago. The Court held the plaintiffs had not specifically enough alleged "methods of administration" that had led to a disparate impact on African-Americans in Chicago or the deficiencies in the villages' actions or policies that caused the level of gun violence in Chicago. The present complaint, however, is far different as it identifies the particular features of regulation that have caused the disparate impact, and the particular remedies that, if adopted, would reduce (if not eliminate) the racial impact. The *Coalition* decision, in any event, cannot be squared with the Appellate Court's decision in *Central Austin Neighborhood Assn.* or the Title VI law that ICRA is meant to embody. *See, Rao v Gondi, 2017 U.S. Dist. LEXIS 86152 (N.D.Ill. 2017), at p. 70.*

## NOTICE OF FILING AND CERTIFICATE OF SERVICE

Thomas E. Johnson, one of the attorneys for the Plaintiffs, certifies that he filed the foregoing **PLAINTIFF'S MEMORANDUM IN OPPOSITION TO THE DEFENDANTS' MOTION TO DISMISS** with the Clerk of the United States District Court for the Northern District of Illinois, Eastern Division, using the Court's CM/ECF electronic filing system on March 20, 2019 and served opposing counsel, identified below, through the electronic filing system on the same date:

> Mr. Kwame Raoul
> Attorney General of the State of Illinois
> Mr. Thomas A. Ioppolo
> Assistant Attorney General
> 100 W. Randolph Street, 13th Floor
> Chicago, IL 60601

/s/ Thomas E. Johnson