IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DEMETRIA POWELL, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | No. 18 C 6675 |
| | ) | |
| v. | ) | Judge Gottschall |
| | ) | |
| THE STATE OF ILLINOIS, et al., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS**

The Defendants, the State of Illinois, the Illinois Department of State Police, Governor J. B. Pritzker, and Brendan F. Kelly, Acting Director of the Illinois Department of State Police, by their attorney, Kwame Raoul, Attorney General of Illinois, submit the following reply memorandum in support of their motion to dismiss.

**I.      PLAINTIFFS LACK STANDING TO BRING THESE CLAIMS**

Plaintiffs have failed to allege specific injuries fairly traceable to any alleged failings of the State Defendants. And even if they had, none of the alleged injuries could be reasonably redressed by a federal court. There is a vague and remote distance between the injuries Plaintiffs suffer—poor school performance resulting from actual and threatened gun violence—and the State and the state law enforcement agency targeted for liability.

While the Complaint describes the consequences of living in urban areas where gun violence occurs, it says nothing about how one law enforcement agency among many -- local,

state and federal-- all with responsibility for enforcement of criminal laws, should be held liable under the Americans with Disabilities Act (ADA) or Illinois Civil Rights Act (ICRA) for the intentional criminal acts of third parties. Gun dealers in particular are licensed by ATF, a federal agency. Complaint, ¶21. As we noted in our opening brief, there is no direct causal link between anything the State of Illinois has done or failed to do *with specific reference to the named Plaintiffs* that can be termed an injury directly caused by that state action or inaction. Standing is much harder to obtain when the object of the government's regulation is not the plaintiffs themselves but third parties whom the government is alleged to be regulating too much or not enough. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562 (1998).

Courts are not in a position to enter broad injunctive decrees about issues as general or pervasive as crime. Plaintiffs lack standing to sue in federal court for the passage of laws or administrative rules, such as stricter regulation of gun shops, which they allege will benefit them. It is also not correct to say that the Illinois State Police can simply, "today," promulgate all the rules and "mandatory obligations," that Plaintiffs propose. Complaint at ¶28. Plaintiffs are sliding past some important process requirements of the Illinois APA. The statute that Plaintiffs cite, *id.,* 20 ILCCS 2605/2605-15, authorizes the Department of State Police to promulgate rules "pursuant to the Illinois Administrative Procedure Act," 5 ILCS 100/1-1. A "rule" is an agency "statement of general applicability that implements, applies, interprets, or prescribes law or policy…." 5 ILCS 100/1-55.  Any proposed rule must go through a notice and comment period so the public can be heard. 5 ILCS 100/5-40.  The proposed rule is reviewed by and subject to the approval of the Joint Committee on Administrative Rules (JCAR). If JCAR objects to a proposed rule, the General Assembly by joint resolution can vote to overturn the JCAR

prohibition. 5 ILCS 100/5-115(c)(a)-(c). JCAR is comprised of members of the General Assembly.

Thus, this Court cannot simply issue an injunction directing the Illinois State Police to promulgate regulations about gun shops—an injunction that would have to override or bypass the APA -- and then impose a mandatory injunction on JCAR and the General Assembly. Plaintiffs are seeking relief for generalized grievances and complex social problems with many causes that go beyond the bounds of Article III federal jurisdiction. Nor do Plaintiffs have standing to sue seeking more vigorous enforcement of existing laws.

Plaintiffs' experts may have any number of policy ideas that the legislature or law enforcement should consider to control illegal gun sales. But those policy ideas have to be considered in a legislative setting or a forum outside the context of a federal lawsuit. Here, the Article III case or controversy requirement limits the scope of the federal court's jurisdiction "to those disputes which confine federal courts to a role consistent with a system of separated powers and which are traditionally thought capable of resolution through the judicial process." *Valley Forge Christian College v. Americans United for Church and State*, 454 U.S. 464, 472 (1982).

Plaintiffs also claim to link these State Defendants to plaintiffs' performance in local public schools. The parents have made no claims against any local school district that their children are being denied any necessary education services or that their school educational problems can be reasonably traced, not to criminal activity of the persons committing the gun violence, or failings of local police, or failings of ATF, or preexisting medical or psychological conditions, but specifically to the State and State Police. Illinois law does not make the State

itself responsible for the operation of local public schools. Instead, Illinois has a system of local control of public schools. Under Illinois law, the State supports local schools with state aid and in other ways, but the actual provision of education is the responsibility of the local school districts. Although the claim has been attempted often, the Education Article of the Illinois Constitution, Art. X, sec. 1, does not provide a private right of action to obtain particular educational benefits from the State. *Committee for Educational Rights v. Edgar,* 174 Ill.2d 1 (1996); *Lewis E. v. Spagnolo,* 186 Ill.2d 198 (1999). Nothing in the State Constitution would provide any basis to link the State generally, or the State Police, to particular educational or psychological issues that the children in this case may face. Nothing in state law would fill the gaps so notable here in the Article III case or controversy requirement—the lack of traceability between the alleged injury and the Defendants' conduct, and the inability of the Court to redress a societal problem within the narrow confines of a federal case.

Plaintiffs cite no cases that would suggest there is standing to sue. For example, they cite *P.P. v. Compton Unified School District,* 135 F.Supp.3d 1098 (C.D. Cal. 2015). The similarity to our case is that the plaintiffs were youths who alleged trauma from violence and contacts with the criminal justice system. But the massive dissimilarity is that the defendant was the local school district that was alleged to be inadequately accommodating their disabilities. The State of California and California State Police were not sued for the much more causally remote claim of failing to stop the violence to which the plaintiffs were exposed.

Plaintiffs also cite *Johnson v. United States E.E.O.C.*, 1995 WL 374058 (N.D. Ill. 1995). That case, too, differs significantly from this one. The EEOC gave a specific exemption from the Age Discrimination in Employment Act to an apprenticeship program for conduct that would have been arguably illegal if the agency had not carved out the exception. The court held there

4

was standing to sue the EEOC because of its action in creating the exemption. The court relied on a footnote in *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 45 n.25 (1976), which made the same point, that an agency action of this type might be the basis for a federal suit. In such cases, it might be possible to claim an injury fairly traceable to the governmental body. That is not the case here.

Moreover, a full reading of *Simon* does not support plaintiffs' position here. In *Simon*, the Court ultimately decided the plaintiffs lacked standing to sue. The plaintiffs were low-income persons who challenged the beneficial tax treatment of certain hospitals by alleging the hospitals were undeserving of such treatment because they did not fully treat and care for indigent patients. The defendants were the Secretary of the Treasury and Commissioner of the Internal Revenue Service. Nothing in the relief sought would have altered the tax liability of the plaintiffs. In deciding that the plaintiffs lacked standing, the Court again emphasized that "indirectness of injury, while not necessarily fatal to standing, may make it substantially more difficult to meet the minimum requirements of Art. III: To establish that, in fact, the asserted injury was the consequence of the defendants' actions, or that prospective relief will remove the harm." *Id.* at 44-45 (citations and internal quotation marks omitted).

Plaintiffs also cite *American Medical Association v. Mathews,* 429 F.Supp. 1179 (N. D. Ill. 1977). In that case, the challenge was to certain Medicare and Medicaid reimbursement rules that were alleged to directly impair medical judgment by physicians in their prescribing practices. It was alleged that reimbursement rules would incentivize hospitals to carry only the lower-cost drugs, thus impairing the physicians' medical judgments. The Court thought the injury was direct and palpable enough to confer standing, but still noted the general principle of

*Simon* that indirectness made standing much more challenging. This case, too, is quite different factually from the one here.

Another case cited by Plaintiffs is *Rowe v. State Bank of Lombard,* 125 Ill.2d 203 (1988). An employee at a business (a tenant) was murdered and another seriously injured. Plaintiffs sued the owner of the building on a negligence theory, alleging that master and pass keys were not properly controlled. The ADA and ICRA claims in the case before this Court are not based on negligence, so right at the outset the *Rowe* case is not germane. In *Rowe,* the Court permitted plaintiffs' claim to proceed, but the link between the alleged negligence and the resulting harm was much closer than anything alleged in this case. The *Rowe* court, however, was also careful to note the more general rule of tort law, which in the absence of special circumstances should control: "Generally, where between the defendant's negligence and the plaintiff's injury an independent, illegal act of a third person has intervened which causes the plaintiff's injury, and without which it would not have occurred, the criminal act is a superseding cause of injury relieving the original negligent party of liability." *Id.* at 224, citing Prosser and Keaton on Torts, §33, at 201 (5th ed. 1984).

Here, Plaintiffs do not allege that the State and State Police gave particular gun shops exemptions from laws, and that this exemption directly caused injury to plaintiffs. As we noted in the opening brief, some individuals may lawfully own and lawfully use guns (for example, in self-defense), or may use their lawfully obtained gun in an illegal way. And plaintiffs do not allege that the State Defendants are leading teachers or other professionals in the local schools or elsewhere to take actions detrimental to the students. Again, the Defendants' alleged connections to the harms Plaintiffs have been exposed to are much more general, indirect, and speculative.

6

No injunction targeted at one law enforcement agency can credibly be predicted to redress the problems of gun violence in Chicago. Accordingly, Plaintiffs lack standing to sue.

## II. PLAINTIFFS' CLAIMS SHOULD BE DISMISSED ON THE MERITS.

### A. The ADA claim fails as a matter of law.

Plaintiffs have cited no case where a police department's general law enforcement responsibilities have been considered a "service, program, or activity" of a public entity. Plaintiffs have cited no case that any discrete member of the public or subset of the public has a claim under Title II of the ADA for being "excluded from participation in or…denied the benefits of" the service, program, or activity, or be subjected to discrimination by the law enforcement agency, because the law enforcement is allegedly not being proactive enough to prevent criminal activity. 42 U.S.C. § 12132. The State Defendants have not engaged in any way with the individual Plaintiffs in this case, and have not rejected them from any service, program, or activity, and therefore have not excluded them from any program for which they "meet the essential eligibility requirements." 42 U.S.C. § 12131(2). And there is no analog in this case to a zoning regulation that has the very direct effect of excluding disabled persons from housing or treatment, as in the cases cited by Plaintiffs, *Oconomowoc Residential Programs, Inc. v. City of Milwaukee*, 300 F.3d 775, 782-83 (7th Cir. 2002), and *Innovative Health Systems,* 117 F.3d 37, 45 (2nd Cir. 1997). Plaintiffs are proposing an unprecedented expansion of Title II liability.

Because there is no "service, program, or activity" here within the ambit of Title II, there are no "essential eligibility requirements" for the Plaintiffs to meet. 42 U.S.C. § 12131(2) There is no governmental anti-handgun violence program admitting some people, but not others such as plaintiffs, into that program. Thus, the comparative element essential to a Title II discrimination

claim is lacking. There is no allegation that any person with a disability is being denied legal protection of a "program, service, or activity" "*by reason of*" their disability. The State's law enforcement and regulatory efforts are not on a dual (discriminatory) track, where gun enforcement efforts toward those with a history of trauma are given less attention than toward others without that history. There is one, across-the-board regulatory effort.

The discrimination requirement also means plaintiffs must establish but-for causation: that if it were not for their disability they would have been able to participate in the "program." *A.H. v. Illinois High School Association,* 881 F.3d 587, 593 (7th Cir. 2018). Nothing here could suggest a direct discriminatory exclusion from a non-existent program based on the fact that plaintiffs have psychological disabilities resulting from urban gun violence. Within the allegations of the complaint, the only obvious service plaintiffs have noted is public education, and there is no claim the State or State Police have imposed discriminatory roadblocks on the students' right to obtain a public education.

As noted in our opening memorandum, one powerful, albeit indirect, way of evaluating the plaintiffs' expansive reading of Title II is to see how radically different it is, and what expanded legal liabilities it would impose, compared to other areas of law that have addressed a similar question: what is the State's liability, or a police department's liability, to a crime victim with whom it has no special obligation to protect. Police traditionally had no common law liability in such a circumstance. And now state statutes often immunize police departments against such claims. *See* 745 ILCS 10/4-102 (police immune for failure to prevent commission of crimes, failure to detect or solve crimes, failure to identify or apprehend criminals).

In federal constitutional law, the police have no duty to protect or rescue individuals or prevent criminal acts absent having created a special relationship with the individual, such as when they attempt to rescue the person or take the person into their custody. *DeShaney v. Winnebago County Department of Social Services,* 489 U.S. 189 (1989); *Hernandez v. City of Goshen Indiana*, 324 F.3d 535, 538 (7th Cir. 2003); *Windle v. City of Marion, Indiana*, 321 F.3d 658, 662 (7th Cir. 2003). In drafting Title II, Congress used language from discrimination law such as "qualified individual with a disability" and "meets the essential eligibility requirements for the receipt of services." One would have to ask if Congress truly intended Title II of the ADA to be read in a way that would overturn the well-established rules in state and federal law that do not impose liability on the police for failing to prevent the criminal acts of third parties. Here, of course, the Plaintiffs are not themselves crime victims, but persons who may have been exposed to crimes perpetrated on others, such as friends or family members, a causal chain yet one more step removed. There is no reasonable way that the language of Title II can be read so expansively.

**B.  The ICRA claim fails as a matter of law.**

A claim under the Illinois Civil Rights Act (ICRA), 740 ILCS 23/5, cannot be broader than the federal statute on which it was based, Title VI of the Civil Rights Act. When *Alexander v. Sandoval,* 532 U.S. 275 (2001), eliminated the private right of action for disparate impact claims under Title VI, ICRA was meant to restore that cause of action, but not expand it. *Illinois Native American Bar Association v. University of Illinois,* 368 Ill. App. 3d 321, 327 (2006). Plaintiffs' theory under ICRA would be a major expansion of liability. For a disparate impact claim like the one alleged in this case, ICRA requires that plaintiffs plead that the governmental defendant is utilizing "criteria or methods of administration" that "have the effect of subjecting

9

individuals to discrimination because of their race, color, national origin, or gender." 740 ILCS 23/5(a)(2).

Plaintiffs have not alleged the State Defendants are using criteria or methods of administration in connection with any program or activity. Their claim is that law enforcement could do more to prevent illegal gun sales that will reduce gun violence, and they propose various policy changes that could be implemented. That is simply not the utilization of "criteria" or "methods of administration" the statute is directed at. Gun shops are not "administered" by the State or State Police. They are private businesses. There is no specific "criteria" by which Plaintiffs suffer discrimination by virtue of their race in connection with how strictly one agency of law enforcement (among many different local, state and federal law enforcement agencies) enforces laws against those private businesses. The causal link is much too remote. As noted in our opening brief, any plaintiff in a disparate impact case must isolate and identify the specific practices of the government agency alleged to be discriminatory and show a causal link between those practices and a discriminatory effect against the protected class. Doc. 25 at 19. That is not what Plaintiffs are doing here. Their claim is that the State or State Police should simply do more to stem the flow of illegally obtained guns in the Chicago area. Those policy prescriptions would require legislative or regulatory amendments. Similar claims could be made about drug trafficking, human trafficking, drunk driving, domestic violence, gang-related crimes, or the operations of the prison system or juvenile justice system. Claims could be made that insufficient resources put toward these different areas of law enforcement could impact a protected class adversely. But they would not be within the scope of ICRA. The decision on gun sales in *Coalition for Safe Chicago Communities v. Village of Riverdale*, 2016 WL 1077293 (Cir Ct. of

10

Cook County), which was discussed in our opening brief, is factually very similar to this case, and the ICRA claim was dismissed on standing grounds and on the merits.

Plaintiffs cite *Central Austin Neighborhood Association v. City of Chicago,* 2013 IL App (1st) 123041 (2013). In that case, the claim was that individuals in black and Hispanic neighborhoods, when calling 911, had to wait longer for the Chicago Police to respond than for calls from individuals in predominantly white neighborhoods. The circuit court dismissed the case on the political question doctrine, and the appellate court reversed. We would note, however, that *Central Austin* has causal links that are much more direct than our case. How a local police department deploys personnel in neighborhoods that are majority-minority, compared to predominantly white neighborhoods, provides a comparative element that our case lacks. Moreover, the conduct at issue is much more obviously a "method of administration" relating to the internal operations of the department.

Plaintiffs also cite *Gallagher v. Magner,* 619 F.3d 823 (8th Cir. 2010), a disparate impact claim brought under the federal Fair Housing Act. *Gallagher* was cited in the *Central Austin* case as well. The plaintiffs alleged that overly aggressive enforcement of the housing code by a municipality had a disparate impact on minorities who are bigger consumers of affordable housing, and the Court held that the plaintiffs' claim on this theory could proceed. The case should not be relied on here. In *Texas Department of Housing and Community Affairs v. Inclusive Communities Project, Inc.*, 135 S.Ct. 2507 (2015), the Supreme Court held that the Fair Housing Act did permit disparate impact claims, but specifically distanced itself from the *Gallagher* opinion, noting that it was decided "without the cautionary standards announced in this opinion." *Id.* at 2524. If *Gallagher* is not authoritative even in the area it addressed—the Fair

Housing Act—it should not be given credence in the very different area of criminal law enforcement.

## CONCLUSION

There is no proper Article III case or controversy presented on the facts alleged. There is no injury fairly traceable to defendants' conduct that can be redressed in this case. And neither the ADA nor ICRA provide a basis for relief for the harms alleged stemming from the use of handguns. For the foregoing reasons, the Defendants request that their motion to dismiss be granted.[1]

          Respectfully submitted,

KWAME RAOUL
Attorney General of Illinois    By:    */s/ Thomas A. Ioppolo*
          Thomas A. Ioppolo
          Assistant Attorney General
          100 W. Randolph Street, 13th Floor
          Chicago, Illinois 60601
          312-814-7198
          tioppolo@atg.state.il.us

---

[1] The Court does not need to reach the Eleventh Amendment question posed by *United States v. Georgia,* 546 U.S. 151 (2006) if the motion is granted on the grounds presented. However, plaintiffs are incorrect that the Eleventh Amendment would be irrelevant if the case does proceed. The state and one of its agencies are defendants, not just state officials, so the exception under *Ex parte Young,* 209 U.S. 123 (1908), would not apply to them and the question of the validity of the Congressional abrogation of the Eleventh Amendment for this kind of Title II case would have to be reached. 42 U.S.C. § 12202.