IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DEMETRIA POWELL, as guardian ad
litem and on behalf of her son D.P., et
al.,

      Plaintiff,

      v.

THE STATE OF ILLINOIS, et al.,

      Defendants.

No. 18-cv-6675

Hon. Joan B. Gottschall

## NOTICE OF INTERLOCUTORY APPEAL

Defendants State of Illinois, Department of State Police, J.B. Pritzker in his
official capacity as Illinois Governor, and Brendan Kelly in his official capacity as
Director for the Illinois State Police, hereby appeal to the United States Court of
Appeals for the Seventh Circuit the portion of the order entered by the district court
on September 30, 2019 (Doc. 37), denying Defendants' motion to dismiss in which
they argued that the relief requested by the plaintiffs was barred by the Eleventh
Amendment to the United States Constitution.  By this appeal, Defendants request
that the portions of that order denying their motion to dismiss on this basis be

reversed and vacated, that this action against Defendants be dismissed, and that this Court grant any other available relief.

October 28, 2019

Defendants THE STATE OF ILLINOIS;
THE DEPARTMENT OF STATE POLICE;
J. B. PRITZKER, in his official capacity as
Illinois Governor; and BRENDAN KELLY,
in his official capacity as Director of the
Illinois State Police

By: KWAME RAOUL,
    Illinois Attorney General

R. Douglas Rees                        /s/ Michael Dierkes
Deputy Attorney General,               Assistant Attorney General
Civil Litigation                       Office of the Illinois Attorney General
Office of the Attorney General         100 West Randolph Street, 12th Floor
100 W. Randolph Street, 12th Floor     Chicago, Illinois 60601
Chicago, Illinois 60601                Tel. 312-814-3672
Tel. 312-814-3498                      mdierkes@atg.state.il.us
drees@atg.state.il.us

2

## PROOF OF FILING AND SERVICE

The undersigned attorney certifies that on October 28, 2019, he caused Defendants' **NOTICE OF INTERLOCUTORY APPEAL** to be filed and served electronically using the Court's CM/ECF system.

_/s/ Michael Dierkes_
One of the attorneys for Defendant

# UNITED STATES DISTRICT COURT
## FOR THE Northern District of Illinois − CM/ECF LIVE, Ver 6.3.1
### Eastern Division

Demetria Powell, et al.

                              Plaintiff,

v.                                              Case No.: 1:18−cv−06675
                                                Honorable Joan B. Gottschall

State of Illinois, The, et al.

                              Defendant.

---

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Monday, September 30, 2019:

     MINUTE entry before the Honorable Joan B. Gottschall: Enter memorandum opinion and order granting in part and denying in part defendants' motion to dismiss [24]. In accordance with the memorandum opinion and order, plaintiffs Patrick and Reese are dismissed for lack of standing. A status hearing is set for 11/15/19 at 9:30 a.m. Mailed notice(mjc, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at *www.ilnd.uscourts.gov*.

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **DEMETRIA POWELL, as guardian *ad litem* and on behalf of her son D.P.; TANYA REESE, as guardian *ad litem* and on behalf of her son M.R.; and TYWANNA PATRICK, as guardian *ad litem* and on behalf of her granddaughter J.C., as well as on behalf of a class of similarly situated children,** | Case No. 18 CV 6675 |
| | Judge Joan B. Gottschall |
| Plaintiffs, | |
| v. | |
| **THE STATE OF ILLINOIS; THE ILLINOIS DEPARTMENT OF STATE POLICE; BRUCE RAUNER, Governor of the State of Illinois; and LEO P. SCHMITZ, Director of the Illinois Department of State Police,** | |
| Defendants. | |

**MEMORANDUM OPINION AND ORDER**

It is common knowledge that, as the plaintiffs in this proposed class action allege, gun violence has ravaged the City of Chicago for decades and that the violence is concentrated in predominately African-American neighborhoods. *See* Compl. ¶ 1, ECF No. 1; *Ezell v. City of Chicago*, 651 F.3d 684, 715 (7th Cir. 2011) ("The City [of Chicago] has legitimate, indeed overwhelming, concerns about the prevalence of gun violence within City limits."). The three named plaintiffs bring claims against the State of Illinois, the Illinois State Police ("State Police"), Illinois' governor, and the head of the State Police on behalf of three children who grew up in a high-crime, predominately African-American neighborhood on Chicago's west side. Plaintiffs' claims arise under Title II of the Americans with Disabilities Act of 1990 ("ADA"), as amended, 42 U.S.C. § 12131 et seq., and the Illinois Civil Rights Act ("ICRA"), 740 ILCS 23/5.

1

The complaint attributes each child's Post-Traumatic Stress Disorder ("PTSD") diagnosis, as well as other disabilities affecting the child's ability to succeed at home and at school, primarily to daily exposure to gun violence and its effects. *See* Compl. ¶¶ 3–6, ECF No. 1. As a reasonable accommodation under the ADA, plaintiffs seek injunctive and declaratory relief. They want the court to require defendants to pass regulations, primarily focusing on gun shops, which they contend would appreciably stem the tide of gun violence in Chicago. *See id.* ¶ 28.

Defendants move to dismiss the complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). They argue that plaintiffs do not have standing under Article III of the Constitution. They also argue that the complaint fails to state a claim for which relief can be granted. For the following reasons, the court denies the motion except as to two plaintiffs who lack standing because they have moved out of the City of Chicago.

## I. The Complaint

Because defendants attack the sufficiency of the complaint, the court must accept its allegations as true and draw all reasonable inferences from its well-pleaded facts in the light most favorable to plaintiffs. *See Manistee Apts., LLC v. City of Chicago*, 844 F.3d 630, 633 (7th Cir. 2016) (failure to state a claim); *Berger v. Nat'l Collegiate Athletic Ass'n*, 843 F.3d 285, 289 (7th Cir. 2016) (lack of subject matter jurisdiction). The complaint here begins by citing statistics and reports concerning gun violence in Chicago and then recounts facts particular to each child. The complaint attributes its statistics to scholarly articles, data, and reports issued by the Chicago Police Department, the University of Chicago Crime Lab, and the Bureau of Alcohol, Tobacco, Firearms, and Explosives.[1] *See* Compl. ¶¶ 16–20 & n.1. Chicago has no licensed gun shops. Compl. ¶ 19.

---

[1] Plaintiffs did not attach the primary sources they cite to their complaint, and so they are not presently before the court. *See* Fed. R. Civ. P. 12(d). Although the court accepts plaintiffs' well-pleaded allegations about these statistics

## A. __Prevalence and Distribution  of Gun Violence in Chicago__

Chicago has more gun-related homicides than any other major U.S. city.  Compl. ¶ 16.

Ninety percent of the murders in Chicago between January 1, 2015, and June 30, 2018, were by

gunshot.  *Id.*  "Nearly 20 percent of homicide victims in Chicago are teenagers or younger."  *Id.*

> This gun violence most dramatically afflicts the African-American community in
> Chicago, and particularly the neighborhoods of Austin, Englewood, West
> Englewood, New City and Grand Crossing ("the communities of concentrated gun
> violence"). In 2015-2016, according to the University of Chicago Crime Lab,
> eighty (80)% of Chicago homicide victims were African-American, though
> African-Americans comprise only about one-third of the city's population. Eighty
> (80)% of homicide victims continue to be African-American when one looks only
> at killings during the first seven months of 2018. African-American men aged
> fifteen (15) to thirty-four (34) made up more than one-half of the city's homicide
> victims during this same period, while accounting for just four (4) percent of the
> city's population. Despite having only nine (9)% of Chicago's population, the
> African-American neighborhoods of Austin, Englewood, West Englewood, New
> City and Grand Crossing, accounted for almost one-third of homicides in 2016, and
> this pattern has continued. The national homicide rate is about 5 per 100,000
> persons across the whole country. In the Austin neighborhood of Chicago, in 2016,
> the homicide rate was 87.3 per 100,000 persons, according to the University of
> Chicago Crime Lab. In Englewood, the homicide rate was 179.5 per 100,000
> persons; in West Englewood, it was 105 per 100,000 persons; in New City, it was
> 98.6 per 100,000 persons and in Grand Crossing it was 103.5 per 100,000. These
> five neighborhoods have the most death by gun violence of any neighborhoods in
> Chicago. They are African-American neighborhoods. Five of the next six deadliest
> neighborhoods are also African-American. By comparison, the white Chicago
> neighborhoods of Lincoln Park, North Center, Edison Park, Forest Glen, North
> Park, Hegewisch, Beverly and Mount Greenwood had no homicides in 2015 or
> 2016, and the white neighborhoods of Lake View, Lincoln Square, Jefferson Park,
> Calumet Heights, Edgewater, Montclare, O'Hare, Dunning, and Norwood Park had
> two or fewer murders during this two-year period, with a zero or negligible
> homicide rate. This disparate impact of gun violence has continued through to the
> present day.

Compl. ¶ 17.

---

as true at the complaint stage, the court implies nothing else about reports that have not been presented to it through
the adversary process.  The court notes, however, that plaintiffs' statistics appear to be drawn primarily from the
2017 gun trace report discussed in the text *infra*.  *See generally United States v. Rocha*, 2019 WL 4384465, at *6–7
(N.D. Ill. Sept. 11, 2019).

Most people who live in the communities of concentrated gun violence "hear gun fire most nights, while in their homes or walking the streets."  Compl. ¶ 18.

### B. <u>Sources of "Crime Guns"</u>

How many guns are in Chicago is unknown.  Compl. ¶ 18.  The complaint cites statistics regarding Chicago "crime guns."  Compl. ¶¶ 18, 19.  Given the sources cited, the court infers that plaintiffs use this phrase as defined in the City of Chicago's gun trace report, which compiled statistics on guns recovered in 2013–2016.  The report defined a "crime gun" as a gun "possessed, used, or suspected to have been used in furtherance of a crime."  *United States v. Rocha*, 2019 WL 4384465, at *6 (N.D. Ill. Sept. 11, 2019) (citing City of Chicago, Office of the Mayor, "Gun Trace Report 2017" 1 (2017)).

Since 2011 Chicago police have recovered about 7,000 "crime guns" from Chicago's streets—a rate six times the per capita rate of New York City.  Compl. ¶ 18.  This does not count guns recovered in turn-in and buy-back programs.  *Id.*  According to statistics compiled by the Chicago Police Department, "[f]orty percent of the guns being used in gun-related crime in Chicago are purchased at gun stores in Illinois, most in suburbs nearby Chicago."  Compl. ¶¶ 2, 19 (40.4% of "crime guns" recovered in Chicago from 2009–17 purchased from licensed gun dealers in Illinois).  Seven gun shops sell "most of these weapons."  Compl. ¶¶ 2, 19.  The majority of these guns are used in connection with Chicago crimes within one to three years of purchase.  *See* Compl. ¶ 19 (providing examples and statistics for particular shops from 2013–17).  Several gun dealers report that from 2013–16 more than 1,200 guns were lost or stolen.[2]  *Id.*

---

[2] The complaint does not make entirely clear whether this statistic refers to all gun dealers in Illinois or the seven dealers mentioned.  *See* Compl. ¶ 20.  Plaintiffs receive the benefit of a favorable inference here.

¶ 20. "This includes [gun losses from] burglaries and robberies, which are increasing at an alarming rate." *Id.*

### C. **The Effects of Gun Violence**

On how exposure to gun violence affects children, plaintiffs allege:

It is well-established among physicians, trauma specialists and educators, as well as in the scientific, peer-reviewed literature, that when a child, particularly a young child, is exposed to gun violence, there is a dramatic and lasting impairment of the child's basic life activities. This includes deficits in the child's ability to care for himself or herself, the child's sleep, reading abilities, learning capacity, concentration, thinking and communication. . . . . Many studies have found that children directly or indirectly exposed to community violence, most often gun violence, develop acute or post-traumatic stress disorder, including disrupted sleep, anxiety and fear, as well as reduced awareness and difficulty with concentration, thinking and memory, all of which impair cognitive functioning . . . . In Chicago, there have been many studies linking exposure to gun violence directly to deficits in academic performance by African-American children.

Compl. ¶ 31, 32, 34 (internal citations to studies omitted); *see also* Compl. ¶¶ 35–36 (discussing additional studies of Chicago students). Based on these studies and the named plaintiffs' experiences, plaintiffs allege they are disabled within the meaning of the ADA. *See* Compl. ¶¶ 44, 50, 55.

### D. **The Named Plaintiffs**

Each named plaintiff sues as a guardian ad litem of a minor child. *See* Compl. ¶¶ 4–6. Each African-American child lives or lived in Chicago's Austin neighborhood. *Id.* Each child has been diagnosed with Post-Traumatic Stress Disorder. *Id.* Each child alleges that exposure to gun violence on a daily basis contributed substantially to the diagnosis as well as related problems at home and at school. *See id.* In the following summary, ages and places of residence are stated as of the date on which the complaint was filed.

Plaintiff Demetria Powell sues on behalf of her eight-year-old son, D.P. Compl. ¶ 4. Powell, D.P., and D.P.'s two-year-old sister live in Austin. Compl. ¶¶ 4, 37. Most nights they

hear gun shots on the block where they live.  Compl. ¶ 4.  During the first half of 2018, four

shootings occurred within two blocks of D.P.'s home; one was fatal.  *Id.*  In 2016, D.P.'s father

was shot to death in Chicago's West Garfield Park neighborhood.  Compl. ¶¶ 4, 38 (murder

remains unsolved).  Then a kindergartener, "D.P. saw his father's bullet-ridden body."  Compl.

¶ 4; *see also* Compl. ¶ 38.  The effect on D.P. was pronounced:

> D.P. went back to his kindergarten class after a week. His kindergarten teacher, Raven
> McGill, had regarded D.P. as a well-behaved and bright young boy, but after his father
> was killed, he began yelling in class and having angry outbursts. The teacher and family
> tried to respond effectively but could not. For months after the shooting, D.P.
> repeatedly woke up in tears because of terrible dreams about his father. He had a great
> deal of difficulty sleeping. He was afraid. At school, his behavior deteriorated, and he
> was physically aggressive with other students and, at one point, punched and kicked
> his teacher, requiring him to be sent home. D.P. would speak about his father at school,
> once pointing to the clouds and telling his teacher "that's where my dad is[,"] and on
> another occasion telling the teacher he would be excited "when his dad comes back[."]
> Beginning with his father's shooting, D.P. has struggled in school, experiencing
> difficulties in learning, reading, thinking and communicating.

Compl. ¶ 40.

Plaintiff Tanya Reese sues on behalf of her 16-year-old son M.R.  Compl. ¶ 5.  Reese

presently lives in Oak Park, Illinois, but used to live in the Austin neighborhood.  Compl.

¶¶ 5, 46.  While he lived in Austin, M.R. "regularly heard gunshots at night" and was exposed to

a  "consistent" level of gun violence on his block since at least 2014.  Compl. ¶ 5.  Five shootings

were reported in the first six months of 2018 within three blocks of M.R.'s former Austin

address.  *Id.*  In August 2015, M.R.'s older brother, Pierre Reese, was shot to death in the Austin

neighborhood.  Compl. ¶ 47 (crime remains unsolved).  Then 13-year-old M.R. looked up to

Pierre like a father.  Compl. ¶ 48.  In the wake of his brother's death,  M.R. "could not sleep,

communicate about his brother's death or what was going on in his life. He cried often and

withdrew from family life."  Compl. ¶ 48.  The family has moved out of the Austin

neighborhood, and M.R. continues to receive counseling.  Compl. ¶¶ 48, 49.

Plaintiff Tywanna Patrick sues on behalf of her 11-year-old granddaughter, J.C. Compl. ¶ 6. Patrick lives in Chicago's Near West Side; she operates a shop in the Austin neighborhood. *See* Compl. ¶¶ 6, 51. In 2014 Patrick's 21-year-old son was shot to death in the Austin neighborhood. Compl. ¶¶ 6, 52 (two arrests made). J.C. lived in Austin at the time. Compl. ¶ 51. She and her uncle had a "very close" relationship. Compl. ¶ 53. Seven-year-old J.C. was present in Patrick's shop when the police delivered the news of her uncle's shooting; she heard the police describe what happened and also heard "family friends" describe the shooting. *Id.* For months following the shooting, J.C. had difficulty sleeping; she began having trouble concentrating and communicating in school. Compl. ¶ 54. She was "generally unwilling to leave the home" and became "clingy." *Id.*

Like the other children, J.C. continued regularly to feel the effects of gun violence. *See* Compl. ¶ 6. Five shootings, one fatal, occurred within three blocks of her former address in Austin during the first half of 2018. *Id.* J.C. has recently moved to Bellwood, Illinois. *Id.*

### E. **Relief Requested**

Although gun dealers must be licensed by the federal ATF, plaintiffs allege that ATF "does little to monitor guns in [Illinois gun ] stores, or to prevent the loss or theft of gun." Compl. ¶ 21 (tracing this in part to federal laws preventing ATF from requiring gun dealers to submit to regular firearms inventory inspections and permitting regular inspections, absent a warrant, no more than once a year). The complaint also says that Illinois municipalities "have done little" to address the problem.[3] Compl. ¶ 22 (noting that 53 of Illinois' 1,299 municipalities have adopted a gun dealer or trafficking ordinance).

---

[3] As plaintiffs allege, Compl. ¶ 23, the FOID Act preempts local ordinances concerning (among other things) "the regulation, licensing, possession, and registration of handguns and ammunition for a handgun, and the transportation of any firearm and ammunition by a holder of a valid Firearm Owner's Identification Card." 430 ILCS 65/13.1(b); *see also* 430 ILCS 65/13.1(c).

Plaintiffs allege that the Illinois Firearms Owners' Identification Card Act ("FOID Act"), 430 ILCS 65/0.01 et seq., empowers the state defendants here—the state itself and the state police—to enact regulations that would substantially decrease the rate of gun violence in Chicago's predominately African-American neighborhoods. *See* Compl. ¶¶ 23–28. The FOID Act declares that "[n]o person may acquire or possess any firearm, stun gun, or taser within this State without having in his or her possession a Firearm Owner's Identification Card previously issued in his or her name by the Department of State Police." § 65/2(a)(1); *but see id.* § 65/2(b)–(c)(5) (exceptions). The identification card requirement applies to ammunition as well. *Id.* § 65/2(a)(2). Among other things, the FOID Act generally creates a system of background checks for firearms purchases. *See* § 3.1.

The state police have, according to plaintiffs, broad authority to pass regulations under the FOID Act. Compl. ¶ 25 (citing 20 ILCS § 2605 -15, 65/3 (a-10), 65/3.1(f)). The crux of their claims is that defendants have not exercised that authority, and "[t]he Pervasive Gun Violence in Chicago's African-American Neighborhoods Has Caused Thousands of African-American Children to Become Disabled Under the ADA" as a result. Compl. ¶ 28; *see also* Compl. ¶ 29.

Paragraph 28 of the complaint lists 12 specific regulations defendants could enact. They point to "[many] studies" that "have concluded that meaningful regulation of the primary and secondary gun markets, as set forth in par. 28 . . . ." will reduce the number of guns available in cities like Chicago." Compl. ¶ 27 (collecting citations). A sampling of the regulations follows:

A. To conduct and provide verification of background checks on all gun store and gun show employees to make sure they can pass the same background checks as gun purchasers before they handle and sell guns at the stores or at gun shows;

B. To install video recording systems to film the point of sale to discourage

8

traffickers and buyers using false identification, or purchasing multiple guns, and assist law enforcement officers in identifying straw purchasers of "crime guns;"

. . . .

F. To take possession of FOID cards that have been suspended or revoked but not returned by the owner, and develop systems for recovery of such FOID cards independent of gun dealers and gun shows, as only 30% of revoked FOID cards are returned presently, according to . . . an audit by the Office of the Auditor General of Illinois;

. . . .

I. To prohibit the sale of guns "off the books", i.e. that cannot be supported by contemporaneous paperwork which shows compliance with ATF rules (a completed ATF 4473 form) and compliance with 430 ILCS 65/3, which accounted for 5.5% of all Chicago crime guns between 2009-2013, (Cook, at 745 (2015);

Compl. ¶ 28.

In the request for relief beneath each of the complaint's two ADA counts, plaintiffs ask the court to (a) declare that defendants have violated their rights and (b) "[e]nter an injunction requiring that the defendant Illinois Department of State Police exercise its authority, under applicable state law, to make a reasonable accommodation for the disabilities and special needs of the plaintiff children, requiring that such accommodation consist of rules and regulations such as those contained in paragraph 28 above." Compl. pp. 26–27, 28–29 (also requesting reasonable attorney's fees). Count III seeks substantially the same relief. *See* Compl. ¶ 64. Plaintiffs allege in Count III that "the defendants have used methods of administration that permit more illegal guns in African American than white neighborhoods and such lax methods have subjected the plaintiff children to discrimination on the basis of their race." *Id.*

9

## II. Standing

"In every federal case, the party bringing the suit must establish standing to prosecute the action. 'In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues.'" *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11 (2004), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127 (2014) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). "As a jurisdictional requirement, the plaintiff bears the burden of establishing standing." *Apex Dig., Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443 (7th Cir. 2009). "'[A] plaintiff must demonstrate standing for each claim he seeks to press' and 'for each form of relief' that is sought." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)).

Citing Federal Rule of Civil Procedure 12(b)(1), defendants challenge the complaint on its face. *See* Mem. Supp. Mot. to Dismiss 4–10, ECF No. 25. A Rule 12(b)(1) motion raises either a facial or factual challenge to subject matter jurisdiction. *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015) (citing *Apex Dig.*, 572 F.3d at 443). A facial challenge claims that the complaint's, or another pleading's, allegations are insufficient, while "[a] factual challenge contends that 'there is in fact no subject matter jurisdiction,' even if the pleadings are formally sufficient." *Id.* (quoting *Apex Dig.*, 572 F.3d at 444) (emphasis omitted). Regardless of which type of challenge is raised, the plaintiff, as the party invoking federal jurisdiction, always bears the burden to establish that subject matter jurisdiction exists. *United Phosphorus, Ltd. v. Angus Chem. Co.*, 322 F.3d 942, 946 (7th Cir. 2003), *overruled on other grounds by Minn–Chem, Inc. v. Agrium, Inc.*, 683 F.3d 845 (7th Cir. 2012). On a facial challenge like the one here, "'the district court must accept as true all material allegations of the complaint, drawing all reasonable

10

inferences therefrom in the plaintiff's favor.'" *Remijas v. Neiman Marcus Grp., LLC*, 794 F.3d 688, 691 (7th Cir. 2015) (quoting *Reid L. v. Ill. State Bd. of Educ.*, 358 F.3d 511, 515 (7th Cir. 2004)).

To meet the minimum standing requirements of Article III, a plaintiff must establish three things: (1) he or she suffered or will suffer a concrete and particularized injury that is actual or imminent; (2) the injury is fairly traceable to the defendant's action; and (3) it is likely that the injury will be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992); *Berger v. Nat'l Collegiate Athletic Ass'n*, 843 F.3d 285, 291 (7th Cir. 2016). Defendants contest the traceability and redressability components of standing. *See* Mem. Supp. Mot. to Dismiss 6–11, ECF No. 25.

The briefs cite the general black letter test for Article III standing just quoted, but do not discuss its more specific application to requests for injunctive and declaratory relief. *See* Mem. Supp. Mot. to Dismiss 6–7; Resp. to Mot to Dismiss 6, ECF No. 31. To establish standing to seek a permanent injunction, plaintiffs must demonstrate that: "(1) they are under threat of an actual and imminent injury in fact; (2) there is a causal relation between that injury and the conduct to be enjoined; and (3) it is likely, rather than speculative or hypothetical, that a favorable judicial decision will prevent or redress that injury" *Schirmer v. Nagode*, 621 F.3d 581, 586 (7th Cir. 2010) (quoting *Summers v. Earth Island Institute*, 555 U.S. 488, 490 (2009)) (other citations omitted). When a plaintiff seeks a declaratory judgment, "'[b]asically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *MedImmune, Inc. v. Genentech,*

11

*Inc.*, 549 U.S. 118, 127 (2007) (quoting *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)).

## A. **Threat of Actual or Imminent Injury in Fact**

Defendants concede that the complaint adequately alleges an injury in fact: "there is no question the complaint adequately alleges the psychological trauma to children who hear and are frightened by the sounds of gunshots, who personally see victims of violence dead or dying at crime scenes, and who have to cope on a frequent basis with the news of friends or loved ones killed or injured from gun violence." Mem. Supp. Mot. to Dismiss 6. The precise nature of the ongoing threatened injury alleged in the complaint bears emphasis here. If plaintiffs sought money damages, the psychological harm and trauma alleged in the complaint certainly would meet the injury in fact requirement. *See, e.g., Clarkson v. Town of Florence*, 198 F. Supp. 2d 997, 1003–04 (E.D. Wis. 2002) (citing *Freedom from Religion Found., Inc. v. Zielke*, 845 F.2d 1463, 1467–68 (7th Cir. 1988)). But standing to seek damages for past wrongs does not necessarily give a plaintiff standing to seek a prospective injunction. "A plaintiff 'must demonstrate standing separately for each form of relief sought.'" *Schirmer v. Nagode*, 621 F.3d 581, 585 (7th Cir. 2010) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 185 (2000)) (other citation omitted).

The complaint defines the ongoing injury as the threat of continuing exposure to incidents of gun violence in the five primarily African-American Chicago neighborhoods in which it is most concentrated.[4] The trauma each child suffered in the past frames this ongoing

---

[4] The complaint also seeks an award of plaintiffs' attorneys' fees. *See* Compl. ¶¶ 61, 64. That request does not establish Article III standing. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998) (explaining that "[a] plaintiff cannot achieve standing to litigate a substantive issue by bringing suit for the cost of bringing suit. The litigation must give the plaintiff some other benefit besides reimbursement of costs that are a byproduct of the litigation itself.").

injury by establishing that each plaintiff represents a child with a disability. *See* Compl. ¶ 31. Plaintiffs do not seek money damages to compensate them for the child's trauma suffered in the past as a result of exposure to gun violence or indeed for anything else. *See id.* Plaintiffs want a declaration and prospective injunction requiring defendants to promulgate regulations designed to curb future gun violence on Chicago's streets. *See* Compl. ¶¶ 27–28.

Having defined the ongoing threat of injury the complaint alleges with precision, the court has little trouble concluding that it is discrete and particularized. A "generalized grievance" does not satisfy the injury in fact requirement; standing does not lie where "the impact on [plaintiff] is plainly undifferentiated and 'common to all members of the public.'" *Lujan*, 504 U.S. at 575 (quoting *United States v. Richardson*, 418 U.S. 166, 171, 176–77 (1974)) (alterations, internal quotations and other citations omitted); *see also id.* at 575–76 (further discussing taxpayer standing cases and the insufficiency of generalized grievances to establish standing). Though not couched in injury in fact terms, the gist of many of defendants' arguments against standing is that gun violence in Chicago is a problem that affects everyone in the city of Chicago and State of Illinois to some measure. The complaint contains ample statistical evidence that gun violence in Chicago is concentrated in Austin and other predominately African-American neighborhoods. *See* Compl. ¶¶ 16–19. It is reasonable to infer that the concentrated violence begets trauma and the psychological and behavioral injuries described in the complaint, creating discrete pockets of predominately African-American individuals disproportionately likely to be harmed by ongoing exposure.

The complaint here shares its theory of discrete and particularized harm with a recent Supreme Court case, *Bank of America Corp. v. City of Miami*, 137 S. Ct. 1296 (2017). Considering the Fair Housing Act, the Supreme Court held that a city had standing to sue a

lender based on allegations that two lenders intentionally gave African-American and Latino individuals risky mortgages. *Id.* at 1301–02. The Court held that the plaintiff's complaint established the standing of the City of Miami to sue under the Fair Housing Act based on allegations that the lender's "unlawful conduct led to a 'concentration' of 'foreclosures and vacancies' in [certain] neighborhoods." *Id.* at 1304. Those concentrated "foreclosures and vacancies" caused "stagnation and decline in African-American and Latino neighborhoods," impairing the plaintiff's efforts to create integrated neighborhoods. *Id.* at 1304 (relying on *Gladstone Realtors v. Vill. of Bellwood*, 441 U.S. 91, 99 (1979)). Similarly here, the plaintiffs allege a chain of causation from defendants' unlawful conduct leading to concentrations of preventable gun violence in predominately African-American neighborhoods. *See* Compl. ¶¶ 16–19; *see also Gladstone Realtors*, 441 U.S. at 109–10 (allegations of "racial steering" (i.e., red lining) had the effect of "replacing what is presently an integrated neighborhood with a segregated one"). Just as residing in an allegedly gerrymandered voting district confers standing on members of minority racial groups to challenge the district, *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018) (citing *Ala. Legislative Black Caucus v. Ala.*, 575 U.S. ——, ——, 135 S. Ct. 1257, 1265 (2015)), so too does residing in Chicago neighborhoods in which gun violence is concentrated. *Cf. Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d 1, 28 (D.D.C. 2009) (analogous to concentration theory; plaintiffs had standing to challenge rule change allowing firearms in discretely concentrated area to which they intended to go, specifically national parks).

14

Nonetheless, the complaint raises standing questions about where two of the three plaintiff children lived when it was filed.[5]  Establishing standing to seek injunctive relief to stem a harm within a geographic locus generally requires the plaintiff to allege some intent to return to the place in which the harm will again occur.  *See Lujan*, 504 U.S. at 564 (holding that affidavit averring that plaintiff planned to return "some day" was insufficient to establish standing "without any description of concrete plans, or indeed even any specification of *when* the some day will be").   The Seventh Circuit has held that standing to sue under Title II of the ADA for injunctive relief requires a "'real and immediate' threat that plaintiffs will be harmed by the non-ADA-compliant courthouse" or, as in this case, regulations.  *Hummel v. St. Joseph Cty. Bd. of Comm'rs*, 817 F.3d 1010, 1017 (7th Cir. 2016) (quoting *Scherr v. Marriott Int'l, Inc.*, 703 F.3d 1069, 1074 (7th Cir. 2013) (holding plaintiffs lacked standing to seek injunction to require county courthouse to comply with ADA requirements).  Standing may also be established by allegations that a plaintiff with a disability has been reasonably deterred from using an accommodation.  *Chapman v. Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939, 949 (9th Cir. 2011) (en banc); *see also Access Living of Metro. Chicago v. Uber Tech., Inc.*, 351 F. Supp. 3d 1141, 1149 (N.D. Ill. 2018).

Applying this standard here, only D.P. faces an actual or imminent threat of exposure to further gun violence in Chicago.  D.P. continues to live in Chicago's Austin neighborhood where the complaint alleges gun violence continues on a daily basis.  *See* Compl. ¶¶ 5, 16–19.  But T.C. and M.R. moved out of Chicago before the complaint was filed, T.C. to Bellwood and M.R. to Oak Park.  Compl. ¶¶ 5, 6.  The complaint says nothing about how the regulations plaintiffs

---

[5] No party raised this issue.  The court is nevertheless bound to address it because "[a]s a jurisdictional requirement, standing to litigate cannot be waived or forfeited."  *Va. House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945, 1951 (2019) (citing *Wittman v. Personhuballah*, 578 U.S. ——, —— – ——, 136 S. Ct. 1732, 1736–1737 (2016)).

propose would affect either child's exposure to gun violence, if any, in Oak Park or Bellwood. To the contrary, plaintiffs specifically plead that the regulations will "stem the flow of guns into Chicago." Compl. ¶ 28. Probably due to the scope of the reports and scholarly materials on which plaintiffs rely, they confine their allegations of the prevalence and concentration of gun violence to the City of Chicago and its neighborhoods. *See* Compl. ¶¶ 16–19. The complaint does not indicate that either T.C. or M.R. intends to return to the Austin neighborhood or that either child is likely to move to another Chicago neighborhood in which gun violence is concentrated. Accordingly, the court is forced to conclude that neither T.C. nor M.R. faces a reasonably likely ongoing threat of experiencing the harm alleged in the complaint—exposure to gun violence in Chicago.[6] *See Lujan*, 504 U.S. at 556; *Hummel*, 817 F.3d at 1017; *Scherr*, 703 F.3d at 1074. The court therefore dismisses them, or rather their representatives, for lack of standing.

### B. Causal Relationship and Redressability

The parties' arguments concerning causation and redressability often overlap. This should come as no surprise. The standing elements of "'[c]ausation and redressability are closely related[,] like two sides of a coin.'" *Duberry v. District of Columbia*, 924 F.3d 570, 581 (D.C. Cir. 2019) (quoting *West v. Lynch*, 845 F.3d 1228, 1235 (D.C. Cir. 2017)). The elements have focused on different things, however. *Id.* To satisfy the causation element, the plaintiff's injury must be "fairly traceable" to the challenged action of the defendant, and not the result of the independent action of some third party before the court. *Lujan*, 504 U.S. at 560 (quoting

---

[6] Plaintiffs have not offered any separate theory of standing to seek declaratory relief. Accordingly, the court sees no way in which T.C. and M.R. have standing to seek a declaratory judgment. *See Hummel*, 817 F.3d at 1024 (dismissing claim for declaratory relief and stating, "If the injunctive relief is moot, we doubt whether, on these facts, the declaratory judgment request can stand alone.") (quoting *Volkman v. Ryker*, 736 F.3d 1084, 1091 n.1 (7th Cir. 2013)).

*Allen v. Wright*, 468 U.S. 737, 751 (1984)). Redressability, by contrast, focuses on whether there is a "likelihood that the requested relief will redress that injury." *Steel Co.*, 523 U.S. at 84 (citations omitted).

Defendants argue that the chain of causation is too long and attenuated and that redressability is too uncertain to support standing. As they put the matter, "A gun shop may lawfully sell a gun to a person who uses the gun in a crime. A gun shop also may violate the law in selling a gun to a person who might steal the gun from the store or from a lawful purchaser. In all instances, however, the crime of the gun store or the gun user cannot be attributed to [the Illinois State Police]." Mem. Supp. Mot. to Dismiss 6, ECF No. 25. A crime gun might not even have been purchased in Illinois at all, add defendants, making any injunction ineffective. *Id.* And what is more, the federal government has a role to play in gun regulation as well. *See id.*

Defendants' arguments are not without force, but they fall on the merits' side of the line between the laxer standing causation requirement and the common law concept of proximate causation. Notably, defendants rely on merits cases to bolster their standing analysis. *See* Mem. Supp. Mot. Dismiss 8 (citing *Bacon v. City of Richmond*, 475 F.3d 633, 638 (4th Cir. 2007) (applying equitable principles in ADA Title II case at summary judgment)).

While the requirement of proximate causation "is not easy to define," it "generally bars suits for alleged harm" that is "'too remote'" from the defendant's unlawful conduct. That is ordinarily the case if the harm is purely derivative of "'misfortunes visited upon a third person by the defendant's acts.'" *Lexmark Int'l*, *supra*, 572 U.S. at 133 (quoting *Holmes v. Secs. Investor Prot. Corp.*, 503 U.S. 258, 268–69 (1992) (other citation omitted)). The causation component of Article III standing doctrine does not demand as close a causal connection as the common law proximate causation requirement. *See Lexmark Int'l*, 572 U.S. at 132–33; *Rothstein v. UBS AG*,

17

708 F.3d 82, 91 (2d Cir. 2013) (citations omitted); *Cty. of Cook v. Wells Fargo & Co.*, 115 F. Supp. 3d 909, 920 (N.D. Ill. 2015) (citing *Lexmark Int'l*, 572 U.S. at 127). Indeed, the Supreme Court has held that the defendant's actions do not have to be "the very last step in the chain of causation" to find standing. *Bennett v. Spear*, 520 U.S. 154, 169 (1997). The traceability requirement may be satisfied when the injury is "produced by [a] determinative or coercive effect upon the action of someone else." *Id.* at 169.

Thus, as defendants concede, standing may be fairly traced to government "inaction" as well as action. *Lujan*, 504 U.S. at 562. "When the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish" at the summary judgment stage. *Id.* (quoting *Allen*, 468 U.S. at 758). When the claimed injury "arises from the government's . . . lack of regulation [of a third party,] . . . causation and redressability ordinarily hinge on the response of the regulated (or regulable) third party to the government action or inaction—and perhaps on the response of others as well." *Id.* (quoting *ASARCO Inc. v. Kadish*, 490 U.S. 605, 615 (1989)).

The complaint here contains specific allegations of how regulable third parties will respond to the regulations plaintiffs propose. Plaintiffs cite statistical and anecdotal evidence showing what few dispute: that gun violence in Chicago is an epidemic and systemic problem that has the features of a public nuisance such as pollution inasmuch as its effects are geographically concentrated: the greater the concentration, the greater the harm inflicted on children exposed to it. *See* Compl. ¶¶ 16–26. Plaintiffs also allege that defendants have the power to pass regulations that could appreciably abate this nuisance. *See id.* ¶¶ 26–28. They do not just say so; they cite scholarly research they claim demonstrates as much. *See id.* All of this the court must accept as true, and the court must "presum[e] that general allegations embrace

18

those specific facts that are necessary to support the claim." *Lujan*, 504 U.S at 561 (quoting *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 889 (1990)).

Accordingly, the complaint's well-pleaded allegations suffice to establish causation and redressability at the complaint stage. The Supreme Court has found standing in environmental cases where the alleged injury is caused most immediately by a third party but is fairly traceable to the government's failure to regulate that party and redressable by a favorable decision. *See Summers*, 555 U.S. at 493–94 (plaintiff had standing at outset of suit to challenge agency's failure to regulate; injury more immediately traceable to causes of forest fires; claim subsequently became moot); *Massachusetts v. E.P.A.*, 549 U.S. 497, 521–26 (2007) (state had standing to challenge denial of petition for rulemaking to abate third parties' release of greenhouse gases); *see also Laidlaw*, *supra*, 528 U.S. at 181–83 (private plaintiffs had standing to sue to enforce provisions in EPA permit); *Solid Waste Agency of N. Cook Cty v. U.S. Army Corps of Eng'rs*, 101 F.3d 503, 506–07 (7th Cir. 1996). The court's causation and redressability reasoning has been extended by analogy to the problem of gun violence. *See, e.g., Salazar*, 612 F. Supp. 2d at 28; *N.A.A.C.P. v. Acusport Corp.*, 210 F.R.D. 446, 460–61 (E.D.N.Y. 2002). "Viewing the relevant injury as 'widespread criminal access to firearms' circumvents the 'intervening' third party actor problem. It is obviated by finding harm short of the point at which the third party acts." *Acusport*, 210 F.R.D. at 460. As for the problem of guns flowing from other states or being obtained through criminal means, the short answer at the complaint stage comes from the redressability reasoning of *Massachusetts*, 549 U.S. 497, a case about the regulations of vehicle emissions the plaintiff alleged contributed to global climate change. The defendants in *Massachusetts* argued that global climate change could not be fully ameliorated by adopting federal regulations raising the emission standards for vehicles because other emissions,

19

including those from other countries, would continue to contribute to climate change. The Court responded, "A reduction in domestic emissions would slow the pace of global emissions increases, no matter what happens elsewhere." *Massachusetts*, at 549 U.S. at 500. The same holds for gun violence in the Chicago area on the complaint's well-pleaded facts. As with the problem of global warming, the plaintiffs here "need not show that a favorable decision will relieve [their] *every* injury . . . . [b]ecause of the enormity of the potential consequences associated with" gun violence. *Id.* at 525 (quoting *Larson v. Valente*, 456 U.S. 228, 244, n.15 (1982)). The complaint adequately alleges that the injunctions plaintiffs seek would appreciably diminish the rate of gun violence in Chicago's predominately African-American neighborhoods, *see* Compl. ¶¶ 25–28, and that is sufficient to show redressability.

Defendants' remaining counter arguments miss the mark by mischaracterizing the relief plaintiffs seek and the nature of their alleged ongoing injuries.[7] First, the defendants cite *Children's Healthcare is a Legal Duty, Inc. v. Deters*, 92 F.3d 1412, 1424 (6th Cir. 1996), a nonbinding case, for the proposition that "'a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another" (quoting *Diamond v. Charles*, 476 U.S. 54, 64 (1986) (separate opinion of Batchelder, J.)) (quoted in Mem. Supp. Mot. to Dismiss 8). To put it mildly, the case at hand does not involve a claimed interest in forcing a state actor to prosecute someone for a crime, which is what the opinion in *Children's Healthcare* discussed. *See id.* As

---

[7] Defendants also cite a state trial court opinion applying Illinois' standing principles to a claim brought by private plaintiffs against private gun dealers. *See Coal. for Safe Chicago Communities v. Vill. of Riverdale,* 2016 WL 1077293 (Cook Cty. Cir. Ct., Ill. Feb. 25, 2016). This is the only case involving claims against a gun manufacturer or seller discussed by the parties. Several federal district courts have found at the complaint stage that organizations or individuals have standing to bring claims against firearms manufacturers, though claims of individuals, as contrasted with organizations, have raised causation and redressability concerns. *See, e.g., Salazar*, 612 F. Supp. 2d at 28; *Acusport*, 210 F.R.D. at 446. Speaking broadly, what distinguishes the claims in the complaint here for causation and redressability purposes is the presence of government actors as defendants and plaintiffs' plausible allegations that they have the power to enact regulations that could staunch gun violence flowing from the sale of guns in Illinois. *Compare Salazar*, 612 F. Supp. 2d at 28, *with Acusport*, 210 F.R.D. at 460–61.

explained above, plaintiffs want defendants to enact regulations, and this is not a non-prosecution case because defendants have passed no regulations to enforce. *See* Compl. ¶ 28.

The court also finds inapposite to the standing analysis defendants' string citation to Illinois Supreme Court cases holding that the Illinois constitution does not require the state to fund schools at a particular level. *See* Mem. Supp. Mot. to Dismiss 8 (citing *Lewis E. v. Spagnolo,* 186 Ill. 2d 198, 209 (1999); *Comm. for Educ. Rights v. Edgar,* 174 Ill. 2d 1, 29 (1996); *Blasé v. State,* 55 Ill. 2d 94, 99-100 (1973)). This argument is somewhat understandable, for the complaint alleges that the Illinois constitution makes the state ultimately responsible for ensuring that children have a meaningful opportunity to participate in school. *See* Compl. ¶ 56 (citing Ill. Const. Art. X § 1). The court reads this as rhetorical flourish. Plaintiffs bring no Illinois constitutional claim, and they do not ask the state to increase school funding. *See* Compl. pp. 28, 57. They want injunctive relief that they say will accommodate their gun-violence-related disabilities which hamper, among other things, their ability to perform in school. *See* Compl. ¶¶ 56–57. Of course, for an injury to be redressable by an injunction, the defendant enjoined must have the legal power to do what the court orders. *See, e.g.*, *McDaniel v. Bd. of Educ. of City of Chicago,* 956 F. Supp. 2d 887 (N.D. Ill. 2013) (cited by Mem. Supp. Mot. Dismiss 9). The defendants here do not deny that they have the power to enact the regulations listed in paragraph 28 of the complaint, *see id.*, so even if the Illinois constitution does not require defendants to pass the regulations plaintiffs want, redressability is satisfied if Title II of the ADA does. Whether the ADA does require this is a merits question.

\* \* \*

In sum, the complaint adequately alleges the three essential ingredients of standing as to D.P.—an ongoing threatened injury that is concrete and particularized, that is fairly traceable to

defendants' failure to regulate, and that is redressable through injunctive and declaratory relief.

Defendants' causation arguments raise, at least at the complaint stage, merits issues on the proper

reach of an ADA claim and proximate causation.  Plaintiffs' burden to establish the elements of

standing generally increases throughout the litigation, but that is not the issue at the moment.

*See Lujan*, 504 U.S. at 561.  The complaint adequately alleges standing.  Having determined that

plaintiffs' complaint adequately establishes standing for D.P.'s claims, the court turns to the

related merits issues raised by defendants.

### III. Merits

Defendants argue on the merits that the complaint fails to state a claim under Title II of

the ADA or the Illinois Civil Rights Act.  They also contend that the Eleventh Amendment bars

plaintiffs' ADA claims.  The court first analyzes the ADA claims and then turns to the ICRA

claim in Count III.

### A. Failure to State a Claim Standard

Defendants' merits challenges arise under Federal Rule of Civil Procedure 12(b)(6).  A

Rule 12(b)(6) motion to dismiss a complaint for failure to state a claim "tests the sufficiency of

the complaint, not the merits of the case."  *McReynolds v. Merrill Lynch & Co., Inc.*, 694 F.3d

873, 878 (7th Cir. 2012) (internal quotation marks omitted).  A complaint need only set forth a

"short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R.

Civ. P. 8(a)(2).  That is, the complaint must "state a claim to relief that is plausible on its face."

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007)).  A claim satisfies this standard when its factual allegations "raise a right to relief above

the speculative level."  *Twombly*, 550 U.S. at 545; *see also Swanson v. Citibank, N.A.*, 614 F.3d

400, 404 (7th Cir. 2010).  "Threadbare recitals of the elements of a cause of action, supported by

mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. The court must "construe the complaint in the 'light most favorable to the [plaintiff.]'" *Zahn v. N. Am. Power & Gas, LLC*, 847 F.3d 875, 877 (7th Cir. 2017) (quoting *Bell v. City of Chicago*, 835 F.3d 736, 738 (7th Cir. 2016)). The court also assumes that all of the well-pleaded facts in the complaint are true and draws reasonable inferences in the plaintiff's favor. *See Iqbal*, 556 U.S. at 678; *Collins v. Vill. of Palatine*, *Ill.*, 875 F.3d 839, 842 (7th Cir. 2017) (citing *McCauley v. City of Chicago*, 671 F.3d 611, 615–16 (7th Cir. 2011)); *Tagami v. City of Chicago*, 875 F.3d 375, 377 (7th Cir. 2017) (citing *United Cent. Bank v. Davenport Estate LLC*, 815 F.3d 315, 318 (7th Cir. 2016)).

### B. Merits of ADA Claims

When it enacted the ADA, Congress sought "to enforce [a] prohibition on irrational disability discrimination" in Title II and "to enforce a variety of other basic constitutional guarantees." *Tennessee v. Lane*, 541 U.S. 509, 510 (2004) (citations omitted); *see also id*. at 522–23 (discussing constitutional rights). "Congress enacted Title II against a backdrop of pervasive unequal treatment of persons with disabilities in the administration of state services and programs, including systematic deprivations of fundamental rights." *Id*. at 510. Indeed, Congress explicitly found at the ADA's enactment that persistent disability discrimination exists in "education, transportation, communication, recreation, institutionalization, health services, voting, and access to public services." 42 U.S.C. § 12101(a)(3). Defendants submit that there is "an obvious and inescapable disconnect between the facts alleged in the complaint" and the plain text of the ADA. Mem. Supp. Mot. to Dismiss 11, ECF No. 25.

Title II declares that no qualified person with a disability "shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination" by a state or local unit of

government.  42 U.S.C. § 12132; *see also Brumfield v. City of Chicago*, 735 F.3d 619, 629 (7th

Cir. 2013).  To state a claim, each plaintiff must plausibly allege that "(1) he [or she] is a

qualified person (2) with a disability and (3) the [defendant] denied him [or her] access to a

program or activity because of his [or her] disability."  *Jaros v. Ill. Dep't of Corr.,* 684 F.3d 667,

672 (7th Cir. 2012) (citations omitted).  Under Title II, a "qualified individual with a disability"

means a person who, "with or without modifications to rules, policies, or practices . . . meets the

essential eligibility  requirements for the receipt of services or the participation in programs or

activities provided by a public entity." 42 U. S. C. § 12131(2).

The primary Seventh Circuit case to which defendants direct the court is *Ashby v.

Warrick County School Corporation,* 908 F.3d 225, 231–32 (7th Cir. 2018).  In *Ashby*, the

Seventh Circuit surveyed the authority on what is a program, activity, or service under Title II

and found that it provided limited guidance.  *Id.  Ashby* provides little specific guidance here

because the *Ashby* court faced a question not present here: in what circumstances a covered state

actor's interaction with an uncovered private entity subjects the state actor to Title II liability.

*See id.* at 227 (asking whether public school choir concert at local history museum was a

program, service, or activity of the school).  That is not the problem here.  Defendants are not

alleged to be providing any services or conducting any activities with private actors.  *See Ashby*,

908 F.3d at 232 (schools covered by Title II); Mem. Supp. Mot. to Dismiss 12–13.

*Ashby* provides helpful guidance on another line of defendants' argument by teaching that

the court should pay attention carefully to the facts.  Defendants cite several cases discussing

whether a state licensing entity is liable for a license holder's failure to accommodate an

individual with a disability.  *See Noel v. N.Y. City Taxi and Limousine Comm'n,* 687 F.3d 63,

69–70 (2nd Cir. 2012) (state entity licensing taxi drivers); *Tyler v. City of Manhattan,* 849 F.

24

Supp. 1429, 1441-42 (D. Kan. 1994) (city issuing liquor licenses to businesses). *Ashby* considered one such case on facts more analogous to those alleged here, yet it found the licensing case to be "of very limited utility." 908 F.3d at 233 (discussing *Ivy v. Williams*, 781 F.3d 250, 256 (5th Cir. 2015), vacated and remanded sub nom. *Ivy v. Morath*, 137 S. Ct. 414 (2016)). Because plaintiffs do not suggest that regulated entities, i.e., handgun holders, have failed to accommodate them, this court finds the licensure cases defendants cite as unhelpful as the *Ashby* court did, if not more so.

However, another of the high level "basic principles" discussed by *Ashby* serves as the proper point of departure for the analysis here. *Id.* at 232. "[I]s clear that a governmental entity cannot avoid its obligations under the statute by ceding its governmental functions to private entities. . . . Accordingly, the question whether a particular event is a service, program, or activity *of* a public entity turns on what the public entity itself is doing, providing, or making available." *Id.*

Defendants seek to frame plaintiffs' ADA claims as challenging everything they are doing at an exceedingly high level of generality. According to defendants, "The decisions by a law enforcement agency, like ISP, regarding how to allocate its resources to protect public safety—e.g., to what extent it should address drug interdiction, domestic violence, Internet fraud, or gun violence—are not "programs, activities, or services" from which a "qualified individual with a disability" would be excluded from the coverage of Section 12132. Mem. Supp. Mot. to Dismiss 11. Thus, defendants cite a case considering whether, at a high level, an arrest can be considered a program or service under Title II. *See Haberle v. Troxell,* 885 F.3d 170, 178–79 (3rd Cir. 2018). They opine that "it is difficult to conceptualize how the plaintiffs (or any other

25

discrete group of people) 'meet the essential eligibility requirements' of criminal law enforcement activities." Mem. Supp. Mot. to Dismiss 12.

Defendants' framing conflicts irreconcilably with the allegations of the complaint, however. The complaint defines the program or service not as statewide law enforcement but as the FOID firearms identification program. *See* Compl. ¶¶ 24–25. Defendants offer no argument as to why this is not a program or activity of theirs, and the complaint's well-pleaded allegations, as well as Illinois statutory law, confirms that it is. *See id.* ¶ 25 (citing 20 ILCS § 2605 -15, 65/3 (a-10), 65/3.1(f)). As the ADA's regulations make Title II applicable to "anything a public entity does," the complaint more than adequately identifies a program, activity, or service provided by the defendants. *Ashby*, 908 F.3d at 231 (quoting 28 C.F.R. Pt. 35, App. B); *see also Oconomowoc Residential Programs v. City of Milwaukee*, 300 F.3d 775, 782 (7th Cir. 2002), for the proposition that this regulatory definition is controlling.

It does not matter that defendants administer a state program. There can be little doubt that Title II of the ADA reaches statewide programs or services. To cite a well-known example, the Supreme Court held in *Olmstead v. L.C.*, 527 U.S. 581, 597–603 (1999), that Title II requires states to take affirmative steps to accommodate persons with mental disabilities in its programs for them. *See also generally Steimel v. Wernert*, 823 F.3d 902, 914 (7th Cir. 2016). To cite another example, the Seventh Circuit has repeatedly applied Title II to requests to accommodate statewide rules for high school athletics. *See, e.g.*, *A.H. by Holzmueller v. Ill. High Sch. Ass'n*, 881 F.3d 587, 592–96 (7th Cir. 2018); *Washington v. Ind. High Sch. Athletic Ass'n, Inc.*, 181 F.3d 840 (7th Cir. 1999). Like these programs, or a system of zoning, *see Oconomowoc*, 300 F.3 at 782, the complaint plausibly alleges that the FOID program is a Title II program, service, or activity.

26

The same fundamental mischaracterization of the program or service plaintiffs allege undergirds defendants' other merits arguments. Defendants contend that plaintiffs have not adequately alleged discrimination under the ADA and that plaintiffs do not meet the program, service, or activity's "essential eligibility requirements" 42 U.S. C. 12131(2). In the Seventh Circuit "a plaintiff need not allege either disparate treatment or disparate impact in order to state a reasonable accommodation claim under Title II of the ADA." *Wis. Cmty. Servs. v. City of Milwaukee*, 465 F.3d 737, 753 (7th Cir. 2006) (en banc). Liability under Title II can be established by showing that "(1) the defendant intentionally acted on the basis of the disability, (2) the defendant refused to provide a reasonable modification, or (3) the defendant's rule disproportionally impacts disabled people." *Id.* (quoting *Washington v. Ind. High Sch. Athletic Ass'n*, 181 F.3d 840, 847 (7th Cir. 1999)); *see also Amundson ex rel. Amundson v. Wis. Dep't of Health Servs.*, 721 F.3d 871, 874 (7th Cir. 2013). The complaint here specifically alleges that defendants' FOID rules, or rather the lack of them, disproportionately impacts them and other persons with disabilities, citing statistical and anecdotal evidence which must be accepted as true for present purposes. *See* Compl. ¶¶ 16–19; *see also Wis. Cmty. Servs*, 465 F.3d at 751 ("[A]s our cases already hold, failure to accommodate is an *independent* basis for liability under the ADA.") (emphasis in original) (citations omitted)).

Rather than engage with these allegations about the FOID program, defendants argue as though the relevant program or service is Illinois statewide law enforcement writ large or, as in one passage of the reply, public education. *See* Reply 8, ECF No. 35. They say that "[t]here is no claim that ISP has *intentionally acted* on the basis of disability; refused to provide a reasonable modification, because there is no program or activity alleged within the contemplation of the ADA that could be modified; and likewise there is no 'rule' discriminating

27

against (disproportionately impacting) disabled people."  Mem. Supp. Mot. to Dismiss 16 (emphasis in original).  Since these arguments are premised on a definition of the applicable program or service not found in the complaint, they talk past the complaint instead of articulating a legal basis for dismissing it.  *See id.* at 15–17.  This court has no obligation to make the parties' arguments for them, and given the complexity and importance of the issues, it will not do so here.  *See, e.g., United States v. McLee*, 436 F.3d 751, 760 (7th Cir. 2006) ("'it is not the obligation of this court to research and construct the legal arguments open to parties, especially when they are represented by counsel'") (quoting *United States v. Holm*, 326 F.3d 872, 877 (7th Cir. 2003)); *Vaughn v. King*, 167 F.3d 347, 354 (7th Cir. 1999) ("It is not the responsibility of this court to make arguments for the parties.").

In particular, the court will not attempt to identify the essential eligibility criteria for the FOID program as it relates to plaintiffs—an inquiry that is intertwined with defendants' argument that no discrimination occurred.  Of course, the children plaintiffs represent do not want a FOID card, a gun, or ammunition.  However, defendants argue for the first time in their reply that plaintiffs should have petitioned for a rulemaking under Illinois' Administrative Procedure Act before filing this lawsuit.  Reply 1.  It would seem to be a necessary predicate of defendants' argument that plaintiffs would be eligible to petition for a rulemaking enacting their proposed changes.  But because defendants have waived this argument by waiting until their reply to make it, the court has no occasion to explore its significance.  *See United States ex rel. Berkowitz v. Automation Aids, Inc.*, 896 F.3d 834, 843 (7th Cir. 2018) (citing *Hess v. Reg–Ellen Mach. Tool Corp.*, 423 F.3d 653, 665 (7th Cir. 2005)); *UIRC–GSA Holdings Inc. v. William Blair & Co.*, 289 F. Supp. 3d 852, 863 (N.D. Ill. 2018) (citation omitted).

The court intimates no view on what discovery may reveal about these claims or on legal theories not adequately developed in the briefing. The court finds only that dismissal is unwarranted on the theories adequately developed in the motion to dismiss.

### C.  Eleventh Amendment Immunity for ADA Claims

Defendants next argue that if the court does not dismiss the complaint's ADA claims, then the Eleventh Amendment bars them.[8]  "The Eleventh Amendment grants states immunity from private suits in federal court without their consent."  *Nuñez v. Ind. Dep't of Child Servs.*, 817 F.3d 1042, 1044 (7th Cir. 2016).  Under *Ex parte Young*, 209 U.S. 123 (1908), the Eleventh Amendment permits suits against government officials insofar as they seek prospective injunctive relief.  *E.g., Nuñez*, 817 F.3d at 1044 (citing *Marie O. v. Edgar*, 131 F.3d 610, 615 (7th Cir. 1997)).

Defendants want the court to answer a question left open in *Tennessee v. Lane*, 541 U.S. 509 (2004).  *See* Mem. Supp. Mot. to Dismiss 17–18.  In *Lane*, the Court "conclude[d] that Title II, as it applies to the class of cases implicating the fundamental right of access to the courts, constitutes a valid exercise of Congress' § 5 authority to enforce the guarantees of the Fourteenth Amendment" and abrogates the state sovereign immunity guaranteed by the Eleventh Amendment.  *Lane*, 541 U.S. at 533–34.  Defendants invite the court to apply the abrogation framework applied in *Lane*, an analysis based on the test of *City of Boerne v. Flores*, 521 U.S. 507, 513 (1997).  *See Lane*, 541 U.S. at 520–23; *see also Bd. of Tr. of Univ. of Ala. v. Garrett*, 531 U.S. 356 (2001).

---

[8] The Eleventh Amendment immunity question defendants raise is jurisdictional, and so the court analyzes it under the Rule 12(b)(1) standard discussed in the text *supra*.  *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 73 (1996); *Nelson v. La Crosse Cty. Dist. Att'y*, 301 F.3d 820, 829 (7th Cir. 2002).

The court must decline defendants' invitation to conduct a *Flores* analysis because the *Ex parte Young* doctrine applies. The complaint seeks only prospective injunctive and declaratory relief. *See* Compl. pp. 25, 26–27. In *Garrett*, the Supreme Court held that Congress did not validly abrogate state sovereign immunity in the employment provision of the ADA, Title I, for claims for money damages. 531 U.S. at 365–74. A footnote in *Garrett* spoke directly to this issue:

> Our holding here that Congress did not validly abrogate the States' sovereign immunity from suit by private individuals for money damages under Title I does not mean that persons with disabilities have no federal recourse against discrimination. Title I of the ADA still prescribes standards applicable to the States. Those standards can be enforced by the United States in actions for money damages, as well as by private individuals in actions for injunctive relief under *Ex parte Young*. In addition, state laws protecting the rights of persons with disabilities in employment and other aspects of life provide independent avenues of redress.

*Id.* at 374 n.9 (internal citations omitted); *see also Nev. Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 748 (2003) (Scalia, J., dissenting) (same for Family and Medical Leave Act). As this language makes clear, Title II suits for prospective equitable relief remain available without regard to the *Boerne* abrogation analysis, which is concerned with claims for money damages. *See id.*; *Amundson*, 721 F.3d at 873.

Plaintiffs raise the *Ex parte Young* issue in their response, but defendants suggest no reason to think *Ex parte Young* is inapposite in their reply, *see* ECF No. 35. Hence defendants' Eleventh Amendment argument must be rejected.[9]

---

[9] Moreover, it should be clear from the foregoing analysis of plaintiff's ADA claims that it would be inappropriate to conduct the *Boerne* analysis at this early stage of proceedings. Applying the *Boerne* test requires a congressional enactment to establish "congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." *Lane*, 541 U.S. at 510 (quoting *Hibbs*, *supra*, 538 U.S. at 728). Yet the scope of the ADA claims here has not been defined with the precision such an analysis would require.

### D. **Illinois Civil Rights Act Claim**

The Illinois Civil Rights Act of 2003 forbids a unit of state, county, or local government to, among other things, "utilize criteria or methods of administration that have the effect of subjecting individuals to discrimination because of their race, color, national origin, or gender." 740 ILCS 23/5(a)(2) (West 2019). Several courts have recognized that the ICRA "was expressly intended to provide a state law remedy that was *identical* to the federal disparate impact canon" under Title VII of the Civil Rights Act of 1964.[10] *Jackson v. Cerpa,* 696 F. Supp. 2d 962, 964 (N.D. Ill. 2010) (emphasis in original) (citing *Ill. Native Am. Bar Ass'n v. Univ. of Ill.*, 856 N.E.2d 460 (Ill. App. Ct. 1st Dist. 2006))*; accord McFadden v. Bd. of Educ. for Ill. Sch. Dist. U-46,* 984 F. Supp. 2d 882, 902 (N.D. Ill. 2013); *McQueen v. City of Chicago*, 803 F. Supp. 2d 892, 907 (N.D. Ill. 2011).

Defendants seek dismissal of plaintiffs' ICRA claims "[f]or many of the same reasons" they contend the ADA claims should be dismissed. Mem. Supp. Mot. to Dismiss 19. Defendants here say the causal link between their conduct and the failure to regulate is too attenuated: they cite the intervention of third parties in gun violence and their connection to the resulting harm. *See id.* The court has already explained that the complaint pleads statistical evidence that adequately establishes a causal relationship between defendants and gun violence. *See* Compl. ¶¶ 16–19.

Defendants rely on one case in support of their argument, an Illinois trial court decision dismissing ICRA and other claims against gun shops and municipalities in which they were located. *Coal. for Safe Chicago Communities v. Vill. of Riverdale*, 2016 WL 1077293 (Cook Cty. Cir. Ct., Ill. Feb. 25, 2016). The court there analyzed the plaintiff's complaint and

---

[10] The court need not determine whether the ICRA remedy is broader than the former Title VII disparate impact remedy because plaintiffs do not argue that it is.

concluded that, despite the statistical evidence and reports pleaded in the complaint showing the village's connection to gun violence, "Plaintiffs' Complaint fails to sufficiently allege a *prima facie* case of disparate impact discrimination under section 5(a)(2) of ICRA, and that Plaintiffs' cannot sufficiently allege a *prima facie* case of disparate impact discrimination." *Id.* at *13. The court used "the three-step burden shifting analysis applied to disparate-impact discrimination claims" under Title VII at summary judgment. *Id.* (citing *Gallagher v. Magner*, 619 F.3d 823, 833 (8th Cir. 2010)); *see also id.* at *4 (setting out the burden-shifting framework).

This court finds *Coalition for Safe Chicago Communities* unpersuasive for several reasons. First, the state trial court cited no Illinois authority requiring a burden-shifting analysis at the pleading stage. *See id.* Second, unlike the reports describe in the complaint here, the reports in *Coalition for Safe Chicago Communities* did "not attribute illegal firearm sales and gun violence to the Defendants' regulation of firearms dealers." *Id.* Third, the *Coalition for Safe Chicago Communities* opinion did not distinguish the most on-point Illinois authority the parties have called to this court's attention. A discussion of that authority follows.

The Illinois Appellate Court allowed an ICRA disparate impact claim brought by residents of underserved Chicago neighborhoods to go forward in *Central Austin Neighborhood Association v. City of Chicago*, 1 N.E.3d 976 (Ill. App. Ct. 1st Dist. 2013). The plaintiffs there alleged that the City of Chicago "use[d] a method of administering responses to 911 calls that has the effect of subjecting the residents of police districts populated mostly by African–Americans and Hispanics to longer waiting periods, on average, for responses to 911 calls." *Id.* ¶ 10. The Illinois Appellate Court reversed a trial court order dismissing the case, holding that it was justiciable. *Id.* ¶ 28. The court stated that "[c]ourts have the power to order appropriate relief for the unjustified disparate impact of a city's administrative practices on certain racial and

ethnic groups." *Id.* In its analysis, the *Central Austin* court relied on the reasoning of *Gallagher v. Magner*, 619 F.3d 823, 834 (8th Cir. 2010):

> In *Gallagher*, the plaintiffs alleged that a municipality aggressively enforced housing regulations, issuing some citations for violations that had not occurred and allowing owners inadequate time to comply with discovered violations. The enforcement practices caused landlords to close some buildings and raise rents on others, resulting in a shortage of affordable housing. The burden of the shortage fell most heavily on African–Americans, who made up a disproportionate percentage of lower-income households in the municipality. Although the court lacked authority to tell the municipality how to enforce its housing code, the court found that the complaint stated a cause of action.

*Id.* ¶ 22 (internal citations omitted). *Central Austin Neighborhood Association* provides this court with the closest guidance it can find as to the types of ICRA claims Illinois courts will allow, and the case shows unambiguously that claims like the ones here are cognizable.

A fourth ground exists for distinguishing the *Coalition for Safe Chicago Communities* opinion. The case was decided under Illinois' fact pleading regime, which is more demanding than federal notice pleading. Statistical evidence may be required to survive summary judgment on a disparate impact claim. *See Jackson*, 696 F. Supp. 2d at 967. But federal notice pleading standards do not require a plaintiff to plead a prima facie case in the complaint, so the plaintiff does not have to plead enough statistical information to support her claim that a policy is facially neutral but has a disparate racial impact. *McQueen*, 803 F. Supp. 2d at 906–07 (relying on *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002), and collecting additional cases). On the contrary, "[t]o survive a motion to dismiss [in federal court], a complaint must identify a specific . . . practice, allege its causation of the disparate impact, and give [d]efendants fair notice of the claim." *Id.*

For the reasons discussed throughout this opinion, the complaint does each of those things. The court will not rehash that discussion here except to make a point underscored by the

33

federal cases applying the ICRA. How a state actor "utilizes" methods or criteria as defined in the ICRA can often be a matter of semantics. Utilization can often be recharacterized as a failure to act. The complaint here points to the defendants' administration of the FOID program and alleges a double negative: "defendants have no reasonable basis for not adopting reasonable gun trafficking regulations." Compl. ¶ 64. Stated affirmatively, defendants administered the FOID program by not adopting certain practices (¶ 28), and that administration has visited harms disproportionately on residents of predominately African-American neighborhoods in Chicago. *Id.* ¶ 64.

Federal cases support the proposition that ICRA liability does not turn on whether the challenged state action is stated in the negative or the positive; liability can arise from the failure to take some step provided that the failure has a disparate impact. *See McFadden*, 984 F. Supp. 2d at 901; *McQueen*, 803 F. Supp. 2d at 907 (allegation that defendants had a "policy of not considering for promotion individuals with recent disciplinary records" stated disparate impact claim).[11]

## IV. Conclusion

For the reasons stated, defendants' motion to dismiss plaintiffs' complaint is granted in part and denied in part. The claims of plaintiffs Reese and Patrick are dismissed for lack of standing.

Dated: September 30, 2019

Joan B. Gottschall
United States District Judge

---

[11] Defendants assert that the Illinois legislature did not intend for ICRA to reach claims like the ones here because Title VII disparate impact jurisprudence does not reach such claims. They cite no Title VII authority supporting that proposition. *See* Mem. Supp. Mot. to Dismiss 20–21; Reply 9–11.

APPEAL,FINNEGAN

# United States District Court
## Northern District of Illinois - CM/ECF LIVE, Ver 6.3.1 (Chicago)
## CIVIL DOCKET FOR CASE #: 1:18-cv-06675
### Internal Use Only

| | |
|---|---|
| Powell et al v. State of Illinois, The et al | Date Filed: 10/03/2018 |
| Assigned to: Honorable Joan B. Gottschall | Jury Demand: Plaintiff |
| Cause: 28:1331 Federal Question: Other Civil Rights | Nature of Suit: 446 Civil Rights: Americans with Disabilities - Other |
| | Jurisdiction: Federal Question |

**Plaintiff**

**Demetria Powell**
*as guardian ad litem and on behalf of her
son D.P.*

represented by    **Thomas Howard Geoghegan**
Despres Schwartz & Geoghegan
77 West Washington Street
Suite 711
Chicago, IL 60602
(312) 372-2511
Email: admin@dsgchicago.com
*LEAD ATTORNEY
ATTORNEY TO BE NOTICED*

**Michael Schorsch**
Despres, Schwartz, & Geoghegan, Ltd.
77 W. Washtington St.
Suite 711
Chicago, IL 60602
(312) 372-2511
Email: mschorsch@dsgchicago.com
*TERMINATED: 02/06/2019*

**Thomas Edward Johnson**
Johnson, Jones, Snelling & Gilbert
36 South Wabash Street
Suite 1310
Chicago, IL 60603
578-8100
Email: tjohnson@jjsgd.com
*ATTORNEY TO BE NOTICED*

**Michael Paul Persoon**
Despres Schwartz & Geoghegan
77 W. Washington Street

Chicago, IL 60602
312 372 2511
Email: mpersoon@dsgchicago.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Tanya Reese**                          represented by   **Thomas Howard Geoghegan**
*as guardian ad litem and on behalf of her*              (See above for address)
*son M.R.*                                               *LEAD ATTORNEY*
*TERMINATED: 09/30/2019*                                 *ATTORNEY TO BE NOTICED*

                                                         **Michael Schorsch**
                                                         (See above for address)
                                                         *TERMINATED: 02/06/2019*

                                                         **Thomas Edward Johnson**
                                                         (See above for address)
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Michael Paul Persoon**
                                                         (See above for address)
                                                         *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Tywanna Patrick**                      represented by   **Thomas Howard Geoghegan**
*as guardian ad litem and on behalf of her*              (See above for address)
*granddaughter J.C. as well as on behalf of*             *LEAD ATTORNEY*
*a class of similarly situated children*                 *ATTORNEY TO BE NOTICED*
*TERMINATED: 09/30/2019*
                                                         **Michael Schorsch**
                                                         (See above for address)
                                                         *TERMINATED: 02/06/2019*

                                                         **Thomas Edward Johnson**
                                                         (See above for address)
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Michael Paul Persoon**
                                                         (See above for address)
                                                         *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**State of Illinois, The**               represented by   **Thomas A. Ioppolo**
                                                         Illinois Attorney General's Office (100

West Randolph)
100 West Randolph Street
13th Floor
Chicago, IL 60601
(312)814-7198
Email: tioppolo@atg.state.il.us
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael T. Dierkes**
Illinois Attorney General's Office (100
West Randolph)
100 West Randolph Street
13th Floor
Chicago, IL 60601
(312) 814-3672
Email: mdierkes@atg.state.il.us
*ATTORNEY TO BE NOTICED*

**Defendant**

**Bruce Rauner**                                          represented by **Thomas A. Ioppolo**
*Governor of the State of Illinois*                       (See above for address)
*TERMINATED: 10/16/2019*                                  *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

**Defendant**

**Illinois Department of State Police, The**             represented by **Thomas A. Ioppolo**
                                                          (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Michael T. Dierkes**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

**Defendant**

**Leo P Schmitz**                                        represented by **Thomas A. Ioppolo**
*Director of the Illinois Department of State*           (See above for address)
*Police*                                                 *LEAD ATTORNEY*
*TERMINATED: 10/16/2019*                                 *ATTORNEY TO BE NOTICED*

**Defendant**

**J.B. Pritzker**                                        represented by **Michael T. Dierkes**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

**Defendant**

Brendan F. Kelly         represented by   **Michael T. Dierkes**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 10/03/2018 | 1 | COMPLAINT filed by Demetria Powell, Tywanna Patrick, Tanya Reese; Jury Demand. Filing fee $ 400, receipt number 0752-15018380.(Persoon, Michael) (Entered: 10/03/2018) |
| 10/03/2018 | 2 | CIVIL Cover Sheet (Persoon, Michael) (Entered: 10/03/2018) |
| 10/03/2018 | 3 | CIVIL Cover Sheet (Persoon, Michael) (Entered: 10/03/2018) |
| 10/03/2018 | | SUMMONS Issued as to Defendants State of Illinois, Bruce Rauner, Leo P Schmitz, illinois department of state police (rc, ) (Entered: 10/03/2018) |
| 10/03/2018 | | CASE ASSIGNED to the Honorable Joan B. Gottschall. Designated as Magistrate Judge the Honorable Sheila M. Finnegan. (lma, ) (Entered: 10/03/2018) |
| 10/04/2018 | | SUMMONS Issued as to Defendants Leo P Schmitz, illinois department of state police (jjr, ) (Entered: 10/04/2018) |
| 10/04/2018 | 4 | ATTORNEY Appearance for Plaintiffs Tywanna Patrick, Demetria Powell, Tanya Reese by Michael Paul Persoon (Persoon, Michael) (Entered: 10/04/2018) |
| 10/04/2018 | 5 | ATTORNEY Appearance for Plaintiffs Tywanna Patrick, Demetria Powell, Tanya Reese by Michael Paul Persoon (Persoon, Michael) (Entered: 10/04/2018) |
| 10/05/2018 | 6 | ORDER: Status hearing set for 12/5/2018 at 9:30 AM in Courtroom 2325. If, by the date of the scheduled status hearing, defendant has not been served, plaintiff should call the courtroom deputy (312-435-5641) to request a new status date. No status hearing should be held until all defendants have been served. Plaintiff is directed to advise the defendants of the status hearing forthwith. Pursuant to LR 5.2(f), a stapled and/or bound paper copy of all electronically filed pleadings, including the complaint, must be delivered to chambers (2356) within one business day of filing. Noncompliance with LR 5.2(f) will result in the imposition of a $200.00 fine payable to the Clerk of the Court, 219 South Dearborn Street, 20th Floor, Chicago, Illinois 60604. Parties are directed to discuss settlement and whether they consent to proceed before the Magistrate Judge. They are further directed to meet and confer regarding a proposed discovery plan. See Judge Gottschall's civil case management packet regarding pretrial case management procedures at: http://www.ilnd.uscourts.gov. Signed by the Honorable Joan B. Gottschall on 10/5/2018.Mailed notice(mjc, ) (Entered: 10/05/2018) |
| 10/09/2018 | 7 | ATTORNEY Appearance for Plaintiffs Tywanna Patrick, Demetria Powell, Tanya Reese by Michael Schorsch (Schorsch, Michael) (Entered: 10/09/2018) |
| 10/09/2018 | 8 | ATTORNEY Appearance for Plaintiffs Tywanna Patrick, Demetria Powell, Tanya Reese by Thomas Howard Geoghegan (Geoghegan, Thomas) (Entered: 10/09/2018) |

| | | |
|---|---|---|
| 10/22/2018 | 9 | SUMMONS Returned Executed by Demetria Powell, Tywanna Patrick, Tanya Reese as to All Defendants. (Attachments: # 1 Supplement Leo P. Schmitz, # 2 Supplement, # 3 Supplement)(Geoghegan, Thomas) (Entered: 10/22/2018) |
| 10/23/2018 | 10 | ATTORNEY Appearance for Defendants Bruce Rauner, State of Illinois, The by Thomas A. Ioppolo (Ioppolo, Thomas) (Entered: 10/23/2018) |
| 10/26/2018 | 11 | ATTORNEY Appearance for Defendant Leo P Schmitz by Thomas A. Ioppolo (Ioppolo, Thomas) (Entered: 10/26/2018) |
| 10/29/2018 | 12 | ATTORNEY Appearance for Defendant Illinois Department of State Police, The by Thomas A. Ioppolo (Ioppolo, Thomas) (Entered: 10/29/2018) |
| 10/29/2018 | 13 | MOTION by Defendants Illinois Department of State Police, The, Bruce Rauner, Leo P Schmitz, State of Illinois, The for extension of time to file answer regarding complaint 1 (Ioppolo, Thomas) (Entered: 10/29/2018) |
| 10/29/2018 | 14 | NOTICE of Motion by Thomas A. Ioppolo for presentment of motion for extension of time to file answer 13 before Honorable Joan B. Gottschall on 11/2/2018 at 09:30 AM. (Ioppolo, Thomas) (Entered: 10/29/2018) |
| 11/01/2018 | 15 | MINUTE entry before the Honorable Joan B. Gottschall: Defendants' unopposed motion for extension of time to file answer 13 is granted. Defendants' deadline to answer or otherwise plead to the complaint 1 is extended to and including 12/14/18. The motion hearing set for 11/2/18 is stricken; no appearance required. Due to the extension, the initial status conference set for 12/5/18 is stricken and reset to 12/19/18 at 9:30 a.m. Mailed notice (mjc, ) (Entered: 11/01/2018) |
| 11/09/2018 | 16 | MOTION by Plaintiff Demetria Powell to appoint Guardian ad litem (Johnson, Thomas) (Entered: 11/09/2018) |
| 11/09/2018 | 17 | NOTICE of Motion by Thomas Edward Johnson for presentment of motion to appoint guardian/attorney ad litem 16 before Honorable Joan B. Gottschall on 11/16/2018 at 09:30 AM. (Johnson, Thomas) (Entered: 11/09/2018) |
| 11/15/2018 | 18 | MINUTE entry before the Honorable Joan B. Gottschall: Plaintiff's agreed motion to appoint guardians ad litem to prosecute this case on behalf of the minor plaintiffs under Fed. Rule of Civil Procedure 17(c)(2) 16 is granted. Motion hearing set for 11/16/18 is stricken; no appearance required. Mailed notice (mjc, ) (Entered: 11/15/2018) |
| 12/11/2018 | 19 | MOTION by Defendants Illinois Department of State Police, The, Bruce Rauner, Leo P Schmitz, State of Illinois, The for extension of time to file answer regarding complaint 1 (Ioppolo, Thomas) (Entered: 12/11/2018) |
| 12/11/2018 | 20 | NOTICE of Motion by Thomas A. Ioppolo for presentment of motion for extension of time to file answer 19 before Honorable Joan B. Gottschall on 12/14/2018 at 09:30 AM. (Ioppolo, Thomas) (Entered: 12/11/2018) |
| 12/12/2018 | 21 | MINUTE entry before the Honorable Joan B. Gottschall: Defendants' motion for extension of time to answer or otherwise plead by 1/31/19 19 is granted. Motion hearing set for 12/14/18 is stricken; no appearance required.Mailed notice (mjc, ) (Entered: 12/12/2018) |

| 12/13/2018 | 22 | MINUTE entry before the Honorable Joan B. Gottschall: On the court's own motion, the status hearing set for 12/19/18 is stricken and reset to 2/1/19 at 9:30 a.m.Mailed notice (mjc, ) (Entered: 12/13/2018) |
|---|---|---|
| 12/28/2018 | 23 | ATTORNEY Appearance for Plaintiffs Tywanna Patrick, Demetria Powell, Tanya Reese by Thomas Edward Johnson (Johnson, Thomas) (Entered: 12/28/2018) |
| 01/31/2019 | 24 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM by Defendants Illinois Department of State Police, The, State of Illinois, The, Leo P Schmitz, Bruce Rauner , MOTION by Defendants Illinois Department of State Police, The, State of Illinois, The, Leo P Schmitz, Bruce Rauner to dismiss for lack of jurisdiction (Ioppolo, Thomas) (Entered: 01/31/2019) |
| 01/31/2019 | 25 | MEMORANDUM by Illinois Department of State Police, The, Bruce Rauner, Leo P Schmitz, State of Illinois, The in support of Motion to Dismiss for Failure to State a Claim,, motion to dismiss/lack of jurisdiction, 24 (Ioppolo, Thomas) (Entered: 01/31/2019) |
| 01/31/2019 | 26 | NOTICE of Motion by Thomas A. Ioppolo for presentment of Motion to Dismiss for Failure to State a Claim,, motion to dismiss/lack of jurisdiction, 24 before Honorable Joan B. Gottschall on 2/6/2019 at 09:30 AM. (Ioppolo, Thomas) (Entered: 01/31/2019) |
| 02/01/2019 | 27 | MINUTE entry before the Honorable Joan B. Gottschall: Status hearing held on 2/1/19. Defendants' motion to dismiss is briefed as follows: response due 3/20/19; reply due 4/3/19. As discussed in open court, if the parties believes that a referral to the magistrate judge would be helpful, they should contact the courtroom deputy at (312) 435-5641. Defendants' oral motion to file a brief in excess of 20 pages is granted. Plaintiffs are given leave to file equal number of pages. No appearance is required on 2/6/19. The court will set further dates as necessary when it rules on the motion to dismiss.Mailed notice (mjc, ) (Entered: 02/04/2019) |
| 02/05/2019 | 28 | MOTION by Attorney Michael A. Schorsch to withdraw as attorney for Tywanna Patrick, Demetria Powell, Tanya Reese. No party information provided (Schorsch, Michael) (Entered: 02/05/2019) |
| 02/05/2019 | 29 | NOTICE of Motion by Michael Schorsch for presentment of motion to withdraw as attorney 28 before Honorable Joan B. Gottschall on 2/15/2019 at 09:30 AM. (Schorsch, Michael) (Entered: 02/05/2019) |
| 02/06/2019 | 30 | MINUTE entry before the Honorable Joan B. Gottschall: Plaintiff's motion to withdraw as counsel 28 is granted. Attorney Michael Schorsch may withdraw his appearances on behalf of the plaintiffs. Motion hearing set for 2/15/19 is stricken; no appearance required.Mailed notice (mjc, ) (Entered: 02/06/2019) |
| 03/20/2019 | 31 | MEMORANDUM by Demetria Powell in Opposition to Motion to Dismiss for Failure to State a Claim,, motion to dismiss/lack of jurisdiction, 24 (Johnson, Thomas) (Entered: 03/20/2019) |
| 04/01/2019 | 32 | MOTION by Defendants Illinois Department of State Police, The, State of Illinois, The, J.B. Pritzker, Brendan F. Kelly for extension of time to file *their Reply Memorandum in Support of their Motion to Dismiss (Unopposed)* (Ioppolo, |

| | | Thomas) (Entered: 04/01/2019) |
|---|---|---|
| 04/01/2019 | 33 | NOTICE of Motion by Thomas A. Ioppolo for presentment of motion for extension of time to file 32 before Honorable Joan B. Gottschall on 4/10/2019 at 09:30 AM. (Ioppolo, Thomas) (Entered: 04/01/2019) |
| 04/02/2019 | 34 | MINUTE entry before the Honorable Joan B. Gottschall: Defendants' unopposed motion for extension of time 32 is granted. The deadline to file a reply in support of defendants' motion to dismiss 24 is extended to and including 4/17/19. The motion hearing set for 4/10/19 is stricken; no appearance required. Mailed notice (mjc, ) (Entered: 04/02/2019) |
| 04/17/2019 | 35 | REPLY by Defendants Illinois Department of State Police, The, Brendan F. Kelly, J.B. Pritzker, State of Illinois, The to Motion to Dismiss for Failure to State a Claim,, motion to dismiss/lack of jurisdiction, 24 (Ioppolo, Thomas) (Entered: 04/17/2019) |
| 09/30/2019 | 36 | MINUTE entry before the Honorable Joan B. Gottschall: Enter memorandum opinion and order granting in part and denying in part defendants' motion to dismiss 24 . In accordance with the memorandum opinion and order, plaintiffs Patrick and Reese are dismissed for lack of standing. A status hearing is set for 11/15/19 at 9:30 a.m. Mailed notice (mjc, ) (Entered: 09/30/2019) |
| 09/30/2019 | 37 | MEMORANDUM Opinion and Order Signed by the Honorable Joan B. Gottschall on 9/30/2019. Mailed notice(mjc, ) (Entered: 09/30/2019) |
| 10/01/2019 | 38 | ATTORNEY Appearance for Defendants Illinois Department of State Police, The, Brendan F. Kelly, J.B. Pritzker, State of Illinois, The by Michael T. Dierkes (Dierkes, Michael) (Entered: 10/01/2019) |
| 10/15/2019 | 39 | MOTION by Defendants Illinois Department of State Police, The, Brendan F. Kelly, J.B. Pritzker, State of Illinois, The for reconsideration and to dismiss this action as moot (Dierkes, Michael) (Entered: 10/15/2019) |
| 10/15/2019 | 40 | NOTICE of Motion by Michael T. Dierkes for presentment of motion for miscellaneous relief 39 before Honorable Joan B. Gottschall on 10/18/2019 at 09:30 AM. (Dierkes, Michael) (Entered: 10/15/2019) |
| 10/15/2019 | 41 | MOTION by Plaintiff Demetria Powell to substitute party *defendants* (Johnson, Thomas) (Entered: 10/15/2019) |
| 10/15/2019 | 42 | NOTICE of Motion by Thomas Edward Johnson for presentment of motion to substitute party 41 before Honorable Joan B. Gottschall on 10/18/2019 at 09:30 AM. (Johnson, Thomas) (Entered: 10/15/2019) |
| 10/16/2019 | 43 | MINUTE entry before the Honorable Joan B. Gottschall: Defendants' motion for reconsideration and to dismiss this action as moot 39 is briefed as follows: response due 11/1/19; reply due 11/8/19. The motion hearing set for 10/18/19 is stricken. The court will rule by mail. Mailed notice (mjc, ) (Entered: 10/16/2019) |
| 10/16/2019 | 44 | MINUTE entry before the Honorable Joan B. Gottschall: Plaintiff's uncontested motion to substitute defendants in their official capacities 41 is granted. The motion hearing set for 10/18/19 is stricken; no appearance required. Mailed notice |

| | | |
|---|---|---|
| | | (mjc, ) (Entered: 10/16/2019) |
| 10/28/2019 | 45 | NOTICE of appeal by Illinois Department of State Police, The, Brendan F. Kelly, J.B. Pritzker, State of Illinois, The regarding orders 37 Filing fee $ 505, receipt number 0752-16381150. Receipt number: n (Dierkes, Michael) (Entered: 10/28/2019) |
| 10/28/2019 | 46 | MOTION by Defendants Illinois Department of State Police, The, Brendan F. Kelly, J.B. Pritzker, State of Illinois, The for leave to appeal (Dierkes, Michael) (Entered: 10/28/2019) |
| 10/28/2019 | 47 | NOTICE of Motion by Michael T. Dierkes for presentment of motion for leave to appeal 46 before Honorable Joan B. Gottschall on 11/6/2019 at 09:30 AM. (Dierkes, Michael) (Entered: 10/28/2019) |
| 10/29/2019 | 48 | NOTICE of Appeal Due letter sent to counsel of record regarding notice of appeal 45 (las, ) (Entered: 10/29/2019) |