**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **DEMETRIA POWELL, et al.** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **No. 18 C 06675** |
| | ) | |
| **v.** | ) | **Judge Gottschall** |
| | ) | |
| **THE STATE OF ILLINOIS, et al.** | ) | |
| | ) | |
| **Defendants.** | ) | |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR**
**RECONSIDERATION AND TO DISMISS THIS ACTION AS MOOT**

**I.      INTRODUCTION**

Relying upon the Illinois Firearm Dealer License Certification Act ("the License Act"),

***430 ILCS 68/5 et seq.***, the defendants now say this case is moot. It's not, for at least four reasons:

**First,**  unlike in ***Burbank v Twomey, 520 F.2d 744 (7th Cir. 1975)*** and the other cases the

defendants cite (Defts. Mem, at pp. 7-9), the License Act does not "provide all the relief [the

plaintiff] requested", ***at 748***, but, in fact, falls far short. For example, the plaintiff's complaint

seeks  to bar the purchasers of "crime guns" from purchasing more weapons (by establishing a

"no buy" list), so as to curb the flow of guns to the secondary market where criminals acquire

them. The License Act does not address this. The plaintiff seeks a meaningful plan to recover the

FOID cards and guns from those persons (concentrated in high crime neighborhoods) who have

lost their right to possess guns on account of felony convictions, domestic violence convictions,

assault and aggravated assault convictions, and mental health problems. The License Act does

not address this issue, and the State Police have done nothing to recover these guns. The plaintiff

1

seeks to ban ammunition sales to those with revoked FOID cards or cards that should be revoked. The License Act does not address this issue either. See, the discussion at pp. 9-14 below. This relief goes far beyond the License Act and plaintiff's experts will testify that such relief will make a real difference in terms of the number of "crime guns" used on the street.

**Second,** the License Act has not yet been implemented and therefore has no effect whatsoever presently on the plaintiff or similarly situated children. While the Governor signed the License Act on January 18, 2019, the Illinois State Police did not even propose regulations until August 23, 2019, and they will not be finalized until after public comment, public hearing, further revision by the State Police and public notice of any changes, a second public comment period, and review by the Joint Committee on Administrative Rules ("JCAR", a body of twelve legislators) which may object to, revise or approve the proposed regulation. ***See, 5 ILCS 100/5-35 and 5-40*** (describing the notice and comment rules applicable to what the State Police have proposed here), and ***ILCS 100/5-100, 5-110 and 5-115*** (setting out the rights of JCAR to object to regulations or to force modification by the agency proposing the regulations).[1] Thus, there is no assurance that the proposed regulations discussed at length by the defendants (Defs.' Mem., at 9-14) will ever become law, much less in the form the Illinois State Police have proposed. Nor is there any indication that the defendants will enforce these regulations if and when approved any more seriously than the obligations to revoke cards and recover guns under the FOID Act, which defendants have notoriously failed to enforce, even where there is ample statutory authority to do

---

[1] The regulatory process can take from 90 to 365 days, unless JCAR objects to the rule, which may cause the regulations to never be adopted. http://www.icca-10.org/ILRulemakingProcess.pdf; see also, http://www.ilga.gov/commission/jcar/ILRulemakingProcess.pdf.

so on the books. As such, even if the License Act provided the relief the plaintiff seeks (which it does not), the defendants have not yet voluntarily ceased the conduct challenged in the complaint.

**Third**, as the defendants concede, the License Act itself has also been challenged by Illinois gun dealers in ***BFF Firearms, LLC v Raoul, 2019 CH 253***, now pending in the Circuit Court for the Seventh Judicial Circuit, sitting in Springfield. The plaintiffs there seek both preliminary and permanent injunctive relief against the enforcement of the statute. A copy of their complaint is attached as Exh. A hereto. Thus, even if the License Act provided the relief the plaintiff seeks (which it does not) and it had been implemented by effective and binding regulations (which it has not), there is a real, and not speculative, likelihood that the conduct challenged in the complaint will reoccur, as the License Act may be found invalid.

**Fourth,** while arguing to this Court that the case is moot, the defendants have now filed an appeal, in which they contend that the relief sought here is barred by the Eleventh Amendment. The predicate of that appeal is apparently that under the abrogation framework found in ***Tennessee v Lane, 541 U.S. 509 (2004)***, the relief the plaintiff seeks here goes beyond a reasonable accommodation or somehow transforms a State program in ways that the State opposes and has no intention of permitting. The defendants should be judicially estopped from simultaneously arguing that they have provided all of the relief the plaintiff seeks but that relief is constitutionally barred as too broad. ***See, Grochocinski v Mayer, Brown, Rowe & Maw, 719 F.3d 785, 794 (7th Cir. 2013)***.

**The License Act Is Not a Basis for the Court to Reconsider Its September 30, 2019 Opinion.** The defendants should not be able to seek reconsideration based on the License Act

anyway. The Act was signed by the Governor on January 18, 2019, before the defendants filed their original motion to dismiss in this case on February 6, 2019. They could have raised the Act and suggested the case was moot then (or during the months the motion was pending and not yet ruled upon), but they chose not to do so. It is improper to now suggest that the License Act is something "new" that warrants reconsideration of the Court's September 30, 2019 opinion. *See, Alarm Detection Systems, Inc. v Village of Schaumburg, 2018 U.S. Dist. LEXIS 168170 (N.D. Ill., 2018), at p. 8* (summarizing the law on motions to reconsider, and noting that a Court's opinions "are not intended as mere first drafts, subject to revision and reconsideration at a litigant's pleasure", quoting *Quaker Alloy Casting Co. v Gulfco Industries, Inc., 123 F.R.D. 282, 288 (N.D. Ill. 1988),* that a motion for reconsideration does not "provide a vehicle for a party to undo its own procedural failures, and it certainly does not allow a party to introduce new evidence or advance arguments that could and should have been presented to the district court prior to its judgment", quoting *Moro v Shell Oil Co., 91 F.3d 872, 976 (7ᵗʰ Cir. 1996),* and that motions to reconsider are properly used to identify a "manifest error of law or fact or present newly discovered evidence").

The defendants have opted to protract these proceedings, by sequential motions to dismiss, and now by interlocutory appeals, designed to stay all proceedings (Defs' Mem., at 2, n.2). But every day in plaintiff D.P.'s Austin neighborhood the shooting and the killing continue[2].

---

[2] On July 8, 2019, the Erikson Institute published an analysis showing that even with some decline in the number of shootings in Chicago (from previous 2016 highs), 7% of all Chicago children under five years old (totaling 12,248 children) lived in community areas of the city that each experienced over 30 homicides in 2018 alone. The crisis was most severe in Austin, where D.P. lives, as Austin was the scene of the most murders of any area of the city in 2018 (56), and also the community area with the most children under the age of five. See, https://www.erikson.edu/wp-content/uploads/2019/07/7.22.19-Homicide-press-release.pdf; and

The devastating effects of exposure to this gun violence multiply[3]. The plaintiff therefore intends to move forward by very shortly filing a motion for class certification and a request for expedited discovery. The defendants' motion to reconsider should promptly be denied, so that the Court can address the merits of the complaint.[4]

## II.    THE LICENSE ACT AND THE PROPOSED REGULATIONS DO NOT PROVIDE ALL OF THE RELIEF THE PLAINTIFF SEEKS AND THUS DO NOT MOOT THE CONTROVERSY

No one can argue with the black letter law that: "A case becomes moot when 'a party with standing at the inception of the litigation loses it due to intervening events'" *Pavarti Corp. v City of Oak Forest, 630 F.3d 512, 516 (7th cir. 2010)* (Defs.' Mem., at 7). But the intervening events must provide the plaintiff with *all of the relief* he or she is seeking. *See, St. John's*

---

http://www.chicagotribune.com/news/breaking/ct-chicago-children-violence-homicide-trauma-20 190715-4fp2kqtaprgjvht6cl6ihsply4-story.html

[3] In addition to all of the studies cited in the complaint, see, e.g. the recently published studies in Health Affairs, Vol. 38, No. 10 (October 7, 2019) by Tung, et al., "Social Isolation, Loneliness and Violence Exposure in Urban Adults" (linking exposure to gun violence with pronounced increases in social isolation and loneliness, which are both related to mortality): covered in the Chicago Tribune, see,
http://www.chicagotribune.com/lifestyles/ct-life-loneliness-hypervigilance-linked-to-violence-tt-20191024-20191024-bkk2vcedtraivhjoidekwqlizu-story.html; and Smith, et al "Keeping Your Guard Up: Hypervigilance Among Urban Residents" (concluding that the kind of hypervigilance associated with PTSD increases by an average of 9.8 points (on a 100 hundred point scale) for those in Chicago who are exposed to ongoing gun violence).

[4] The defendants suggested in their motion that they "intend to directly appeal the Court's Eleventh Amendment ruling under *28 USC §1291* and the collateral order doctrine" and will seek leave to file an interlocutory appeal on all other issues in the case. (Defs.' Mem, at 2, fn. 2). Good to their word, they now have done both, and, to top it off, sought a stay in the District Court, all to delay any meaningful relief. Plaintiff will vigorously oppose both the appeal of the Eleventh Amendment question the Court carefully decided (Mem. Opinion at pp. 29-30), as it is premature and without merit, the request for interlocutory appeal, and the stay. Piecemealing this litigation does a great disservice to the plaintiff, who needs prompt discovery and relief.

*United Church of Christ v City of Chicago, 502 F.3d 616, 626 (7th Cir. 2007)* (case moot only when "plaintiff's entire demand is satisfied", so there is no dispute to litigate, as the plaintiff has no remaining stake in the controversy).

Defendants' cases make this clear. So, in *Burbank v Twomey, 520 F.2d 744 (7th Cir. 1975),* cited by defendants at p. 7, a state prisoner sued, alleging a violation of due process, when he was placed in "isolation" for a disciplinary infraction but was not given a complete statement of the reasons for the prison's decision before the imposition of punishment. After the suit was filed, the state prison officials formally adopted a new regulation that the prisoner admitted "provides all the relief he requested", *, at 748*. Given that the plaintiff sought only declaratory and injunctive, the court found the case moot. The same was true in the other cases defendants cite at pp. 7-9 of their Memorandum. *See, Sannon v United States, 631 F.2d 1247 (5th Cir. 1980) (*Haitian refugees' complaint seeking to have their political asylum claims heard by an immigration judge prior to their exclusion [or deportation] hearings mooted by new INS regulation that "afforded each named petitioner... the right to exactly the hearing he sought", *at 1250*); *Rose v Wayne County Airport Authority, 210 F.Supp.3d 870 (E.D.Mich., 2016)* (disabled passengers' ADA claim challenging rule that bus operators carrying the disabled could not stop at Door 402, the location closest to the airport entrance, when non-disabled passengers could exit at Door 402; mooted when the airport authority changed the rule to permit the operators carrying disabled passengers to stop at Door 402); and *Moust v Margolis, 154 F.Supp.3d 719 (N.D. Ill., 2016), aff'd Berron v Concealed Carry Licensing Review Board, 825 F.3d 843 (7th Cir. 2016)* (plaintiffs sued when their applications for concealed carry permits were denied on the basis of objections that they never saw and thus could not address; case mooted

when the State Police adopted new regulations which "speak directly to Plaintiff's complaints by providing applicants with notice of pending objections to their applications and opportunities to be heard once those objections have been raised", *at 727*).

Here, the plaintiff has alleged that Illinois gun dealers have sold 40% of the "crime guns" recovered at crime scenes in Chicago, and the rampant use of these guns has caused severe trauma and permanent impairment among African American children, particularly in five neighborhoods of the city (pars. 1-3, 21-28, 58-64 of the complaint). The plaintiff seeks to stem the flow of these guns into the city. The legislature has provided ample authority (even prior to the passage of the License Act) under which the State Police can adopt and enforce meaningful rules "to prevent the possession of guns by persons who have not been screened and do not have a FOID card...[and] to prevent guns from being sold unlawfully at federally-licensed gun shops, and on the secondary gun market, as well as to prevent guns from being lost or stolen from gun dealers or private citizens" (par. 25). The plaintiff further alleges that the "State Police, however, have never adopted regulations that meaningfully keep guns out of the hands of non-licensed persons" (par. 26). It is this failure to adopt meaningful rules that allows federally-licensed gun dealers and gun show promoters to "continue, year after year, to supply guns that fuel the epidemic of gun violence taking place in African-American neighborhoods of Chicago, either directly or through the secondary market, where the large majority of 'crime guns' recovered by Chicago police were purchased" (par. 26). As the Court has already found, the consequence of this failure on the part of the State Police (if proved) creates liability for the state and state officials under both the Americans with Disabilities Act and the Illinois Civil Rights Act.

If the License Act survives the challenge the gun dealers have brought in the Sangamon

County state court, and if it is ever actually implemented through the final adoption of meaningful regulations that are actually enforced by the State Police (none of which has yet occurred), it will provide some relief to the plaintiff. The plaintiff here wholeheartedly endorses the new Act, but the Act focuses only on what might be described as the "lowest hanging fruit" in terms of gun trafficking in Illinois----the licensing of owners and employees, security at the gun shops, and record keeping. In particular:

**Licensing.** To obtain and maintain a state license, the License Act requires gun dealers to have a valid federal firearms license issued by the ATF, *430 ILCS 68/5-10*, both owners and employees must have valid Illinois FOID cards, *430 ILCS 68/5-40*, and employees must receive two hours of training annually on the legal requirements and responsible business practices related to the sale of guns, *430 ILCS 68/5-30.* The plaintiff sought compliance with these basic licensing rules (for the most part, already found in existing law) in par. 28(A) of his complaint.

**Security.** The Act also requires gun dealers to maintain video security systems covering those areas of the premises where guns are sold and stored, *430 ILCS 68/5-50(a)*, alarm monitoring systems to detect break-ins, *430 ILCS 68/5-50(c)*, and to file and secure State Police approval of a safe storage plan for the guns in the dealer's inventory, *430 ILCS 68/5-55*. All of these provisions are aimed at preventing the loss or theft of guns from gun stores. As plaintiff noted at par. 20 of his complaint, 1200 guns were lost or stolen from Illinois gun dealers during the 2013-2016 period. Plaintiff sought this kind of relief in par. 28(B), (G), and (H) of the complaint and, if enforced, these reforms will be helpful.

**Record Keeping.** The Act also requires an electronic-based record system to track the firearms received and sold by gun dealers, *430 ILCS 68/5-60.* While such a system is already

required under federal law, using ATF paperwork and the FOID screening system, if this provision of the law is meaningfully implemented (which is far from clear even in the proposed regulations), it would assist in identifying sales of weapons "off the books" and in better tracking sales of "crime guns" back to their original point of sale, both of which are part of the relief plaintiff seeks in par. 28(I) and (J) of the complaint.

**Enforcement.** The Act empowers the State Police to inspect gun dealers to ensure compliance with these rules, ***430 ILCS 68/5-35***, and to condition the renewal of a license or otherwise impose penalties on gun dealers for failure to comply with these rules, ***430 ILCS 68/5-85(a)***. Nor may a gun dealer whose license is revoked, seek a new license under a different name, ***430 ILCS 68/5-15(h).*** We do not know what resources the State Police will commit to this effort but if it is sufficient, the relief plaintiff sought in par. 28 (K) and (L) may be achieved..[5]

The problem is that the License Act does not address the most important sources of "crime guns" on the streets of Chicago: 1) "straw purchasing" and the unlawful sale of guns on the secondary market; 2) the recovery of guns from those whose FOID cards have been revoked (because of felony convictions, the issuance of orders of protection, mental health admissions or issues, and other reasons); and 3) other important issues. The plaintiff's complaint addresses these very important issues, see par. 28 (C), (D) and (F).

**"Straw Purchasing"[6] and the Secondary Market**. The Act does require the State Police

---

[5] The ATF does not have the resources to inspect more than 5% of the gun dealers it licenses (par. 21 of the complaint), though inspections are authorized under federal law.

"Straw purchasing" refers to the purchase of a gun by a licensed FOID card holder who has no intention of keeping the gun, but instead sells or gives the gun to a second person who cannot obtain a FOID card, usually because of a felony criminal record.

to "develop and implement by rule statewide training standards for assisting licensees in recognizing indicators that would lead a reasonable dealer to refuse sale of a firearm, including, but not limited to, indicators of a straw purchase", *430 ILCS 68/5-60*. Such training can be helpful, and was sought by the plaintiff in par. 28 (E), but neither the Act, nor the proposed implementing regulation *20 Ill.Adm.Code §1232.90* provide any guidance as to what this training would consist of. In any event, training of gun shop employees, who have an incentive to sell as many guns as possible, will have only a very small effect on "straw purchasing". The ATF experts who will testify for the plaintiff insist that the only effective way to curtail "straw purchasing" is the relief set out in par. 28 (C) and (D) of the complaint.

In these paragraphs of the complaint, plaintiff seeks relief that starts with the thousands of "crime guns" recovered in Chicago that are traced back to Illinois gun dealers. Where the FOID card holder who originally purchased the "crime gun" has not reported the loss or theft of the gun to law enforcement authorities, in accordance with *720 ILCS 5/24-4.1* or transferred the gun by sale or gift in accordance with *430 ILCS 65/3* (thus establishing that the re-sale was not an unlawful secondary market sale)-----prior to the recovery of the "crime gun", that person will be prohibited from purchasing another gun in Illinois. This is the only effective, objective and easily administered way to diminish the sale of guns that later appear as "crime guns" on the secondary market. It cuts off an important access point through which felons and others not entitled to possess guns nonetheless access them. This exact "NO BUY" list has recently been adopted by ordinance in Lyons, Illinois (where one of the seven largest gun dealers—Midwest Sporting Goods-----is located), as a result of separate state court litigation, *Coalition for Safe Chicago Communities v Village of Lyons, 15 CH 10390.* A copy of the Settlement Agreement and

10

Release, and the Lyons ordinance adopted is attached as Exh. B hereto (see, Section 4(a)(2)(ii) of the ordinance). Imposing this requirement on one gun store, however, is not very effective, when the "straw purchaser" of a crime gun can simply go to another gun store to continue to buy weapons that end up on the streets. A statewide system to track "crime guns" and disqualify their original purchasers from buying additional guns anywhere in the state would have a dramatic effect on the flow of guns into Chicago.[7] Neither the License Act, nor the proposed regulations require that these "crime gun" purchasers be placed on a no buy list in Illinois.

 **Guns in the Hands of Revoked FOID Card Holders.** In April of 2012, the Illinois Auditor General found that during the preceding three years, 20,227 persons had their FOID cards revoked statewide and were no longer permitted to possess weapons. Under *430 ILCS 65/8,* FOID cards can be revoked for many reasons, but most commonly because the FOID card holder has been convicted of a felony; certain other crimes including domestic violence; or has a mental health condition that poses a clear danger to the cardholder or others. The Auditor General found that only 30% of revoked FOID cards were returned to the State Police. A copy of the synopsis of this report is attached as Exhibit C hereto.[8]

 More recent Illinois State Police data shows that 5,019 Chicagoans had their FOID cards

---

[7] While "straw purchasers" may still find their way to Indiana, this Court has noted that other states' failure meaningfully to regulate gun trafficking is no excuse for Illinois not to attempt to limit the flow of guns into the City from Illinois gun dealers. *See, Mem. Opinion (Sept. 30, 2019, at pp. 19-20).*

[8] The situation has not improved since 2012, as the State Police reported that statewide 10,818 FOID cards were revoked in 2018, but only 3,469 cards were returned (32%), and only 2,616 Firearm Disposition Records were received (demonstrating that guns were no longer in the hands of the revoked FOID card holders). See, https://www.isp.state.il.us/media/pressdetails.cfm?ID=1019.

revoked from March of 2015 to March of 2019, and 84% (4,208 persons) did not return their

FOID cards. More disturbing is that of these 5,019 persons, 1,680 appeared on the Firearm

Transfer Inquiry Program ("FTIP"), which shows that they purchased one or more weapons.[9]

Even more disturbing is that those persons who fail to return their FOID cards and fail to account

for their unlawful weapons are concentrated in the highest crime areas of Chicago. See, the

summary of this data, attached as Exhibit D.[10]

　　　The Illinois State Police do nothing to recover these FOID cards and, more importantly,

the owners' guns, other than to send out a notice asking for a return of the FOID card. Plaintiff

seeks adoption of a meaningful plan to recover these FOID cards and the guns the owners

unlawfully maintain, par. 28 (F). The defendants address FOID card recovery in the section of

their brief on the proposed regulations (Defts.' Mem., at 11-12), however, they do not point to

anything in the License Act or the proposed regulations bearing on this issue, but only the pre-

existing FOID Act, which requires that a revoked FOID card holder return his card. The problem

is revoked FOID card holders do not do this. They hold onto their FOID card and their guns.[11]

---

[9] The Illinois State Police do not share important parts of the FTIP data with local law enforcement, so one cannot determine how many guns are in the hands of these revoked FOID card holders. Nor do the gun dealers record with accuracy the information required by the FTIP program.

[10] The Tribune reported that more than 34,000 Illinois residents had their FOID cards revoked over a four year period from 2015 to 2019. Nearly 27,000 had not informed law enforcement authorities about the whereabouts of their weapons. See, http://www.chicagotribune.com/news/ct-met-illinois-guns-foid-cards-revoked-20190520-story.html.

[11] There are a host of other sub-issues related to the recovery of guns from revoked FOID card holders, including the failure of circuit court clerks to inform the State Police of mental health commitments (according to the Auditor General's report, only three of the state's 102 counties do this); the failure of the Department of Human Services to inform the State Police of

12

And the defendants have no meaningful program in place to recover the FOID cards and the guns, as plaintiff's experts and important law enforcement officials will describe for the Court.

**Other Issues.** The plaintiff seeks to reduce the level of gun violence in Chicago's African-American neighborhoods. Par. 28 of the complaint was not meant to be an exhaustive list of the remedies sought.[12] There are many other forms of relief available in this case that are not addressed by the License Act. One example may suffice. Gun violence cannot occur in Chicago without large amounts of ammunition. The FOID Act provides that: "No person may acquire or possess firearm ammunition within this State without having in his or her possession a FOID Card...", ***430 ILCS 65/2(a)(2).*** Illinois gun dealers require an ammunition purchaser to show a FOID card (if they follow the law), but do not contact the State Police to determine whether the FOID card is still valid of if it should be revoked (e.g. because the owner appears on a list of those recently convicted of a felony). Plaintiff seeks a requirement that ammunition

---

mental health admissions at private hospitals and nursing homes; the failure of the State Police to give notice to local law enforcement or to themselves object to petitions to restore FOID card eligibility to someone with a history of mental illness and/or commitment; the failure of the State Police to provide meaningful FTIP data to local law enforcement so that it can prioritize which revoked FOID card holders to visit, if local law enforcement makes any effort in this regard (currently only the Sheriff of Cook County makes any effort to recover these cards and guns); and the failure of the State Police to share information about private gun sales and transfers with local law enforcement.

[12] We are only at the pleading stage and ***Fed. R. Civ. Proc. 8(a)(2)*** merely requires a "short and plain statement of the claim showing that the pleader is entitled to relief", and need not specify all of the detailed relief sought. Indeed, without discovery, it would be virtually impossible to identify all of the relief that would be appropriate. Plaintiff need only provide facts sufficient to show a plausible claim for relief. ***Bell Atlantic Corp. v Twombly, 550 U.S. 544 (2007);*** and ***Ashcroft v Iqbal, 556 U.S. 662 (2009)***. This Court's September 30, 2019 ruling demonstrates that plaintiff has satisfied this standard.

purchasers, like gun purchasers, must have their FOID cards run through the State Police screening system. Nothing in the License Act or the proposed regulations requires this.

## III. THE LICENSE ACT HAS NEITHER SURVIVED THE PENDING LEGAL CHALLENGE NOR BEEN FINALLY IMPLEMENTED AND THEREFORE THIS CASE IS NOT MOOT

It is well-established that where a government defendant voluntarily ceases its allegedly illegal conduct, its action does not moot litigation. *United States v W.T. Grant Co., 345 U.S. 629, 632 (1953)*; *LAF v VA, 2018 U.S. Dist. LEXIS 107366 (N.D. Ill. 2018)*. Even where a defendant repeals an ordinance that is the subject of a federal lawsuit, the claim may not be moot. *See, Weigand v Village of Tinley Park, 129 F.Supp.2d 1170, 1172-73 (N.D. Ill., 2001)*. The key is whether the defendant will be free to return to its old ways once it is not under threat of suit. *United States v Raymond, 228 F.3d 804, 813-14 (7th Cir. 2000)* sets out six factors to consider.

Here, the defendants have not ceased their illegal conduct (as that term is used in *W.T. Grant Co.*, i.e. they have not yet provided the reasonable accommodation to the needs of the plaintiff and other children required by the ADA and ICRA under these circumstances)----even in terms of the limited licensing, security, record keeping and enforcement provisions of the License Act, as the License Act has not yet been implemented. Proposed regulations have been published but they are far from final or adopted, and the State Police have thus not begun to enforce the terms of the statute (if they are ever given the resources to do so). Independently, the License Act has been challenged in court, in a lawsuit that seeks to invalidate the Act. Thus, we do not know if the Act will withstand challenge or if any regulations promulgated under the Act will ever take effect.

To be sure, if the License Act is sustained by the courts and final regulations are adopted,

14

implemented and enforced, this would represent a permanent change in the defendants' position with respect to the limited issues covered by the Act.[13] But we are not there, and there is every reason to believe that those opposed to regulating gun trafficking in Illinois will derail the License Act. Until we know we have a valid Act and it is fully implemented, this case is not moot, even with respect to the limited licensing, security, record keeping and enforcement provisions of the License Act.

## IV.    CONCLUSION

For the reasons set forth above, the plaintiff prays that the Court deny the defendants' motion for reconsideration and motion to dismiss this action as moot.


/s/ Thomas E. Johnson
One of the Attorneys for the Plaintiff



THOMAS GEOGHEGAN
MICHAEL P. PERSOON
Despres, Schwartz & Geoghegan
77 W. Washington Street, Suite 711
Chicago, IL 60602
(312) 372-2511

THOMAS E. JOHNSON
Johnson, Jones, Snelling, Gilbert & Davis
36 S. Wabash Avenue, Suite 1310
Chicago, IL 60603
(312) 578-8100


Attorneys for the Plaintiffs

---

[13] It would not be a mere informal promise that could change, *see, e.g. United States v Concentrated Phosphate Export Ass'n., Inc., 393 U.S. 199 (1968)*, or an order with a brief or limited duration that where upon expiration, the plaintiff would face the same harm, *Rabinowitz v Board of Junior College District No. 508, 507 F.2d 1255 (7th Cir. 1974)*.

15