**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

DEMETRIA POWELL, as guardian ad litem
and on behalf of her son D.P., et al.,

    Plaintiff,

    v.

THE STATE OF ILLINOIS, et al.,

    Defendants.

No. 18-cv-6675

Hon. Joan B. Gottschall

**DEFENDANTS' ANSWER TO CLASS ACTION COMPLAINT**

Defendants State of Illinois, Department of State Police, J.B. Pritzker in his official capacity as Illinois Governor, and Brendan Kelly in his official capacity as Director of the Illinois State Police (or "State Police"), by and through their attorney, Illinois Attorney General Kwame Raoul, answer plaintiffs' class action complaint as follows:

**INTRODUCTION**

1.    Thousands of African-American children in Chicago have endured an epidemic of gun violence for years. Many have been shot, while others have been traumatized when their family members, classmates, and neighbors have been gunned down. The gun violence is not episodic but ongoing, and concentrated in particular African-American neighborhoods. This lawsuit is brought by these children and seeks declaratory and injunctive relief to limit the number of guns flowing into Chicago, and thereby limit the gun violence to which these children are exposed, which is causing them to develop post-traumatic stress disorder and other forms of trauma-related disability.

**ANSWER:**    Defendants admits that this lawsuit seeks declaratory and injunctive relief, and lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations of this paragraph.

2.    Forty per cent (40%) of the guns being used in gun-related crime in Chicago are purchased at gun stores in Illinois, most in suburbs nearby Chicago. Seven gun shops provide most of these weapons. Under current law, and without cost, the Illinois Department of State Police can adopt reasonable regulations that would curtail the gun trafficking by these gun shops, and thereby

1

reduce the gun violence in Chicago, and in turn reduce the terrible effect such gun violence has on the African-American children bringing this case.

**ANSWER:** Defendants admit that they can and have adopted reasonable regulations implementing the Firearm Dealer License Certification Act, 430 ILCS 68/5 *et seq.* *See* https://www.cyberdriveillinois.com/departments/index/register/volume44/register_volume44_iss ue_3.pdf. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations of this paragraph.

3. The defendants' failure to adopt these reasonable regulations constitutes a violation of Title II of the ADA, in that they are failing to offer a reasonable accommodation for the disabilities these plaintiff children suffer and a violation of the Illinois Civil Rights Act, in that the ongoing gun violence, which defendants can curb, has an adverse impact on these African-American children, thus violating their civil rights.

**ANSWER:** Defendants deny the allegations of this paragraph.

## THE PARTIES

### The Plaintiffs

4. Demetria Powell is a twenty-seven year old resident of the Austin neighborhood in Chicago. She works at the United States Postal Service, and has two children, the plaintiff D.P., now eight years old and M.P, now two years old. The father of D.P. and M.P. was shot and killed in the West Garfield Park neighborhood of Chicago on January 30, 2016**.** D.P., then in kindergarten, was present at the murder scene and saw his father's bullet-riddled body. D.P. has experienced enduring gun violence, including the murder of a Chicago Public School employee at his school later in the spring of 2016, the killing of an older classmate in the spring of 2017, and the wounding of other classmates. During the first six months of 2018 alone, there were three non-fatal shootings and one fatal shooting within a two block radius of his home in the Austin neighborhood. Gun shots can be heard most nights on the block where he lives. He has been diagnosed with post-traumatic stress disorder ("PTSD"), to which his exposure to gun violence as significantly contributed. Demetria Powell brings this case on behalf of her son D.P. as *guardian ad litem* under Fed. R. Civ. Proc. 17(c).

**ANSWER**: Defendants admit that Demetria Powell purports to bring this case on behalf of her son D.P. as *guardian ad litem* under Fed. R. Civ. Proc. 17(c), and lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

5.      Tanya Reese is a forty seven-year old resident of Oak Park, Illinois, who formerly lived in the Austin neighborhood of Chicago. She works for a catering company in Chicago. Her children include plaintiff M.R. who is now sixteen years old. On August 5, 2015, Ms. Reese's oldest son, Pierre Reese, was shot and killed in the Austin neighborhood of Chicago, after mistakenly identifying a young man as a girl. M.R. was particularly close to his older brother, and his killing traumatized M.R. Gun violence remained a regular part of M.R.'s life after his brother was killed, as there have been four non-fatal shootings and one fatal shooting within three blocks of his old Austin address just during the first six months of 2018 and this rate of gun violence has been consistent on the block where he lived since at least 2014. While living in Austin, M.R. regularly heard gun shots at night. He was placed at the Mercy Home for two years because of the trauma inflicted on him. M.R. has been diagnosed with PTSD, to which the killing of his brother and his exposure to other gun violence has significantly contributed. Tanya Reese brings this case on behalf of her son M.R. as *guardian ad litem* under Fed. R. Civ. Proc. 17(c).

**ANSWER:**      No answer to this paragraph is required because the Court dismissed the claims of this plaintiff for lack of standing.  To the extent an answer is required, defendants admit that Tanya Reese purported to assert claims behalf of her son M.R. as *guardian ad litem* under Fed. R. Civ. Proc. 17(c), and lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

6.      Tywanna Patrick lives on the Near West Side of Chicago. She owns and operates an African beauty and wellness store at 5823 W. Corcoran Place, in the Austin neighborhood of Chicago. She is the grandmother of eleven-year old plaintiff J.C. On July 6, 2014, Ms. Patrick's twenty-one year old son, Donald Joshua Ray, was shot and killed in the Austin neighborhood of Chicago. Plaintiff J.C. was then seven years old and going into the second grade. She was very close to her uncle, Mr. Ray. J.C. was present at Ms. Patrick's Austin shop when the police arrived to inform the family that Mr. Ray had been shot and killed. He was killed while protecting a young woman who was being harassed by young men. At the time of Mr. Ray's murder, J.C. lived in the Austin neighborhood of Chicago. She has recently moved to Bellwood, Illinois. J.C. experienced gun violence on a regular basis, even after her uncle was murdered. Four non-fatal shootings and one fatal shooting occurred within three blocks of her former home in Austin during the first six months of 2018 alone. The level of gun violence near her home has been consistent since 2014. J.C. heard gun shots most nights at her home in the Austin neighborhood. J.C. has been diagnosed with PTSD, to which her exposure to gun violence has significantly contributed. Tywanna Patrick brings this case as *guardian ad litem* on behalf of her granddaughter under Fed. R. Civ. Proc. 17(c).

**ANSWER:**      No answer to this paragraph is required because the Court dismissed the claims of this plaintiff for lack of standing.  To the extent that an answer is required, defendants admit that Tanya Reese purported to assert claims behalf of her granddaughter as *guardian ad litem* under Fed.

3

R. Civ. Proc. 17(c), and lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

7.       Pursuant to Fed. R. Civ. Proc. 23(b)(2), the plaintiffs bring this action for declaratory and injunctive relief on behalf of their minor children or grandchild and on behalf of a class of similarly situated children defined as:

> All African-American children under the age of eighteen who live or lived in the City of Chicago and are: 1) disabled under the terms of the ADA on account of their exposure to gun violence; or 2) at risk of becoming disabled by their exposure to gun violence.

**ANSWER:**     Defendants admit that plaintiff purports to bring this action for declaratory and injunctive relief on behalf of himself and a putative class, as defined in this paragraph.  Defendants deny that class certification is appropriate and deny any remaining allegations in this paragraph.

8.       The plaintiff class satisfies the requirements of Fed. R. Civ. Proc. 23(a), in that:

(a) The class is so numerous that joinder of all members is impracticable as gun violence in Chicago is at an epidemic level. Since January 1, 2015, 2,231 persons have been killed in Chicago. 90% died by gun shots. During the same period, 7,971 persons were shot. About 80% of the homicide and shooting victims in Chicago are African-American. At least 20% of these shootings involve teen-agers or younger children. Two-thirds of all minors who have been shot suffer from post-traumatic stress disorder, and thousands of African-American children in Chicago who have experienced gun violence but not been shot also have PTSD or trauma-related disabilities.

(b)       There are questions of law and fact common to the class. These include whether African-American children in Chicago are disabled, within the meaning of the ADA, by their exposure to gun violence; whether the State of Illinois, as the party responsible for their education, has provided a reasonable accommodation for their disability; and whether the State has effectively discriminated against disabled African-American children, in terms of their educational opportunity, by failing to limit the flow of guns onto Chicago's streets.

(c)       The claims of the named plaintiffs are typical of the claims of the class, as they represent Chicago, African-American children traumatized and disabled by gun violence, for whom no reasonable accommodation and no meaningful remedy has been provided.

(d)       The named plaintiffs will fairly and adequately protect the interests of the class. The named plaintiffs have no interests antagonistic to the class. The named plaintiffs seek declaratory and injunctive relief on behalf of the entire class to remedy injuries to all class members. Counsel for the plaintiffs are competent and experienced in class action and civil rights litigation.

**ANSWER:**     Defendants deny the allegations of this paragraph.

9.     The plaintiff class satisfies the requirements of Fed. R. Civ. Proc. 23(b)(2) because the defendants have acted on grounds that apply generally to the class, so final injunctive relief and corresponding declaratory relief is appropriate with respect to the class.

**ANSWER:**     Defendants deny the allegations of this paragraph.

## The Defendants

10.     The defendant State of Illinois is a "public entity" within the meaning of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §12131(1)(A), and a "State" within the meaning of Section 5 of the Illinois Civil Rights Act of 2003, 740 ILCS 23/5.

**ANSWER:**     Defendants admit the allegations of this paragraph.

11.     The defendant Illinois Department of State Police is also a "public entity" within the meaning of Title II of the ADA, 42 U.S.C. §12131(1)(B), and a unit of the State within the meaning of Section 5 of the Illinois Civil Rights Act of 2003, 740 ILCS 23/5.

**ANSWER:**     Defendants deny that Defendant Illinois State Police is named the Illinois Department of State Police.  Defendants admit the remaining allegations of this paragraph.

12.     The defendant Bruce Rauner is the Governor of the State of Illinois, and responsible for the policies implemented by the defendant State of Illinois.

**ANSWER:**     Defendants admit that J.B. Pritzker is the Governor of the State of Illinois, and that he has "the supreme executive power" and is "responsible for the faithful execution of the laws." *See* Ill. Const. Art. V, Section 8.  Defendants deny the remaining allegations of this paragraph.

13.     The defendant Leo P. Schmitz is the Director of the Illinois Department of State Police and, under the direction of defendant Rauner, is responsible for the policies implemented by the State Police.

**ANSWER:**     Defendants admit that Brendan Kelly is the Director of the Illinois State Police, and that he is "responsible for the management and control" of the Illinois State Police.  *See* 20 ILCS 2610/2.  Defendants deny any remaining allegations in this paragraph.

**Jurisdiction and Venue**

14.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1331 and 1343, and because of its supplemental jurisdiction over the related state law claim.

**ANSWER:**    Defendants admit that the Court has federal question jurisdiction over Counts I and

II pursuant to 28 U.S.C. §§ 1331, 1343, and supplemental jurisdiction over Count III (which it

may decline to exercise in certain circumstances, 28 U.S.C. §1367(c)), but further state that

plaintiff lacks standing and his claims are barred by the Eleventh Amendment and are moot or not

ripe.

15.    Venue is proper in the Northern District of Illinois, as all of the plaintiffs and defendants are residents of the Northern District of Illinois, and the events and omissions giving rise to all of the claims alleged occurred in the Northern District of Illinois.

**ANSWER:**    Defendants admit that venue is proper.

**FACTUAL ALLEGATIONS**

**Chicago Is Awash In Gun Violence**

16.    During the young lives of the plaintiffs bringing this case, they have experienced unremitting gun violence in the neighborhoods where they live or lived. Chicago Police Department and University of Chicago Crime Lab studies document that from January 1, 2015 through June 30, 2018, two thousand two-hundred thirty-one (2,231) people were murdered. Ninety percent of these murders were by gunshots. Chicago has more gun-related homicides than any other major U.S. city. From January 1, 2015 through July 31, 2018, seven thousand nine-hundred seventy-one (7,971) people were shot in Chicago–about one shooting victim every 2.5 hours. Nearly 20% of homicide victims are teenagers or younger in Chicago. During the first six months of 2018, sixty-one (61) children age 15 or younger were shot, which is about the same number as in the two preceding years.

**ANSWER:**    Defendants lack knowledge or information sufficient to form a belief as to the truth

of the allegations in this paragraph.

17.    This gun violence most dramatically afflicts the African-American community in Chicago, and particularly the neighborhoods of Austin, Englewood, West Englewood, New City and Grand Crossing ("the communities of concentrated gun violence"). In 2015-2016, according to the University of Chicago Crime Lab, eighty (80) % of Chicago homicide victims were African-American, though African-Americans comprise only about one-third of the city's population. Eighty (80)% of homicide victims continue to be African-American when one looks only at killings

during the first seven months of 2018. African-American men aged fifteen (15) to thirty-four (34) made up more than one-half of the city's homicide victims during this same period, while accounting for just four (4) percent of the city's population. Despite having only nine (9) % of Chicago's population, the African-American neighborhoods of Austin, Englewood, West Englewood, New City and Grand Crossing, accounted for almost one-third of homicides in 2016, and this pattern has continued. The national homicide rate is about 5 per 100,000 persons across the whole country. In the Austin neighborhood of Chicago, in 2016, the homicide rate was 87.3 per 100,000 persons, according to the University of Chicago Crime Lab. In Englewood, the homicide rate was 179.5 per 100,000 persons; in West Englewood, it was 105 per 100,000 persons; in New City, it was 98.6 per 100,000 persons and in Grand Crossing it was 103.5 per 100,000. These five neighborhoods have the most death by gun violence of any neighborhoods in Chicago. They are African-American neighborhoods. Five of the next six deadliest neighborhoods are also African-American. By comparison, the white Chicago neighborhoods of Lincoln Park, North Center, Edison Park, Forest Glen, North Park, Hegewisch, Beverly and Mount Greenwood had no homicides in 2015 or 2016, and the white neighborhoods of Lake View, Lincoln Square, Jefferson Park, Calumet Heights, Edgewater, Montclare, O'Hare, Dunning, and Norwood Park had two or fewer murders during this two-year period, with a zero or negligible homicide rate. This disparate impact of gun violence has continued through to the present day.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth

of the allegations in this paragraph.

18. Gun murders and shootings are, however, only the tip of the gun violence iceberg in Chicago. The plaintiffs and those who live or have lived in Chicago's African-American communities, particularly the communities of concentrated gun violence, hear gun fire most nights, while in their homes or walking the streets. No one knows how many guns are in Chicago, but Chicago police recover guns at a per capita rate that is six times the number of guns recovered in New York City. Since 2011, Chicago police have recovered about seven thousand (7,000) "crime guns" from the streets of Chicago every year (not counting guns recovered through turn-in and buy-back programs). "Crime guns" are firearms that were illegally possessed, used or suspected to have been used in furtherance of a crime. The University of Chicago Crime Lab has documented that increasing numbers of the guns recovered are 9 millimeter (nearly 30% of the guns in 2016) and .40 caliber handguns (about 13% of the guns) which accommodate larger-diameter ammunition and support higher capacity magazines, and are thus more powerful than .22 caliber handguns.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth

of the allegations in this paragraph.

### A Substantial Number of the "Crime Guns" Used in Chicago Come from Chicago Area Gun Dealers

19. Chicago has no licensed gun dealers, but according to the Chicago Police Department, 40.4 % of the "crime guns" recovered on Chicago streets every year, from 2009

through 2016, were purchased from federally-licensed gun dealers in Illinois. This figure has not changed materially in 2017 and 2018. Seven of the stores selling the most guns used in Chicago shootings are located in Illinois (with the remainder located nearby in Indiana). These Illinois gun dealers are:

> Chuck's Gun Shop in Riverdale, IL
> Midwest Sporting Goods in Lyons, IL
> Shore Galleries in Lincolnwood, IL
> GAT Guns in East Dundee, IL
> Suburban Sporting Goods in Melrose Park, IL
> Pelcher's Shooter Supply in Lansing, IL
> Sporting Arms & Supply in Posen, IL

Large numbers of guns purchased from these dealers were used in crimes within one year of their purchase. So, Suburban Sporting Goods in Melrose Park, IL sold 85 guns used in Chicago crimes in 2016 alone, and 46% of these guns were sold less than a year before their use in these crimes. 68% of the "crime guns" sold were used by criminals within three years of purchase. Chuck's Gun Shop in Riverdale, IL sold 997 "crime guns" during the period 2013-2016, and 21% of their guns were used in Chicago crimes within one year. Ninety-two percent of the "crime guns" sold by these stores are handguns.[1]

**ANSWER:** Defendants admit that none of the listed gun dealers are located in the City of Chicago, and lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

20.     During the 2013-2016 period, federally-licensed gun dealers in Illinois reported that 1,200 guns were lost or stolen from these dealers prior to any sale. This includes burglaries and robberies, which are increasing at an alarming rate. Burglaries at these stores tripled between 2015 and 2016. The federal Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") has found that these stolen guns are almost assuredly destined for criminal use in the immediate area of the theft. Chuck's Gun Shop alone reported 43 guns stolen between 2013 and 2016.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

---

[1] Only 3-5 % of "crime guns" have their serial numbers obliterated, making it impossible to trace them back to their original purchase, according to Cook, et al., "Sources of Crime Guns in Chicago", Journal of Criminal Law & Criminology, Vol. 104, No. 4: 717-759, at 725 (2015) (hereafter "Cook, at _____ (2015)).
**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this footnote.

**The State of Illinois Has Failed To Implement Meaningful Regulation of
Gun Trafficking in Illinois, Despite Ample Authority to Do So**

21.     Illinois gun dealers, including those identified in par. 19 above, must be licensed by the ATF. The ATF, however, does little to monitor or control the sale of guns in these stores, or to prevent the loss or theft of guns, though every sale of a gun requires the purchaser to complete ATF form 4473. Since 1986, absent a warrant, Congress has prevented ATF from conducting gun dealer inspections, other than during one annual inspection. However, the United States Inspector General found in 2004 that because of a lack of resources, the ATF was able to do annual inspections at only 5% of the more than 50,000 federally licensed gun stores. This inability to police these gun stores has continued into 2018. Federal law also prohibits ATF from requiring federally-licensed gun dealers to submit to regular firearm inventory inspections. As such, there is no effective monitoring of gun sales or inventory at the federal level.

**ANSWER:**     Defendants admit that Illinois gun dealers must be licensed by the ATF, and lack

knowledge or information sufficient to form a belief as to the truth of the remaining allegations in

this paragraph.

22.     Local villages and towns have done little, by way of ordinance, to limit the sales of gun dealers or prevent the theft or loss of guns. Nor is there any meaningful enforcement of these ordinances. Indeed, only fifty-three (53) of Illinois' one thousand two-hundred ninety-nine (1,299) municipalities have adopted any kind of gun dealer/trafficking ordinance, and most require nothing more than the documentation of sales, as required by state law. Those municipalities with stricter ordinances like Chicago and Oak Park have no gun dealerships or gun shows.

**ANSWER:**     Defendants lack knowledge or information sufficient to form a belief as to the truth

of the allegations in this paragraph.

23.     As a matter of law, the regulation of gun trafficking in Illinois is a state matter, over which the State of Illinois has claimed preemption, 430 ILCS 65/13.1. The only way to limit the flow of "crime guns" from Illinois gun dealers into the City of Chicago is for the State of Illinois and its Department of State Police ("the State Police") to exercise the authority the state legislature has provided, and both adopt and enforce meaningful rules on the trafficking and storage of guns.

**ANSWER:**     Defendants admit that 430 ILCS 65/13.1 governs the extent to which local

regulation of gun trafficking in Illinois is preempted by state law, and deny the remaining

allegations of the first sentence of this paragraph.  Defendants state that the Illinois State Police

has drafted and caused to be published proposed regulations implementing the Firearm Dealer

License Certification Act, 430 ILCS 68/5 *et seq.*, and deny the remaining allegations of the second

sentence of this paragraph.

24. Under current law, the State Police are charged with administering the Firearm Owners Identification Card Act, 20 ILCS 2605/2605-10 and 2605-120. The Firearm Owners Identification Card Act ("the FOID Act"), 430 ILCS 65/2, makes it unlawful for anyone to possess a firearm in Illinois unless they have been screened and found eligible for a FOID card. 430 ILCS 65/3 prohibits the sale of any firearm or firearm ammunition to any person in the state who does not hold a valid Firearm Owners Identification Card ("FOID card") or a valid concealed carry permit. This prohibition applies to federally-licensed firearm dealers, 430 ILCS 65/3(a)(1), and to any sale by someone who is not a federally-licensed firearm dealer, i.e. a sale in what is customarily referred to as the secondary gun market, either at a gun show, 430 ILCS 65/3(a-5), or through a private sale, 430 ILCS 65/3(a-10). The State Police provide a call-in process so that gun sellers may check to determine if the purchaser has a valid FOID card, and this entails a background check as well, 430 ILCS 65/3.1.

**ANSWER:** Defendants admit that this paragraph provides a summary of the FOID Act, part of

which is accurate, and deny any remaining allegations.

25. The State Police have broad authority to adopt regulations to implement and enforce this scheme, and to prevent the possession of guns by persons who have not been screened and who do not have a FOID card. The State Police have regulatory authority to prevent guns from being sold unlawfully at federally-licensed gun shops, and on the secondary gun market, as well as to prevent guns from being lost or stolen from gun dealers or private citizens. 20 ILCS 2605/2605-15 grants such regulatory authority to the State Police for the administration of any powers and duties bestowed upon the agency by any provision of law. 20 ILCS 65/3 (a-10) underscores this duty with respect to the FOID card licensing system in the secondary market, and 20 ILCS 65/3.1(f) provides express authority to adopt regulations and rules pertaining to the FOID background check system.

**ANSWER:** Defendants admit that under 20 ILCS 2605/2506-15, the State Police may

"promulgate rules and regulations necessary for the administration and enforcement of its powers

and duties, whenever granted and imposed, pursuant to the Illinois Administrative Procedure Act."

Defendants admit that 430 ILCS 65/3(a-10) provides that "any person who is not a federally

licensed firearm dealer and who desires to transfer or sell a firearm or firearms to any person who

is not a federally licensed firearm dealer shall, before selling or transferring the firearms, contact

the Department of State Police with the transferee's or purchaser's Firearm Owner's Identification

Card number to determine the validity of the transferee's or purchaser's Firearm Owner's

Identification Card," and that the State Police "may adopt rules concerning the implementation of this subsection." Defendants admit that 430 ILCS 65/3.1(a) requires the State Police to "provide a dial up telephone system or utilize other existing technology which shall be used by any federally licensed firearm dealer, gun show promoter, or gun show vendor who is to transfer a firearm, stun gun, or taser" under the provisions of the FOID Act, and 430 ILCS 65/3.1(f) provides that the State Police shall "adopt rules not inconsistent with this Section to implement this system." Defendants deny any remaining allegations of this paragraph.

26.     The State Police, however, have never adopted regulations that meaningfully keep guns out of the hands of non-licensed persons. The agency has never developed regulations to license Illinois gun dealers. Nor have the State Police adopted regulations that would make the FOID permit and background check system a meaningful barrier to the purchase of "crime guns" either in the primary market, i.e. at federally-licensed gun stores, or in the secondary market. Further, the State Police have made no attempt meaningfully to enforce their statutory responsibilities, through inspection, monitoring and policing gun dealers or the secondary gun market. As a result, federally-licensed gun dealers continue, year after year, to supply guns that fuel the epidemic of gun violence taking place in African-American neighborhoods of Chicago, either directly or through the secondary market, where the large majority of "crime guns" recovered by Chicago police were purchased.

**ANSWER:**     Defendants deny the allegations of this paragraph.

27.     Many studies have concluded that meaningful regulation of the primary and secondary gun markets, as set forth in par. 28 below, will reduce the number of guns available in cities like Chicago, and thereby reduce the number of African-Americans killed or shot, and most importantly reduce the debilitating level of gun violence that has led to the disability of the plaintiff children and similarly situated children. These include: Webster, Vernick, Bulzacchelli & Vittes, "Recent Federal Gun Laws, Gun Dealer Accountability and the Diversion of Guns to Criminals in Milwaukee", Journal of Urban Health Vol. 89:87-97 (2012); Irvin, Rhodes, Cheney & Wiebe, "Evaluating the Effect of State Regulation of Federally Licensed Firearm Dealers on Firearm Homicide", Am. Journal of Pub. Health, Vol. 104(8): 1384-1386 (2014); and the City of Chicago's Gun Trace Report, 2017 (2017),
https://www.cityofchicago.org/content/dam/city/depts/mayor/Press%20Room/Press%20Releases
/2017/October/GTR2017.pdf.

**ANSWER:**     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

28. Without any change in Illinois law, and without any cost to the State of Illinois, the

11

State Police can today, consistently with their duty to administer the statutory provisions set out in pars. 23-25 above, impose on all federally-licensed Illinois gun dealers and gun show promoters mandatory obligations:

     A. To conduct and provide verification of background checks on all gun store and gun show employees to make sure they can pass the same background checks as gun purchasers before they handle and sell guns at the stores or at gun shows;

     B. To install video recording systems to film the point of sale to discourage traffickers and buyers using false identification, or purchasing multiple guns, and assist law enforcement officers in identifying straw purchasers of "crime guns";

     C. To not sell or transfer a gun to any person whom the gun dealer or gun show promoter knows, or reasonably should know, is acquiring the gun not for his or her own use but for the purpose of transferring it to another, including persons who could not legally obtain the gun;

     D. To maintain an alphabetical log of all gun sales where the gun was later recovered in connection with a crime, such that the purchaser of the "crime gun" will be denied the right to purchase another gun, unless and until such purchaser demonstrates that he or she has transferred the original gun in accordance with the provisions of 430 ILCS 65/3 or provided a complete report of the loss or theft of such gun to local law enforcement, in compliance with 720 ILCS 5/24-4.1, and such regulation shall further construe 720 ILCS 5/24-4.1 to presume that gun owners are on notice of the loss or theft of their gun within sixty days of the actual loss or theft of the gun;

     E. To train employees and managers of gun shops and gun shows to identify common signs of straw purchasing to avoid gun trafficking, using state-wide standards developed by the State Police;

     F. To take possession of FOID cards that have been suspended or revoked but not returned by the owner, and develop systems for recovery of such FOID cards independent of gun dealers and gun shows, as only 30% of revoked FOID cards are returned presently, according to the an audit by the Office of the Auditor General of Illinois;

     G. To provide the State Police with a safety plan, which must be approved by local law enforcement, before the store or gun show may open, which (for stores) must be examined yearly thereafter for compliance, in order to prevent the theft and loss of guns, as over 16,000 guns are reported lost or stolen each year from licensed gun dealers, according to the ATF's minimal inspections. Such plans must require adequate exterior lighting, surveillance cameras, alarm systems and other reasonable measures, and further address the safe storage of weapons and ammunition, as well as fire hazards;

H.. To submit to a mandatory, at least quarterly, audit of the store's inventory to help detect theft and trafficking, to be conducted by local law enforcement;

I. To prohibit the sale of guns "off the books", i.e. that cannot be supported by contemporaneous paperwork which shows compliance with ATF rules (a completed ATF 4473 form) and compliance with 430 ILCS 65/3, which accounted for 5.5% of all Chicago crime guns between 2009-2013, (Cook, at 745 (2015);

J. To participate in the implementation of a State Police firearms registration system to track lawful firearm transfers (from federally-licensed gun dealers, gun shows, and private sellers), which will assist in tracking "crime guns" to their original point of sale;

K. To comply with the foregoing provisions as a condition of doing business; and

L.To prohibit the establishment of any new gun dealership with the stockholders or principals of a gun dealer whose state license to operate has been revoked for failure to follow federal law, Illinois law, or State Police regulations.

The State Police's failure to adopt these needed regulations has caused more guns to flow onto Chicago's streets and has directly caused more African-Americans to be killed, shot and exposed to gun violence in Chicago. The City of Chicago, in two reports ("Gun Trace Report: 2017", https://www.cityofchicago.org/content/dam/city/depts/mayor/Press%20Room/Press%20Releases /2017/October/GTR2017.pdf; and "Tracing the Guns: The Impact of Illegal Guns on Violence in Chicago" (May 27, 2014), https://www.cityofchicago.org/content/dam/city/depts/mayor/Press%20Room/Press%20Releases /2014/May/05.27.14TracingGuns.pdf., as well as Chicago's Superintendent of Police, recommend the adoption of these or similar regulations in order to stem the flow of guns into Chicago.[2]

**ANSWER:** Defendants adopt and incorporate by reference their response to paragraph 25 above, and further state that the Illinois State Police has drafted and caused to be published proposed regulations implementing the Firearm Dealer License Certification Act, 430 ILCS 68/5 *et seq.*, see also Dkt. Nos. 39, 54 (discussing proposed regulations), and emergency rules published

---

[2] Near the end of 2015, the City of Lyons, Illinois adopted an ordinance which placed restrictions on licensed gun dealers-specifically, Midwest Sporting Goods. The restrictions include some of those the defendants have authority to issue, as identified in par. 28 herein at p. 7 of its 2017 Gun Trace Report, the City of Chicago took note that while still too early to conduct a meaningful study, there is already an "encouraging" decline in the recovery of crime guns traceable to Midwest Sporting Goods since adoption of the ordinance.
**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this footnote.

on January 17, 2020. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the last sentence of this paragraph, and deny the remaining allegations of this paragraph.

### The Pervasive Gun Violence in Chicago's African-American Neighborhoods Has Caused Thousands of African-American Children to Become Disabled Under the ADA

29.     The unending gun violence in Chicago has left thousands of African-Americans, including children, dead and wounded, with deep psychological scarring. But this pervasive gun violence also has a dramatic effect on those African-American children exposed to such violence who have not been shot, like the plaintiffs in this case. They are far larger in number than those who have been killed and maimed.

**ANSWER:**     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

30.     The ADA defines a disability as "a physical or mental impairment that substantially limits one or more major life activities of such individual", 42 U.S.C. §12102(1)(A). Major life activities then "include, but are not limited to, *caring for oneself*, performing manual tasks, seeing, hearing, eating, *sleeping*, walking, standing, lifting, bending, speaking, breathing, *learning, reading, concentrating, thinking, communicating,* and working", 42 U.S.C. §12102(2)(A) (emphasis supplied).

**ANSWER:**     Defendants admit the allegations of this paragraph.

31.     It is well-established among physicians, trauma specialists and educators, as well as in the scientific, peer-reviewed literature, that when a child, particularly a young child, is exposed to gun violence, there is a dramatic and lasting impairment of the child's basic life activities. This includes deficits in the child's ability to care for himself or herself, the child's sleep, reading abilities, learning capacity, concentration, thinking and communication. As a result of these deficits, gun violence directly undermines the child's academic performance and his or her educational opportunities.

**ANSWER:**     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

32.     Many studies have found that children directly or indirectly exposed to community violence, most often gun violence, develop acute or post-traumatic stress disorder, including disrupted sleep, anxiety and fear, as well as reduced awareness and difficulty with concentration, thinking and memory, all of which impair cognitive functioning. Exposure to gun violence floods a child's body with stress hormones (adrenaline and cortisol) which independently undermine cognitive performance by compromising the function of the prefrontal cortex of the brain (the area

of the brain that is most rapidly developing in adolescence). This portion of the brain is responsible for reflective self-regulation and sustained attention, thus inhibiting the child's memory, ability to sustain concentration and brain development. The child's analytical capacities (or executive function) tends to disintegrate, leaving the child disorganized cognitively and emotionally, and thus prone to react in school with extreme helplessness, confusion, withdrawal, or rage.[3]  The more directly the child experiences gun violence the more often it happens, the more enduring and permanent are his or her deficits. This literature is summarized in many places, including by the Violence Policy Center, "The Relationship Between Community Violence and Trauma: How Violence Affects Learning, Health and Behavior", (July, 20017), www.vpc.org; by Sharkey, "The Long Reach of Violence: A Broader Perspective on Data, Theory, and Evidence on the Prevalence and Consequences of Exposure to Violence", Annual Review of Criminology, Vol. 1:85-102 (January, 2018); and by Cook, et al. "Complex Trauma in Children and Adolescents", Psychiatric Annals, Vol. 35(5): 390-398 (2005).

**ANSWER:**    Defendants lack knowledge or information sufficient to form a belief as to the truth

of the allegations in this paragraph.

33.    For twenty years, research has shown that exposure to gun violence negatively affects a range of developmental outcomes across social-emotional, behavioral, and cognitive domains. See, e.g. Bingenheimer, et al., "Firearm Violence Exposure and Serious Violent Behavior", Science, Vol. 308:1323-26 (2005); and Osofsky, "The Impact of Violence on Children", Future of Children, Vol. 9:33-49 (1999). It has also consistently shown that exposure to gun violence and other forms of violence are associated with lower performance on assessments of reading, cognitive skills, grade point average, and school attendance. See, e.g. Bowen, et al., "Effects of Crime and Violence in Neighborhoods and Schools on the Social Behavior and Performance of Adolescents", Journal of Adolescent Research, Vol. 14:319-42 (1999) and Delaney-Black, et al., "Violence Exposure, Trauma and IQ and/or Reading Deficits among Urban Children", Archives  of Pediatrics and Adolescent Medicine, Vol. 156: 280-85 (2002).

**ANSWER:**    Defendants lack knowledge or information sufficient to form a belief as to the truth

of the allegations in this paragraph.

34.    In Chicago, there have been many studies linking exposure to gun violence directly to deficits in academic performance by African-American children. In 2010, Dr. Patrick Sharkey used Chicago homicide data and cognitive assessment data on hundreds of children aged 5 to 17 from the Project on Human Development in Chicago Neighborhoods to assess the effect of a single homicide incident located near a student's home on that student's vocabulary and reading skills,

---

[3] A recent study of 82 children aged 11-18 documented that cortisol levels in these children increased 111% the day after exposure to nearby gun violence, indicating extreme levels of stress, which has a dramatic effect on the child's ability to sleep, among other things, Heissel, "Violence and Vigilance: The acute Effects of Community Violent Crime on Sleep and Cortisol", Child Development, Vol. 89(4):e323-e331 (July, 2018)
**ANSWER:**  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

using sub-tests of the Wechsler Intelligence Scale for Children and the Wide Range Achievement Test. For African-American children, a homicide located on their block within one week of cognitive assessment testing showed (on average) a reduction in performance of 0.5 standard deviations relative to other African-American children living in the same neighborhood who had not been exposed to a homicide. The children lost .65 standard deviations in their reading scores when tested within four days of a homicide occurring on their block (whether the child saw the homicide or not). A separate study of Chicago data referenced by Dr. Sharkey, and used for comparison, found that a homicide within a child's census tract occurring within fourdays of cognitive assessment found loss of a full 1.0 in standard deviation on a letter-word test, as compared with other children from the same neighborhood. Sharkey, "The Acute Effect of Local Homicides on Children's Cognitive Performance", Proceedings of the National Academy of Sciences, Vol. 107(26): 11733-38 (2010). Dr. Sharkey has demonstrated the same causal effect between exposure to gun violence and deficits in standardized test scores administered in the schools of New York City (using time and location), see Sharkey, et al., "High Stakes in the Classroom, High Stakes on the Street: The Effects of Community Violence on Students' Standardized Test Performance", Sociological Science, Vol. 1(3): 199-220 (2014); see also, Lacoe, et al., "Too Scared to Learn? The Academic Consequences of Feeling Unsafe in the Classroom", Urban Education, https://doi.org/10.1177/0042085916674059 (October, 2016), (tracking 340,000 New York city public school students over successive academic years to find that in years when students reported feeling unsafe, their standardized test scores declined significantly).

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth

of the allegations in this paragraph.

35. Dr. Dana Charles McCoy and colleagues studied 602 Chicago children from high-crime Chicago neighborhoods in 2004 and 2005, and then followed up with them in 2010 and 2011 to study the relationship between their exposure to violent crime (taking place within a half mile of their home (which they may or may not have witnessed) and within seven days of testing) and their performance on a neuropsychological assessment which measured their cognitive performance and selective attention. These researchers found a direct relationship between exposure to violence and a deficit in neuropsychological functioning, as a result of the children's exposure to gun violence. McCoy, et al., "Children's Cognitive Performance and Selective Attention Following Recent Community Violence", Journal of Health and Social Behavior, Vol. 56(1): 19-36 (2015).

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth

of the allegations in this paragraph.

36. Gun violence affects everyone in school, even those not exposed. This was demonstrated by Dr. Julia Burdick-Will, who took five cohorts of Chicago Public School students (from 2002 to 2010) and examined the relationship between performance on standardized tests and the level of violence experienced in the school (as determined by Chicago police locational crime data and survey tools). Many students did not experience gun violence, but the whole school felt less safe. One standard deviation increase in classmates' exposure to neighborhood violence was

related to a 0.3 standard deviation decline in both reading and math scores----which represents 10% of normal student annual growth. Burdick-Will, "Neighborhood Violence, Peer Effects, and Academic Achievement in Chicago", Sociology of Education, Vol. 91(3): 205-223 (2018).

**ANSWER:**     Defendants lack knowledge or information sufficient to form a belief as to the truth

of the allegations in this paragraph.

### The Plaintiffs' Exposure to Gun Violence Has Left Them Disabled Under the ADA
### The Case of Plaintiff D.P.

37.     D.P. is eight years old and attends a Chicago Public School in the Austin neighborhood of Chicago, where he lives with his mother, grandmother, and a very young sibling. His mother works at the U.S. Postal Service and his grandmother works at the Chicago Transit Authority.

**ANSWER:**     Defendants lack knowledge or information sufficient to form a belief as to the truth

of the allegations in this paragraph.

38.     On the night of January 29, 2016, D.P. and his mother were together with his father, DeMorrow Stephens (age 26). Mr. Stephens lived in the Austin neighborhood near his son and had been a good father to D.P., who was then just in kindergarten. Mr. Stephens seemed fatalistic that night, telling D.P. and his mom that: "if I die tonight, I still love my family". In the early morning hours of January 30, 2016, D.P and his mother were awakened with news that Mr. Stephens had been shot in the West Garfield Park neighborhood. D.P.'s mother woke him and they rushed to the scene, where they saw Mr. Stephens' body slumped in the driver's seat of a 2007 Audi, having been shot in the chest, torso, left thigh and pelvis. The sight of his father was deeply disturbing to D.P. and he was rushed away. Though deemed a homicide by the coroner and the police, no one has been charged with his murder.

**ANSWER:**     Defendants lack knowledge or information sufficient to form a belief as to the truth

of the allegations in this paragraph.

39.     The killing was devastating to D.P. and his mother. She was off work for three months and kept D.P. out of school. D.P.'s grandmother cared for both of them, as best she could. There was no emotional counseling available to the family, and D.P.'s mother and grandmother did not know what to say or how to explain what had happened to D.P.

**ANSWER:**     Defendants lack knowledge or information sufficient to form a belief as to the truth

of the allegations in this paragraph.

40.     D.P. went back to his kindergarten class after a week. His kindergarten teacher, Raven McGill, had regarded D.P. as a well-behaved and bright young boy, but after his father was

killed, he began yelling in class and having angry outbursts. The teacher and family tried to respond effectively but could not. For months after the shooting, D.P. repeatedly woke up in tears because of terrible dreams about his father. He had a great deal of difficulty sleeping. He was afraid. At school, his behavior deteriorated, and he was physically aggressive with other students and, at one point, punched and kicked his teacher, requiring him to be sent home. D.P. would speak about his father at school, once pointing to the clouds and telling his teacher "that's where my dad is", and on another occasion telling the teacher he would be excited "when his dad comes back". Beginning with his father's shooting, D.P. has struggled in school, experiencing difficulties in learning, reading, thinking and communicating.

**ANSWER:**    Defendants lack knowledge or information sufficient to form a belief as to the truth

of the allegations in this paragraph.

41.    Near the end of D.P.'s first year of school, on June 16, 2016, a Chicago Public School employee (food compliance officer), Denzel Thornton, was shot in the head and killed at 12:30 pm immediately outside D.P.'s school. The students, including D.P., were in the school at the time, and observed all that went on.\

**ANSWER:**    Defendants lack knowledge or information sufficient to form a belief as to the truth

of the allegations in this paragraph.

42.    The next year, as D.P. navigated first grade, a well-liked eighth grader at his school was shot and killed on March 24, 2017. He was shot on a Saturday by someone in a passing car just after 3 pm, while on the sidewalk of a playground in the 4900 block of West Hubbard, in the Austin neighborhood, about eight blocks from D.P.'s home. The eighth grader had been shot the year before as well, but survived. Everyone at the school, including D.P. and his family, were devastated.

**ANSWER:**    Defendants lack knowledge or information sufficient to form a belief as to the truth

of the allegations in this paragraph.

43.    Gun violence continued unabated in D.P.'s life, as he entered the second grade. At least one other student at the school was shot during the 2017-18 school year. A shoot-out directly in front of the school required D.P. and his second grad classmates (whose windows looked out on the front of the school) to seek cover in his classroom. During the first six months of 2018 alone, there were three non-fatal shootings and one fatal shooting within a two block radius of D.P.'s home in the Austin neighborhood. Gun shots can be heard most nights on the block where he lives. D.P. continues to have difficulties sleeping, concentrating, communicating, reading and in his school work. He continues to struggle with communication and inter-personal relationships, both at school and at home.

**ANSWER:**    Defendants lack knowledge or information sufficient to form a belief as to the truth

of the allegations in this paragraph.

44.    D.P. is disabled under the ADA, 42 U.S.C. §12102, in that he suffers from a trauma-induced mental impairment that substantially limits his abilities to sleep, speak, learn, read, concentrate, think, communicate and participate fully in school.

**ANSWER:**    Defendants lack knowledge or information sufficient to form a belief as to the truth

of the allegations in this paragraph.

45.    D.P. continues to reside in the Austin neighborhood of Chicago where gun violence continues unabated. He remains in his school where killings and gun violence are persistent. His past and continued exposure to gun violence has impaired his basic life activities and threatens to make his condition more severe. He is unable to achieve the full benefits of the education available to him at his Chicago public school.

**ANSWER:**    Defendants lack knowledge or information sufficient to form a belief as to the truth

of the allegations in this paragraph.

### The Case of Plaintiff M.R.

46.    M.R. is sixteen years old and currently lives in Oak Park, Illinois with his mother and a younger sibling. He attends Oak Park-River Forest high school. The family previously lived in the Austin neighborhood of Chicago, along with M.R.'s older brother, Pierre Reese. Gun violence was epidemic in their community.

**ANSWER:**    No answer to this paragraph is required because the Court dismissed the claims of

this plaintiff for lack of standing.   To the extent that an answer is required, defendants lack

knowledge or information sufficient to form a belief as to the truth of the allegations in this

paragraph.

47.    On August 5, 2015, Pierre Reese (then age 27) was shot and killed outside TJ's Jamaican Cuisine Restaurant, located at 5604 W. Division Street in the Austin neighborhood of Chicago. Pierre had gone to the restaurant to eat with a male friend (Dionte). Pierre commented on the looks of a young woman, but then realized that this person was a man. Pierre apologized but the young man was offended. He left and returned with his brother. The brother opened fire on the vehicle in which Pierre and Dionte were sitting. They tried to drive off, but Pierre was hit in

19

the head by the gun fire and killed. No arrests have been made in the case, despite diligent cooperation by M.R. and Pierre's mother and family.

**ANSWER:**     No answer to this paragraph is required because the Court dismissed the claims of

this plaintiff for lack of standing.   To the extent that an answer is required, defendants lack

knowledge or information sufficient to form a belief as to the truth of the allegations in this

paragraph.

48.     In the aftermath of Pierre's murder, his family was devastated and particularly M.R., who was thirteen at the time of the murder, and very close with his murdered brother, and looked up to him as a father figure. M.R. responded with rage, seemingly unable to control his emotions. He could not sleep, communicate about his brother's death or what was going on in his life. He cried often and withdrew from family life. He could not concentrate, communicate or participate meaningfully in school. M.R. received social/emotional support services from the Learn Charter School in Chicago, where he attended at the time of the shooting. Within several months, however, M.R.'s mother could no longer cope with the symptoms of his trauma, and placed him at the Mercy Home in Chicago, to get him out of the neighborhood where his brother was shot and hopefully to get some help in processing the trauma. M.R. lived at Mercy Home for two years. While at Mercy, medical professionals and counseling staff worked continuously with M.R. to assist him in managing his anger, processing his grief and increasing his ability to communicate with others. Staff there also worked with M.R. on his capacity to participate in school. When he arrived, psychological testing showed he was severely compromised in his competency, problem-solving, and social capacities on account of the trauma he had suffered. M.R. was withdrawn and depressed as a result of the trauma, and he required medication. Through two years of medical treatment and individual counseling, as well as group and individual therapy, M.R. made sufficient progress to return home.

**ANSWER:**     No answer to this paragraph is required because the Court dismissed the claims of

this plaintiff for lack of standing.   To the extent that an answer is required, defendants lack

knowledge or information sufficient to form a belief as to the truth of the allegations in this

paragraph.

49.     While M.R. lived at Mercy Home, his mother and younger sibling moved to Oak Park, Illinois. M.R. rejoined the family to begin his freshman year at Oak Park River Forest ("OPRF") high school. He receives weekly counseling from one of the social workers at OPRF on account of the trauma he has suffered. M.R. currently cries often, suffers from a profound depression, and often is found laying silently on the floor of his bedroom. He continues to take medication to assist with his inability to sleep. He did not have these problems prior to the loss of his brother. His brother's gunshot murder has impaired his basic life activities. He is unable to

achieve the full benefits of the education available to him at his high school, despite the presence of an individualized education program ("IEP") and the support of the school social worker.

**ANSWER:**    No answer to this paragraph is required because the Court dismissed the claims of this plaintiff for lack of standing.   To the extent that an answer is required, defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

50.    M.R. is disabled under the ADA, 42 U.S.C. §12102, in that he suffers from a trauma-induced mental impairment that substantially limits his abilities to sleep, speak, learn, read, concentrate, think, communicate and participate fully in school.

**ANSWER:**    No answer to this paragraph is required because the Court dismissed the claims of this plaintiff for lack of standing.   To the extent that an answer is required, defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

### The Case of Plaintiff J.C.

51.    J.T. is eleven years old and entering the sixth grade. She lives with her mother and younger siblings in Bellwood, Illinois. Her grandmother, who lives in Chicago, also cares for her. Her grandmother, Tywanna Patrick, owns and operates an African beauty and wellness store at 5823 W. Corcoran Place, in the Austin neighborhood of Chicago. Until recently, J.C. lived in the Austin neighborhood of Chicago with her mother and grandmother.

**ANSWER:**    No answer to this paragraph is required because the Court dismissed the claims of this plaintiff for lack of standing.   To the extent that an answer is required, defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

52.    On July 6, 2014, Donald Joshua Ray was shot in the head and killed at 5237 W. Lake Street in the Austin neighborhood of Chicago. He was twenty-one (21) years old, the son of Tywanna Patrick, and the uncle of J.C. He was killed by young men after Mr. Ray and a friend came to the assistance of a girl being harassed by a group of young men. The police were called and the harassment stopped. Shortly thereafter, Mr. Ray and his friend returned to the corner store near his mother's store on Corcoran Place in Austin. The group of boys involved in the altercation were present. One of them pulled a gun and shot through the rear window of Mr. Ray's vehicle,

hitting Mr. Ray in the head. His friend, with the assistance of his family, and Chicago police detectives have arrested two young men in connection with the killing. One was convicted and sentenced to twenty years in prison; the other awaits trial.

**ANSWER:**    No answer to this paragraph is required because the Court dismissed the claims of this plaintiff for lack of standing.   To the extent that an answer is required, defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

53.    J.C. was at her grandmother's store when the police arrived the night of July 6, 2014 to tell the family of the murder. J.C heard the police explain the killing. Family friends also arrived who had seen the killing and also described it. J.C. was going into the second grade at the time and was very close with her uncle. Both J.C. and her mother, and grandmother, were distraught at hearing this news, and angry. J.C.'s mother was not capable of caring for J.C. and she was sent to live with her father for a week and a half.

**ANSWER:**    No answer to this paragraph is required because the Court dismissed the claims of this plaintiff for lack of standing.   To the extent that an answer is required, defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

54.    In the immediate months after the shooting, J.C. refused to sleep alone, had trouble sleeping, engaged in regular conversations with her mother and grandmother about what happened to her uncle, and was generally unwilling to leave their home, or travel in the Austin neighborhood. J.C. became clingy and was afraid to go outside. She refused to visit her grandmother's store and did not want to pass anywhere near the scene of the murder. J.C. had great difficulty in school, with problems concentrating, thinking, learning and communicating. Her mother removed her from her Chicago public school after the 2014-15 school year, and home schooled J.C., because of her fears and to prevent her from experiencing any more violence. Her mother later moved to Bellwood, Illinois to escape the regular gun violence and danger in the Austin neighborhood. J.C. continues to have problems with her sleep, still dreams about her uncle, and is very fragile emotionally. She had none of these problems prior to her uncle's murder.

**ANSWER:**    No answer to this paragraph is required because the Court dismissed the claims of this plaintiff for lack of standing.   To the extent that an answer is required, defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

55. J.T. is disabled under the ADA, 42 U.S.C. §12102, in that she suffers from a trauma-induced mental impairment that substantially limits her abilities to sleep, speak, learn, read, concentrate, think, communicate and participate fully in school.

**ANSWER:** No answer to this paragraph is required because the Court dismissed the claims of this plaintiff for lack of standing. To the extent that an answer is required, defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

### The State of Illinois Is Responsible for Providing Plaintiffs With a High Quality Education

56. Under Article X, Section 1 of the Illinois Constitution, the State of Illinois is responsible for ensuring that the plaintiffs' ability to participate meaningfully in school is not compromised by their exposure to gun violence. That provision of the Constitution provides that:

> A fundamental goal of the People of the State of Illinois is the educational development of all persons to the limits of their capacities. The State shall provide for an efficient system of high quality public educational institutions and services. Education in public schools shall be free. There may be such other free education as the General Assembly provides by law. The State has the primary responsibility for financing the system of public education.

While the State of Illinois may delegate part of its responsibilities to local school districts, it remains the party legally responsible for ensuring the quality of plaintiffs' education, including by providing accommodations for their disability, as it relates to their education.

**ANSWER:** Defendants admit that this paragraph includes a quotation from Article X, Section 1 of the Illinois Constitution. Defendants deny the remaining allegations of this paragraph.

57. The State of Illinois, through its Department of State Police has failed to implement meaningful gun trafficking regulations, despite the authority to do so, and in this failure, has contributed to the disabling of African-American children in the City of Chicago, continues to do so, and has failed to provide an accommodation for those already disabled.

**ANSWER:**     Defendants deny the allegations of this paragraph.

## CLAIMS

### COUNT I–VIOLATION OF TITLE II OF THE ADA (EDUCATION)

58.     By failing to use the State's existing regulatory authority to reduce the gun related violence that impedes the plaintiff children from participating in the State's program of public education, the defendants are failing in their duty to make a reasonable accommodation to the disabled plaintiffs and are thereby violating their rights under Title II of the ADA, 42 U.S.C. §12132;

**ANSWER:**     Defendants deny the allegations of this paragraph.

59.     As a result of this breach of legal duty, the plaintiff children in these neighborhoods will have continued or greater difficulty than children in learning, reading, communicating, thinking and concentrating, and will be excluded from obtaining the full benefit of public education available to children who are not exposed to such gun violence and are not disabled.

**ANSWER:**     Defendants deny the allegations of this paragraph.

WHEREFORE, plaintiffs pray that this Court:

A.  Declare that the defendants have violated the rights of the plaintiffs under Title II of the ADA, 42 U.S.C. §12132, by failing to make a reasonable accommodation to the needs and disabilities of the plaintiff children.

B.  Enter an injunction requiring that the defendant Illinois Department of State Police exercise its authority, under applicable state law, to make a reasonable accommodation for the disabilities and special needs of the plaintiff children, requiring that such accommodation consist of rules and regulations such as those contained in paragraph 28 above.

C. Grant plaintiffs their reasonable attorneys' fees, costs and such other relief as may be appropriate.

**ANSWER:**     Defendants deny that plaintiff is entitled to any relief.

### COUNT II–VIOLATION OF TITLE II OF THE ADA (LAW ENFORCEMENT)

60.     By failing to use the State's existing regulatory authority to prevent the illegal trafficking in guns that expose the plaintiff children to continued or greater limits on their major life activities, the defendants are failing to make a reasonable accommodation to the special needs of the plaintiff children in the conduct of the federally assisted law enforcement programs designed to protect the people of the State.

**ANSWER:**     Defendants deny the allegations of this paragraph.

61.     As a result, by such breach of their legal duty, the defendants have denied the right of plaintiffs to have the defendants conduct law enforcement with due regard to their disabilities and special needs. Without cost, the defendants could reduce the level of gun violence to which the plaintiff children are exposed and thereby reduce the impairment of their life activities, both now and into their adult years.

**ANSWER:**     Defendants deny the allegations of this paragraph.

WHEREFORE, plaintiffs pray that this Court:

A.  Declare that the defendants have violated the rights of the plaintiffs under Title II of the ADA, 42 U.S.C. §12132, by failing to make a reasonable accommodation to the needs and disabilities of the plaintiff children.

B.  Enter an injunction requiring that the defendant Illinois Department of State Police exercise its authority, under applicable state law, to make a reasonable accommodation for the disabilities and special needs of the plaintiff children, requiring that such accommodation consist of rules and regulations such as those contained in paragraph 28 above.

C.  Grant plaintiffs their reasonable attorneys' fees, costs and such other relief as may be appropriate.

**ANSWER:**     Defendants deny that plaintiff is entitled to any relief.

### COUNT III–VIOLATION OF THE ILLINOIS CIVIL RIGHTS ACT

62.     Gun violence in Chicago is concentrated in the African-American community and African-Americans, including the plaintiff children, are primarily the victims of exposure to gun violence and those disabled by the traumatic effects of gun violence.

**ANSWER:**    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph**.**

63.    The defendants' failure to issue reasonable gun trafficking regulations in order to reduce the level of gun violence to which the plaintiff children are exposed, under the authority granted to the Illinois Department of State Police, has had an adverse effect upon African-American children, in that they have endured and continue to endure the effects of gun violence, causing them to become disabled, and preventing them from obtaining a public education.

**ANSWER:**    Defendants deny the allegations of this paragraph.

64.    Under the Firearm Owners Identification Act and otherwise, the defendants have used methods of administration that permit more illegal guns in African American than white neighborhoods and such lax methods have subjected the plaintiff children to discrimination on the basis of their race. Such lax methods serve no legitimate State purpose and deny the benefit of law enforcement to the children of this State in an unfair and racially disparate manner. The defendants have no reasonable basis for not adopting reasonable gun trafficking regulations and preventing the adverse impact of gun violence on African-American children. As such, the defendants have deprived the plaintiff children of their right to be free of racial discrimination by the State, in violation of 740 ILCS 23/5(a)(2) of the Illinois Civil Rights Act.

**ANSWER:**    Defendants deny the allegations of this paragraph.

WHEREFORE, plaintiffs pray that this Court:

A. Declare that the defendants have violated the rights of the plaintiffs under 740 ILCS 23/5(a)(2), by failing to take reasonable steps to control the gun trafficking that is having an adverse impact on African-American children.

B. Enter an injunction requiring that the defendant Illinois Department of State Police exercise its authority, under applicable law, to adopt reasonable gun trafficking regulations in order to reduce the level of gun violence, including rules and regulations such as those contained in paragraph 28 above, in order to eliminate the adverse racial impact of gun violence on African-American children.

C. Grant plaintiffs their reasonable attorneys' fees, costs and such other relief as may be appropriate.

**ANSWER:**    Defendants deny that plaintiff is entitled to any relief. Defendants also deny each and every allegation not heretofore answered.

**AFFIRMATIVE DEFENSES**

**First Affirmative Defense**

Plaintiff's claims are barred by the Eleventh Amendment.  *See* Dkt. Nos. 25 at 16-18, 35 at 12 n. 1.

**Second Affirmative Defense**

Plaintiff lacks standing to sue.  *See* Dkt. Nos. 25 at 4-10, 35 at 1-7.

**Third Affirmative Defense**

Plaintiff's claims are moot and/or not ripe.  *See* Dkt. Nos. 39, 54.

**Fourth Affirmative Defense**

Plaintiff's claims are barred by the Tenth Amendment.


WHEREFORE, defendants deny that plaintiff is entitled to any relief and request that this Court dismiss plaintiff's complaint and grant any other relief that the Court deems just.

January 17, 2019

Respectfully submitted,

Defendants THE STATE OF ILLINOIS; THE
DEPARTMENT OF STATE POLICE; J. B.
PRITZKER, in his official capacity as Illinois
Governor; and BRENDAN KELLY, in his official
capacity as Director of the Illinois State Police

By: KWAME RAOUL,
     Illinois Attorney General

/s/ *Michael Dierkes*
Assistant Attorney General
Office of the Illinois Attorney General
100 West Randolph Street, 12th Floor
Chicago, Illinois 60601
Tel. 312-814-3672
mdierkes@atg.state.il.us

R. Douglas Rees
Deputy Attorney General,
Civil Litigation
Office of the Attorney General
100 W. Randolph Street, 12th Floor
Chicago, Illinois 60601
Tel. 312-814-3498
drees@atg.state.il.us