**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

DEMETRIA POWELL, as guardian ad
litem and on behalf of her son D.P.; and
SHANICE MATHEWS, as guardian ad
litem and on behalf of her son D.W.,

          Plaintiffs,

      v.

STATE OF ILLINOIS; ILLINOIS
DEPARTMENT OF STATE POLICE; JB
PRITZKER, in his official capacity as
Governor of the state of Illinois; and
BRENDAN F. KELLY, in his official
capacity as Director of the Illinois
Department of State Police,

          Defendants.

No. 1:18-cv-06675

Judge Joan B. Gotschall

**DEFENDANTS' MEMORANDUM OF LAW**
**IN SUPPORT OF THEIR MOTION TO DISMISS**

Date: October 13, 2021

KWAME RAOUL
Attorney General of Illinois

R. Douglas Rees
Michael T. Dierkes
Eileen E. Boyle Perich
Office of the Illinois Attorney General
100 W. Randolph Street
Chicago, Illinois 60601

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................ 1

BACKGROUND .............................................................................................................. 2

LEGAL STANDARD ....................................................................................................... 6

ARGUMENT .................................................................................................................... 6

I.      Plaintiffs Lack Standing ......................................................................................... 6

      A.     Plaintiffs' injuries are not fairly traceable to defendants' alleged conduct. ........... 7

      B.     Plaintiffs' injuries are not redressable by the relief they seek. ............................ 11

II.     Plaintiffs Fail To Plead Plausible Section 504 Claims .................................................... 13

      A.     Plaintiffs fail to plead the existence of a "program or activity" to which they have been denied access ........................................................................... 14

      B.     Plaintiffs fail to plead that defendants have discriminated against them "solely by reason of" their disabilities. ............................................................ 15

      C.     Plaintiffs fail to plead any actionable legal claim in Count II. ............................ 19

CONCLUSION ................................................................................................................. 20

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Alexander v. Choate,*
    469 U.S. 287 (1985)..................................................................................14, 16, 18

*Brady Campaign To Prevent Gun Violence United With The Million Mom March v.*
    *Ashcroft,* 339 F. Supp. 2d 68 (D.D.C. 2004) .......................................................9, 10

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013)..........................................................................................7

*City of Los Angeles v. Lyons,*
    461 U.S. 95 (1983)........................................................................................8, 13

*Conners v. Wilkie,*
    984 F.3d 1255 (7th Cir. 2021) ..........................................................................15

*Davis v. Echo Valley Condo. Ass'n,*
    945 F.3d 483 (6th Cir. 2019) ............................................................................18

*EEOC v. Concentra Health Servs., Inc.,*
    496 F.3d 773 (7th Cir. 2007) ..............................................................................6

*Goldhamer v. Nagode,*
    621 F.3d 581 (7th Cir. 2010) ....................................................................6, 10, 12

*Good Shepherd Manor Found., Inc. v. City of Momence,*
    323 F.3d 557 (7th Cir. 2003) ............................................................................16

*Hemisphere Bldg. Co. v. Vill. of Richton Park,*
    171 F.3d 437 (7th Cir. 1999) ............................................................................16

*Husted v. A. Philip Randolph Inst.,*
    138 S. Ct. 1833 (2018)....................................................................................15

*Jackson v. Birmingham Bd. of Educ.,*
    544 U.S. 167 (2005)........................................................................................17

*Juliana v. United States,*
    947 F.3d 1159 (9th Cir. 2020) ..................................................................10, 11, 12

*Linda R.S. v. Richard D.,*
    410 U.S. 614 (1973)........................................................................................12

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) .................................................................................6, 7, 8, 10

*Massachusetts v. EPA*,
  549 U.S. 497 (2007) ...........................................................................................10

*Rucho v. Common Cause*,
  139 S. Ct. 2484 (2019) ........................................................................................11

*School Bd. of Nassau Cty., Fla. v. Arline*,
  480 U.S. 273 (1987) ...........................................................................................18

*Schroeder v. Chicago*,
  927 F.2d 957 (7th Cir. 1991) ..............................................................................20

*Simon v. E. Ky. Welfare Rights Org.*,
  426 U.S. 26 (1976) .............................................................................................13

*Southeastern Cmty. Coll. v. Davis*,
  442 U.S. 397 (1979) ...........................................................................................18

*Summers v. Earth Island Institute*,
  555 U.S. 488 (2009) ...........................................................................................10

*Taylor v. McCament*,
  875 F.3d 849 (7th Cir. 2017) ..............................................................................11

*Tex. Indep. Producers & Royalty Owners Ass'n v. EPA*,
  410 F.3d 964 (7th Cir. 2005) ................................................................................7

*Tobey v. Chibucos*,
  890 F.3d 634 (7th Cir. 2018) ................................................................................6

*Tyska by Tyska v. Bd. of Educ. Twp. High Sch. Dist. 214, Cook Cty.*,
  453 N.E.2d 1344 (Ill. 1983) ...............................................................................19

*Wagoner v. Lemmon*,
  778 F.3d 586 (7th Cir. 2015) ..............................................................................14

*Wis. Cmty. Servs. v. City of Milwaukee*,
  465 F.3d 737(7th Cir. 2006) (en banc) ...............................................................16

**Statutes and Regulations**

29 U.S.C. § 794 .........................................................................................4, 13, 15, 19

42 U.S.C. § 12131 .................................................................................................14

5 ILCS 830/10-1 ...............................................................................................4, 12

20 ILCS 2605/2605 ....................................................................................................19

105 ILCS 5/34-2 .......................................................................................................20

430 ILCS
    68/5 ....................................................................................................................1, 3
    68/5-30 ...................................................................................................................3
    68/5-40 ...................................................................................................................3
    68/5-50 ...................................................................................................................3
    68/5-60 ...................................................................................................................3
    68/5-65 ...................................................................................................................4

Ill. H.B. 562 (2021) ...............................................................................................1, 4

20 Ill. Admin. Code
    1232.10 ..................................................................................................................3
    1232.60 ..................................................................................................................3
    1232.90 ..................................................................................................................3
    1232.100 ................................................................................................................4
    1232.150 ................................................................................................................4

## Other Authorities

Ill. State Police, *Training*, https://isp.illinois.gov/foid/fdlc/training ................................1

Press Release, *Governor Pritzker Signs FOID Modernization Bill* (Aug. 2, 2021),
    https://www.illinois.gov/news/press-release.23654.html ........................................4

## INTRODUCTION

Plaintiffs raise serious and legitimate concerns about gun violence in the City of Chicago. As Governor Pritzker and others have acknowledged, gun violence is a public-health crisis that requires the sustained and serious attention of policymakers across the State. The current rates of gun violence in the City, in particular, raise nuanced public-policy problems—problems that the Governor, the General Assembly, the State Police, and a range of other federal, state, county, and city officials have devoted significant time and energy to addressing. Most notably, since the filing of this lawsuit over three years ago, the State has created a new regulatory regime to license and oversee gun dealers, *see* 430 ILCS 68/5 *et seq.*, and in doing so has provided much, if not all, of the relief plaintiffs requested in their original complaint. And the State has done more, including by enacting omnibus legislation that, among other things, has increased funding for and comprehensively overhauled the system for issuing Firearm Owner's Identification (FOID) cards, *see* Ill. H.B. 562 (2021). As a result, the State now has a best-in-class regulatory scheme that oversees gun dealers (through licensure, inspections, and training) that is among the strongest in the country. The State also has provided the Illinois State Police with substantial additional funding to remove firearms from individuals with revoked FOID cards.

The amendments to plaintiffs' complaint demonstrate their recognition of this progress. Whereas plaintiffs' initial complaint focused on the State's alleged failure to regulate firearm dealers (an issue the State has generally remedied), their amended complaint now presents a grab-bag of purported flaws in *how* the State has chosen to regulate these businesses, *e.g.*, Doc. 97 ("Am. Compl.") ¶¶ 55–75. For instance, plaintiffs would replace the gun dealer training on straw purchasing instituted by the Illinois State Police, *see* Ill. State Police, *Training*,[1] with a checklist

---

[1] https://isp.illinois.gov/foid/fdlc/training.  All websites last visited Oct. 13, 2021.

1

written by plaintiffs' counsel, Am. Compl. ¶ 116; Doc. 95-2. Plaintiffs also apparently take issue with the manner in which the State determines whether to issue and revoke licenses. *Id.* ¶ 116. To remedy that alleged flaw, plaintiffs would have the State engage in court-monitored investigations of certain gun dealers, with the Court ultimately responsible for determining whether to revoke state-issued gun dealer licenses. *Id.* In short, plaintiffs center their amended complaint on their belief that discrete aspects of the State's comprehensively revised regulatory regime could (and should) be managed the way they see fit. Whatever the merits of plaintiffs' initial complaint, the Court should reject plaintiffs' new effort to have plaintiffs' counsel and the Court micromanage these complicated policy matters that the State is actively and diligently working to resolve.

The Court should dismiss the amended complaint under the Rehabilitation Act because it does not present a viable claim under that Act. Plaintiffs' legal argument—that the State and the State Police are intentionally discriminating against children on the basis of their disabilities by failing to impose certain regulations on firearms dealers—is fatally flawed. First, plaintiffs lack standing to superintend the State Police's regulation of firearms dealers because their children's injuries are neither fairly traceable to that regulatory regime nor redressable by the relief they now seek. Second, plaintiffs' claims fail on the merits: Plaintiffs identify no relevant "program or activity" that their children have been denied access to, and they cannot show that the State has intentionally discriminated against their children on the basis of disability by failing to impose plaintiffs' preferred regulations on third parties.

## BACKGROUND

Plaintiff Demetria Powell and two other Chicago residents brought this action in October 2018, seeking declaratory and injunctive relief for alleged violations of the Americans with Disabilities Act and the Illinois Civil Rights Act. Doc. 1. Plaintiffs initially alleged that defendants discriminated against Chicago-area schoolchildren by failing to regulate the State's gun dealers

2

and by failing to take possession of FOID cards that had been suspended or revoked. *Id.* ¶¶ 28, 58–60. Plaintiffs asked the Court to enter an injunction requiring the State to regulate gun dealers in a variety of ways, including by imposing requirements that dealers conduct background checks on all gun store employees, install video recording systems, train employees on common signs of straw purchasing, take possession of FOID cards that have been suspended or revoked, submit regular audits of inventory, and participate in a tracking system designed to trace "crime guns." *Id.*

Defendants moved to dismiss, Doc. 24, and the Court granted and denied in part that motion, Doc. 37, leading to defendants' interlocutory appeal of the denial of their sovereign-immunity defense, Doc. 45. In June 2021, while the appeal was pending, plaintiffs Powell and Shanice Matthews sought and were granted leave to file an amended complaint, Docs. 94, 96, thus mooting the appeal.

In the three years since plaintiffs filed their initial complaint, the State has made significant changes to the way it regulates gun dealers. Most obviously, in 2019 the State substantially enhanced its regulatory regime overseeing firearms dealers in Illinois. That regime—governed by the Firearm Dealer License Certification Act, 430 ILCS 68/5 *et seq.*, and its implementing regulations, 20 Ill. Admin. Code 1232.10 *et seq.*—imposes a licensure requirement on firearms dealers in Illinois. Now, to receive and maintain a dealer license, gun dealers must comply with a number of wide-ranging conditions. For instance, gun dealers must aver that their employees have a valid FOID card (and thus have submitted to a background check), 430 ILCS 68/5-40(a); install video recording systems, *id.* 68/5-50(a); 20 Ill. Admin. Code 1232.60; receive annual training that includes common signs of straw purchasing, 430 ILCS 68/5-30, 5-60; 20 Ill. Admin. Code 1232.90; and implement an electronic recordkeeping system to track inventory, 430 ILCS 68/5-

3

65; 20 Ill. Admin. Code 1232.100. Gun dealers are also subject to regular inspections, and, if found in violation of the Act, face sanctions that include suspension or revocation of their license, 20 Ill. Admin. Code 1232.150. At the same time, the General Assembly also enacted the Gun Trafficking Information Act, 5 ILCS 830/10-1 *et seq.*, which tasks the State Police with studying and making public, where possible, information regarding gun trafficking within the State.

More recently, the State has also adopted significant measures to modernize and support the FOID system. Relevant here, the Governor recently signed HB562, the most comprehensive reform of the FOID system in years, which among other things requires the State Police to remove firearms from individuals with revoked FOID cards and provides additional funding for the State Police to carry out that task. *See* Ill. H.B. 562 (2021); *see also* Press Release, *Governor Pritzker Signs FOID Modernization Bill* (Aug. 2, 2021).[2] The legislation also expands background checks to all firearm sales, invests in mental health programs for communities most impacted by gun violence, creates a stolen firearms database, provides incentives for FOID card applicants to submit fingerprints, and formalizes many internal programs established by Director Kelly during his tenure. *Id.* As relevant here, the legislation also directs the State Police to establish a "stolen gun database" and to monitor state and federal databases for prohibited gun buyers. *See* Ill. H.B. 562, §§ 20, 25 (to be codified at 430 ILCS 65/3(a-25), 65/8.5, 66/66).

Plaintiffs' amended complaint reflects these comprehensive changes in two major ways. First, plaintiffs have changed legal theories, now alleging violations of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a), rather than the ADA and the Illinois Civil Rights

---

[2] https://www.illinois.gov/news/press-release.23654.html. The text of the bill is available at https://www.ilga.gov/legislation/102/HB/PDF/10200HB0562lv.pdf.

4

Act. Am. Compl. ¶¶ 114–23.[3] Specifically, Plaintiffs allege that Illinois law obligates defendants, and in particular the State Police, to "issue regulations" that would "curb the diversion of legal guns to the illegal market," and that the State Police's failure to issue regulations of this kind constitutes "discrimination against children whose daily exposure to gun violence aggravates their mental and emotional disabilities" in violation of Section 504. *Id.* ¶¶ 8, 13. Plaintiffs seek declaratory and injunctive relief against defendants—the State, the Governor, the State Police, and its director, Brendan Kelly. *Id.* ¶¶ 116, 123.

Second, the nature of plaintiffs' allegations has shifted, presumably in recognition that the State has already accomplished much, if not all, of what plaintiffs initially sought: new state-level regulations on gun dealers and additional resources to enforce FOID card revocation. Plaintiffs' amended complaint sets forth a number of ways in which they would fine-tune the workings of the gun-dealer licensing regime to align with their priorities and preferences. *E.g.*, Am. Compl. ¶¶ 55–75. And for a remedy, plaintiffs seek injunctive relief in the form of an order directing ISP to "require gun dealers to comply" with a set of "responsible business practices" plaintiffs have separately lodged with the Court. *Id.* ¶¶ 114, 116. Plaintiffs also ask the Court to reallocate resources to "enforce the FOID Act in Cook County" and to direct ISP to investigate "patterns of straw purchase sales" and to "revoke the licenses" of gun dealers. *Id.* ¶¶ 114, 116. Finally, plaintiffs repeatedly request that defendants be required "to use their full authority under [the] Gun Dealer Licensing Act, the FOID Act, and the Gun Trafficking Information Act." *Id.* ¶¶ 116, 122.

---

[3] The amended complaint still references the Illinois Civil Rights Act, *e.g.*, Am. Compl. ¶¶ 16, 18, 23, 24, 122, but the State assumes these references are unintentional, given that plaintiffs no longer allege a violation of that Act.

## LEGAL STANDARD

Defendants seek dismissal under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Tobey v. Chibucos*, 890 F.3d 634, 639 (7th Cir. 2018) (cleaned up). A plaintiff must plead sufficient facts to give a defendant fair notice of the claim and the grounds upon which it rests; those facts, if true, must plausibly suggest that the plaintiff is entitled to relief, "raising that possibility above a speculative level." *EEOC v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (cleaned up).

## ARGUMENT

Plaintiffs' amended complaint should be dismissed on either of two grounds. First, plaintiffs lack standing to superintend the State Police's regulation of third parties, because their alleged injuries are neither traceable to the regulatory regime they challenge nor redressable by the relief they seek. Second, plaintiffs' claims fail on the merits, because (among other reasons) they fail to allege a "program or activity" to which defendants have denied plaintiffs' children access "solely" on the basis of their disabilities.

## I. Plaintiffs Lack Standing

Plaintiffs' suit should be dismissed at the threshold under Rule 12(b)(1) because plaintiffs lack standing to superintend the State Police's regulation of third-party gun dealers. Article III of the Constitution "limits the jurisdiction of the federal courts to actual 'Cases' and 'Controversies.'" *Goldhamer v. Nagode*, 621 F.3d 581, 584 (7th Cir. 2010); *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). To establish standing to seek prospective relief, plaintiffs must show that "(1) they are under threat of an actual and imminent injury in fact; (2) there is a causal relation between that injury and the conduct to be enjoined; and (3) it is likely, rather than speculative or hypothetical, that a favorable judicial decision will prevent or redress that injury." *Goldhamer*, 621

F.3d at 585. These requirements "prevent the judicial process from being used to usurp the powers of the political branches." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). Plaintiffs have not established and cannot establish standing, both because their injuries are not fairly traceable to the State Police's regulation of firearms dealers and because it is not likely that those injuries could be redressed by the relief they seek.

A.    **Plaintiffs' injuries are not fairly traceable to defendants' alleged conduct.**

Plaintiffs' suit should be dismissed first and foremost because the causal chain between plaintiffs' alleged injuries and defendants' alleged failure to regulate private parties not before the Court is too attenuated to support Article III standing. As the Supreme Court explained in *Lujan*, "when [a] plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is . . . 'substantially more difficult' to establish." 504 U.S. at 562 (quoting *Allen v. Wright*, 468 U.S. 737, 758 (1984)). That is because, in such a context, "causation and redressability ordinarily hinge on the response of the regulated (or regulable) third party to the government action or inaction," meaning that the existence of jurisdiction "depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict." *Id.* As a consequence, "when, as here, 'a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else*, much more is needed.'" *Tex. Indep. Producers & Royalty Owners Ass'n v. EPA*, 410 F.3d 964, 971 (7th Cir. 2005) (quoting *Lujan*, 504 U.S. at 562 (emphasis in original)). And the question in this context is not whether there is a causal connection between defendants' regulation of licensed firearm dealers and gun violence in the City of Chicago as a general matter, or between such regulation and the injuries of the putative class. Rather, plaintiffs must show a causal connection between defendants' regulation of firearm dealers and plaintiffs' *own* asserted injury—i.e., that their children will encounter gun violence in the

future, triggering their traumatic stress disorder. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983).

Plaintiffs cannot satisfy this exacting standard. Plaintiffs' traceability argument is, in short, that if defendants were to adopt some or all of their suggested regulatory measures—by promulgating revised regulations regarding sales protocols, issuing reports about gun trafficking within the State, increasing resources to analyze "trace data," and the like, Am. Compl. ¶¶ 54–78—their children would be less likely to encounter gun violence in the future. That is so, plaintiffs posit, because dealers would be less likely to sell firearms to straw purchasers, which would reduce the number of firearms circulating in Chicago, which would reduce gun violence, which would decrease the chance that their children would be exposed to such violence in the future, which would reduce the "PTSD symptoms and resulting handicaps." Am. Compl. ¶ 15.

Plaintiffs' suggested causal chain is far too attenuated, and turns on far too many speculative inferences, to invoke the jurisdiction of federal courts, especially given the extraordinary remedies they seek—essentially, federal-court supervision over the State's regulation of firearms dealers. *Infra* pp. 11–12. Whether plaintiffs' children will personally encounter gun violence in the future turns on the actions of a wide range of third parties, including federal, county, and city co-regulators; regulated firearms dealers; dealers outside of Illinois; gun traffickers; and, of course, the perpetrators of violence. Plaintiffs have not "adduce[d] facts showing that" the many decisions made by these third parties "will be made in such manner as to produce causation," *Lujan*, 504 U.S. at 562.

That plaintiffs' new complaint focuses on the State's implementation of the statutes the General Assembly has passed (and the regulations the State Police have promulgated) since they first filed suit, as opposed to the State's failure to take any action at all, differentiates the standing

issue here from the standing issue the Court previously adjudicated. *See* Doc. 37 at 16–21. As the Court explained in its 2019 opinion, plaintiffs' prior complaint alleged the existence of specific regulations the State Police could promulgate that (plaintiffs alleged) would "appreciably diminish the rate of gun violence" in the City. *Id.* at 19–20. Since that time, though, the General Assembly has passed (and the Governor has signed) statutes taking most if not all of the steps that plaintiffs alleged were needed to stem gun violence, and the State is in the process of implementing those measures. *Supra* pp. 3–4. As a result, plaintiffs' new complaint no longer "lists . . . specific regulations" the State could enact, Doc. 37 at 8; rather, it pairs generalized complaints about the State's alleged failure to use its "full regulatory authority" under the newly enacted statutes, *see, e.g.*, Am. Compl. ¶¶ 3, 9, 14, 17, 18, 22, 52, 74, 78, 79, 115, 118, with directives about how exactly the State could (in plaintiffs' view) best direct its existing regulatory resources, *see, e.g.*, *id.* ¶ 64 (implement nonprofit-drafted "checklist"); *id.* ¶ 68 ("dedicate resources to analyze trace data"); *id.* ¶ 116 ("determine and submit to th[e] Court a determination of patterns of straw purchase sales"); *id.* ("revoke the licenses" of specific gun dealers). Plaintiffs have not made a plausible showing that their injuries are traceable to the State's regulation of gun dealers or that fine-tuning the State's regulatory machine in their preferred manner would redress those injuries.

Courts in analogous cases have found standing lacking, and for good reason. In *Brady Campaign To Prevent Gun Violence United With The Million Mom March v. Ashcroft*, 339 F. Supp. 2d 68 (D.D.C. 2004), for instance, a nonprofit organization sued the Bureau of Alcohol, Tobacco, and Firearms ("ATF"), arguing that its policy regarding the repair of semiautomatic assault weapons violated federal law. *Id.* at 72. Plaintiff there, like plaintiffs here, argued that it had standing because the challenged policy increased the number of assault weapons available, which in turn exposed plaintiff's members, many of whom "live[d] in neighborhoods where

[assault weapon]-related violence occur[ed] regularly," to increased rates of violence. *Id.* at 71–72. The court held that plaintiffs had not met their "heavy burden" to establish traceability. *Id.* at 77. That was so, the court explained, because even if the policy were set aside, the regulated entities would simply take other actions to ensure the availability of firearms. *Id.* The same is true here. Plaintiffs have not "adduce[d] facts showing that" the many third parties whose actions are implicated in the causal chain will respond in the precise way they posit to the regulatory actions they want defendants to take and, in doing so, decrease the risk that their children will personally encounter gun violence in the future. *Lujan*, 504 U.S. at 562.

To be sure, the Court previously rejected defendants' motion to dismiss the prior complaint on standing grounds, relying principally on an analogy to environmental-law cases. Doc. 37 at 16–22. But those authorities do not support plaintiffs' standing, at least not on the current complaint. *Summers v. Earth Island Institute*, 555 U.S. 488 (2009), and *Massachusetts v. EPA*, 549 U.S. 497 (2007), each involved the denial of a procedural right—a right whose denial, the Supreme Court explained in *Massachusetts*, a plaintiff may challenge "without meeting all the normal standards for redressability and immediacy." *Id.* at 517–518; *see also Lujan*, 504 U.S. at 572 n.7 (explaining that "'procedural rights' are special"). In such a case, a plaintiff may establish standing simply by showing that "there is *some* possibility" that adherence to the procedure would alleviate the alleged injury. *Massachusetts*, 549 U.S. at 518 (emphasis added). But the standard plaintiffs face here is more exacting: They must show that it is "likely" that the relief they request would redress their asserted injuries. *Goldhamer*, 621 F.3d at 585. Because the causal connection between defendants' regulation of firearm dealers and plaintiffs' asserted injuries is far from "likely," and is at best extremely remote, plaintiffs cannot make their required showing. *Accord Juliana v. United States*, 947 F.3d 1159, 1171 (9th Cir. 2020) (distinguishing *Massachusetts* on this ground).

### B.    Plaintiffs' injuries are not redressable by the relief they seek.

Plaintiffs also lack standing because it is not "likely" that the relief they seek will remedy their children's alleged injuries. *Goldhamer*, 621 F.3d at 585. That is so for multiple reasons.

First, plaintiffs ask the Court to enter a sweeping remedy—essentially, federal supervision of the State's regulation of firearms dealers—that extends far beyond its institutional capacity. To establish redressability, plaintiffs must identify relief that is "within the court's power to award." *Juliana*, 947 F.3d at 1170; *see Taylor v. McCament*, 875 F.3d 849, 853 (7th Cir. 2017) (no standing where court is "unable to provide relief"). Here, plaintiffs ask the Court to enter not a prohibitory injunction—i.e., one that bars defendants from taking affirmative actions that they say violate the law—but to direct the State, as a sovereign entity, to regulate firearms dealers on the terms that plaintiffs (or the Court) think best. Am. Compl. ¶¶ 54–76. As the Supreme Court recently explained, however, federal courts "have no commission to allocate political power . . . in the absence of a constitutional directive or legal standards to guide [them] in the exercise of such authority." *Rucho v. Common Cause*, 139 S. Ct. 2484, 2508 (2019). Applying that standard, the Ninth Circuit held last year that plaintiffs who (like plaintiffs here) sought to harness governmental regulatory power to better address widespread social harms lacked standing to do so, because the federal courts lack manageable standards for overseeing such a regulatory enterprise (and so plaintiffs' injuries were not redressable). As that court explained, "it is beyond the power of an Article III court to order, design, supervise, or implement" such a "remedial plan"—i.e., one that "would necessarily require a host of complex policy decisions entrusted, for better or worse, to the wisdom and discretion of the executive and legislative branches." *Juliana*, 947 F.3d at 1171.

That is exactly what plaintiffs seek here. They ask the Court to take control of the State's policymaking apparatus and direct it to promulgate regulations, reallocate enforcement resources, and more, on the premise that the State's own decisionmaking in this area has violated federal law.

*See* Am. Compl. ¶¶ 54–76. But plaintiffs identify no standards that could conceivably guide the Court in issuing a remedy. For instance, plaintiffs argue repeatedly that the State has failed to use its "full regulatory authority" under several Illinois statutes, *e.g.*, *id.* ¶¶ 3, 9, 14, 17, 18, 22, 52, 74, 78, 79, 115, 118, and even request that the Court "[o]rder" the State and the State Police to "use their full authority" under those statutes as a remedy for their alleged discrimination, *id.* ¶ 116(c). But the decision *how* to use that authority requires "consideration of 'competing social, political, and economic forces,' which must be made by the People's 'elected representatives, rather than by federal judges.'" *Juliana*, 947 F.3d at 1172 (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 128–29 (1992)). Plaintiffs would have the Court accept that authority for itself, but offer no manageable standard for how the Court would do so. Plaintiffs' scattered specific requests are of no more help. Plaintiffs ask the Court, for instance, to "[o]rder" the State Police to "revoke the licenses" of certain unidentified firearms dealers, Am. Compl. ¶ 116(d), but plaintiffs lack standing to obtain specific relief of that sort, *see Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973). In the end, plaintiffs' effort to direct the State's policymaking apparatus fails because they seek relief that the Court lacks the authority to order. *Juliana*, 947 F.3d at 1172–73.[4]

Second, even if the Court were able to discern manageable standards for the award of the relief plaintiffs seek, it still would not be "likely," *Goldhamer*, 621 F.3d at 585, that such relief would reduce the likelihood that their children would personally encounter gun violence in the future. As the court explained its prior opinion, Doc. 37 at 12–13, because plaintiffs seek only

---

[4] Aspects of the relief plaintiffs seek are also squarely outside the agency's authority. For instance, plaintiffs argue that the State Police should promulgate regulations to implement the Gun Trafficking Information Act, 5 ILCS 830/10-1 *et seq.*, Am. Compl. ¶ 8, but that statute does not confer rulemaking authority on the agency. Plaintiffs likewise argue that the State Police should "require the fingerprinting of all applicants" for FOID cards, *id.* ¶ 72, but identify no statutory provision conferring such authority on the agency.

prospective injunctive relief, the question is not whether (for instance) an award of money damages would ameliorate their completed injuries, but rather whether it is likely that the regulatory measures that they suggest would prevent *future* injury. And plaintiffs must make that showing as to their own children, not other children. *See Lyons*, 461 U.S. at 105; *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40 n.20 (1976) ("That a suit may be a class action . . . adds nothing to the question of standing."). Plaintiffs cannot satisfy that standard. Even if they could show (as they suggest) that the adoption of some or all of their preferred regulations would reduce the level of gun violence in Chicago in the aggregate, Am. Compl. ¶ 80, they cannot plausibly show that the adoption of those regulations would impact their children personally, as they must to invoke the jurisdiction of the federal courts. *See Simon*, 426 U.S. at 45 ("[U]nadorned speculation will not suffice to invoke the federal judicial power."). Their action should be dismissed on this basis as well.

## II.     Plaintiffs Fail To Plead Plausible Section 504 Claims

If the Court considers the merits of plaintiffs' Rehabilitation Act claims, the Court should dismiss them under Rule 12(b)(6) because plaintiffs have failed to state plausible claims under Section 504. Section 504 provides that "[n]o otherwise qualified individual" may "be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance" if any such adverse action occurs "solely by reason of his or her disability."  29 U.S.C. § 794(a). Plaintiffs assert that defendants' failure to regulate firearms dealers constitutes disability discrimination because exposure to gun violence can cause children to "develop acute or post-traumatic stress disorder," Am. Compl. ¶ 86, rendering them disabled within the meaning of Section 504. *Accord id.* p. 27 (alleging that

plaintiffs "exposure to gun violence has left them disabled within the meaning of Section 504"). These allegations fail on multiple levels.

### A. Plaintiffs fail to plead the existence of a "program or activity" to which they have been denied access.

First, plaintiffs have failed to plead the existence of a "program or activity" to which they have been denied access. A plaintiff alleging a violation of the Rehabilitation Act must allege that the defendant "denied him access to a program or activity because of his disability." *Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015). The crux of plaintiffs' argument is that defendants have discriminated against their children by failing to use their "full regulatory authority" to regulate state-licensed firearms dealers. *See, e.g.*, Am. Compl. ¶¶ 14, 17, 18, 22(b), 38, 52, 54, 56, 57, 60–62, 76–77, 114, 118–19.[5] But plaintiffs do not allege the existence of any particular service, program, or activity that this alleged failure denies them access to.

The Court read plaintiffs' prior complaint to allege discrimination in "the FOID firearms identification program," Doc. 37 at 26, but that basis cannot sustain plaintiffs' present complaint. For one, the current focus of plaintiffs' complaint appears to be not FOID firearms identification, but the State Police's regulation of firearms dealers. *See* Am. Compl. ¶¶ 54–62 (describing regulatory regime regarding licensure of firearms dealers in detail). Regardless, though, neither regulatory regime—FOID card enforcement nor firearm dealer licensure—is a *program* in which plaintiffs, as members of the public, participate in any meaningful way. The key purpose of Section 504, as the Supreme Court has explained, is to ensure that disabled people are given "meaningful access" to a "program or benefit." *Alexander v. Choate*, 469 U.S. 287, 301 (1985); *see also* 42 U.S.C. § 12131(2) (defining disabled individuals as those who are eligible "for the receipt of

---

[5]  To state the obvious, although defendants are, in many of the contexts identified in the complaint, using their "full regulatory authority" to combat gun violence, even if they were not, that fact would be irrelevant to the question whether they are violating Section 504.

services or the participation in programs or activities provided by a public entity"). But here, plaintiffs do not allege that they have been denied meaningful access to *any* program or benefit to which they are personally entitled. They simply allege that defendants' administration of programs and services in which they do *not* participate have a collateral effect on them. That argument does not state a Section 504 claim.

**B.    Plaintiffs fail to plead that defendants have discriminated against them "solely by reason of" their disabilities.**

Plaintiffs also do not and cannot make a plausible showing that defendants have discriminated against their children "solely by reason of" their disabilities. 29 U.S.C. § 794(a). Section 504 has a "stricter causation requirement" than the ADA, the statute under which plaintiffs previously attempted to press their claims: "[T]he plaintiff's disability must be the sole reason for the alleged discriminatory action." *Conners v. Wilkie*, 984 F.3d 1255, 1260 (7th Cir. 2021). "Solely by reason of" means that a defendant must have acted "for no reason other" than the plaintiff's disability. *See Husted v. A. Philip Randolph Inst.*, 138 S. Ct. 1833, 1842 (2018). Plaintiffs cannot plausibly meet this demanding standard.

At the outset, plaintiffs cannot show that defendants have *intentionally* declined to adopt the wide-ranging regulations of the firearms industry plaintiffs suggest because of plaintiffs' PTSD. Indeed, plaintiffs do not genuinely attempt to make such a showing. Although they allege that defendants have "discriminat[ed] against the plaintiff children as a class and inflict[ed] a special injury upon them by virtue of their disability," Am. Compl. ¶ 115, they do not allege any facts raising a plausible inference that defendants acted with discriminatory intent. Nor could they. Defendants have not declined to adopt plaintiffs' preferred regulations out of discriminatory animus against plaintiffs, other disabled individuals, or, for that matter, anyone else.

15

Plaintiffs' claim, instead, appears to be that defendants have discriminated against them by failing to accommodate their disabilities. *See id*. ¶¶ 114, 116(b). As the Seventh Circuit has explained, the "Supreme Court has located a duty to accommodate" within Section 504, *Wis. Cmty. Servs. v. City of Milwaukee*, 465 F.3d 737, 747 (7th Cir. 2006) (en banc), under which public entities must "assure meaningful access" to covered programs and services, *Choate*, 469 U.S. at 301. Even assuming plaintiffs have alleged any covered program or service to which they have been denied access, *supra* pp. 14–15, plaintiffs have not alleged a failure to accommodate that is actionable under Section 504.

To start, plaintiffs have not plausibly alleged that defendants have failed to accommodate them by removing some barrier to program access that affects them *because they are disabled*— the only "accommodation" defendants are required to make under Section 504. In a series of cases building on *Choate*, the Seventh Circuit has explained that "the Rehabilitation Act helps disabled individuals obtain access to benefits only when they would have difficulty obtaining those benefits 'by reason of' their disabilities, and not because of some quality that they share generally with the public." *Wis. Cmty. Servs.*, 465 F.3d at 748; *accord Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 562 (7th Cir. 2003) (ADA); *Hemisphere Bldg. Co. v. Vill. of Richton Park*, 171 F.3d 437, 440 (7th Cir. 1999) (FHAA). These cases reject the argument that a defendant is obligated to provide a reasonable accommodation to disabled people simply because a practice that "adversely affects [everyone's] ability" to access a program or service "also affects disabled [people's] access." *Good Shepherd*, 323 F.3d at 562. But that is essentially plaintiffs' argument. Plaintiffs do not allege facts, for instance, that their children have been denied whatever benefits of their preferred regulatory regime might exist because they are disabled; rather, they argue that *all* Chicago children (or, alternatively, all Black Chicago children) would benefit from adoption

of their preferred regime, disabled and able-bodied alike. *See, e.g.*, Am. Compl. ¶ 21 (defining the proposed class as, in part, "[a]ll African-American children" living in Chicago who are "at risk of becoming disabled by their exposure to gun violence"); *id.* ¶ 30 (explaining that gun violence affects certain populations more than others, without regard to present disability).

In actuality, plaintiffs' claims do not show discrimination at all. Plaintiffs do not allege any facts to make a plausible showing that defendants have treated plaintiffs' children differently because they are disabled. *See Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174 (2005) (explaining that "the normal definition of discrimination is differential treatment"). Plaintiffs' claim does not even appear to be that defendants have taken facially neutral action that has a differential *effect* on their children because they are disabled—i.e., a disparate-impact claim. Instead, plaintiffs assert that defendants have taken a facially neutral action that has caused their children, and similarly situated individuals, to *become* disabled. *See* Am. Compl. ¶ 21 (defining the proposed class to include children who are not presently disabled but who are "at risk of becoming disabled"); *id.* p. 27 (alleging that plaintiffs' "exposure to gun violence has left them disabled within the meaning of Section 504"). But that is not a claim that is actionable under Section 504, because it is simply not a discrimination claim at all. Plaintiffs' reading of Section 504 would give that statute an outsized mandate, transforming any and all state action that could plausibly be viewed to cause injury into actionable discrimination. Plaintiffs identify no reason to read Section 504 in such an expansive manner.

Plaintiffs' reasonable-accommodation theory finally fails for one additional reason: None of the relief plaintiffs request could plausibly be viewed as a reasonable accommodation. As the Supreme Court has explained, although a recipient of federal funding may be required in certain circumstances to make a "reasonable" accommodation to ensure "meaningful access" to a program

17

or service, the recipient is not required to "make 'fundamental' or 'substantial' modifications" to programs in order to do so. *Choate*, 469 U.S. at 300–01; *Se. Cmty. Coll. v. Davis*, 442 U.S. 397, 412–13 (1979). Section 504, in other words, does not intrude upon "the States' longstanding discretion" to enact generally applicable programs and policies, *Choate*, 469 U.S. at 307; it simply requires States to make "individualized" exceptions to those polices where doing so is necessary to ensure access for disabled people, *Sch. Bd. of Nassau Cty., Fla. v. Arline*, 480 U.S. 273, 287 (1987); *see Davis v. Echo Valley Condo. Ass'n*, 945 F.3d 483, 491 (6th Cir. 2019) ("A request works a fundamental change if it turns the challenged policy into something else entirely.").

Plaintiffs' requested relief plainly crosses this line. Plaintiffs at bottom seek to have the Court harness the State's "full regulatory authority" and alter the basic terms and conditions of multiple state programs, all on the theory that doing so is necessary to ameliorate discrimination against children who do not participate in those programs. *See, e.g.*, Am. Compl. ¶¶ 14, 17, 18, 22(b), 38, 52, 54, 56, 57, 60–62, 76–77, 114, 118–19. But this does not really seek an "accommodation" at all, *see Echo Valley*, 945 F.3d at 490 ("In this context, the word 'accommodation' means 'adjustment.'"), and even if it could be characterized as such, it is not a "reasonable" one. Rather, plaintiffs seek across-the-board change for all State residents. Plaintiffs admit as much. They describe gun violence as a "public health emergency" affecting all Chicago residents, Am. Compl. ¶¶ 1–3, 17, one that they believe State could ameliorate if it simply exercised its regulatory authority in the manner they prefer. But Section 504 preserves States' "longstanding discretion" to make policy decisions of this kind, *see Choate*, 469 U.S. at 307, and plaintiffs have identified no "reasonable accommodation" that the State has failed to make that could rise to the level of discrimination. Plaintiffs' claims should be dismissed on this basis as well.

### C. Plaintiffs fail to plead any actionable legal claim in Count II.

Plaintiffs' claims can be dismissed in their entirety for any or all of the above reasons. But Count II, which purports to allege disability discrimination in the context of the State's education system, suffers from additional legal defects, each of which independently warrants dismissal.

First, Count II does not allege disability discrimination—the only form of discrimination actionable under Section 504—at all. As noted, Section 504 prohibits discrimination in federally funded programs "by reason of . . . disability." 29 U.S.C. § 794(a). But Count II does not allege disability discrimination. Instead, it appears to allege race discrimination, alleging that defendants have by failing to regulate firearms dealers "created a public health emergency for the plaintiff Black children," "subjected [plaintiffs' children] to discrimination based on race," and caused "a needless adverse racial impact." Am. Compl. ¶ 122. Defendants vehemently deny any allegation of racial discrimination, whether in the administration of Illinois firearms dealer regulations or in any other context. Regardless, though, racial discrimination is not actionable under Section 504, and so Count II should be dismissed on this basis alone.

Second, even if it were read to allege disability discrimination, Count II should separately be dismissed because no defendant named in this suit is responsible for the state public education system—the focus of Count II. The State Police and its director have no statutory or regulatory authority over the State's public education system and so are not responsible for any injury to plaintiffs because of the public education system. *See* 20 ILCS 2605/2605 *et seq.* (defining the authority and responsibilities of the State Police). Nor are the State as a whole, or its Governor, proper defendants under Section 504. The State's constitutional duty to provide a high-quality educational system is generally "discharged by the State through local boards of educations" and the authority to establish the State's system of free schooling is delegated to the "electorate of the several school districts, and their duly-elected school boards." *Tyska by Tyska v. Bd. of Educ. Twp.*

*High Sch. Dist. 214, Cook Cty.*, 453 N.E.2d 1344, 1352 (Ill. 1983); 105 ILCS 5/34-2 (providing that all cities in Illinois with a population exceeding 500,000, including Chicago, "shall constitute one school district. . . under the charge of a board of education"). Plaintiffs have not sued any of these entities. And the Seventh Circuit has explained that Section 504 was not meant to "sweep in" the whole state or local government if only one agency is discriminating. *Schroeder v. Chicago*, 927 F.2d 957, 962 (7th Cir. 1991). Because none of the named defendants have responsibility over the public education system, Count II should also be dismissed on this basis.

## CONCLUSION

For these reasons, plaintiffs' claims should be dismissed under either Rule 12(b)(1) or Rule 12(b)(6).


Dated: October 13, 2021                          Respectfully submitted,

                                                 KWAME RAOUL
                                                 Illinois Attorney General

                                       By:    */s/ Michael T. Dierkes*
                                                 Michael T. Dierkes
R. Douglas Rees                                  Office of the Illinois Attorney General
Eileen E. Boyle Perich                           100 W. Randolph Street, 13th Floor
Office of the Illinois Attorney General          Chicago, Illinois 60601
100 W. Randolph Street                           (312) 814-3672
Chicago, Illinois 60601                          michael.dierkes@ilag.gov