**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| DEMETRIA POWELL, as guardian ad litem and on behalf of her son D.P.; and SHANICE MATHEWS, as guardian ad litem and on behalf of her son D.W., <br><br> Plaintiffs, <br><br> v. <br><br> STATE OF ILLINOIS; ILLINOIS DEPARTMENT OF STATE POLICE; JB PRITZKER, in his official capacity as Governor of the state of Illinois; and BRENDAN F. KELLY, in his official capacity as Director of the Illinois Department of State Police, <br><br> Defendants. | No. 1:18-cv-06675 <br><br> Judge Joan B. Gotschall |

**DEFENDANTS' MEMORANDUM OF LAW**
**IN SUPPORT OF THEIR MOTION TO DISMISS**

Date: December 17, 2021

KWAME RAOUL
Attorney General of Illinois

R. Douglas Rees
Michael T. Dierkes
Eileen E. Boyle Perich
Office of the Illinois Attorney General
100 W. Randolph Street
Chicago, Illinois 60601

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... ii

INTRODUCTION ................................................................................................................. 1

BACKGROUND .................................................................................................................. 3

LEGAL STANDARD............................................................................................................. 6

ARGUMENT ...................................................................................................................... 7

I.      Plaintiffs Lack Standing................................................................................................ 7

      A.      Plaintiffs' injuries are not fairly traceable to defendants' alleged conduct. ........... 8

      B.      Plaintiffs' injuries are not redressable by the relief they seek. ............................ 11

II.      Plaintiffs Fail To Plead Plausible Section 504 Claims ..................................................... 14

      A.      Plaintiffs fail to plead the existence of a "program or activity" to which they
have been denied access......................................................................................... 14

      B.      Plaintiffs fail to plead that defendants have discriminated against them "solely
by reason of" their disabilities. ............................................................................. 16

III.      Plaintiffs Fail to Plead a Plausible Illinois Civil Rights Act Claim.

      CONCLUSION.................................................................................................................... 24

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Adams v. City of Indianapolis,*
  742 F.3d 720, 733 (7th Cir. 2014)……………………………………………………… 21

*Alexander v. Choate,*
   469 U.S. 287 (1985)............................................................................................14, 16, 18

*Alexander v. Sandoval,*
   532 U.S. 275 (2001)………………………………………………………………......…. 20

*Brady Campaign To Prevent Gun Violence United With The Million Mom March v.*
   *Ashcroft*, 339 F. Supp. 2d 68 (D.D.C. 2004) ...................................................................9, 10

*Cary v. N.E.. Ill. Reg'l Commuter R.R. Corp.,*
   19-cv-3014, 2020 U.S. Dist. LEXIS 49102, at *12-13 (N.D. Ill. March 22, 2020)……….. 21

*City of Los Angeles v. Lyons,*
   461 U.S. 95 (1983)....................................................................................................8, 13

*Clapper v. Amnesty Int'l USA,*
   568 U.S. 398 (2013)......................................................................................................7

*Coalition for Safe Chicago Communities v. Village of Riverdale,*
   2015-CH-10390, 2016 WL 1077293, at *1 (Ill. Cir. Ct. Feb. 25, 2016)……………….....22

*Combs v. Grand Victoria Casino & Resort,*
   2008 U.S. Dist, LEXIS 75726, at *7-8 (S.D. Ind. Sept. 30, 2008)………………….……… 20

*Conners v. Wilkie,*
   984 F.3d 1255 (7th Cir. 2021) ....................................................................................15

*Davis v. Echo Valley Condo. Ass'n,*
   945 F.3d 483 (6th Cir. 2019) .......................................................................................18

*EEOC v. Chicago Miniature Lamp Works,*
   947 F.2d 292 (7th Cir. 1991)………………………………………………...…………… 22

*EEOC v. Concentra Health Servs., Inc.,*
   496 F.3d 773 (7th Cir. 2007) ........................................................................................6

*Goldhamer v. Nagode,*
   621 F.3d 581 (7th Cir. 2010) .................................................................................6, 10, 12

*Good Shepherd Manor Found., Inc. v. City of Momence*,
    323 F.3d 557 (7th Cir. 2003) ...........................................................................16

*Hemisphere Bldg. Co. v. Vill. of Richton Park*,
    171 F.3d 437 (7th Cir. 1999) ...........................................................................16

*Husted v. A. Philip Randolph Inst.*,
    138 S. Ct. 1833 (2018)......................................................................................15

*Ill. Native Am. Bar Ass'n v. Univ. of Ill.*,
    856 N.E.2d 460, 467 (Ill. App. 1st Dist. 2006)…………………………………………………… 20

*Jackson v. Birmingham Bd. of Educ.*,
    544 U.S. 167 (2005).........................................................................................17

*James v. City of Evanston*,
    No. 20-cv-551, 2021 U.S. Dist. LEXIS 186804 at *45-46 (N.D. Ill Sept 29, 2021)………..20

*Juliana v. United States*,
    947 F.3d 1159 (9th Cir. 2020) ..............................................................10, 11, 12

*Linda R.S. v. Richard D.*,
    410 U.S. 614 (1973).........................................................................................12

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)...............................................................................6, 7, 8, 10

*Massachusetts v. EPA*,
    549 U.S. 497 (2007).........................................................................................10

*Petrote-Salinas v. Johnson*,
    No. 17-cv-5093, 2018 U.S. Dist. LEXIS 85912, at *17-18 (N.D. Ill. May 22, 2018)…….. 20

*Rucho v. Common Cause*,
    139 S. Ct. 2484 (2019).....................................................................................11

*RWJ Mgmt. Co. v. BP Prods N.A.*,
    672 F.3d 476, 479 (7th Cir. 2021)…………………………………………………….….. 19

*School Bd. of Nassau Cty., Fla. v. Arline*,
    480 U.S. 273 (1987)........................................................................................18

*Schroeder v. Chicago*,
    927 F.2d 957 (7th Cir. 1991) ...........................................................................20

*Simon v. E. Ky. Welfare Rights Org.*,
    426 U.S. 26 (1976)..........................................................................................13

*Southeastern Cmty. Coll. v. Davis*,
    442 U.S. 397 (1979).............................................................................18

*Summers v. Earth Island Institute*,
    555 U.S. 488 (2009).............................................................................10

*Taylor v. McCament*,
    875 F.3d 849 (7th Cir. 2017) ............................................................11

*Tex. Indep. Producers & Royalty Owners Ass'n v. EPA*,
    410 F.3d 964 (7th Cir. 2005) ..............................................................7

*Tobey v. Chibucos*,
    890 F.3d 634 (7th Cir. 2018) ..............................................................6

*Tyska by Tyska v. Bd. of Educ. Twp. High Sch. Dist. 214, Cook Cty.*,
    453 N.E.2d 1344 (Ill. 1983) ..............................................................19

*Smith v. City of Jackson*,
    544 U.S. 228, 241 (2005)…………………………………………………….... 20

*United States EEOC v. Warshawsky & Co.*,
    90-cv-1352, 1993 U.S. Dist. LEXIS 5011, at *51 (N.D. Ill. Apr. 15, 1993)………………..22

*Wagoner v. Lemmon*,
    778 F.3d 586 (7th Cir. 2015) ............................................................14

*Weiler v. Vill. Of Oak Lawn*,
    86 F.Supp, 3d 874, 889 (N.D. Ill. 2015)……………………………………………… 20

*Wis. Cmty. Servs. v. City of Milwaukee*,
    465 F.3d 737(7th Cir. 2006) (en banc) ..............................................16

**Statutes and Regulations**

29 U.S.C. § 794...............................................................................4, 13, 15, 19

42 U.S.C. § 12131..........................................................................................14

5 ILCS 830/10-1.......................................................................................4, 12

20 ILCS 2605/2605......................................................................................19

105 ILCS 5/34-2...........................................................................................20

430 ILCS
    68/5 ..........................................................................................1, 3
    68/5-30 ........................................................................................3

68/5-40 ..................................................................................................................3
68/5-50 ..................................................................................................................3
68/5-60 ..................................................................................................................3
68/5-65 ..................................................................................................................4

Ill. H.B. 562 (2021) .............................................................................................1, 4

20 Ill. Admin. Code
1232.10 ..................................................................................................................3
1232.60 ..................................................................................................................3
1232.90 ..................................................................................................................3
1232.100 ................................................................................................................4
1232.150 ................................................................................................................4

## Other Authorities

Ill. State Police, *Training*, https://isp.illinois.gov/foid/fdlc/training ...............................................1

Press Release, *Governor Pritzker Signs FOID Modernization Bill* (Aug. 2, 2021),
https://www.illinois.gov/news/press-release.23654.html ........................................................4

## INTRODUCTION

Although Plaintiffs raise serious and legitimate concerns about gun violence in the City of Chicago, their efforts to seek redress through legal claims against the State and the Illinois State Police fail as a matter of law. As Governor Pritzker and others have acknowledged, gun violence is a public-health crisis that requires the sustained and serious attention of policymakers across the State. The current rates of gun violence in the City, in particular, raise nuanced public-policy problems—problems that the Governor, the General Assembly, the State Police, and a range of other federal, state, county, and city officials have devoted significant time and energy to addressing. Most notably, since the filing of this lawsuit over three years ago, the State has created a new regulatory regime to license and oversee gun dealers, *see* 430 ILCS 68/5 *et seq.*, and in doing so has provided much, if not all, of the relief plaintiffs requested in their original complaint. And the State has done more, including by enacting omnibus legislation that, among other things, has increased funding for and comprehensively overhauled the system for issuing Firearm Owner's Identification (FOID) cards, *see* Ill. H.B. 562 (2021). As a result, the State now has a best-in-class regulatory scheme that oversees gun dealers (through licensure, inspections, and training) that is among the strongest in the country. The State also has provided the State Police with substantial additional funding to remove firearms from individuals with revoked FOID cards, and has created a new agency—the Office of Firearm Violence Prevention—to oversee the implementation of trauma-informed programs and practices in the areas hardest hit by gun violence.

The amendments to plaintiffs' complaint demonstrate their recognition of this progress. Whereas plaintiffs' initial complaint focused on the State's alleged failure to regulate firearm dealers (an issue the State has remedied), their second amended complaint now presents a grab-bag of purported flaws in *how* the State has chosen to regulate these businesses, *e.g.*, Doc. 115 ("SAC") ¶¶ 55–75. For instance, plaintiffs would replace the gun dealer training on straw

1

purchasing instituted by the Illinois State Police, *see* Ill. State Police, *Training*,[1] with a checklist written by plaintiffs' counsel, SAC ¶ 116; Doc. 95-2. Plaintiffs also apparently take issue with the manner in which the State determines whether to issue and revoke licenses. *Id.* ¶ 116. To remedy that alleged flaw, plaintiffs would have the State engage in court-monitored investigations of certain gun dealers, with the Court ultimately responsible for determining whether to revoke state-issued gun dealer licenses. *Id.* In short, plaintiffs center their second amended complaint on their belief that discrete aspects of the State's comprehensively revised regulatory regime could (and should) be managed the way they see fit. Whatever the merits of plaintiffs' initial complaint, the Court should reject plaintiffs' new effort to have plaintiffs' counsel and the Court micromanage these complicated policy matters that the State is actively and diligently working to resolve.

The Court should dismiss the amended complaint because it does not present a viable claim. Plaintiffs' legal argument—that the State and the State Police are intentionally discriminating against children on the basis of their disabilities by failing to impose certain regulations on firearms dealers—is fatally flawed. First, plaintiffs lack standing to superintend the State Police's regulation of firearms dealers because their children's injuries are neither fairly traceable to that regulatory regime nor redressable by the relief they now seek. Second, plaintiffs' claims fail on the merits. With respect to the Rehabilitation Act claim, plaintiffs identify no relevant "program or activity" that their children have been denied access to, and they cannot show that the State has intentionally discriminated against their children on the basis of disability by failing to impose plaintiffs' preferred regulations on third parties. With respect to the Illinois Civil Rights Act (ICRA) claim, plaintiffs do not adequately allege that they are subjected to

---

[1] https://isp.illinois.gov/foid/fdlc/training. All websites last visited Oct. 13, 2021.

discrimination as a result of specific "criteria or methods of administration" of the State Police or the State, as required to state a claim.

## BACKGROUND

Plaintiff Demetria Powell and two other Chicago residents brought this action in October 2018, seeking declaratory and injunctive relief for alleged violations of the Americans with Disabilities Act and the Illinois Civil Rights Act. Doc. 1. Plaintiffs initially alleged that defendants discriminated against Chicago-area schoolchildren by failing to regulate the State's gun dealers and by failing to take possession of FOID cards that had been suspended or revoked. *Id.* ¶¶ 28, 58–60. Plaintiffs asked the Court to enter an injunction requiring the State to regulate gun dealers in a variety of ways, including by imposing requirements that dealers conduct background checks on all gun store employees, install video recording systems, train employees on common signs of straw purchasing, take possession of FOID cards that have been suspended or revoked, submit regular audits of inventory, and participate in a tracking system designed to trace "crime guns." *Id.*

Defendants moved to dismiss, Doc. 24, and the Court granted and denied in part that motion, Doc. 37, leading to defendants' interlocutory appeal of the denial of their sovereign-immunity defense, Doc. 45. In June 2021, while the appeal was pending, plaintiffs Powell and Shanice Matthews sought and were granted leave to file an amended complaint, Docs. 94, 96, thus mooting the appeal. After defendants filed a motion to dismiss the amended complaint, Doc. 106, plaintiffs sought and were granted leave to file a second amended complaint, Docs. 113, 114.

In the three years since plaintiffs filed their initial complaint, the State has made significant changes to the way it regulates gun dealers. Most obviously, in 2019 the State substantially enhanced its regulatory regime overseeing firearms dealers in Illinois. That regime—governed by the Firearm Dealer License Certification Act, 430 ILCS 68/5 *et seq.*, and its implementing

3

regulations, 20 Ill. Admin. Code 1232.10 *et seq.*—imposes a licensure requirement on firearms dealers in Illinois. Now, to receive and maintain a dealer license, gun dealers must comply with a number of wide-ranging conditions. For instance, gun dealers must aver that their employees have a valid FOID card (and thus have submitted to a background check), 430 ILCS 68/5-40(a); install video recording systems, *id.* 68/5-50(a); 20 Ill. Admin. Code 1232.60; receive annual training that includes common signs of straw purchasing, 430 ILCS 68/5-30, 5-60; 20 Ill. Admin. Code 1232.90; and implement an electronic recordkeeping system to track inventory, 430 ILCS 68/5-65; 20 Ill. Admin. Code 1232.100. Gun dealers are also subject to regular inspections, and, if found in violation of the Act, face sanctions that include suspension or revocation of their license. 20 Ill. Admin. Code 1232.150. At the same time, the General Assembly also enacted the Gun Trafficking Information Act, 5 ILCS 830/10-1 *et seq.*, which tasks the State Police with studying and making public, where possible, information regarding gun trafficking within the State.

More recently, the State has also adopted significant measures to modernize and support the FOID system. Relevant here, the Governor recently signed HB562, the most comprehensive reform of the FOID system in years, which among other things requires the State Police to remove firearms from individuals with revoked FOID cards and provides additional funding for the State Police to carry out that task. *See* Ill. H.B. 562 (2021); *see also* Press Release, *Governor Pritzker Signs FOID Modernization Bill* (Aug. 2, 2021).[2] The legislation also expands background checks to all firearm sales, invests in mental health programs for communities most impacted by gun violence, creates a stolen firearms database, provides incentives for FOID card applicants to submit fingerprints, and formalizes many internal programs established by Director Kelly during his

---

[2] https://www.illinois.gov/news/press-release.23654.html. The text of the bill is available at https://www.ilga.gov/legislation/102/HB/PDF/10200HB0562lv.pdf.

tenure. *Id.* As relevant here, the legislation also directs the State Police to establish a "stolen gun database" and to monitor state and federal databases for prohibited gun buyers. *See* Ill. H.B. 562, §§ 20, 25 (to be codified at 430 ILCS 65/3(a-25), 65/8.5, 66/66).

In addition to implementing measures directed at regulating gun dealers and enhancing the FOID system, the State recently enacted legislation creating the Office of Firearm Violence Prevention, which is tasked with creating and overseeing evidence-based programs designed to reduce gun violence and trauma in the communities most affected by that violence. *See* Reimagine Public Safety Act, 430 ILCS 69/1 *et seq.* (eff. June 17, 2021); Public Act 102-0679 (eff. Dec. 10, 2021) (amending the Reimagine Public Safety Act). And on November 1, 2021, the Governor issued an executive order declaring gun violence to be a public health crisis and pledged $250 million over three years to implement the Reimagine Public Safety plan. *See* Press Release, *Governor Pritzker Declares Gun Violence a Public Health Crisis, Pledges $250 Million Investment for Hardest Hit Communities* (Nov. 1, 2021).[3]

Plaintiffs' second amended complaint reflects these comprehensive changes in two major ways. First, plaintiffs have changed legal theories on their federal claim, now alleging a violation of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a), rather than the ADA. SAC ¶¶ 114–23. Specifically, Plaintiffs allege that Illinois law obligates defendants, and in particular the State Police, to "issue regulations" that would "curb the diversion of legal guns to the illegal market," and that the State Police's failure to issue regulations of this kind constitutes "discrimination against children whose daily exposure to gun violence aggravates their mental and emotional disabilities" in violation of Section 504. *Id.* ¶¶ 8, 13. Plaintiffs seek declaratory and

---

[3] https://www.illinois.gov/news/press-release.24090.html.

injunctive relief against defendants—the State, the Governor, the State Police, and its director, Brendan Kelly. *Id.* ¶¶ 116, 123.

Second, the nature of plaintiffs' allegations have shifted, presumably in recognition that the State has already accomplished much, if not all, of what plaintiffs initially sought: new state-level regulations on gun dealers and additional resources to enforce FOID card revocation. Plaintiffs' amended complaint sets forth a number of ways in which they would fine-tune the workings of the gun-dealer licensing regime to align with their priorities and preferences. *E.g.*, SAC ¶¶ 55–75. And for a remedy, plaintiffs seek injunctive relief in the form of an order directing ISP to "require gun dealers to comply" with a set of "responsible business practices" plaintiffs have separately lodged with the Court. *Id.* ¶¶ 114, 116. Plaintiffs also ask the Court to reallocate resources to "enforce the FOID Act in Cook County" and to direct ISP to investigate "patterns of straw purchase sales" and to "revoke the licenses" of gun dealers. *Id.* ¶¶ 114, 116. Finally, plaintiffs repeatedly request that defendants be required "to use their full authority under [the] Gun Dealer Licensing Act, the FOID Act, and the Gun Trafficking Information Act." *Id.* ¶¶ 116, 122.

## LEGAL STANDARD

Defendants seek dismissal under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Tobey v. Chibucos*, 890 F.3d 634, 639 (7th Cir. 2018) (cleaned up). A plaintiff must plead sufficient facts to give a defendant fair notice of the claim and the grounds upon which it rest; those facts, if true, must plausibly suggest that the plaintiff is entitled to relief, "raising that possibility above a speculative level." *EEOC v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (cleaned up).

**ARGUMENT**

Plaintiffs' second amended complaint should be dismissed on either of two grounds. First, plaintiffs lack standing to superintend the State Police's regulation of third parties, because their alleged injuries are neither traceable to the regulatory regime they challenge nor redressable by the relief they seek. Second, plaintiffs fail to state a claim. Plaintiffs' Section 504 claim fails on the merits, because (among other reasons) they fail to allege a "program or activity" to which defendants have denied plaintiffs' children access "solely" on the basis of their disabilities. And plaintiffs' ICRA claim fails on the merits because they do not adequately allege that defendants utilize specific "criteria or methods of administration" that subject them to discrimination based on their race.

## I.      Plaintiffs Lack Standing

Plaintiffs' suit should be dismissed at the threshold under Rule 12(b)(1) because plaintiffs lack standing to superintend the State Police's regulation of third-party gun dealers. Article III of the Constitution "limits the jurisdiction of the federal courts to actual 'Cases' and 'Controversies.'" *Goldhamer v. Nagode*, 621 F.3d 581, 584 (7th Cir. 2010); *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). To establish standing to seek prospective relief, plaintiffs must show that "(1) they are under threat of an actual and imminent injury in fact; (2) there is a causal relation between that injury and the conduct to be enjoined; and (3) it is likely, rather than speculative or hypothetical, that a favorable judicial decision will prevent or redress that injury." *Goldhamer*, 621 F.3d at 585. These requirements "prevent the judicial process from being used to usurp the powers of the political branches." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). Plaintiffs have not established and cannot establish standing, both because their injuries are not fairly traceable to the State Police's regulation of firearms dealers and because it is not likely that those injuries could be redressed by the relief they seek.  Their Section 504 and ICRA claims should be dismissed.

A.     **Plaintiffs' injuries are not fairly traceable to defendants' alleged conduct.**

Plaintiffs' suit should be dismissed first and foremost because the causal chain between plaintiffs' alleged injuries and defendants' alleged failure to regulate private parties not before the Court is too attenuated to support Article III standing. As the Supreme Court explained in *Lujan*, "when [a] plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is . . . 'substantially more difficult' to establish." 504 U.S. at 562 (quoting *Allen v. Wright*, 468 U.S. 737, 758 (1984)). That is because, in such a context, "causation and redressability ordinarily hinge on the response of the regulated (or regulable) third party to the government action or inaction," meaning that the existence of jurisdiction "depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict." *Id.* As a consequence, "when, as here, 'a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else*, much more is needed.'" *Tex. Indep. Producers & Royalty Owners Ass'n v. EPA*, 410 F.3d 964, 971 (7th Cir. 2005) (quoting *Lujan*, 504 U.S. at 562 (emphasis in original)). And the question in this context is not whether there is a causal connection between defendants' regulation of licensed firearm dealers and gun violence in the City of Chicago as a general matter, or between such regulation and the injuries of the putative class. Rather, plaintiffs must show a causal connection between defendants' regulation of firearm dealers and plaintiffs' *own* asserted injury—i.e., that their children will encounter gun violence in the future, triggering their traumatic stress disorder. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983).

Plaintiffs cannot satisfy this exacting standard. Plaintiffs' traceability argument is, in short, that if defendants were to adopt some or all of their suggested regulatory measures—by promulgating revised regulations regarding sales protocols, issuing reports about gun trafficking

within the State, increasing resources to analyze "trace data," and the like, SAC ¶¶ 54–78—their children would be less likely to encounter gun violence in the future. That is so, plaintiffs posit, because dealers would be less likely to sell firearms to straw purchasers, which would reduce the number of firearms circulating in Chicago, which would reduce gun violence, which would decrease the chance that their children would be exposed to such violence in the future, which would reduce the "PTSD symptoms and resulting handicaps." SAC ¶ 15.

Plaintiffs' suggested causal chain is far too attenuated, and turns on far too many speculative inferences, to invoke the jurisdiction of federal courts, especially given the extraordinary remedies they seek—essentially, federal-court supervision over the State's regulation of firearms dealers. *Infra* pp. 11–12. Whether plaintiffs' children will personally encounter gun violence in the future turns on the actions of a wide range of third parties, including federal, county, and city co-regulators; regulated firearms dealers; dealers outside of Illinois; gun traffickers; and, of course, the perpetrators of violence. Plaintiffs have not "adduce[d] facts showing that" the many decisions made by these third parties "will be made in such manner as to produce causation," *Lujan*, 504 U.S. at 562.

That plaintiffs' new complaint focuses on the State's implementation of the statutes the General Assembly has passed (and the regulations the State Police have promulgated) since they first filed suit, as opposed to the State's failure to take any action at all, differentiates the standing issue here from the standing issue the Court previously adjudicated. *See* Doc. 37 at 16–21. As the Court explained in its 2019 opinion, plaintiffs' prior complaint alleged the existence of specific regulations the State Police could promulgate that (plaintiffs alleged) would "appreciably diminish the rate of gun violence" in the City. *Id.* at 19–20. Since that time, though, the General Assembly has passed (and the Governor has signed) statutes taking most if not all of the steps that plaintiffs

9

alleged were needed to stem gun violence, and the State is in the process of implementing those measures. *Supra* pp. 3–4. As a result, plaintiffs' new complaint no longer "lists . . . specific regulations" the State could enact, Doc. 37 at 8; rather, it pairs generalized complaints about the State's alleged failure to use its "full regulatory authority" under the newly enacted statutes, *see, e.g.*, SAC ¶¶ 3, 9, 14, 17, 18, 22, 52, 74, 78, 79, 115, 118, with directives about how exactly the State could (in plaintiffs' view) best direct its existing regulatory resources, *see, e.g.*, *id.* ¶ 64 (implement nonprofit-drafted "checklist"); *id.* ¶ 68 ("dedicate resources to analyze trace data"); *id.* ¶ 116 ("determine and submit to th[e] Court a determination of patterns of straw purchase sales"); *id.* ("revoke the licenses" of specific gun dealers). Plaintiffs have not made a plausible showing that their injuries are traceable to the State's regulation of gun dealers or that fine-tuning the State's regulatory machine in their preferred manner would redress those injuries.

Courts in analogous cases have found standing lacking, and for good reason. In *Brady Campaign To Prevent Gun Violence United With The Million Mom March v. Ashcroft*, 339 F. Supp. 2d 68 (D.D.C. 2004), for instance, a nonprofit organization sued the Bureau of Alcohol, Tobacco, and Firearms ("ATF"), arguing that its policy regarding the repair of semiautomatic assault weapons violated federal law. *Id.* at 72. Plaintiff there, like plaintiffs here, argued that it had standing because the challenged policy increased the number of assault weapons available, which in turn exposed plaintiff's members, many of whom "live[d] in neighborhoods where [assault weapon]-related violence occur[ed] regularly," to increased rates of violence. *Id.* at 71– 72. The court held that plaintiffs had not met their "heavy burden" to establish traceability. *Id.* at 77. That was so, the court explained, because even if the policy were set aside, the regulated entities would simply take other actions to ensure the availability of firearms. *Id.* The same is true here. Plaintiffs have not "adduce[d] facts showing that" the many third parties whose actions are

implicated in the causal chain will respond in the precise way they posit to the regulatory actions they want defendants to take and, in doing so, decrease the risk that their children will personally encounter gun violence in the future. *Lujan*, 504 U.S. at 562.

To be sure, the Court previously rejected defendants' motion to dismiss the prior complaint on standing grounds, relying principally on an analogy to environmental-law cases. Doc. 37 at 16–22. But those authorities do not support plaintiffs' standing, at least not on the current complaint. *Summers v. Earth Island Institute*, 555 U.S. 488 (2009), and *Massachusetts v. EPA*, 549 U.S. 497 (2007), each involved the denial of a procedural right—a right whose denial, the Supreme Court explained in *Massachusetts*, a plaintiff may challenge "without meeting all the normal standards for redressability and immediacy." *Id.* at 517–518; *see also Lujan*, 504 U.S. at 572 n.7 (explaining that "'procedural rights' are special"). In such a case, a plaintiff may establish standing simply by showing that "there is *some* possibility" that adherence to the procedure would alleviate the alleged injury. *Massachusetts*, 549 U.S. at 518 (emphasis added). But the standard plaintiffs face here is more exacting: They must show that it is "likely" that the relief they request would redress their asserted injuries. *Goldhamer*, 621 F.3d at 585. Because the causal connection between defendants' regulation of firearm dealers and plaintiffs' asserted injuries is far from "likely," and is at best extremely remote, plaintiffs cannot make their required showing. *Accord Juliana v. United States*, 947 F.3d 1159, 1171 (9th Cir. 2020) (distinguishing *Massachusetts* on this ground).

### B. Plaintiffs' injuries are not redressable by the relief they seek.

Plaintiffs' also lack standing because it is not "likely" that the relief they seek will remedy their children's alleged injuries. *Goldhamer*, 621 F.3d at 585. That is so for multiple reasons.

First, plaintiffs ask the Court to enter a sweeping remedy—essentially, federal supervision of the State's regulation of firearms dealers—that extends far beyond its institutional capacity. To establish redressability, plaintiffs must identify relief that is "within the court's power to award."

*Juliana*, 947 F.3d at 1170; *see Taylor v. McCament*, 875 F.3d 849, 853 (7th Cir. 2017) (no standing where court is "unable to provide relief"). Here, plaintiffs ask the Court to enter not a prohibitory injunction—i.e., one that bars defendants from taking affirmative actions that they say violate the law—but to direct the State, as a sovereign entity, to regulate firearms dealers on the terms that plaintiffs (or the Court) think best. SAC ¶¶ 54–76. As the Supreme Court recently explained, however, federal courts "have no commission to allocate political power . . . in the absence of a constitutional directive or legal standards to guide [them] in the exercise of such authority." *Rucho v. Common Cause*, 139 S. Ct. 2484, 2508 (2019). Applying that standard, the Ninth Circuit held last year that plaintiffs who (like plaintiffs here) sought to harness governmental regulatory power to better address widespread social harms lacked standing to do so, because the federal courts lack manageable standards for overseeing such a regulatory enterprise (and so plaintiffs' injuries were not redressable). As that court explained, "it is beyond the power of an Article III court to order, design, supervise, or implement" such a "remedial plan"—i.e., one that "would necessarily require a host of complex policy decisions entrusted, for better or worse, to the wisdom and discretion of the executive and legislative branches." *Juliana*, 947 F.3d at 1171.

That is exactly what plaintiffs seek here. They ask the Court to take control of the State's policymaking apparatus and direct it to promulgate regulations, reallocate enforcement resources, and more, on the premise that the State's own decisionmaking in this area has violated federal law. *See* SAC ¶¶ 54–76. But plaintiffs identify no standards that could conceivably guide the Court in issuing a remedy. For instance, plaintiffs argue repeatedly that the State has failed to use its "full regulatory authority" under several Illinois statutes, *e.g.*, *id.* ¶¶ 3, 9, 14, 17, 18, 22, 52, 74, 78, 79, 115, 118, and even request that the Court "[o]rder" the State and the State Police to "use their full authority" under those statutes as a remedy for their alleged discrimination, *id.* ¶ 116(c). But the

12

decision *how* to use that authority requires "consideration of 'competing social, political, and economic forces,' which must be made by the People's 'elected representatives, rather than by federal judges.'" *Juliana*, 947 F.3d at 1172 (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 128–29 (1992)). Plaintiffs would have the Court accept that authority for itself, but offer no manageable standard for how the Court would do so. Plaintiffs' scattered specific requests are of no more help. Plaintiffs ask the Court, for instance, to "[o]rder" the State Police to "revoke the licenses" of certain unidentified firearms dealers, SAC ¶ 116(d), but plaintiffs lack standing to obtain specific relief of that sort, *see Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973). In the end, plaintiffs' effort to direct the State's policymaking apparatus fails because they seek relief that the Court lacks the authority to order. *Juliana*, 947 F.3d at 1172–73.[4]

Second, even if the Court were able to discern manageable standards for the award of the relief plaintiffs seek, it still would not be "likely," *Goldhamer*, 621 F.3d at 585, that such relief would reduce the likelihood that their children would personally encounter gun violence in the future. As the court explained its prior opinion, Doc. 37 at 12–13, because plaintiffs seek only prospective injunctive relief, the question is not whether (for instance) an award of money damages would ameliorate their completed injuries, but rather whether it is likely that the regulatory measures that they suggest would prevent *future* injury. And plaintiffs must make that showing as to their own children, not other children. *See Lyons*, 461 U.S. at 105; *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40 n.20 (1976) ("That a suit may be a class action . . . adds nothing to

---

[4] Aspects of the relief plaintiffs seek are also squarely outside the agency's authority. For instance, plaintiffs argue that the State Police should promulgate regulations to implement the Gun Trafficking Information Act, 5 ILCS 830/10-1 *et seq.*, SAC ¶ 8, but that statute does not confer rulemaking authority on the agency. Plaintiffs likewise argue that the State Police should "require the fingerprinting of all applicants" for FOID cards, *id.* ¶ 72, but identify no statutory provision conferring such authority on the agency.

13

the question of standing."). Plaintiffs cannot satisfy that standard. Even if they could show (as they suggest) that the adoption of some or all of their preferred regulations would reduce the level of gun violence in Chicago in the aggregate, SAC ¶ 80, they cannot plausibly show that the adoption of those regulations would impact their children personally, as they must to invoke the jurisdiction of the federal courts, *see Simon*, 426 U.S. at 45 ("[U]nadorned speculation will not suffice to invoke the federal judicial power."). Their action should be dismissed on this basis as well.

## II.     Plaintiffs Fail To Plead A Plausible Section 504 Claim

If the Court considers the merits of plaintiffs' Rehabilitation Act claim, the Court should dismiss it under Rule 12(b)(6) because plaintiffs have failed to state a plausible claim under Section 504. Section 504 provides that "[n]o otherwise qualified individual" may "be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance" if any such adverse action occurs "solely by reason of his or her disability." 9 U.S.C. § 794(a). Plaintiffs assert that defendants' failure to regulate firearms dealers constitutes disability discrimination because exposure to gun violence can cause children to "develop acute or post-traumatic stress disorder," SAC ¶ 86, rendering them disabled within the meaning of Section 504. *Accord id.* p. 27 (alleging that plaintiffs "exposure to gun violence has left them disabled within the meaning of Section 504"). These allegations fail on multiple levels.

### A.     Plaintiffs fail to plead the existence of a "program or activity" to which they have been denied access.

First, plaintiffs have failed to plead the existence of a "program or activity" to which they have been denied access. A plaintiff alleging a violation of the Rehabilitation Act must allege that the defendant "denied him access to a program or activity because of his disability." *Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015). The crux of plaintiffs' argument is that defendants

have discriminated against their children by failing to use its "full regulatory authority" to regulate state-licensed firearms dealers. *See, e.g.*, SAC ¶¶ 14, 17, 18, 22(b), 38, 52, 54, 56, 57, 60–62, 76–77, 114, 118–19.[5] But plaintiffs do not allege the existence of any particular service, program, or activity that this alleged failure denies them access to.

The Court read plaintiffs' prior complaint to allege discrimination in "the FOID firearms identification program," Doc. 37 at 26, but that basis cannot sustain plaintiffs' present complaint. For one, the current focus of plaintiffs' complaint appears to be not FOID firearms identification, but the State Police's regulation of firearms dealers. *See* SAC ¶¶ 54–62 (describing regulatory regime regarding licensure of firearms dealers in detail). Regardless, though, neither regulatory regime—FOID card enforcement nor firearm dealer licensure—is a *program* in which plaintiffs, as members of the public, participate in any meaningful way. The key purpose of Section 504, as the Supreme Court has explained, is to ensure that disabled people are given "meaningful access" to a "program or benefit." *Alexander v. Choate*, 469 U.S. 287, 301 (1985); *see also* 42 U.S.C. § 12131(2) (defining disabled individuals as those who are eligible "for the receipt of services or the participation in programs or activities provided by a public entity"). But here, plaintiffs do not allege that they have been denied meaningful access to *any* program or benefit to which they are personally entitled. They simply allege that defendants' administration of programs and services in which they do *not* participate have a collateral effect on them. That argument does not state a Section 504 claim.

---

[5] To state the obvious, although defendants are, in many of the contexts identified in the complaint, using their "full regulatory authority" to combat gun violence, even if they were not, that fact would be irrelevant to the question whether they are violating Section 504.

### B. Plaintiffs fail to plead that defendants have discriminated against them "solely by reason of" their disabilities.

Plaintiffs also do not and cannot make a plausible showing that defendants have discriminated against their children "solely by reason of" their disabilities. 29 U.S.C. § 794(a). Section 504 has a "stricter causation requirement" than the ADA, the statute under which plaintiffs previously attempted to press their claims: "[T]he plaintiff's disability must be the sole reason for the alleged discriminatory action." *Conners v. Wilkie*, 984 F.3d 1255, 1260 (7th Cir. 2021). "Solely by reason of" means that a defendant must have acted "for no reason other" than the plaintiff's disability. *See Husted v. A. Philip Randolph Inst.*, 138 S. Ct. 1833, 1842 (2018). Plaintiffs cannot plausibly meet this demanding standard.

At the outset, plaintiffs cannot show that defendants have *intentionally* declined to adopt the wide-ranging regulations of the firearms industry plaintiffs suggest because of plaintiffs' PTSD. Indeed, plaintiffs do not genuinely attempt to make such a showing. Although they allege that defendants have "discriminat[ed] against the plaintiff children as a class and inflicting a special injury upon them by virtue of their disability," SAC ¶ 115, they do not allege any facts raising a plausible inference that defendants acted with discriminatory intent. Nor could they. Defendants have not declined to adopt plaintiffs' preferred regulations out of discriminatory animus against plaintiffs, other disabled individuals, or, for that matter, anyone else.

Plaintiffs' claim, instead, appears to be that defendants have discriminated against them by failing to accommodate their disabilities. *See id*. ¶¶ 114, 116(b). As the Seventh Circuit has explained, the "Supreme Court has located a duty to accommodate" within Section 504, *Wis. Cmty. Servs. v. City of Milwaukee*, 465 F.3d 737, 747 (7th Cir. 2006) (en banc), under which public entities must "assure meaningful access" to covered programs and services, *Choate*, 469 U.S. at 301. Even assuming plaintiffs have alleged any covered program or service to which they have

16

been denied access, *supra* pp. 14–15, plaintiffs have not alleged a failure to accommodate that is actionable under Section 504.

To start, plaintiffs have not plausibly alleged that defendants have failed to accommodate them by removing some barrier to program access that affects them *because they are disabled*—the only "accommodation" defendants are required to make under Section 504. In a series of cases building on *Choate*, the Seventh Circuit has explained that "the Rehabilitation Act helps disabled individuals obtain access to benefits only when they would have difficulty obtaining those benefits 'by reason of' their disabilities, and not because of some quality that they share generally with the public." *Wis. Cmty. Servs.*, 465 F.3d at 748; *accord Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 562 (7th Cir. 2003) (ADA); *Hemisphere Bldg. Co. v. Vill. of Richton Park*, 171 F.3d 437, 440 (7th Cir. 1999) (FHAA). These cases reject the argument that a defendant is obligated to provide a reasonable accommodation to disabled people simply because a practice that "adversely affects [everyone's] ability" to access a program or service "also affects disabled [people's] access." *Good Shepherd*, 323 F.3d at 562. But that is essentially plaintiffs' argument. Plaintiffs do not allege facts, for instance, that their children have been denied whatever benefits of their preferred regulatory regime might exist because they are disabled; rather, they argue that *all* Chicago children (or, alternatively, all Black Chicago children) would benefit from adoption of their preferred regime, disabled and able-bodied alike. *See, e.g.*, SAC ¶ 21 (defining the proposed class as, in part, "[a]ll African-American children" living in Chicago who are "at risk of becoming disabled by their exposure to gun violence"); *id.* ¶ 30 (explaining that gun violence affects certain populations more than others, without regard to present disability).

In actuality, plaintiffs' claims do not show discrimination at all. Plaintiffs do not allege any facts to make a plausible showing that defendants have treated plaintiffs' children differently

17

because they are disabled. *See Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174 (2005) (explaining that "the normal definition of discrimination is differential treatment"). Plaintiffs' claim does not even appear to be that defendants have taken facially neutral action that has a differential *effect* on their children because they are disabled—i.e., a disparate-impact claim. Instead, plaintiffs assert that defendants have taken a facially neutral action that has caused their children, and similarly situated individuals, to *become* disabled. *See* SAC ¶ 21 (defining the proposed class to include children who are not presently disabled but who are "at risk of becoming disabled"); *id.* p. 27 (alleging that plaintiffs' "exposure to gun violence has left them disabled within the meaning of Section 504"). But that is not a claim that is actionable under Section 504, because it is simply not a discrimination claim at all. Plaintiffs' reading of Section 504 would give that statute an outsized mandate, transforming any and all state action that could plausibly be viewed to cause injury into actionable discrimination. Plaintiffs identify no reason to read Section 504 in such an expansive manner.

Plaintiffs' reasonable-accommodation theory finally fails for one additional reason: None of the relief plaintiffs request could plausibly be viewed as a reasonable accommodation. As the Supreme Court has explained, although a recipient of federal funding may be required in certain circumstances to make a "reasonable" accommodation to ensure "meaningful access" to a program or service, the recipient is not required to "make 'fundamental' or 'substantial' modifications" to programs in order to do so. *Choate*, 469 U.S. at 300–01; *Se. Cmty. Coll. v. Davis*, 442 U.S. 397, 412–13 (1979). Section 504, in other words, does not intrude upon "the States' longstanding discretion" to enact generally applicable programs and policies, *Choate*, 469 U.S. at 307; it simply requires States to make "individualized" exceptions to those polices where doing so is necessary to ensure access for disabled people, *Sch. Bd. of Nassau Cty., Fla. v. Arline*, 480 U.S. 273, 287

(1987); *see Davis v. Echo Valley Condo. Ass'n*, 945 F.3d 483, 491 (6th Cir. 2019) ("A request works a fundamental change if it turns the challenged policy into something else entirely.").

Plaintiffs' requested relief plainly crosses this line. Plaintiffs at bottom seek to have the Court harness the State's "full regulatory authority" and alter the basic terms and conditions of multiple state programs, all on the theory that doing so is necessary to ameliorate discrimination against children who do not participate in those programs. *See, e.g.*, SAC ¶¶ 14, 17, 18, 22(b), 38, 52, 54, 56, 57, 60–62, 76–77, 114, 118–19. But this does not really seek an "accommodation" at all, *see Echo Valley*, 945 F.3d at 490 ("In this context, the word 'accommodation' means 'adjustment.'"), and even if it could be characterized as such, it is not a "reasonable" one. Rather, plaintiffs seek across-the-board change for all state residents. Plaintiffs admit as much. They describe gun violence as a "public health emergency" affecting all Chicago residents, SAC ¶¶ 1–3, 17, one that they believe State could ameliorate if it simply exercised its regulatory authority in the manner they prefer. But Section 504 preserves States' "longstanding discretion" to make policy decisions of this kind, *see Choate*, 469 U.S. at 307, and plaintiffs have identified no "reasonable accommodation" that the State has failed to make that could rise to the level of discrimination. Plaintiffs' claims should be dismissed on this basis as well.

## III.    Plaintiffs Fail to Plead a Plausible Illinois Civil Rights Act Claim

Plaintiffs also assert (Count II) a state-law claim under the Illinois Civil Rights Act, 740 ILCS 23/5(a)(2). *See* SAC ¶¶ 117-21. But if this Court dismisses plaintiffs' Section 504 claim, as it should, then the Court should decline to exercise supplemental jurisdiction over the ICRA claim. *See* 28 U.S.C. § 1367(c)(3). When all federal claims have been dismissed before trial, "the presumption is that the court will relinquish federal jurisdiction over any supplemental state law claims." *RWJ Mgmt. Co. v. BP Prods. N.A.*, 672 F.3d 476, 479 (7th Cir. 2012). This presumption "should not be lightly abandoned, as it is based on a legitimate and substantial concern with

19

minimizing federal intrusion into areas of purely state law." *Id.* Here, relinquishing jurisdiction over plaintiffs' ICRA claim is appropriate because the Court has not yet committed substantial judicial resources to addressing the claim, and also because the claim is novel. *Id.* at 481; *see also James v. City of Evanston*, No. 20-cv-551, 2021 U.S. Dist. LEXIS 186804, at *45–46 (N.D. Ill. Sept. 29, 2021) (declining to exercise supplemental jurisdiction over ICRA claim); *Petrote-Salinas v. Johnson*, No. 17-cv-5093, 2018 U.S. Dist. LEXIS 85912, at *17–18 (N.D. Ill. May 22, 2018) (same).

In any event, plaintiffs' second amended complaint does not state a valid ICRA claim. After the U.S. Supreme Court limited the scope of disparate impact claims brought under Title VI of the Federal Civil Rights Act in *Alexander v. Sandoval,* 532 U.S. 275 (2001), the Illinois legislature passed ICRA, which in effect preserved the Title VI cause of action in Illinois law, but was not intended to create new rights beyond what had been previously recognized in federal law. *See Ill. Native Am. Bar Ass'n v. Univ. of Ill.,* 856 N.E.2d 460, 467 (Ill. App. 1st Dist. 2006); *Weiler v. Vill. of Oak Lawn,* 86 F. Supp. 3d 874, 889 (N.D. Ill. 2015). Thus, in interpreting ICRA, courts may look to federal civil rights cases for guidance. *Weiler*, 86 F. Supp. 3d at 889.

To state an ICRA claim, plaintiffs must adequately allege that the defendant (1) utilizes "criteria or methods of administration" that (2) "have the effect of subjecting individuals to discrimination because of their race, color, rational origin, or gender." 740 ILCS 23/5(a)(2). Federal courts have understood this standard to mean that plaintiffs asserting a disparate impact claim must isolate and identify the "specific practice" responsible for the alleged disparity. *See Smith v. City of Jackson*, 544 U.S. 228, 241 (2005) (noting that it is "not enough" for plaintiffs to "point to a generalized policy that leads to such an impact"); No. 08-cv-414, *Combs v. Grand Victoria Casino & Resort*, 2008 U.S. Dist. LEXIS 75726, at *7-8 (S.D. Ind. Sept. 30, 2008)

(dismissing ADEA disparate impact claim at pleading stage for failure to challenge specific employment practice). Then, once a specific practice is identified, plaintiffs must allege some facts tending to show that the practice caused a relevant and statistically significant disparity. *See Adams v. City of Indianapolis*, 742 F.3d 720, 733 (7th Cir. 2014) (affirming dismissal of disparate impact claim).

Plaintiffs' ICRA claim fails to meet that standard for several reasons. First, plaintiffs do not identify any specific "criteria or methods of administration." Instead, plaintiffs simply recite the legal standard, alleging that "the defendants have used 'criteria and methods of administration' that have created a public health emergency for the plaintiff Black children and have subjected them to discrimination." SAC at ¶ 121. But to state an ICRA claim, plaintiffs need to explain *which* criteria and methods of administration are at issue. *See, e.g.*, *Cary v. N.E. Ill. Reg'l Commuter R.R. Corp.*, 19-cv-3014, 2020 U.S. Dist. LEXIS 49102, at *12-13 (N.D. Ill. March 22, 2020) (dismissing ICRA claim at pleading stage because plaintiff failed to identify specific practice that caused alleged disparate impact).

The only additional color that plaintiffs provide are their generalized allegations that defendants have "fail[ed] to use their full regulatory authority" to address gun violence. SAC at ¶ 118; *see also id.* at ¶¶ 3, 14, 17, 18, 52. This, too, is insufficient to state an ICRA claim and does not put defendants on notice of which policy or method of administration is at issue. To be sure, the factual allegations in plaintiffs' second amended complaint include examples of additional measures they believe the State *should* take to curb gun violence. SAC at ¶¶ 54-76. But this list does not include, and the ICRA claim nowhere identifies, any policy currently in force, or any practice currently in use, that they claim disparately impacts minorities under ICRA.

Both state and federal case law confirm that plaintiffs have not stated a viable ICRA claim. In *Coalition for Safe Chicago Communities v. Village of Riverdale*, the plaintiffs sued two villages, alleging that they violated ICRA by failing to adequately regulate and license firearms, thus causing a disparate impact on minorities. No. 2015-CH-10390, 2016 WL 1077293, at *1 (Ill. Cir. Ct. Feb. 25, 2016) (J. Valderrama). The court dismissed the claim, holding not only that the plaintiffs lacked standing, but also that they had not identified specific "criteria or methods of administration" that could support an ICRA claim. *Id.* at *13. The Court held that the plaintiffs "impermissibly rely upon Defendants' lack of identifiable policies, practices, criteria or methods of administration to support their claim under ICRA." The same is true here; plaintiffs' theory that the State could do more to regulate gun dealers does not challenge a specific State policy, and therefore does not state a claim.

*Coalition for Safe Chicago Communities* is in line with Seventh Circuit precedent, which similarly holds that disparate impact claims require some affirmative act on the part of the defendant. In *EEOC v. Chicago Miniature Lamp Works*, 947 F.2d 292 (7th Cir. 1991), the trial court found that an employer's reliance on word-of-mouth recruiting disparately impacted minorities in violation of Title VII. *Id.* at 304. The Seventh Circuit reversed, holding that the trial court "erred in considering passive reliance on employee word-of-mouth recruiting as a particular employment practice for purposes of disparate impact." *Id.* at 305. The Seventh Circuit noted that the EEOC did not identify a "specific, affirmative employment practice" that caused the disparity, as required. *Id*; *see also United States EEOC v. Warshawsky & Co.*, No. 90-cv-1352, 1993 U.S. Dist. LEXIS 5011, at *51 (N.D. Ill. Apr. 15, 1993) ("Disparate impact cannot be found, however, where there is not at least some affirmative act on the part of the employer."). In other words, the employer's failure to take additional measures to recruit and hire minorities, such as advertising

22

or using of the State of Illinois unemployment referral service, *see id.* at 295, did not subject it to liability under a disparate impact theory. Likewise, plaintiffs' allegations that the State Police and the State could do more to combat gun violence do not suffice.

Furthermore, plaintiffs fail to adequately allege causation. Even if not adopting plaintiffs' preferred regulations were considered a "criteria or method of administration" within the meaning of ICRA (again, it is not), plaintiffs have not adequately alleged that this "non-adoption" has "the effect of subjecting [plaintiffs] to discrimination because of their race, color, rational origin, or gender." 740 ILCS 23/5(a)(2). Plaintiffs' complaint includes a single paragraph asserting that "[m]any studies have concluded that meaningful regulation of the primary and secondary gun markets, as set forth in the above paragraphs, will reduce the number of guns available in cities like Chicago," thus reducing violence. SAC at ¶ 80. But the handful of studies that plaintiffs cite all pre-date the State's comprehensive regulatory regime for licensing and overseeing gun dealers. Plaintiffs allege no facts showing that their proposed fine-tuning of Illinois' current regulatory scheme, which already imposes a number of wide-ranging requirements on gun dealers, *see* Background Section, would in fact address the disparate impact on minorities they allege. Their ICRA claim should be dismissed for this reason as well. *See Adams*, 742 F.3d at 733 (affirming dismissal of disparate impact claim where the plaintiffs' complaint included no factual allegations tending to show causation).

At bottom, plaintiffs' interpretation of ICRA is untenable. If accepted, it would expose state agencies to vast areas of liability, clearly beyond the scope of the federal laws on which it is based, and certainly beyond anything the General Assembly intended. State agencies have finite budgets and must decide how to best to allocate their limited resources among competing programs and initiatives. Defendants are aware of no case holding that plaintiffs can state an ICRA claim (or

23

any other disparate impact claim, for that matter), not by identifying a specific agency policy that disparately impacts minorities, but rather by claiming that the agency could "do more" to address issues affecting minorities and must fine-tune its regulatory scheme by enacting certain regulations that plaintiffs support. Plaintiffs have not adequately alleged a violation of ICRA, and their claim should be dismissed.

## CONCLUSION

For these reasons, plaintiffs' claims should be dismissed under either Rule 12(b)(1) or Rule 12(b)(6).

Dated: December 17, 2021                    Respectfully submitted,

                                            KWAME RAOUL
                                            Illinois Attorney General

                                    By:    */s/ Michael T. Dierkes*
                                            Michael T. Dierkes
R. Douglas Rees                            Office of the Illinois Attorney General
Eileen E. Boyle Perich                     100 W. Randolph Street, 12th Floor
Office of the Illinois Attorney General    Chicago, Illinois 60601
100 W. Randolph Street                     (312) 814-3672
Chicago, Illinois 60601                    michael.dierkes@ilag.gov

24