IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DEMETRIA POWELL, as guardian ad litem and on behalf of her son D.P., et al., <br><br> Plaintiffs, <br><br> v. <br><br> THE STATE OF ILLINOIS, et al., <br><br> Defendants. | No. 18-cv-6675 <br><br> Hon. Joan B. Gottschall |

**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS**

**INTRODUCTION**

Plaintiffs acknowledge that "Illinois has excellent gun laws." But they are dissatisfied with how the Illinois State Police ("ISP") has chosen to enforce these laws. Plaintiffs thus seek to use this lawsuit—brought on behalf of their children under the Rehabilitation Act and the Illinois Civil Rights Act—as a vehicle to compel the State to change how it exercises its regulatory authority to align with plaintiffs' policy preferences. As defendants explain in their motion to dismiss, these efforts to fine-tune state programs via federal court oversight of licensure and enforcement decisions should be rejected. Plaintiffs do not meaningfully contest this characterization of their goals or their request for relief, claiming instead that these arguments are "not a matter for the pleading stage." Dkt. 120 at 14. But this is incorrect: determining whether, as a matter of law, plaintiffs can obtain the relief they seek is one of the core functions of this stage. Plaintiffs' suggested approach also is impractical. A delayed resolution of the questions presented by defendants would require the parties to expend significant resources litigating claims that are fundamentally flawed.

As defendants showed in their opening brief, plaintiffs' second amended complaint should be dismissed because they lack standing and have not adequately pled claims under the Rehabilitation Act or the Illinois Civil Rights Act. Plaintiffs' primary rejoinder to these arguments is that their claims are sufficiently pled for the same reasons articulated by this Court in its 2019 order denying defendants' motion to dismiss the initial complaint. But much has changed since then, including plaintiffs' legal claims. Contrary to plaintiffs' assertions, there are meaningful distinctions between ADA and Rehabilitation Act claims, and their decision to alter the nature of their claim distinguishes this complaint from their initial complaint. Among other flaws, plaintiffs' Rehabilitation Act claim fails because it does not and cannot plausibly show that the State intentionally discriminates against their children on the basis of disability.

Finally, plaintiffs' response largely ignores the substantial progress the State has made since they filed this lawsuit, including by creating an entire regulatory regime to license and oversee gun dealers, increasing funding for the FOID card program, and dedicating hundreds of millions of dollars to reduce gun violence and trauma in communities affected by that violence. This progress is not only relevant to the factual allegations in plaintiffs' complaint, but also to the nature and scope of their legal theories. As one example, plaintiffs alleged in their initial complaint that defendants violated the ADA and Illinois Civil Rights Act by failing to "train employees and managers of gun shops and gun shows to identify common signs of straw purchasing to avoid gun trafficking, using state-wide standards developed by the State Police." Dkt. 1 at 13. As a result of its newfound authority to take such measures under the Gun Dealer Licensing Act, ISP implemented statewide training materials on how to prevent straw purchasing. Dkt. 177 at 2. Now, however, plaintiffs assert that ISP remains in violation of the Rehabilitation Act unless and until it revises those training materials to mirror those that plaintiffs' counsel has drafted. In other words,

while plaintiffs' initial complaint focused on the State's alleged failure to regulate or train gun dealers, their second amended complaint takes issue with *how* the State has chosen to regulate and train those businesses, and often on a granular level. In short, regardless of whether plaintiffs' initial complaint could survive dismissal, their current one cannot.

## ARGUMENT

**I.    Plaintiffs Lack Standing.**

As explained in the motion to dismiss, plaintiffs' Rehabilitation Act and Illinois Civil Rights Act claims should be dismissed for lack of standing because plaintiffs do not and cannot plausibly show they have injuries that are fairly traceable to ISP's regulation of firearms dealers and because it is not likely that their claimed injuries could be redressed by the relief they seek. Dkt. 117 at 7–14. Rather than focus on defendants' arguments on these fronts, plaintiffs dedicate several pages arguing that they have alleged an injury in fact, a ground on which defendants are not seeking dismissal. With respect to the arguments that defendants *have* made—that plaintiffs' injuries are not fairly traceable to defendants' alleged conduct and are not redressable by the relief they request—plaintiffs' response falls short because they ignore the changes to the State's regulatory landscape since they filed suit, and do not counter the State's argument that the Court cannot provide the far-reaching relief they seek through this lawsuit.

**A.    Plaintiffs' injuries are not fairly traceable to defendants' alleged conduct.**

Defendants have shown that plaintiffs cannot satisfy the causation requirement for standing. Dkt.117 at 8–11. Plaintiffs have the burden of showing that their *own* injuries are *likely* to be redressed by the relief they request, and they have not done so. *Id.* at 11.

Plaintiffs respond that this Court has already found that they alleged sufficient facts to establish standing (Dkt. 120 at 8), as if nothing has changed since they filed their initial complaint. But the State's regulatory landscape is different now. In their 2018 complaint, plaintiffs listed

3

twelve specific regulations that they alleged the State could impose on gun dealers. Dkt. 1 ¶ 28. In 2019, in the Firearm Dealer License Certification Act, 430 ILCS 68/5 *et seq.*, and its implementing regulations, 20 Ill. Admin. Code 1232.10 *et seq.*, the State and ISP adopted the kinds of rules that plaintiffs sought. Dkt. 117 at 3–4; *see also* Dkt. 39 at 28. In addition, since plaintiffs filed their initial complaint, the State has reformed the FOID system, created the Office of Firearm Violence Prevention, appointed a Statewide Firearm Enforcement Coordinator, and pledged additional funding to address gun violence. Dkt. 117 at 4–5. And just this month, Governor Pritzker announced over $150 million in funding to reduce gun violence, with the first round of funding, for more than $50 million, now open for applications.[1] Because of these developments, plaintiffs' reliance on the Court's earlier decision is misplaced.

To establish standing at this juncture, plaintiffs must allege sufficient facts to make a plausible showing that, *relative to the current regulatory landscape*, the specific modifications that they are requesting would likely redress their alleged injuries. Dkt. 117 at 9–10. They have not done so. For example, plaintiffs do not dispute that ISP already trains gun dealers on straw purchasing and may discipline dealers who exhibit a pattern of straw sales. *See* Dkt. 117 at 2 n.1, 430 ILCS 68/5-60, 430 ILCS 68/5-85. While plaintiffs take the position that ISP must require dealers to follow the practices listed in Exhibit B to their complaint (Dkt. 120 at 2–3), their second amended complaint includes no factual allegations showing that the differential impact of imposing such a requirement (as compared to the current training) would be significant enough to likely redress, even in part, their alleged injuries. Likewise, plaintiffs claim that ISP should "reallocate resources" for FOID enforcement (Dkt. 113-1 ¶¶ 73–76), but they ignore that the recently enacted HB 562 requires the removal of firearms from individuals with revoked FOID

---

[1] See February 3, 2022 Press Release at https://www.illinois.gov/news/press–release.24477.html.

cards and provides additional funding to carry out that task (Dkt. 117 at 4). Plaintiffs have not adequately linked their alleged injuries to defendants.

Plaintiffs point to a single paragraph of their second amended complaint, paragraph 80, in response to defendants' argument that they have not adequately alleged causation for standing purposes. Dkt. 120 at 8. Paragraph 80 asserts that "studies have concluded" that "meaningful regulation" of the primary and secondary gun markets "as set forth in the above paragraphs" will reduce the number of guns available in Chicago. Dkt. 113-1. But the handful of studies that plaintiffs cite are not attached to their complaint (and therefore not before the Court, see Dkt. 37 at 2 n.1), and the complaint does not provide any details regarding what these studies entailed or what they purportedly found. It is not even clear that the studies discuss the measures that plaintiffs propose in their current complaint.

Moreover, it is not enough to say in the abstract that "meaningful regulation," or even "meaningful regulation" along the lines of what plaintiffs propose, would reduce gun violence, as compared to no regulation. The State now has a comprehensive regulatory scheme regulating gun dealers in place. The baseline is different. Plaintiffs must now allege facts showing their proposed adjustments to the State's current regulatory scheme would likely redress plaintiffs' injuries, and they have not done so. Indeed, the studies cited in paragraph 80 all pre-date the State's enactment in 2019 of the Firearm Dealer License Certification Act and the more recent measures that the State has taken to reduce gun violence.

Defendants recognize that the Court declined to dismiss plaintiffs' initial complaint on standing grounds. But as set forth above, the analysis is different now that the regulatory landscape has changed. In addition, the Court's prior decision relied principally on an analogy to environmental law cases that, as explained in defendants' opening brief, do not support standing

5

here because they involved the denial of procedural rights, so that the "normal standards for redressability and immediacy" did not apply. Dkt. 117, discussing *Summers v. Earth Island Institute*, 555 U.S. 488 (2009), *Massachusetts v. EPA*, 549 U.S. 497 (2007). Plaintiffs offer no response to this point, and thus have effectively conceded that the environmental law cases do not support their position here.

### B. Plaintiffs' injuries are not redressable by the relief they seek.

Separately, plaintiffs lack standing because their alleged injuries are not redressable by the relief they seek. Dkt. 117 at 11–14. As explained in defendants' opening brief, plaintiffs cannot satisfy the redressability requirement because they are asking this Court for a sweeping remedy— a federal court order compelling the State "to adopt reasonable gun trafficking regulations" to reduce the level of gun violence—that extends far beyond the Court's institutional capacity. *Id.*, citing *Rucho v. Common Cause*, 139 S. Ct. 2484, 2508 (2019), *Juliana v. United States*, 947 F.3d 1159, 1171–73 (9th Cir. 2020).

Plaintiffs offer no response to this point. They do not address defendants' case law, including *Juliana*, 947 F.3d 1159, and do not counter defendants' argument that plaintiffs "identify no standards that could conceivably guide the Court in issuing a remedy." Dkt. 117 at 12. (To the contrary, plaintiffs acknowledge in a separate section of their response, regarding their Rehabilitation Act claim, that "there is nothing in the complaint beyond a prayer for injunctive relief." Dkt. 120 at 14.) Plaintiffs' failure to meaningfully respond to defendants' redressability argument warrants dismissal of their complaint for lack of standing. *See, e.g., Lee v. Northeast Illinois Regional Commuter Railroad Corp.*, 912 F.3d 1049, 1054 (7th Cir. 2019) (affirming dismissal of complaint when plaintiff "fail[ed] to cite a single legal case and only argues through unsupported conclusions of fact"); *Kirskey v. R.J. Reynolds Tobacco Co.*, 168 F.3d 1039, 1041

6

(7th Cir. 1999) ("our system of justice is adversarial" and "if [judges] are given plausible reason for dismissing a complaint, they are not going to do the plaintiff's research and try to discover whether there might be something to say against the defendants' reasoning").

In sum, plaintiffs have not established standing. While plaintiffs claim that defendants are arguing that "nothing they do" can affect the level of gun violence in Chicago (Dkt. 120 at 8), this is *not* defendants' argument; indeed, since plaintiffs filed suit, the State has taken significant measures to combat gun violence. Plaintiffs have no standing because they do not and cannot allege facts to plausibly show that their alleged injuries, which depend on "the unfettered choices made by independent actors not before the courts," *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562 (1992), are likely to be redressed by the relief they request, and have not identified relief "within the court's power to award," *Julianna*, 947 F.3d at 1170. Because Plaintiffs have not met and cannot meet this burden, their claims should be dismissed for lack of standing.

## II. Plaintiffs Fail To Plead A Plausible Section 504 Claim.

Even if the Court finds that plaintiffs have made sufficient allegations to support standing at this stage of the proceedings, their claims still should be dismissed under Rule 12(b)(6). Plaintiffs' Section 504 Rehabilitation Act claim fails for two independent reasons: first, plaintiffs have not identified a "program or activity" to which they have been denied access; and second, they do not and cannot plausibly show that defendants are discriminating against them because of their disabilities.

### A. Plaintiffs fail to plead the existence of a "program or activity" to which they have been denied access.

Plaintiffs' Rehabilitation Act claim fails at the outset because they have not identified a "program or activity" to which they have been denied access. Dkt. 117 at 14–15. Plaintiffs assert in their response that the relevant program or activity is "regulating" under the Dealer Licensing

7

Act, the Gun Trafficking Act, and the FOID Act. Dkt. 18 at 14. But this is nonsensical. While the Rehabilitation Act defines program or activity" broadly, the term must be understood in the context of the rest of the statute. Members of the public do not participate in "regulating" (except that rulemaking is generally subject to public comment, which of course is not plaintiffs' concern here), and thus plaintiffs cannot claim that they are "excluded from participating" in "regulating." *See* 28 U.S.C. § 794(a). Likewise, one cannot say that plaintiffs are by virtue of their disabilities "denied the benefits" (*see id.*) of "regulating," as the regulations at issue here (which apply to third–party gun dealers, not plaintiffs) benefit all persons regardless of disability. Courts have recognized that there are some limitations on what constitutes a "program or activity." *See, e.g., Rosen v. Montgomery Cty.*, 121 F.3d 154, 157 (4th Cir. 1997) ("calling a drunk driving arrest a 'program or activity' . . . strikes us as a stretch of the statutory language and of the underlying legislative intent"). And plaintiffs here do not, and cannot, cite a single case, from any jurisdiction, holding that "regulating" third parties not before the Court is a "program or activity" for purposes of the Rehabilitation Act. Plaintiffs' Rehabilitation Act claim should be dismissed for this threshold reason.

**B.     Plaintiffs fail to plead that defendants have discriminated against them "solely by reason of" their disabilities.**

Apart from plaintiffs' failure to plead facts plausibly showing the existence of a "program or activity" to which they have been denied access, they also have not pled a plausible Rehabilitation Act claim. The Seventh Circuit recently confirmed that the Rehabilitation Act has a stricter causation standard than the ADA: "the plaintiff's disability must be the *sole* reason for the alleged discriminatory action." *Conners v. Wilkie*, 984 F.3d 1255, 1260 (7th Cir. 2021). Plaintiffs dismiss this statement as "dictum" (Dkt. 120 at 11), but the rule is well established, and it is beyond dispute that the plain language of Section 504 of the Rehabilitation Act adopts the

8

sole–causation standard. *See* 29 U.S.C. 794(a) ("[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance…"). And the Seventh Circuit has for decades applied a sole–causation standard to Rehabilitation Act claims. *See, e.g.*, *Mallett v. Wisc. Div. of Vocational Rehabilitation*, 130 F.3d 1245, 1257 (7th Cir. 1997) ("The word *solely* provides the key: the discrimination must result from the handicap and the handicap alone."); *Grzan v. Charter Hosp.*, 104 F.3d 116, 119–21 (7th Cir. 1997) (plaintiff must allege discrimination "solely by reason of" handicap to avoid dismissal). Other Circuits apply the same standard as well. *See, e.g.*, *Johnson v. Thompson*, 971 F.2d 1487, 1493 (10th Cir. 1992) (affirming dismissal of Section 504 claim alleging that "but for (1) having spinal bifida and (2) being of low socioeconomic status," plaintiffs would have received better medical care because "[i]f others with the same handicap do not suffer the discrimination, then the discrimination does not result "solely by reason of [the] handicap"). The sole-causation standard is not mere "dictum," and it applies here.

Plaintiffs effectively concede that they are not pursuing any claim under the Rehabilitation Act for intentional discrimination. Dkt. 120 at 10–12. While they argue that a failure to provide a reasonable accommodation and disparate impact are independent "bases of liability" that do not require proof of discriminatory intent (*id.* at 11), this misses the point: the Rehabilitation Act's "by reason of" language is a *causation* requirement that applies across the board to all types of claims. As the Seventh Circuit explained in discussing a reasonable accommodation claim, "the Rehabilitation Act helps disabled individuals obtain access to benefits only when they would have difficulty obtaining those benefits 'by reason of' their disabilities, and not because of some quality that they share generally with the public." *Wis. Cmty. Servs. v. City of Milwaukee*, 465 F.3d 737,

9

748 (7th Cir. 2006), citing *Washington v. Indiana High Sch. Athletic Assoc.*, 181 F.3d 840, 848 (7th Cir. 1999) ("[t]here must be a causal connection between the disability and [the plaintiff's] ineligibility").

Here, plaintiffs have not stated a reasonable accommodation claim. As established in defendants' opening brief, plaintiffs have not plausibly alleged that defendants have failed to accommodate them by removing some barrier to program access that affects them "by reason of" their disabilities. Dkt. 117 at 17. As defendants pointed out, plaintiffs argue that *all* Chicago children, disabled and able-bodied alike, would benefit from their preferred regime, which is why their proposed class includes not only disabled persons, but also persons "at risk" of becoming disabled at some point in the future. Dkt. 117, citing Dkt. 113-1 at 21, 30. Plaintiffs do not address this point. Nor do they address defendants' argument that plaintiffs cannot state a disability discrimination claim based on their allegations that defendants' actions (or failure to act) have caused them to *become* disabled. Dkt. 117 at 18. Plaintiffs reference only paragraph 115 of their complaint, which asserts that by failing to use its full regulatory authority, the State is "inflicting a special injury upon [plaintiffs] by virtue of their disability." Dkt. 120 at 10, citing Dkt. 113-1 ¶ 115. But this allegation does not identify any barrier preventing plaintiffs from accessing any existing State program, much less a barrier that denies plaintiffs the benefits of such a program "by reason of" their disabilities.

Plaintiffs also have not stated a disparate impact claim. Defendants did not understand plaintiffs to be asserting such a claim, as the complaint includes no allegation that defendants' conduct has caused a disparate or disproportionate impact on disabled persons because of their disabilities. The complaint uses the word "disparate" only once, alleging that gun violence has a disparate impact on certain Black neighborhoods. Dkt. 113-1 at 31. And the complaint uses the

10

word "disproportionate" only when referring to the impact of gun violence on Black persons. *Id.* ¶¶ 2, 17. The complaint includes no factual allegations regarding a disparate impact on the basis of disability, as opposed to race. To the extent that plaintiffs are purporting to sue a disparate impact claim, the claim should be dismissed.

The Supreme Court's decision in *Alexander v. Choate*, 469 U.S. 287 (1985), confirms that plaintiffs cannot state a disparate impact claim under the Rehabilitation Act. In *Alexander*, the plaintiffs were disabled Medicaid recipients who challenged a reduction in the number in-patient hospital days per year (from 20 to 14) that Tennessee Medicaid would pay for. *Id.* at 289. It was undisputed that the reduction would affect disabled persons more than non-disabled persons. *Id.* But even so, the Court held that the plaintiffs could not state a Rehabilitation Act claim because the 14-day limit was neutral on its face and did not invoke criteria that had a "particular exclusionary affect" on persons with disabilities. *Id.* at 302.[2] Because Tennessee's 14-day rule did not deny disabled persons access to the "particular package of Medicaid services that Tennessee has chosen to provide," plaintiffs had no disparate impact claim. *Id.* at 306–09. For similar reasons, plaintiffs here have not alleged a viable Rehabilitation Act claim. They assert that the State could do more to address gun violence, but they do not allege that they are excluded from the benefits of any existing State program because of their disability.

Plaintiffs' claim also fails because they are not seeking a reasonable accommodation, but rather "fundamental" or "substantial" modifications to how the State addresses gun violence in Chicago. Dkt. 117 at 18. Plaintiffs' argument that they are merely asking defendants to "do what

---

[2] In *Choate*, the Supreme Court "assume[d] without deciding" that the Rehabilitation Act "reaches at least some conduct that has an unjustifiable disparate impact upon the handicapped." *Id.* at 299. There is a circuit split on this point. While some circuits including the Seventh Circuit have recognized such claims, see *McWright v. Alexander*, 892 F.2d 222 (7th Cir. 1992), the Sixth Circuit has held Section 504 "does not prohibit disparate–impact discrimination." *Doe v. BlueCross BlueShield of Tenn., Inc.*, 926 F.3d 235, 241 (6th Cir. 2019).

11

they are supposed to do" (Dkt. 120 at 12–13) under existing law is disingenuous and incorrect. For example, plaintiffs cite to 430 ILCS 68/5-30, which provides that gun dealers "shall receive at least 2 hours of training annually regarding legal requirements and responsible business practices as applicable to the sale or transfer of firearms," and that ISP "may adopt rules regarding continuing education" on such issues. 430 ILCS 68/5-30. But plaintiffs do not dispute that ISP *has* instituted training (Dkt. 116 at 2 n.1) and *has* promulgated regulations requiring training, see 20 Ill. Admin. Code. § 1232.90. Plaintiffs are not merely requesting that ISP comply with the statute they cite—they are, instead, requesting that ISP *mandate* that gun dealers follow the specific practices that they prefer, as set forth in Exhibit B to their complaint, subject to fines or suspension for non-compliance. Dkt. 113-1 ¶¶ 60–66.

And this is only the tip of the iceberg. Plaintiffs also cite to 430 ILCS 68/5-85(a)(2), which states for certain violations of the Firearm Dealer License Certification Act, the Illinois State Police "may" take disciplinary action. But again, plaintiffs' claim is not that ISP is violating this statute. Rather, plaintiffs seem to want a federal court order compelling ISP to "reallocate resources" and significantly increase its FOID card enforcement efforts. Dkt. 113-1 ¶¶ 74, 76; *see also id.* at 75 (stating that the Cook County Sheriff has estimated that it would require "$3 million per year for 28 additional committed law enforcement positions" to "begin a meaningful enforcement of FOID in Cook County alone"). This Court interpreted plaintiffs' initial complaint as seeking regulations, not changes to the State's enforcement efforts. Dkt. 37 at 21 ("[P]laintiffs want defendants to enact regulations, and this is not a non-prosecution case because defendants have passed no regulations to enforce."). But plaintiffs' current complaint goes further and seeks accommodations that are not reasonable.

Plaintiffs cite to *Alexander v. Choate*, but this case supports defendants' position and confirms that the relief that plaintiffs are requesting here goes far beyond a reasonable accommodation. In addition to challenging Tennessee's reduction in the number of in-patient hospital days allowed by Medicaid (as discussed above), the plaintiffs in *Choate* requested that Tennessee modify its Medicaid plan by eliminating the durational limitation on inpatient coverage. *See* 469 U.S. at 306. The Supreme Court held that Tennessee had no obligation under the Rehabilitation Act to change its existing Medicaid program, "even if in doing so the State could achieve its immediate fiscal objectives in a way less harmful to the handicapped." *Id.* at 309. The Rehabilitation Act did not override the States' "longstanding discretion to choose the proper mix of amount, scope, and duration limitations on services covered by state Medicaid." *Id.* at 307. Similarly, in this case, plaintiffs' requested accommodations, which seek wholesale changes in how ISP regulates gun dealers, allocates its limited resources, and exercises its discretion with respect to FOID card enforcement, are not the sorts of modest, "individualized" exceptions to policies necessary to ensure access for disabled people. Dkt. 117 at 18–19. Plaintiffs' Rehabilitation Act claim should be dismissed.

**III.     Plaintiffs Fail To Plead A Plausible Illinois Civil Rights Act Claim.**

Finally, plaintiffs' response confirms that they have not stated a valid Illinois Civil Rights Act ("ICRA") claim. As an initial matter, plaintiffs do not dispute that if the Court dismisses their Rehabilitation Act claim, then it should decline to exercise supplemental jurisdiction over the ICRA claim. Dkt. 117 at 19–20. On the merits, plaintiffs rely on a single inapposite case, *Central Austin Neighborhood Ass'n v. City of Chicago*, 1 N.E.2d 976 (Ill. App. Ct.. 2013), in arguing that they have stated a viable ICRA claim, while entirely ignoring the Seventh Circuit precedent confirming that they have not.

In *Central Austin*, the Court held that the political question doctrine did not bar an ICRA claim challenging how the City of Chicago responded to 911 calls. *Id.* at 985. But that is not the issue here; defendants have not invoked the political question doctrine. Instead, defendants' position is that plaintiffs' ICRA claim fails because they have not identified specific "criteria or methods of administration." Dkt. 117 at 20–23. This was not the issue on appeal in *Central Austin*, where the plaintiffs more obviously challenged a "method of administration," specifically, the City's policy authorizing the Office of Emergency Management and Communications, which answers 911 calls, to dispatch beat officers only from the police district where the call originated. 1 N.E 2d. at 979. In this case, unlike *Central Austin*, plaintiffs have not identified specific "criteria or methods of administration."

Plaintiffs assert that their allegations detailing their preferred adjustments to the State's regulatory system—that is, the measures they believe the State *should* adopt—are sufficient to state a claim. Dkt. 20 at 16, citing Dkt. 113-1 ¶¶ 54–79. But this is incorrect. To allege a disparate impact claim, plaintiffs must isolate and identify a "specific practice" responsible to a disparity. Dkt. 117 at 20. And the State's "non-adoption" of plaintiff's preferred measures for addressing gun violence is not a specific practice, at least for purposes of ICRA. Defendants cited multiple cases, including binding Seventh Circuit precedent, see *EEOC v. Chicago Miniature Lamp Works*, 947 F.2d 292 (7th Cir. 1991), holding that disparate impact claims require some affirmative act on the part of the defendant. Plaintiffs do not address, much less distinguish, any of these cases.

Rather, plaintiffs refer to paragraph 120 of their complaint, which asserts that defendants have "used the narrowest possible definition of their authority" in order to "placate largely white political groups and citizens." Dkt. 120 at 16; Dkt, 113-1 ¶ 120. This allegation is conclusory and "not entitled to be assumed true," *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009); indeed it is patently

14

false. But regardless, the allegation does not identify a "specific practice," and therefore cannot support a disparate impact claim. Dkt. 117 at 20, citing *Smith v. City of Jackson*, 544 U.S. 228, 241 (2005). Plaintiffs' ICRA claim should be dismissed.

## CONCLUSION

For these reasons and those in defendants' memorandum in support of their motion to dismiss, plaintiffs' claims should be dismissed.

Dated: February 18, 2022

Respectfully submitted,

KWAME RAOUL
Illinois Attorney General

By: /s/ *Michael T. Dierkes*
Michael T. Dierkes

R. Douglas Rees
Sarah Hunger
Eileen E. Boyle Perich
Office of the Illinois Attorney General
100 W. Randolph Street
Chicago, Illinois 60601

Office of the Illinois Attorney General
100 W. Randolph Street, 12th Floor
Chicago, Illinois 60601
(312)814-3672
michael.dierkes@ilag.gov