**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| SHANICE MATHEWS as guardian *ad litem* on behalf of her son, D.W. as well as on behalf of a class of similarly situated children, | No. 18-cv-6675 |
| Plaintiff, | Hon. Judge Joan B. Gottschall |
| v. | |
| THE STATE OF ILLINOIS; THE ILLINOIS DEPARTMENT OF STATE POLICE; J.B. PRITZKER, Governor of the State of Illinois; and BRENDAN KELLY, Director of the Illinois Department of State Police, | **THIRD AMENDED CLASS ACTION COMPLAINT** |
| Defendants. | |

## INTRODUCTION

1. Every day, African Americans in Chicago endure the brunt of the nation's gun violence epidemic. In a "good" year, roughly 2,000 Chicagoans are shot by a gun. Other years, that number doubles. The violence is not episodic but ongoing and concentrated in particular Black neighborhoods in Chicago.

2. The list of victims greatly exceeds those individuals who are hit with bullets, and it ultimately encompasses vast swaths of the community. Few victims are as vulnerable as the children living in these neighborhoods disproportionately impacted by gun violence. As of June 2021 alone, more than 120 children under the age of 18 were shot in Chicago. Many more were traumatized when their family members, friends, classmates, and neighbors were gunned down or hit with a stray bullet, sometimes right in front of them.

3. Defendants – the State and State Police – have the legal authority and duty to take actions to stop this torrent of violence and to prevent these pervasive, incessant injuries. But they have failed to exercise that authority. Hence this lawsuit.

4. Brought by children traumatized by Chicago's endemic gun violence, this lawsuit seeks declaratory and injunctive relief requiring defendants take reasonable steps to limit the number of illegal guns flowing into Chicago, thereby limiting these children's exposure to the gun violence that has caused them to develop post-traumatic stress disorder and other forms of trauma-related disability, which will affect the rest of their lives.

5. Like all illegal guns, the guns trafficked into Chicago stem from the legal firearms market. The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) has reported for decades that the legal inventories of retail firearms dealers are a dominant source of weapons for illegal traffickers, who acquire firearms through theft or straw purchases.

6. Accordingly, the retail sale of firearms is the first line of defense in preventing the diversion of legal guns to the illegal market and the business practices of licensed dealers play a critical role in trafficking prevention.

7. Licensed gun dealers operating in Illinois were responsible for selling forty (40) percent of Chicago's "crime guns" – or guns recovered by law enforcement in connection with crime. The majority of these guns stem from licensed dealers operating in suburbs nearby Chicago, with only seven dealers responsible for selling the majority of Chicago's crime guns attributed to Illinois dealers.

8. Yet current law, including the Firearm Owner Identification Card (FOID) Act, 430 ILCS 65/1 *et seq.*, the Firearm Dealer Licensing Certification Act, 430 ILCS 68/1-1 *et seq.*, and the Illinois Gun Trafficking Information Act, 5 ILCS 830/10-1 et seq., give the Illinois Department of State Police (ISP) a mandate to issue regulations that would require these dealers to implement business practices that ATF and the gun industry's own trade association agree will curb the diversion of legal guns to the illegal market through theft, loss, or straw sales.

9. By using authority already granted by the legislature, defendants are more than able to fulfil this mandate to reduce illegal firearms trafficking and the corresponding gun violence to which the plaintiff and other class members are exposed.

10. Doing so would be a reasonable accommodation to the plaintiff's and other class members' needs under the federally assisted programs administered by defendants.

11. Though gun violence has plagued Chicago for decades, the rates of violence remain shocking. Over the weekend of June 5-7, 2021, Chicago received national attention for at least 60 shootings in the impacted neighborhoods where the plaintiff class lives.

12.     While the Chicago Police Department is straining to block the flood of illegal guns, the defendants: State, Governor, Department of Illinois State Police, and its Director refuse to carry out their duty to recover invalid FOID cards and related guns under the FOID Act), 430 ILCS 65/1 *et seq.* By ignoring the clear command of the FOID Act, the defendants have left tens of thousands of guns in the hands of persons who are no longer legally permitted to possess a firearm.

13.     Additionally, the defendants' failure to accommodate the plaintiff class' needs in administrating the state's gun licensing regime constitutes a violation of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C § 794, prohibiting discrimination against children whose daily exposure to gun violence aggravates their mental and emotional disabilities.

14.     In failing to use the ISP's full regulatory authority under the FOID Act and Dealer Licensing Certification Act, the defendants are depriving the plaintiff class of the full benefits of these federally assisted programs. By failing to use their full regulatory authority to carry out these programs, the State of Illinois and ISP are denying the plaintiff class a reasonable accommodation to their special needs as children who have symptoms of trauma and other emotional injuries.

15.     Without a reasonable accommodation to their needs, the plaintiff class' symptoms are certain or likely to seriously worsen.

16.     The defendants' failure to accommodate the plaintiff's special needs is also illegal under Section 5(a)(2) of the Illinois Civil Rights Act of 2003 (ICRA), 740 ILCS 23/5(a)(2). In violation of that Act, defendants are using "criteria and methods of administration" that subject Black children to discrimination based on race.

17.     As shown during the COVID-19 pandemic, the State and Governor take an extremely broad view of their regulatory authority when the public health of the white population is also at risk. Here, by contrast, the defendants fail to use broad regulatory authority in a public health emergency that affects the Black population almost exclusively. Defendants have failed to use regulatory authority to protect Black children's emotional and physical health, instead deferring to a disproportionately white population of gun dealers by favoring their apparent interests above all else.

18.     In deferring to such interests and failing to use their full regulatory authority to protect Black children under the Dealer Licensing Certification Act and the Firearm Owner Identification Card (FOID) Act, the defendants subject Black children to discrimination based on race, in violation of Section 5(a)(2) of ICRA.

**THE PARTIES**

**The Plaintiff**

19.     Shanice Mathews is a forty-seven-year-old resident of the Garfield Park neighborhood in Chicago. She has spent more than twenty years as a case manager for Senior Helpers, an organization primarily involved with in-home care for chronically ill seniors. She has four children, including the plaintiff D.W., now eleven years old. D.W.'s cousin, was shot and killed in the North Lawndale neighborhood of Chicago on October 8, 2018. D.W., then in the fourth grade, was just blocks away from the shooting at the time. Just a month and a half after the murder of D.W.'s cousin, another one of D.W.'s cousin shot and killed himself with a handgun. In the three years D.W. has lived in West Garfield Park following the murder of his cousin, there have been more than ten shootings within a four-block radius of his home. Hearing guns shots is a weekly, and sometimes daily occurrence in D.W.'s life. D.W. is an "individual

with a disability" within the meaning of 29 U.S.C. § 705 (20)(B), which includes any individual who has a disability within the meaning of 42 U.S.C. § 2102. Shanice Mathews brings this case on behalf of her son D.W. as *guardian ad litem* under Fed. R. Civ. Proc. 17(c).

20.    Pursuant to Fed. R. Civ. Proc. 23(b)(2), plaintiff Mathews brings this action for declaratory and injunctive relief on behalf of their minor children or grandchild and on behalf of a class of similarly situated children defined as:

> All African-American children under the age of eighteen who live or lived in the City of Chicago and are: 1) disabled under the terms of the ADA on account of their exposure to gun violence; or 2) at risk of becoming disabled by their exposure to gun violence.

21.    The plaintiff class satisfies the requirements of Fed. R. Civ. Proc. 23(a), in that:

(a) The class is so numerous that joinder of all members is impracticable as gun violence in Chicago is at an epidemic level. Since January 1, 2015, 2,231 persons have been killed in Chicago. Ninety percent (90%) died by a gun. During the same period, 7,971 persons were shot. About 80 percent of the homicide and shooting victims in Chicago are Black. At least 20 percent of these shootings involve children and teens. Two-thirds of all minors who have been shot suffer from post-traumatic stress disorder, and thousands of Black children in Chicago who have experienced gun violence but not been shot also have PTSD or trauma-related disabilities.

(b) There are questions of law and fact common to the class. These include whether the plaintiff and other Black children in Chicago who have suffered from repeated exposure to gun violence and each of whom is an "individual

with a disability" within the meaning of 29 U.S.C. § 70(20)(B), which has the same definition of disability as 42 U.S.C. § 12102 of the Americans with Disabilities Act; whether the State of Illinois, as the party responsible for their education and for licensing the sale or possession of guns, can and should enforce existing Illinois law so as to provide a reasonable accommodation for the special needs of these disabled children for vigorous civil enforcement of the state laws; whether the State has effectively discriminated against these disabled Black children, and even aggravated their emotional and mental handicaps by failing to use existing regulatory authority to stop illegal gun trafficking in Cook County and Chicago.

(c) The claims of the named plaintiff are typical of the claims of the class, as these claims represent Black children who live or have lived in Chicago and are traumatized and disabled by gun violence, for whom no reasonable accommodation and no meaningful regulatory action has been provided.

(d) The named plaintiff will fairly and adequately protect the interests of the class. The named plaintiff has no interests antagonistic to the class. The named plaintiff seeks declaratory and injunctive relief on behalf of the entire class to remedy injuries to all class members. Counsel for the plaintiff are competent and experienced in class action and civil rights litigation.

(e) The plaintiff class satisfies the requirements of Fed. R. Civ. Proc. 23(b)(2) because the defendants have acted on grounds that apply generally to the class, so final injunctive relief and corresponding declaratory relief is appropriate with respect to the class.

**The Defendants**

22.     The defendant State of Illinois is a "State" operating programs receiving federal assistance within the meaning of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §§ 794(b)(1)(A) and (B). It is also a "State" within the meaning of Section 5 of the Illinois Civil Rights Act of 2003, 740 ILCS § 23/5.

23.     The defendant Illinois Department of State Police is also a "department, agency or… other instrumentality of a State" receiving federal assistance and all of whose operations constitute a "program or activity" within the meaning of the Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §§ 794(b)(1)(A) and (B). The ISP is also a unit of the State within the meaning of Section 5 of the Illinois Civil Rights Act of 2003, 740 ILCS § 23/5.

24.     The defendant J.B. Pritzker is the Governor of the State of Illinois, and responsible for the policies implemented by the defendant State of Illinois.

25.     The defendant Brendan Kelly is the Director of the Illinois Department of State Police and, under the direction of defendant Pritzker is responsible for the policies implemented by the State Police.

**JURISDICTION AND VENUE**

26.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§1331 and 1343, and because of its supplemental jurisdiction under 28 U.S.C. § 1366 over the related state law claim.

27.     Venue is proper in the Northern District of Illinois, as the plaintiff and defendants are residents of the Northern District of Illinois, and the events and omissions giving rise to all of the claims alleged occurred in the Northern District of Illinois.

## FACTUAL ALLEGATIONS

### The Public Health Emergency in Chicago

28.     Plaintiff Mathews' son D.W. and other Black children in the proposed class have experienced unremitting gun violence in the neighborhoods where they live or lived. The Chicago Police Department and University of Chicago Crime Lab studies document that from January 1, 2015, through June 30, 2018, more than 2,000 people in Chicago were murdered. Ninety percent of these murders were by gun. Chicago has more gun-related homicides than any other major U.S. city. From January 1, 2015, through July 31, 2018, nearly 8,000 people were shot in Chicago—about one shooting victim every 2.5 hours. Nearly 20 percent of Chicago's homicide victims are teenagers or younger. Law enforcement reported that during the first five months of 2021, 108 children were shot and 16 killed by guns in Chicago.

29.     This gun violence is a public health emergency which afflicts various Black neighborhoods in Chicago, and particularly: Austin, Englewood, West Englewood, New City and Grand Crossing ("the communities of concentrated gun violence"). In 2015-2016, according to the University of Chicago Crime Lab, 80 percent of Chicago homicide victims were Black, though Black people comprise only about one-third of the city's population. Eighty percent (80%) of homicide victims continue to be Black when one looks only at killings during the first seven months of 2018. Black men aged 15 to 34 made up more than one-half of the city's homicide victims during this same period, while accounting for just four percent (4%) of the city's population. Despite having only nine percent (9%) of Chicago's population, the Black neighborhoods of Austin, Englewood, West Englewood, New City and Grand Crossing, accounted for almost one-third of homicides in 2016, and this pattern has continued. The national homicide rate is about 5 per 100,000 persons across the whole country. In the Austin

neighborhood of Chicago, in 2016, the homicide rate was 87.3 per 100,000 persons, according to the University of Chicago Crime Lab. In Englewood, the homicide rate was 179.5 per 100,000 persons; in West Englewood, it was 105 per 100,000 persons; in New City, it was 98.6 per 100,000 persons and in Grand Crossing it was 103.5 per 100,000. These five neighborhoods have the most death by gun violence of any neighborhoods in Chicago. They are Black neighborhoods. Five of the next six deadliest neighborhoods are also predominantly Black.

30.     By comparison, the white Chicago neighborhoods of Lincoln Park, North Center, Edison Park, Forest Glen, North Park, Hegewisch, Beverly and Mount Greenwood had no homicides in 2015 or 2016, and the white neighborhoods of Lake View, Lincoln Square, Jefferson Park, Calumet Heights, Edgewater, Montclare, O'Hare, Dunning, and Norwood Park had two or fewer murders during this two-year period, with a zero or negligible homicide rate. This disparate impact of gun violence has continued through to the present day.

31.     Fatalities are only one aspect of a broader public health emergency that the plaintiff and other members of the class are experiencing. The plaintiff and other class members are suffering from traumatic exposure to this violence in a way that has created serious disabilities and limits on their life activities. The plaintiff and other Black children hear gunfire most nights, while in their homes and walking the streets, and these numerous firings can recreate or lead the children to experience prior traumatic exposures to gun violence, from loss of a family member, parent, sister, brother, cousin, or schoolmate.

32.     Chicago police are currently recovering over 10,000 crime guns a year. Yet all these crime guns were usually purchased in the first instance from a federally licensed gun dealer that Illinois law requires the state to certify to legally operate within the state. Some of these dealers violate the law or fail to implement reasonable business practices that prevent gun traffickers

from acquiring firearms through unlawful transfers, including theft or straw sales.

33.     An increasing number of these guns are 9-millimeter or .40 caliber handguns that have larger capacity magazines for ammunition and are more powerful than the .22 caliber handguns that were the principal handguns in the past.

### A Substantial Number of the "Crime Guns" Used in Chicago Come from Chicago Area Gun Dealers

34.     Chicago has no licensed gun dealers, but according to the Chicago Police Department, 40.4 percent of the "crime guns" recovered on Chicago streets every year, from 2009 through 2016, were purchased from federally licensed gun dealers operating in Illinois. This figure has not changed materially in the 2019 Gun Trace Report issued by the City. Seven of the stores selling the most crime guns recovered in Chicago shootings are located in Illinois (with the remainder located nearby in Indiana). These Illinois gun dealers are:

> Chuck's Gun Shop in Riverdale, IL
>
> Midwest Sporting Goods in Lyons, IL
>
> Shore Galleries in Lincolnwood, IL
>
> GAT Guns in East Dundee, IL
>
> Suburban Sporting Goods in Melrose Park, IL
>
> Pelcher's Shooter Supply in Lansing, IL
>
> Sporting Arms & Supply in Posen, IL

35.     Large numbers of guns purchased from these dealers were recovered in connection with crimes within one year of their purchase. ATF and other law enforcement entities recognize a short "time-to-crime" as an indicator of illegal trafficking.

36.     Suburban Sporting Goods in Melrose Park, IL sold 85 guns recovered as "crime guns" in Chicago in 2016 alone, and 46 percent of these guns were sold less than a year before

their recovery. Sixty-eight percent (68%) of the "crime guns" sold were recovered within three years of retail sale. Chuck's Gun Shop in Riverdale, IL sold 997 "crime guns" during the period 2013-2016, 21 percent (21%) of which were recovered within one year of retail sale. Ninety-two percent (92%) of the "crime guns" sold by these stores are handguns.

37.     During the 2013-2016 period, federally licensed gun dealers in Illinois reported that 1,200 guns were lost or stolen from these dealers prior to any sale. This includes burglaries, robberies, and off-the-books sales. Thefts and burglaries in particular are increasing at an alarming rate. Burglaries at these stores tripled between 2015 and 2016. ATF has found that these stolen guns are almost assuredly destined for criminal use in the immediate area of the theft. Chuck's Gun Shop alone reported 43 guns stolen between 2013 and 2016.

### The State of Illinois Has Failed to Implement Meaningful Gun Trafficking Prevention Regulation in Illinois, Despite Ample Authority to Do So

38.     Firearms regulation in the United States is a patchwork of federal, state, and local law.

39.     Illinois gun dealers, including those identified by name above, must receive a federal license to engage in the business of dealing in firearms, which is issued by ATF. Additionally, Illinois law requires all licensed dealers have their licenses certified by the State to legally operate within Illinois.

40.     The ATF is, by design, underfunded and legally restricted from providing meaningful oversight of licensed gun dealers; so many states, including Illinois, have directed state law enforcement resources to supplement federal oversight.

41.     The Gun Control Act of 1968, 18 U.S.C. § 922 *et seq.*, provides a barebones framework to oversee licensees. Once granted a license, gun dealers are expressly required by the statute to conduct background checks in accordance with the Brady Act, 18 U.S.C.§ 922(t),

require any unlicensed transferee to complete ATF's Firearms Transaction Record ("Form 4473"), 27 CFR § 478.124, and maintain paper records of transactions and other dispositions, 18 U.S.C. § 922(g)(1). Additionally, licensed dealers are required by the text of the statute to comply with minimal reporting requirements that include notifying ATF of any theft or loss of inventory, 18 U.S.C. § 923(g)(6), or when the licensee sells multiple handguns to the same individual within a five-day period. *Id*. at § 923(g)(3).

42.     Federal law does not expressly require licensed dealers to adopt specific business practices to deter illegal transfers, modernize their inventory management to make loss readily apparent, or mandate basic security measures to prevent theft.

43.     Federal law further restricts ATF by limiting the agency to one annual compliance inspection, 18 U.S.C. § 923(g)(1)(B)(iii), and does not require dealers to submit their inventory records to ATF for inspection.

44.     Even if the law were less restrictive, ATF is underfunded and has been unable to adequately inspect dealers for years. A 2013 report issued by the Department of Justice Office of Inspector General (OIG) found that ATF only inspects about 11,000 of the 135,000 licensees each year despite an internal target to inspect each licensee once every three to five years.

45.     The 2013 OIG report also suggests that ATF has not implemented mechanisms to track and prioritize for inspection retail dealers it considers to be "high-risk."

46.     Additional data made public by the federal government indicates ATF only inspected fifteen percent (15%) of retail dealers each year between 2010 and 2019, visiting retail dealers roughly once every seven years. In (FY) 2019, ATF inspected 13,079 licensed retail dealers, which roughly translates to ten percent (10%) of all licensees. Although 2020 posed novel challenges, ATF inspected a mere 5,827 during this past fiscal year despite record-high gun

sales.

47.     Even in rare cases where ATF musters the resources to inspect a licensed retail dealer, licenses are rarely revoked, even when flagrant violations of federal law are uncovered, leaving irresponsible retail dealers to operate at the expense of the public's safety.

48.     An analysis of ATF inspection records obtained by Brady and independently analyzed by USA Today and the Trace found that recommendations from ATF inspectors to take serious remedial action, including recommendations to revoke federal licenses to engage in the business of selling firearms, are routinely overturned or downgraded to warnings.

49.     By state law, regulating gun trafficking in Illinois is a state matter, over which the State of Illinois has claimed exclusive authority, 430 ILCS 65/13.1.

50.     Local villages and towns therefore have done little, by way of ordinance, to limit the sales of gun dealers or prevent the theft or loss of guns. Nor is there any meaningful enforcement of these ordinances. Indeed, only 53 of Illinois' 1,299 municipalities have adopted any kind of gun dealer/trafficking ordinance, and most require nothing more than the documentation of sale, as required by state law. Those municipalities with stricter ordinances like Chicago and Oak Park have no gun dealerships or gun shows.

51.     The only effective way to limit the flow of "crime guns" from Illinois gun dealers into Chicago is for the defendants, State, and the ISP to exercise the full regulatory authority the state legislature has provided in light of the gaps in federal and local regulation, and both adopt and enforce meaningful state-wide rules to reduce illegal gun trafficking.

52.     One key way to reduce illegal trafficking is to deter and detect illegal transfers, including "straw sales" – or a sale where the person that submits to a background check falsely presents him or herself as the actual buyer of the gun when they, in fact, intend to transfer the

gun to another person.

53.     The defendants have multiple sources of authority to reduce such illegal gun trafficking by preventing illegal straw sales.

54.     First, it is illegal in Illinois under federal and state law for either the gun dealer or the transferee to engage in a straw sale if either party *knew or should have known* the transfer was a straw sale. See 18 U.S.C. § 922(a)(6); 27 CFR 4§ 78.128; 430 ILCS 68/5-85(a).

55.     Second, part of the organic statute creating the defendant ISP, vests ISP with the authority to "promulgate rules and regulations *necessary* for the administration and enforcement of its powers and duties, *wherever granted and imposed*, pursuant to the Illinois Administrative Procedure Act." 20 ILCS 2605-15 (emphasis supplied). In the case of the FOID Act described above, ISP specifically has broad authority to "exercise the rights, powers and duties that have been vested in the [ISP] by the Firearm Owners Identification Card Act." 20 ILCS 2605-120.

56.     Additionally, under both the Dealer Licensing Certification Act and the FOID Act, and under further authority of 20 ILCS 2605-15, the ISP has both the power and duty to stop straw sales and other unlawful transfers.

57.     The FOID Act makes it unlawful for anyone to possess a firearm in Illinois unless they have been screened and found eligible for a FOID card. In section 430 ILCS 65/3 the FOID Act prohibits the sale of any firearm or firearm ammunition to any person in the state who does not hold a valid FOID card or a valid concealed carry permit. This prohibition applies to federally licensed firearm dealers, 430 ILCS 65/3(a)(I), and to any sale by someone who is not a federally-licensed firearm dealer, i.e., a sale in what is customarily referred to as the secondary gun market, either at a gun show, 430 ILCS 65/3(a-5), or through a private sale, 430 ILCS 65/3(a-10). The State Police provide a call-in process so that gun sellers may check to determine

if the purchaser has a valid FOID card, and this entails a background check as well, 430 ILCS 65/3.1.

58.     Without attempting to manage in detail what ISP should do, the General Assembly enacted the FOID Act on the premise that the ISP would use its special knowledge about the criminal gun market and its existing authority under 20 ILCS 2065-15 and 2065- 120 as necessary to prevent unlawful transfers.

59.     Subsequently, in 2018 after the filing of this action, the General Assembly adopted the Firearm Dealer Licensing Certification Act, 430 ILCS 68/5-60, for the purpose of stopping illegal gun trafficking by requiring dealers to adopt practices that would reduce diversion of legal firearms to the illegal market through theft, loss, or straw sales. In addition to robust security and inventory management requirements, section 430 ILCS 68/5-60 the Dealer Licensing Act states: "[t]he Department [of State Police] shall develop and implement by rule statewide training standards *that would lead a reasonable dealer to refuse sale of a firearm, including but not limited to indicators of a straw purchase*." (emphasis supplied). Under 430 ILCS 68/5-34 of the same Act, the ISP also has broad regulatory authority to require training in responsible business practices to be determined by ISP.

60.     Necessarily, the ISP has authority to require dealers to follow those responsible business practices and to fine or suspend or deny certification of their licenses if the dealers fail to do so. Under 430 ILCS 68/5-85 of the Dealer Licensing Certification Act, the ISP has the power to "refuse to renew… any licensee, for… (2) a pattern of practice… which demonstrates… incapacity or incompetency to practice under the Act." Such a pattern or practice of incapacity or incompetency is acknowledged by ISP to include incapacity to stop straw purchases, yet the ISP inexplicably claims that it cannot require the dealers to follow such

15

responsible business practices and to document they are used at the time of sale.

61.     Since ISP is authorized by law to discipline dealers under 430 ILCS 68/5-85 for a pattern of straw sales, ISP necessarily has the regulatory authority to require dealers to follow the practices that would be likely to prevent such straw sales. Such authority as is necessary to enforce 430 ILCS 68/5-85 is also within the general grant of authority to ISP in 20 ILCS 2065-15.

62.     The ATF and the National Shooting Sports Foundation (NSSF), the gun industry's trade association, have developed resources that instruct gun dealers to engage potential purchasers in conversation to ferret out indicators that the customer is a straw purchaser through the "Don't Lie for the Other Guy" campaign. Using those materials and building on them based on experience in litigation against negligent gun dealers, Brady has developed a checklist based on common indicators of straw purchasing set out in Exhibit B.

63.     Requiring dealers to follow the practices or protocols set out in Exhibit B as a condition for certification of a dealer license under 430 ILCS 68/5-85 would substantially reduce straw purchases and dramatically reduce the gun violence to which the plaintiff and other class members are now exposed.

64.     For example, as part of the responsible business practices to be followed, the defendant ISP can require dealers to be trained and required to refuse sales when specific indicators of a straw sale are present. Such indicators include but are not limited to: (1) buying multiples of the same handgun in the same transaction or within a short period of time, or (2) seeking purchase of a handgun when a gun previously bought by the same purchaser was recovered at a crime scene and not reported lost or stolen. Dealers should be trained not to sell under these circumstances and held accountable or disciplined by ISP if they do.

65.     Likewise, as a responsible business practice, dealers should be trained to require valid FOID cards from person purchasing ammunition, as failure to do so is effectively facilitating violence by persons without valid FOID cards.

66.     Defendant ISP has also failed to perform its responsibility under the Illinois Gun Trafficking Information Act, 5 ILCS 830/10-5 to produce reports to determine patterns of straw purchasing by specific dealers, and to develop a state-wide firearms trace system to do so.

67.     Defendant ISP has failed particular to create a single or central gun trace database that is truly comprehensive and able to determine straw purchasing patterns. Under the Gun Trafficking Information Act, ISP can and should dedicate resources to analyze trace data. Where the local police departments are small and lack the capacity to do so, ISP can provide appropriate financial assistance to ensure such officers are in place.

68.     ISP has also failed to provide transparency or disclose its own actions in enforcing state gun laws, including the FOID Act and the Firearm Dealer Licensing Certification Act in violation of the Gun Trafficking Information Act, 5 ILCS 830/10-5.

69.     ISP can and should disclose properly redacted summaries of its inspections of dealers and other enforcement activities, and "use all reasonable efforts to make publicly available, on a regular and going basis, key information related to firearms used in the commission of crimes in this State," including the identity of the "Federal Firearms Licensee that sold the firearm…."

70.     The ISP is also supposed to "study on a regular and ongoing basis and compile reports on straw purchase patterns," but has produced no such reports even at this late date.

71.     With respect to enforcement of the FOID Act, the ISP has failed to use its full and necessary regulatory authority to stop illegal users from obtaining cards under false identities. Specifically, the ISP has failed require the fingerprinting of all applicants, which is the only sure

way to determine identity, and the only way to stop the current criminal activity. Instead, the ISP has insisted on further legislative authorization for a practice that nothing in the FOID Act prohibits and is preventing enforcement of the FOID Act.

72.     Generally, the ISP has failed to perform its core obligation under the FOID Act – to collect guns from persons whose FOID cards are invalid. While Chicago police strain to collect thousands of illegal firearms, ISP has failed to make a meaningful effort to collect at least 36,000 or more illegal guns now held by persons whose FOID cards have been revoked over the years.

73.     Not even ISP doubts it has full regulatory authority under the FOID Act to carry out the revocations and return of guns. Yet the ISP has consistently failed to require owners to complete a Firearm Owner Disposition Record and surrender their guns when FOID cards are revoked. In 2018, 10,818 gun owners' FOID cards were revoked, but only 2,616 Firearm Disposition Records were received, and only 3,469 FOID cards were returned.

74.     To begin a meaningful enforcement of FOID in Cook County alone, the Sheriff of Cook County has estimated that it would require $3 million a year for 28 additional committed law enforcement positions.

75.     The ISP has ample authority to reallocate resources to meet the plaintiff class' life and death emergency needs, as well as its obligations under the FOID Act, but has refused to do so.

76.     In all these instances identified above, ISP has failed to use obvious express or implied regulatory power to stop even criminal activities by dealers with respect to straw sales or to collect guns already in the possession of felons and other illegal FOID card holders.

77.     By refusing to use ISP's full authority, defendants continue to permit problem dealers to engage in straw sales without any sanction and without requiring responsible standard

business practices by which these dealers can be judged.

78.    This narrow and limited view of regulatory authority when necessary to protect the health and safety of Black children conflicts with the State defendants' expansive view of regulatory authority towards the COVID-19 public health emergency when white citizens' health and well-being are at stake. The view of authority in a public health emergency for Black children is treated in an entirely different and discriminatory manner than a public health emergency for white citizens of the State.

79.    Many studies have concluded that meaningful regulation of the primary and secondary gun markets, as set forth in the above paragraphs, will reduce the number of guns available in cities like Chicago, and thereby reduce the number of Black children killed or shot, and most importantly reduce the debilitating level of gun violence that has led to the disability of the plaintiff and similarly situated children. These include: Webster, Vernick, Bulzacchelli & Vittes, "Recent Federal Gun Laws, Gun Dealer Accountability andthe Diversion of Guns to Criminals in Milwaukee," Journal of Urban Health Vol. 89:87-97 (2012); Irvin, Rhodes, Cheney & Wiebe, "Evaluating the Effect of State Regulation of Federally Licensed Firearm Dealers on Firearm Homicide", Am. Journal of Pub. Health, Vol. 104(8): 1384-1386 (2014); and the City of Chicago's Gun Trace Report, 2017 (2017), https://www.cityofchicago.org/content/dam/city/depts/mayor/Press%20Room/Press%20Releases.

**The Pervasive Gun Violence in Chicago's African-American Neighborhoods Has Caused Thousands of African-American Children to Become Disabled Under the ADA**

80.    The unending gun violence in Chicago has left thousands of city's Black residents, including children in the plaintiff class, dead or with physical and emotional wounds. As Dr. Shani Buggs from the University of California at Davis Gun Violence Research Center notes, gun trafficking and pervasive gun violence's repercussions stretch well beyond those directly hit

with a bullet, reverberating within entire communities for decades through depressed home prices, reduction in growth of new retail and services, lack of economic or career opportunities in the immediate vicinity, and lack of access to healthcare, healthy food, or social opportunities.

81.     Pervasive gun violence and the constant trauma and fear that it produces has had an acute and dramatic effect on the social and emotional health and educational opportunities of the children exposed to such violence that have not been shot, like the plaintiff and other class members in this case. A Chicago mother interviewed by a local author, Alex Kotlowitz, in his book "An American Summer" captured it best: "It's like Russian roulette every time they walk out the door."

82.     The number of children that are traumatized by living under that daily fear when deciding whether to play with friends, get fresh air, or go to school are far larger in number than those who have been killed and maimed.

83.     Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 protects an "individual with a disability" under 29 U.S.C. § 705(20)(B) which adopts the definition of a "disability" under 42 U.S.C. § 12102 of the Americans with Disabilities Act as "a physical or mental impairment that substantially limits one or more major life activities of such individual", 42 U.S.C. §12102(1)(A). Major life activities under this section "include, but are not limited to, *caring for oneself*, performing manual tasks, seeing, hearing, eating, *sleeping*, walking, standing, lifting, bending, speaking, breathing, *learning, reading, concentrating, thinking, communicating,* and working" (emphasis supplied).

84.     It is well-established among physicians, trauma specialists and educators, as well as in the scientific, peer-reviewed literature, that when a child, particularly a young child, is exposed to gun violence, there is a dramatic and lasting impairment of the child's basic life

activities. This includes deficits in the child's ability to care for himself or herself, the child's sleep, reading abilities, learning capacity, concentration, thinking and communication. As a result of these deficits, gun violence directly undermines the child's academic performance and his or her educational opportunities.

85.     Many studies have found that children directly or indirectly exposed to community violence, most often gun violence, develop acute or post-traumatic stress disorder, including disrupted sleep, anxiety, and fear, as well as reduced awareness and difficulty with concentration, thinking and memory, all of which impair cognitive functioning. Exposure to gun violence floods a child's body with stress hormones (adrenaline and cortisol) which independently undermine cognitive performance by compromising the function of the prefrontal cortex of the brain (the area of the brain that is most rapidly developing in adolescence). This portion of the brain is responsible for reflective self-regulation and sustained attention, thus inhibiting the child's memory, ability to sustain concentration and brain development. The child's analytical capacities (or executive function) tend to disintegrate, leaving the child disorganized cognitively and emotionally, and thus prone to react in school with extreme helplessness, confusion, withdrawal, or rage. The more directly the child experiences gun violence and the more often it happens, the more enduring and permanent are his or her deficits. This literature is summarized in many places, including by the Violence Policy Center, "The Relationship Between Community Violence and Trauma: How Violence Affects Learning, Health and Behavior," (July, 20017), www.vpc.org; by Sharkey, "The Long Reach of Violence: A Broader Perspective on Data, Theory, and Evidence on the Prevalence and Consequences of Exposure to Violence," Annual Review of Criminology, Vol. l:85-102 (January, 2018); and by Cook, et al. "Complex Trauma in Children and Adolescents," Psychiatric Annals, Vol. 35(5):

390-398 (2005).

86.     For twenty years, research has shown that exposure to gun violence negatively affects a range of developmental outcomes across social-emotional, behavioral, and cognitive domains. *See, e.g.*, Bingenheimer, et al., "Firearm Violence Exposure and Serious Violent Behavior," Science, Vol. 308:1323-26 (2005); and Osofsky, "The Impact of Violence on Children," Future of Children, Vol. 9:33-49 (1999). It has also consistently shown that exposure to gun violence and other forms of violence are associated with lower performance on assessments of reading, cognitive skills, grade point average, and school attendance. *See, e.g.*, Bowen, et al., "Effects of Crime and Violence in Neighborhoods and Schools on the Social Behavior and Performance of Adolescents," Journal of Adolescent Research, Vol. 14:319-42 (1999) and Delaney-Black, et al., "Violence Exposure, Trauma and IQ and/or Reading Deficits among Urban Children," Archives of Pediatrics and Adolescent Medicine, Vol. 156: 280-85 (2002).

87.     In Chicago, there have been many studies linking exposure to gun violence directly to deficits in academic performance by Black children. In 2010, Dr. Patrick Sharkey used Chicago homicide data and cognitive assessment data on hundreds of children aged 5 to 17 from the Project on Human Development in Chicago Neighborhoods to assess the effect of a single homicide incident located near a student's home on that student's vocabulary and reading skills, using sub-tests of the Wechsler Intelligence Scale for Children and the Wide Range Achievement Test. For Black children, a homicide located on their block within one week of cognitive assessment testing showed (on average) a reduction in performance of 0.5 standard deviations relative to other Black children living in the same neighborhood who had not been exposed to a homicide. The children lost .65 standard deviations in their reading scores when tested within four days of a homicide occurring on their block (whether the child saw the

homicide or not). A separate study of Chicago data referenced by Dr. Sharkey, and used for comparison, found that a homicide within a child's census tract occurring within four days of cognitive assessment found loss of a full 1.0 in standard deviation on a letter-word test, as compared with other children from the same neighborhood. Sharkey, "The Acute Effect of Local Homicides on Children's Cognitive Performance," Proceedings of the National Academy of Sciences, Vol. 107(26): 1 1733-38 (2010). Dr. Sharkey has demonstrated the same causal effect between exposure to gun violence and deficits in standardized test scores administered in the schools of New York City (using time and location), *see* Sharkey, et a1., "High Stakes in the Classroom, High Stakes on the Street: The Effects of Community Violence on Students' Standardized Test Performance", Sociological Science, Vol. l (3): 199-220 (2014); *see also*, Lacoe, et al., "Too Scared to Learn? The Academic Consequences of Feeling Unsafe in the Classroom," Urban Education, https://doi.org/10.I 177/0042085916674059 (October, 2016), (tracking 340,000 New York city public school students over successive academic years to find that in years when students reported feeling unsafe, their standardized test scores declined significantly).

88.     Dr. Dana Charles McCoy and colleagues studied 602 Chicago children from high-crime Chicago neighborhoods in 2004 and 2005, and then followed up with them in 2010 and 2011 to study the relationship between their exposure to violent crime (taking place within a half mile of their home (which they may or may not have witnessed) and within seven days of testing) and their performance on a neuropsychological assessment which measured their cognitive performance and selective attention. These researchers found a direct relationship between exposure to violence and a deficit in neuropsychological functioning, as a result of the children's exposure to gun violence. McCoy, et al., "Children's Cognitive Performance and

Selective Attention Following Recent Community Violence," <u>Journal of Health and Social Behavior</u>, Vol. 56(l): 19-36 (2015).

89.     Gun violence affects everyone in school, even those not exposed. This was demonstrated by Dr. Julia Burdick-Will, who took five cohorts of Chicago Public School students (from 2002 to 2010) and examined the relationship between performance on standardized tests and the level of violence experienced in the school (as determined by Chicago police locational crime data and survey tools). Many students did not experience gun violence, but the whole school felt less safe. One standard deviation increase in classmates' exposure to neighborhood violence was related to a 0.3 standard deviation decline in both reading and math scores – which represents ten percent (10%) of normal student annual growth. Burdick-Will, "Neighborhood Violence, Peer Effects, and Academic Achievement in Chicago," <u>Sociology of Education</u>, Vol. 91(3): 205-223 (2018).

### Plaintiff's Exposure to Gun Violence Has Left Him Disabled Within the Meaning of Section 504 of the Rehabilitation Act

90.     D.W. is eleven years old. He lives with his mother, his sister Ashley, and Ashley's two children. D.W.'s mother works for Senior Helpers as a case manager in charge of coordinating in-home care for chronically ill seniors.

91.     D.W. attends a Chicago Public School in the Austin neighborhood of Chicago. The same school that D.P. attends, another plaintiff in this case. His sister, Tierra Scott, works as a teacher at the school. D.W. chose to attend the school his sister works at rather than his local public school because it makes him feel safer.

92.     On the night of October 8, 2018, D.W. and his mother were spending quality time with their family in the neighborhood where D.W. was raised, North Lawndale. That same night, Marquise Willingham, D.W.'s cousin was returning home from a high school football game at

Collins Academy High School. Just blocks away from where D.W. and his family were having a quiet night with their relatives, a car pulled up next to Marquise on his walk home from the game. A gunman got out of the car and shot Marquise twice in the shoulder and once in the head. Ms. Mathews heard a banging on the door and answered. It was a family friend in tears screaming that Marquise had been murdered.

93.    D.W., just nine years old at the time, heard the news from the other room of the house. D.W. was shielded from seeing his cousins bleeding body by his mother. He would later accompany his family to the coroner's office to identify the body. D.W., overcome with grief, decided to stay in the car. The police have labeled Marquise's death a homicide. The case remains unsolved.

94.    The loss of D.W.'s cousin at the hands of gun violence forever altered D.W.'s life. With little money and no counseling resources available to the family, D.W. was left with very little to deal with so much trauma.

95.    At the time of the murder, D.W.'s sister was his fourth-grade teacher. Ms. Scott drove D.W. every day to and from school. She continues to transport D.W. to this day. It simply was not and is still not safe for D.W. to walk, take the bus, or take the train to get to and from school. Prior to the death of their cousin, Ms. Scott knew D.W. to be an inquisitive, mild-mannered, and thoughtful child. He sang and still does sing in their church choir and leads the family prayer every Thanksgiving. D.W. was then and still is now obsessed with space, soccer, and Greek mythology.

96.    After the killing of his cousin, D.W. began having severe emotional swings manifesting in massive angry outbursts seemingly triggered by small discomforts. These outbursts disrupted class, caused D.W. to shake uncontrollably, and lasted long periods of time.

97.     D.W.'s learning has also suffered. For the first time in his school career, he started manifesting symptoms of attention deficit hyperactivity disorder, often requiring fidget spinners and other gadgets to keep him in his seat. Much more than was the case prior to the murder, D.W. now experiences difficulties in focusing, reading, communicating, and listening. D.W. is currently being evaluated for an Individual Education Plan ("IEP") at his school in order to secure extra resources to help him keep pace with his peers and manage his stress.

98.     D.W.'s exposure to gun violence has caused D.W. to seem more stressed. He is acutely aware of the dangers guns pose to him and his family. D.W. has ongoing fear for his own life and the lives of his family members. Accordingly, D.W. refuses to play outside unless his mother is supervising. He has made it a consistent habit of calling each of his siblings and his mother in the afternoon and at night just to make sure they are safe.

99.     On November 23, 2018, just a month and a half after his cousin's murder, another one of D.W.'s cousins committed suicide by shooting himself in the head. D.W. was with his family mourning the recent death of another cousin from cancer. As the family huddled together in D.W.'s living room after returning from the hospital, D.W.'s aunt received the heart wrenching phone call concerning her son's suicide. D.W., like the rest of his family, broke down in tears as the news was shared throughout the house. Neither D.W. nor Ms. Mathews knows why Keyonte killed himself.

100.    Not only has gun violence touched D.W.'s family directly, it remains a consistent part of his life. On more than a handful of occasions, D.W. and his classmates have been held back during dismissal because gun shots were heard on an adjacent block. In the three years since D.W. has lived in Garfield Park, at least ten shootings have occurred within a four-block radius of D.W.'s home. D.W and his mother regularly hear gun shots at night while going to sleep.

Since the murder of his cousin, D.W. has had trouble sleeping, often reporting dreams about his cousin to his mother.

101.    D.W. is an individual with a disability under 29 U.S.C. 705 (20)(B) of Section 504 of the Rehabilitation Act, because D.W. has a disability within the meaning of 42 USC 12102 of the Americans with Disabilities Act. He suffers from a trauma-induced mental impairment that substantially limits his abilities to sleep, learn, read, concentrate, think, communicate, and participate fully in school.

102.    D.W. continues to live in the Garfield Park neighborhood of Chicago where gun violence is just a normal part of life. D.W. is now in sixth grade. He has fallen behind in school according to his end-of-year standardized test scores. But his effort is not the cause of his struggles in school. D.W. has perfect attendance and shows up to school an hour early with his sister and often stays after school when his sister needs to work late.

103.    D.W.'s past and continued exposure to gun violence has impaired his basic life activities and threatens to make his condition more severe. He is unable to achieve the full benefits of the education available to him at his Chicago public school.

## CLAIMS

### COUNT I—VIOLATION OF SECTION 504 OF THE REHABILITATION ACT (CIVIL GUN REGULATION)

104.    By failing to use the ISP's full regulatory power to restrict illegal gun racketeering under the Dealer Licensing Act and the FOID Act, and in violation of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, the defendants have unlawfully refused a reasonable accommodation to plaintiff and other handicapped children of the class, by reason of their handicap. Defendants have failed to take actions described above and within their authority to reduce the exposure of the plaintiff class to the gun violence which creates and aggravates the

PTSD symptoms and resulting handicaps from which the plaintiff and other Black children suffer.

105.    Likewise, by such failure to use that full authority, and in further violation of Section 504 of the Rehabilitation Act, the defendants are discriminating against the plaintiff and other children as a class and inflicting a special injury upon them by virtue of their disability. Defendants have allowed a dangerous condition to persist.

106.    As a result of such discrimination by defendants, and unless restrained by this Court the plaintiff and other class members will be exposed to further events that traumatize them and increase the limitations on life activities.

 WHEREFORE, plaintiff prays that this Court:

A.    Certify the proposed class under Rule 23(b)(2), Fed. R. Civ. P.

B.    Declare pursuant to 28 U.S.C.§ 2201 that by the acts set out above, defendants have denied a reasonable accommodation to the plaintiff and the plaintiff class and discriminated against the plaintiff class by reason of their handicap in violation of Section 504 of the Rehabilitation Act of 1974, 29 U.S.C. § 794.

C.    Order defendants to cease and desist from such discriminatory practices, and to use their full authority under Dealer Licensing Act, the FOID Act and the Gun Trafficking Information Act, and in particular to require gun dealers to comply with responsible business practices set out in Exhibit B, and to provide resources or reallocate resources necessary to enforce the FOID Act in Cook County.

D.    Order defendants to determine submit to this Court patterns of straw purchase sales attributable to specific Illinois dealers and to hold such dealers accountable.

E.    Grant plaintiff his reasonable attorneys' fees, costs and such other relief as may be

appropriate.

## COUNT II—VIOLATION OF ILLINOIS CIVIL RIGHTS ACT

107.     Plaintiff incorporates the allegations set out in Count I above.

108.     By the acts set forth above, and failing to use their full regulatory authority, the defendants have increased the existence of an already serious dangerous condition jeopardizing the mental and emotional health of the plaintiff and other class members.

109.     Gun violence in Chicago is concentrated in the Black neighborhoods, including those in which the plaintiff and other class members live, and they have been emotionally damaged by exposure to gun violence which defendants could prevent by full use of their regulatory authority under state law.

110.     The defendants have used the narrowest possible definition of their authority in order to placate largely white political groups and citizens who do not face and whose children do not face repeated exposure to gun violence from illegal trafficking in guns.

111.     Under state laws for the regulation of handguns, the defendants have used "criteria and methods of administration" that have created a public health emergency for the plaintiff and other Black children and have subjected them to discrimination based on race and otherwise have had a needless adverse racial impact, in violation of Section 5(a)(2) of the Illinois Civil Rights Act, 740 ILCS 23/5.

WHEREFORE, plaintiff prays that this Court:

A.     Certify the proposed class.

B.     Declare that by failing to use the full regulatory authority to prevent illegal gun trafficking and straw sales as described above, the defendants have used methods of

administration that have subjected the plaintiff and other Black children to discrimination based upon race in violation of 740 ILCS 23/5(a)(2).

      C.     Enter an injunction requiring the defendants to use their full regulatory authority to prevent exposure of the plaintiff and other Black children to the violence that is resulting from illegal gun trafficking and straw sales.

      D.     Grant plaintiff his reasonable attorneys' fees, costs and such other relief as maybe appropriate.

_/s/ Thomas H. Geoghegan_

Thomas H. Geoghegan
Michael P. Persoon
Willem W. Bloom
**Despres Schwartz & Geoghegan Ltd**
77 W Washington St., Ste. 711
Chicago, IL 60602
admin@dsgchicago.com

Jonathan Lowy[*]
Kelly Nicole Sampson[*]
Shira Lauren Feldman[*]
**Brady**
840 First Street, Suite 400
Washington, DC 20002
jlowy@bradyunited.org
ksampson@bradyunited.org
sfeldman@bradyunited.org

[*] _pro hac vice forthcoming_

Attorneys for the Plaintiff