IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SHANIECE MATHEWS, as guardian *ad*, *litem* and on behalf of her son D.W. et al., | ) ) ) | |
| Plaintiff, | ) ) | |
| | ) | No. 18 CV 6675 |
| v. | ) | Judge Joan B. Gottschall |
| | ) | |
| The State of Illinois et al., | ) ) | |
| Defendants. | ) | |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR CLASS CERTIFICATION PURSUANT TO RULE 23(b)(2)**

**INTRODUCTION**

Plaintiff Shanice Mathews is the guardian of her son D.W. and seeks to represent the proposed class set out in paragraph 20 of the Third Amended Complaint (DK. 139) ("TAC"). The class members are Black children under age 18, living in Chicago, who are disabled from exposure to illegal gun violence *or* who risk becoming disabled. Plaintiff and the other class members challenge the same conduct of the Defendants. The proposed class meets the four requirements of Fed. R. Civ. P. 23(a) and seeks the same class-wide injunctive relief under Fed. R. Civ. P. 23(b)(2). The Defendants have failed to use their full regulatory authority to reduce the violence to which the class members are exposed, and they refuse to modify their policies to do so. Defendants could prevent straw sales—which flood crime guns into the neighborhoods where these children live—and collect and dispose of guns now held by tens of thousands of illegal users. As set out in Count I, in developing their programs to enforce various Illinois gun laws, the Defendants have denied a reasonable accommodation to meet the needs of these children, in violation of Section 504 of

1

Rehabilitation Act of 1973, 29 U.S.C. § 794. Even if only from this case, which has been pending since 2018, Defendants are well aware that they are doing so, and make no apology for refusing to take account of the class members' needs in Defendants' regulatory programs under the State's various gun laws.

Specifically, Defendants have failed to use their full regulatory authority under the Firearm Dealer License Certification Act, 430 ILCS § 68/5-1, *et seq.*; the Firearm Owner Identification Card Act, 430 ILCS § 65/1, *et seq.* (as amended in 2021 by Illinois Public Act 102-0237, the so-called "Fix The FOID" Act); and the Illinois Gun Trafficking Information Act, 5 ILCS § 830/10-1, *et seq.* Apart from these laws, the Illinois Department of State Police (ISP) has a broad grant of regulatory authority in 20 ILCS § 2605-15 to carry out its law enforcement responsibilities, which include the laws set out above as well as criminal statutes that prohibit straw purchases and illegal gun trafficking. That statute vests ISP with the authority to "promulgate rules and regulations *necessary* for the administration and enforcement of its powers and duties, *wherever granted and imposed*, pursuant to the Illinois Administrative Procedure Act" (emphasis supplied). 20 ILCS § 2605-15.

Plaintiff also seeks certification as a class representative under Count II, which alleges a violation of the Illinois Civil Rights Act of 2003, 740 ILCS § 23/5. In violation of this obligation of State agencies to avoid racially disparate impacts in their policies, the Defendants' failure to enforce the laws set out above has had a severe racial impact in the neighborhoods where policies have left so many Black children isolated from resources and subjected them to segregated and impoverished schools. The failure to enforce the laws above has no legitimate purpose, nor any purpose except to avoid offending largely white firearm dealers and various largely white gun groups and political interests.

# ARGUMENT

## I. The plaintiff class has been exposed to terrifying levels of violence.

As this Court is aware, at least three former plaintiffs, all mothers of young Black children, have moved out of the City of Chicago for safety reasons since this action was filed in 2018. They have done so to escape the high level of community violence from illegal gun racketeering that Defendants have done so little to stop. The remaining plaintiff, Shanice Mathews, is a forty-seven-year-old resident of the East Garfield Park neighborhood in Chicago. She has spent more than twenty years as a case manager for Senior Helpers, an organization that provides in-home care for chronically ill seniors. She has four children, including her son D.W., now eleven years old, for whom she is guardian *ad litem.* On October 8, 2018, D.W.'s cousin was shot and killed in North Lawndale. At that time, D.W. lived a few blocks away. A month later, another cousin shot and killed himself with a handgun. In the three years that D.W. has lived in East Garfield Park, there have been more than ten shootings within a four-block radius of his home. Hearing gun shots is a weekly and sometimes a daily occurrence.

D.W. lives just adjacent to West Garfield Park, which has been described by both the Chicago Sun-Times and the Chicago Tribune as the most violent neighborhood in the city. From an October 28, 2021, Chicago Sun-Times article:

> West Garfield Park, the City's most dangerous community area, has experienced a per capita rate of shootings nearly *20 times* higher than downtown, according to the Sun-Times analysis of city data. The gap is even higher with six other police districts that make up much of the North Side. Crime has surged across the city in 2020 and this year, but the wave has been hardest on neighborhoods far from the city center that have long experienced violence at *terrifyingly* elevated rates. And the gap in safety between the city's mostly white, affluent neighborhoods and largely poor, Black, and Latino areas has never been greater (emphasis supplied). Andy Grimm, *As violent crime soars in Chicago, 'safety gap' among neighborhoods widens*, Chicago Sun-Times (Oct. 28, 2021), https://chicago.suntimes.com/crim-

e/2021/10/28/22751765/violent-crime-safety-gap-west-garfield-park-downtown-north-side-shootings.

The characteristic common to the young children who are class members is the constant exposure to gun related violence at these terrifyingly elevated rates. Defendants have argued in their latest motion to dismiss that it is conjectural whether any of these children will "personally encounter" violence in the future. Defendants do not elaborate what they mean by "personally encounter." But, like D.W., these children live in neighborhoods where they hear gun shots every day. They have lost family members and go to schools in which classmates their own age have been shot or killed. All these children either have Post Traumatic Stress Disorder (PTSD) or are at high risk of developing it. The constant exposure to the murders, attempted murders, suicides, and other types of gun violence that take place all around them will result in ever greater limitations and barriers to normal development. These children suffer from paralyzing fear, brought on by specific events and then reenforced by the terrifying gunfire and shootings that take place in the immediate blocks around them. These children, unlike other children, are in a semi-permanent state of lockdown—and are keenly aware that they are.

**II. The plaintiff class members are disabled within the meaning of Section 504 of the Rehabilitation Act.**

The children in the proposed class are disabled within the meaning of Section 504 of the Rehabilitation Act, which borrows the definition of "disability" from the Americans with Disabilities Act (ADA) (42 U.S.C. § 12101, *et seq.*). A disability under the ADA is "a physical or mental impairment that substantially limits one or more major life activities of such individual..." 42 U.S.C. § 12102(1)(A). A "major life activity" includes "sleeping... speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." A substantial limitation on "major life activities" is a special barrier to public education. The medical literature cited in the TAC

notes the huge neurological effect on brain development, and Dr. Colleen Cicchetti, Executive Director of the Center for Child Resilience at Lurie Children's Hospital, has emphasized the long-term impact on young children. Peter Nickeas, *'Staggering' number of children exposed to violence in Chicago; new study says kid population greater in high-homicide areas*, Chicago Tribune (Jul. 15, 2019), https://www.chicagotribune.com/news/breaking/ct-chicago-children-violence-homicide-trauma-20190715-4fp2kqtaprgjvht6cl6ihsply4-story.html. The emotional and mental resources that other non-disabled children use for skill development go instead into defensive mechanisms—often various forms of withdrawal or other coping mechanisms for managing panic.

As shown in the medical literature cited in the TAC, and as expert testimony in this case will further establish, these children use up all their emotional resources to cope with fear—resources that are diverted from learning, thinking, reading, concentrating, and engaging with others, all the skills that young children have to acquire. Some class members can be diagnosed with formal PTSD today, and should be receiving treatment, though it is rare that they do. Dr. Bradley Stolbach, a clinical psychologist who runs a major intervention program at Comer Children's Hospital of the University of Chicago, treats 400 children every year and will affirm that many of the children he treats, as well as many others in the area, have PTSD, are on the cusp of developing it, or are at high risk for developing it. As Dr. Stolbach stated in a July 15, 2019, Chicago Tribune article:

> Homicide has a major effect on people, and that one [the effect of homicides on individuals beyond the victims and their immediate family] often does get lost. We've become just bean counters and numb to the fact that [when] one person gets killed, there are hundreds of people directly affected by that." Peter Nickeas, *'Staggering' number of children exposed to violence in Chicago; new study says kid population greater in high-homicide areas*, Chicago Tribune (Jul. 15, 2019), https://www.chicagotribune.com/news/breaking/ct-chicago-children-violence-homicide-trauma-20190715-4fp2kqtaprgjvht6cl6ihsply4-story.html.

The TAC refers to the neurological impact on young children.

The shocking level of illegal gun violence in the city generally has an enormous and disproportionate effect on children under the age of five. In a 2019 Chicago Tribune article, the Erikson Institute determined that 60 percent of Chicago's children under the age of five live in neighborhoods where over 91 percent of its homicides occur. Peter Nickeas, *'Staggering' number of children exposed to violence in Chicago; new study says kid population greater in high-homicide areas*, Chicago Tribune (Jul. 15, 2019), https://www.chicagotribune.com/news/breaking/ct-chicago-children-violence-homicide-trauma-20190715-4fp2kqtaprgjvht6cl6ihsply4-story.html. As the Erikson Institute stated in its press release:

> A child's development during the first five years sets the foundation for the rest of his or her life, and early violence exposure may negatively impact that development. Children exposed to violence, especially repeated incidents, can become extremely fearful and may demonstrate aggression, anxiety, depression, sadness, and may have difficulty feeling safe and secure." Press Release, Erikson Institute, "New homicide data analysis reveals most of Chicago's young children live in communities with high violence" (Jul. 8, 2019), https://www.erikson.edu/wp-content/uploads/2019/07/7.22.19-Homicide-press-release.pdf.

Like prior versions, the TAC cites specific studies that show how young children directly or indirectly exposed to violence develop acute PTSD or lesser cognitive impairment that limits their life chances and performance in school:

> 87. In Chicago, there have been many studies linking exposure to gun violence directly to deficits in academic performance by Black children. In 2010, Dr. Patrick Sharkey used Chicago homicide data and cognitive assessment data on hundreds of children aged 5 to 17 from the Project on Human Development in Chicago Neighborhoods to assess the effect of a single homicide incident located near a student's home on that student's vocabulary and reading skills, using sub-tests of the Wechsler Intelligence Scale for Children and the Wide Range Achievement Test. For Black children, a homicide located on their block within one week of cognitive assessment testing showed (on average) a reduction in performance of 0.5 standard deviations relative to other Black children living in the same

neighborhood who had not been exposed to a homicide. The children lost .65 standard deviations in their reading scores when tested within four days of a homicide occurring on their block (whether the child saw the homicide or not). A separate study of Chicago data referenced by Dr. Sharkey, and used for comparison, found that a homicide within a child's census tract occurring within four days of cognitive assessment found loss of a full 1.0 in standard deviation on a letter-word test, as compared with other children from the same neighborhood. Sharkey, "The Acute Effect of Local Homicides on Children's Cognitive Performance," Proceedings of the National Academy of Sciences, Vol. 107(26): 1 1733-38 (2010). Dr. Sharkey has demonstrated the same causal effect between exposure to gun violence and deficits in standardized test scores administered in the schools of New York City (using time and location), see Sharkey, et a1., "High Stakes in the Classroom, High Stakes on the Street: The Effects of Community Violence on Students' Standardized Test Performance", Sociological Science, Vol. l (3): 199-220 (2014); *see also*, Lacoe, et al., "Too Scared to Learn? The Academic Consequences of Feeling Unsafe in the Classroom," Urban Education, https://doi.org/10.I 177/0042085916674059 (October 2016), (tracking 340,000 New York city public school students over successive academic years to find that in years when students reported feeling unsafe, their standardized test scores declined significantly).

88. Dr. Dana Charles McCoy and colleagues studied 602 Chicago children from high- crime Chicago neighborhoods in 2004 and 2005, and then followed up with them in 2010 and 2011 to study the relationship between their exposure to violent crime (taking place within a half mile of their home (which they may or may not have witnessed) and within seven days of testing) and their performance on a neuropsychological assessment which measured their cognitive performance and selective attention. These researchers found a direct relationship between exposure to violence and a deficit in neuropsychological functioning, as a result of the children's exposure to gun violence. McCoy, et al., "Children's Cognitive Performance and Selective Attention Following Recent Community Violence," Journal of Health and Social Behavior, Vol. 56(l): 19-36 (2015).

89. Gun violence affects everyone in school, even those not exposed. This was demonstrated by Dr. Julia Burdick-Will, who took five cohorts of Chicago Public School students (from 2002 to 2010) and examined the relationship between performance on standardized tests and the level of violence experienced in the school (as determined by Chicago police locational crime data and survey tools). Many students did not experience gun violence, but the whole school felt less safe. One standard deviation increase in classmates' exposure to neighborhood violence was related to a 0.3 standard deviation decline in both reading and math scores – which represents ten percent (10%) of normal student annual growth. Burdick-Will,

"Neighborhood Violence, Peer Effects, and Academic Achievement in Chicago," <u>Sociology of Education</u>, Vol. 91(3): 205-223 (2018).

TAC ¶¶ 87-89.

### III. The injunctive relief sought against Defendants will benefit all members of the class.

Plaintiff seeks a change in the Defendants' law enforcement policies to provide a reasonable accommodation to the needs of these children—a reduction in the availability of crime guns that come from in-store purchases with Illinois gun dealers and a reduction in the number of guns still in possession or easily available to persons whose Firearm Owners Identification ("FOID") cards have been reduced. With respect to existing programs or activities of the ISP, Plaintiff seeks the changes or modifications described in paragraphs 52 through 78 of the TAC. As set out in paragraph 79, these measures will reduce the number of crime guns, the number of those shot and killed, and the debilitating level of gun violence that exacerbates the disabilities from which the plaintiff class already suffers. As expert testimony will show, any such reduction in availability of illegal guns provides meaningful relief to the class—if only because children with PTSD symptoms would hear fewer gun shots every day.

First, Defendants can require Illinois dealers to follow responsible business practices to stop straw sales to persons whom they know or should know are engaging in illegal gun transfers. Under the Firearm Dealer License Certification Act, 430 ILCS § 68/5-1, *et seq.* ("Dealer License Act"), the law already requires the Defendants to train dealers in such practices, but Defendants choose to do so in a cursory and perfunctory way. Defendants could determine the practices that dealers should follow. Such best practices are codified in the Guidelines of the Bureau of the Alcohol, Tobacco, Firearms and Explosives and the National Shooting Sports Foundation, known as "Don't Lie for the Other Guy." There is also the Brady Center to Prevent Gun Violence checklist

for dealers, attached as Exhibit A to the TAC. Defendants deny that they can require the use of such practices, but the Dealer License Act is specific that the Defendants can sanction dealers for "a pattern of practice or other behavior which demonstrates incapacity or incompetency to practice under this Act." 430 ILCS § 68/5-85(a)(2).

Defendants necessarily have authority to prevent federal criminal law violations. Under 18 U.S.C. § 922(a)(6), it is a criminal violation for persons to make any "false or fictitious oral or written statement… intended or likely to deceive" a dealer with respect to any fact "material to the lawfulness of the sale…" See also, 27 CFR § 478.128. Dealers cannot look the other way when they know or should know that a straw purchase is occurring, nor can they fail to document and alert authorities. Under the Firearm Dealer License Certification Act, Defendants are *obligated* to train dealers, in a serious and not cursory way, such that dealers either know or should know that a straw sale is occurring when indicators are present. There are objective criteria for the "responsible business practices" that Defendants are supposed to train dealers to follow, and which dealers should document for law enforcement purposes that they are using. These responsible business practices are not just a safe harbor: rather, the deliberate failure to follow them, in general or in specific cases, is to aid and abet, or at least be complicit in, federal crimes. Under the Firearm Dealer License Certification Act, Defendants not only could, but should, have a duty to hold accountable dealers if they show "incapacity or incompetency to practice under the Act." 430 ILCS § 68/5-85(a)(2). By providing only cursory training, with no documentation that the training is being followed, Defendants effectively permit the irresponsible business practices that the Dealer License Act is intended to stop. The ISP is thus sanctioning no one nor going outside of its bureaucratic comfort zone to protect these children from continued exposure to violence. The result is that crime guns are transferred steadily into severely low-income, racially isolated

neighborhoods, where they contribute to extraordinary levels of community violence. To sanction dealers under the Dealer License Act for failure to follow responsible business practices is well within the authority of the Defendants. In the circumstances here it is the legal duty of the Defendants to do so under federal law, namely, Section 504, when it is so necessary to stop exacerbating the disabilities of so many thousands of children.

Second, in an open and notorious way, and in flat violation of Illinois law, Defendants fail or refuse to collect and dispose of guns from owners whose FOID cards have been revoked. According to a May 23, 2019, Chicago Tribune article, there are over 34,000 illegal users who are still armed because the Defendants give no priority to collecting their guns. Annie Sweeney, *et al.*, *More than 34,000 Illinoisans have lost their right to own a gun. Nearly 80% may still be armed*, Chicago Tribune (May 23, 2019), https://www.chicagotribune.com/news/ct-met-illinois-guns-foid-cards-revoked-20190520-story.html. This is not a meaningless exercise, even if the country is awash in guns. Under Illinois law, these persons do not have valid FOID cards to buy other guns and therefore must depend on straw purchases. Defendants have left in place a small army of gun users who should be disarmed. Worse, in the rare cases where the ISP purports to "dispose" of a gun, the ISP frequently allows the user to simply transfer ownership to a significant other or family member, after which the owner can easily regain possession. The ISP resists taking the necessary steps of obtaining a judicial warrant to allow ISP to ensure the recovery and disposition of the gun. But this is simply a matter of ISP failing to reallocate the resources it has to carry out its obligation under the Act. The ISP can also take additional measures to halt fraudulent acquisition of FOID cards and ban the purchase of ammunition without valid FOID cards.

Finally, Defendants have inexcusably failed to create a single gun tracing database or a statewide firearms trace system, as required by the Illinois Gun Trafficking Information Act, 5

ILCS § 830/10-5. Contrary to their obligations under the statute, Defendants have failed to produce public reports that identify patterns of straw purchasing for specific dealers. Defendants apparently do not find it worth bothering with producing the reports required by the statute, since ISP does not contemplate taking any actions against dealers, no matter how many crime guns are being traced back to them.

Because Plaintiff seeks only declaratory and injunctive relief as to Counts I and II, and because the relief sought against the Defendants is not individual in nature but uniform with respect to all the children in the class, Plaintiff respectfully seeks certification of this class pursuant to Fed. R. Civ. P. 23(b)(2). As set forth below, the named plaintiff has shown her commitment—indeed, performed a public service—in leading this action not just on behalf of her own child but other Black children for whom this case raises life and death issues, and she has further demonstrated her capacity as class representative by retaining Despres, Schwartz, and Geoghegan, Ltd. and lawyers from Brady United, who are experienced in class action litigation and litigation concerning gun violence prevention.

## LEGAL STANDARD

Under the Federal Rules of Civil Procedure, "[o]ne or more members of a class may sue or be sued as representative parties on behalf of all members only if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). "A class action may be maintained if Rule 23(a) is satisfied and if the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that

11

final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

### I. Plaintiff satisfies the four requirements of Rule 23(a) for class certification.

This proposed class action satisfies all four criteria enumerated under Fed. R. Civ. P. 23(a).

First, the class is sufficiently numerous as required by Fed. R. Civ. P. 23(a)(1). The proposed class includes all Black children living in Chicago, under age 18, and either disabled or likely to become disabled with PTSD from exposure to gun violence. While there "is no hard and fast rule as to when the size of a class renders joinder impracticable, plaintiff's allegation that the classes include hundreds of persons an allegation that is uncontroverted by the defendants is enough to satisfy this requirement." *Johnson v. Brelje*, 482 F. Supp. 121, 123 (N.D. Ill. 1979). Significantly smaller classes, as small as forty, have been found to satisfy numerosity. *Swanson v. Am. Consumer Indus., Inc.*, 415 F.2d 1326, 1333 n.9 (7th Cir. 1969). In this case, as set out in the TAC, the proposed class runs into the tens of thousands.

A 2019 study by the Erikson Institute determined that, in 2018, 54,529 Chicago children under five years of age lived in a community that experienced over ten homicides, and 12,248 such children lived in a community that experienced over 30 homicides. Press Release, Erikson Institute, "New homicide data analysis reveals most of Chicago's young children live in communities with high violence" (Jul. 8, 2019), https://www.erikson.edu/wp-content/uploads/2019/07/7.22.19-Homicide-press-release.pdf.

No one seriously doubts the exposure of tens of thousands of African-American children in Chicago to high levels of violence. In any case, the facts describing the scope of the violence, as set forth above, are matters of public record.

Second, there are common issues of fact and law. Pursuant to Fed. R. Civ. P. 23(a)(2), members of the proposed class of Black children all have limitations or are at risk of acquiring them because of exposure to gun violence and the failure of Defendants to modify their policies to limit that exposure. A "common nucleus of operative fact is usually enough" to satisfy commonality. *Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir. 1998). Courts readily find commonality when the proposed class seeks injunctive relief pursuant to Rule 23(b)(2). *Nicholson v. Williams*, 205 F.R.D. 92, 98 (E.D.N.Y. 2001); see also, 7A Wright & Miller, § 1763 at 201 (1986) ("Injunctive actions by their very nature often present common questions satisfying Rule 23(a)(2)"). Commonality also has often been found in class actions certified under the ADA or Section 504 of the Rehabilitation Act. See, *e.g.*, *Berardi v. City of Pekin*, 2021 US Dist. LEXIS 74731, *20 (C.D. Ill. Apr. 19, 2021). "What matters to class certification… is not the raising of common questions… but rather, the capacity of a classwide proceeding to general common *answers* apt to drive the resolution of the litigation." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). "The critical point is the need for conduct common to members of the class" (internal quotations and emphasis omitted). *Berardi v. City of Pekin,* 2021 US Dist. LEXIS 74731, *20 (C.D. Ill. Apr. 19, 2021). Plaintiff here seeks such a change in conduct common to the class. The same reasonable accommodation of law enforcement policies to all class members' special needs will resolve this litigation.

The "typicality" requirement under Fed. R. Civ. P. 23(a)(3) is closely related to commonality, and the two requirements often merge in Rule 23(b)(2) class actions. See, *Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir. 1998).

As to the third factor, "typicality exists where, as here, all class members are at risk of being subjected to the same harmful practices, regardless of any class member's individual

circumstances." *DG v. Devaughn*, 594 F.3d 1188, 1201 (10th. Cir 2010); see also, *Connor B. v. Patrick*, 272 F.R.D. 288, 295 (D. Mass. 2011). This factor is closely related to commonality.

Finally, Plaintiff satisfies the adequacy requirement of Rule 23. Plaintiff Mathews, on behalf of her son D.W., has already demonstrated her commitment and courage in acting as the lead plaintiff in this case against Defendants. She is pursuing this case for the sake of both her child and many similarly situated African-American children.

In service of this commitment, she has retained counsel that can adequately represent the class, experienced with class litigation broadly and gun violence prevention litigation specifically. The firm of Despres, Schwartz, and Geoghegan, Ltd. ("DSG") is experienced in class litigation. Another court in this district stated, of DSG, that "[the court] has no doubt that plaintiffs' attorneys will be able to litigate the case fairly and adequately on behalf of the proposed class." *Healy v. IBEW, Local Union No. 134*, 296 F.R.D. 587, 593 (N.D. Ill. 2013). In addition to *Healy*, in which the firm negotiated a settlement including reinstatement and $1.8 million in back pay, DSG has served as class counsel in numerous other class actions. The firm recovered $19 million in total for plaintiffs and other employees in the related cases *Lumpkin v. International Harvester Co.*, No. 81 C 6674 (N.D. Ill.) and *Lumpkin v. Envirodyne Industries, Ltd.*, 933 F.2d 449 (7th Cir. 1991), which were concerned in part with a breach of fiduciary duty by an employer under the Employee Retirement Income Security Act of 1974. In *Baker v. Kingsley*, 387 F.3d 649 (7th Cir. 2004), the firm achieved a settlement of $5 million to the class. The firm has also obtained large settlements for employee class members in *Phason v. Meridian Rail Corp.*, 479 F.3d 527 (7th Cir. 2007), *Hughes v. Merit Lincoln Park LLC*, No. 08-cv-6191 (N.D. Ill.), and *Local 1239, International Brotherhood of Boilermakers v. Allsteel, Inc.*, 955 F. Supp. 78 (N.D. Ill. 1996).

For over 30 years, the legal team at the Brady Center to Prevent Gun Violence ("Brady Legal") has sought justice for the victims of gun violence through litigation. Brady Legal has litigated gun cases in over 40 states, routinely litigates gun industry claims, advises and educates other attorneys and groups pursuing civil claims against the firearms industry and other actors obstructing the remediation of gun violence, files amicus briefs defending life-saving gun violence prevention policies, and advances thought leadership on issues of gun violence prevention. Brady Legal has secured over $60 million dollars in settlements and verdicts on behalf of victims and drives gun manufacturers and sellers to make significant business practice reforms. Brady incorporates and accounts for racial, ethnic, and socioeconomic disparities in gun violence in all aspects of its gun violence prevention work, partnering with organizations from Black and Brown communities most impacted by daily gun violence.

## II.     Plaintiff satisfies the requirement for a class under Fed R. Civ. P. 23(b)(2).

This class seeking declaratory and injunctive relief is especially well suited to certification under Rule 23(b)(2) because plaintiff is challenging a common failure of the Defendants to use their regulatory authority as set out in paragraphs 52 through 78 of the TAC. No individual relief is sought, nor is relief sought that requires in any way the individual participation of a class member, every one of whom is equally denied a reasonable accommodation for participation in a State program and every one of whom suffers a racial stigma from the failure of the Defendants to act. The Rule states: "A class action may be maintained if Rule 23(a) is satisfied and if the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

Defendants' refusal to act applies generally to the class, which includes those who have already been harmed and those who are at risk of being harmed. "All the class members need not be aggrieved by or desire to challenge the defendant[s'] conduct in order for one or more of them to seek relief under rule 23(b)(2)"—they must show just that defendants' conduct applied to the entire class. *Edmondson v. Simon*, 86 F.R.D. 375, 383 (N.D. Ill. 1980); see also, 5 Moore's Federal Practice, Civil §23.43(2)(a). Even where members of the proposed class have not yet been harmed by the treatment common to the class, that common treatment is sufficient. "[A] class will often include persons who have not been injured by the defendant's conduct…[s]uch a possibility or indeed inevitability does not preclude class certification." *Kohen v. Pac. Investment Mgmt. Co. & PIMCO Funds*, 571 F.3d 672, 677 (7th Cir. 2009); see also, *DG v. Devaughn*, 594 F.3d 1188, 1201 (10th. Cir 2010) ("That a class possibly or even likely includes persons unharmed by a defendant's conduct should not preclude certification."). Here, the named plaintiff, who has already suffered as a result of Defendants' refusal to take action, represents a class that has been either put at risk of harm or already harmed by Defendants' failure to do so. This satisfies the requirement of general application.

This action also satisfies the requirement that the remedy sought is final injunctive relief appropriate to the whole class. Here, Plaintiff does not seek monetary damages, only (1) a class-wide declaratory judgment with respect to whether Defendants' failure to reasonably accommodate the class members violated the law and (2) a final injunction ordering Defendants to enact such reasonable accommodations as would apply to the class as a whole. This is precisely the kind of case for which Rule 23(b)(2) was written: "to assist litigants seeking institutional change in the form of injunctive relief." *Nicholson v. Williams*, 205 F.R.D. 92, 99 (E.D.N.Y. 2001).

**III.     Plaintiff also seeks certification of the same proposed class for claims arising under Section 5(a)(2) of the Illinois Civil Rights Act of 2003, 740 ILCS § 23/5.**

For all the reasons that justify certification of the class in Count I under Rule 23(b)(2), Plaintiff seeks certification of Count II under Rule 23(b)(2) as well. Certification under Rule 23(b)(2) was designed especially for class actions challenging race discrimination. The Illinois Civil Rights Act prohibits Defendants from adopting criteria and methods of administration that have a racially disparate impact, and for which there are alternatives. See*, Cent. Austin Neighborhood Association v. City of Chi.*, 2013 Ill. App. (1st) 123041 (November 13, 2013) (racial disparity in police response to 911 calls). The class meets the requirements of numerosity, commonality, typicality, and adequacy of representation in challenging conduct common to all members of the class; it raises no individual issues.

## CONCLUSION

For the above reasons, Plaintiff respectfully requests that this Court certify this action as a class action on behalf of all Black children under the age of eighteen who live or lived in the City of Chicago and are (1) disabled under the terms of Section 504 of the Rehabilitation Act on account of their exposure to gun violence or (2) at risk of becoming disabled by their exposure to gun violence.

                                                            Respectfully submitted,

Dated: June 9, 2022                                   By: /s/ Thomas H. Geoghegan
                                                                   One of Plaintiff's Attorneys

Thomas H. Geoghegan
Michael P. Persoon
Willem Bloom
Despres, Schwartz & Geoghegan, Ltd.
77 West Washington Street, Suite 711
Chicago, Illinois 60602
(312) 372-2511
admin@dsgchicago.com

Kelly Nicole Sampson (*pro hac vice* forthcoming)
Shira Lauren Feldman (*pro hac vice* forthcoming)
Brady Center to Prevent Gun Violence
840 First Street NE, Suite 400
Washington, DC 20002
(202) 370-8100
ksampson@bradyunited.org
sfeldman@bradyunited.org

Attorneys for the Plaintiff