# EXHIBIT B

| (Slip Opinion) | OCTOBER TERM, 2022 | 1 |
|---|---|---|

Syllabus

> NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## DEPARTMENT OF EDUCATION ET AL. *v.* BROWN ET AL.

### CERTIORARI BEFORE JUDGMENT TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

No. 22–535. Argued February 28, 2023—Decided June 30, 2023

To alleviate hardship expected to be caused by the impending resumption of federal student-loan repayments that had been suspended during the multi-year coronavirus pandemic, Secretary of Education Miguel Cardona announced a substantial student-loan debt-forgiveness plan (Plan). The Plan discharges $10,000 to $20,000 of an eligible borrower's debt, depending on criteria such as the borrower's income and the type of loan held. The Secretary invoked the Higher Education Relief Opportunities for Students Act of 2003 (HEROES Act), which authorizes the Secretary "to waive or modify any provision" applicable to federal "student financial assistance" programs "as may be necessary to ensure that . . . recipients of student financial assistance" are no worse off "financially in relation to that financial assistance because" of a national emergency or disaster. 20 U. S. C. §§1098bb(a)(1), (a)(2)(A), 1098ee(2)(C)–(D). The HEROES Act also exempts rules promulgated pursuant to it from the otherwise-applicable negotiated-rulemaking and notice-and-comment processes.

  Before the Plan took effect, various plaintiffs—including respondents here—sued to enjoin it. Respondents Myra Brown and Alexander Taylor are two borrowers who do not qualify for the maximum relief available under the Plan. Their one-count complaint alleges that the Secretary was required to follow notice-and-comment and negotiated-rulemaking procedures in promulgating the Plan, which all agree he did not do. Brown and Taylor argue that the HEROES Act's procedural exemptions apply only when the rule promulgated is substantively authorized by the Act, and because the HEROES Act does not authorize the Plan (they argue), the Secretary was required to follow negotiated rulemaking and notice and comment. The District Court

rejected their argument regarding the scope of the HEROES Act's procedural exemptions, but nevertheless vacated the Plan as substantively unauthorized. This Court granted certiorari before judgment to consider this case alongside *Biden* v. *Nebraska*, No. 22–506, which presents a similar challenge to the Plan.

*Held*: Because respondents fail to establish that any injury they suffer from not having their loans forgiven is fairly traceable to the Plan, they lack Article III standing, so the Court has no jurisdiction to address their procedural claim. Pp. 6–15.

   (a) "This case begins and ends with standing." *Carney* v. *Adams*, 592 U. S. ___, ___. The Court's authority under the Constitution is limited to resolving "Cases" or "Controversies." Art. III, §2. The Court's jurisprudence has "established that the irreducible constitutional minimum of standing contains three elements" that a plaintiff must plead and—ultimately—prove. *Lujan* v. *Defenders of Wildlife*, 504 U. S. 555, 560. Those elements are: (1) a "concrete and particularized" injury that is (2) "fairly traceable" to the challenged action of the defendant and (3) "likely" to be "redressed by a favorable decision." *Id.*, at 560–561 (alterations and internal quotation marks omitted). But where, as here, the plaintiff alleges that she has been deprived of a procedural right to protect her concrete interest, she need not show that observing the contested procedure would necessarily lead to a different substantive result. *Id.*, at 572, n. 7. Pp. 6–8.

   (b) As articulated in this Court, respondents' claim and theory of standing are twofold: First, because the HEROES Act does not substantively authorize the Plan, the Secretary was obligated to follow typical negotiated-rulemaking and notice-and-comment requirements. Second, if the Secretary had observed those procedures, respondents might have used those opportunities to convince him not only that proceeding under the HEROES Act is unlawful, but also that he should instead adopt a different loan-forgiveness program under the Higher Education Act of 1965 (HEA), and to make that program more generous to respondents than the Plan. Respondents assert there is at least a chance that this series of events will come to pass *now* if this Court vacates the Plan. Pp. 8–9.

   (c) Respondents' standing claim most clearly fails on traceability: They cannot show that their purported injury of not receiving loan relief under the HEA is fairly traceable to the Department's (allegedly unlawful) decision to grant loan relief under the HEROES Act. Pp. 9–15.

      (1) Significantly, respondents are not claiming that they are injured by not being sufficiently included among the Plan's beneficiaries: They think the Plan is substantively unlawful and instead seek debt forgiveness under the HEA. But a decision regarding the lawfulness

Cite as: 600 U. S. ____ (2023) 3

Syllabus

of the Plan does not directly affect respondents' ability to obtain loan relief under the HEA; the Department's authority to grant loan relief under the HEA (upon which the Court does not pass) is not affected by whether the Plan is lawful or unlawful. Any connection between loan forgiveness under the two statutes is speculative.

While it is true that the Court's procedural-standing case law tolerates uncertainty over whether observing certain procedures would have led to (caused) a different substantive outcome, see *Lujan*, 504 U. S., at 572, n. 7, the causal uncertainty here is not so limited. Instead, the uncertainty concerns whether the *substantive* decisions the Department has made regarding the Plan under the HEROES Act have a causal relationship with other *substantive* decisions respondents want the Department to make under the HEA. There is no precedent for tolerating this sort of causal uncertainty. Respondents cannot show that the denial of HEA loan relief—their ostensible injury— "fairly can be traced to" the Department's decision to grant loan relief in the Plan. *Simon* v. *Eastern Ky. Welfare Rights Organization*, 426 U. S. 26, 42–43. There is little reason to think that the Department's discretionary decision to pursue one mechanism of loan relief under the HEROES Act has anything to do with its discretionary decision to pursue (or not pursue) action under the HEA. "The line of causation between" the Department's promulgation of the Plan and respondents' lack of benefits under the HEA "is attenuated at best," *Allen* v. *Wright*, 468 U. S. 737, 757, and all too dependent on "'conjecture,'" *Summers* v. *Earth Island Institute*, 555 U. S. 488, 496. Pp. 10–13.

(2) Respondents' attempts to tie the Plan to potential HEA relief are unavailing. Although the Department has occasionally referred to "one-time" student-loan relief in publicizing the Plan, the Plan itself contains no such reference. And any incidental effect of the Plan on the likelihood that the Department will undertake a separate loan-forgiveness program under a different statute is too weak and speculative to show that the absence of HEA-based loan forgiveness is fairly traceable to the Plan. See, *e.g.*, *Simon*, 426 U. S., at 42–43. To the extent the Department has determined that the Plan crowds out other efforts to forgive student loans, that determination is a discretionary one that respondents may petition the Department to reconsider. Finally, respondents cannot demonstrate causation on the theory that the Department's failure to observe the requisite procedural rules cost them a chance to obtain debt forgiveness; they do not want debt forgiveness under the HEROES Act, and nothing the Department has done deprives them of a chance to seek debt forgiveness under the HEA. Respondents cannot meaningfully connect the absence of loan relief under the HEA to the adoption of the Plan, so they have failed to show that their injury is fairly traceable to the Plan. Pp. 13–14.

4  DEPARTMENT OF EDUCATION *v.* BROWN

Syllabus

Vacated and remanded.

ALITO, J., delivered the opinion for a unanimous Court.

NOTICE: This opinion is subject to formal revision before publication in the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

# SUPREME COURT OF THE UNITED STATES

_____

No. 22–535

_____

## DEPARTMENT OF EDUCATION, ET AL., PETITIONERS *v.* MYRA BROWN, ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[June 30, 2023]

JUSTICE ALITO delivered the opinion of the Court.

In August 2022, the Secretary of Education announced a large-scale student-loan forgiveness program. He pledged to discharge hundreds of billions of dollars in student-loan debt owed by millions of borrowers. According to the Secretary, the discharge was necessary to alleviate hardship caused by the impending resumption of loan repayments, which had been suspended during the multi-year coronavirus pandemic, and he therefore invoked authority that he claimed he enjoyed under the Higher Education Relief Opportunities for Students Act of 2003 (HEROES Act). 117 Stat. 904, codified at 20 U. S. C. §1070 *et seq.* The following month, the Secretary directed that specific actions be taken to implement the loan-forgiveness plan (Plan). The amount of relief available to a borrower under the Plan depends on various criteria, including the borrower's income and the type of loan the borrower holds.

Before the Plan took effect, however, various plaintiffs— including respondents here—sued to enjoin it. Respondents are two individual borrowers who, for different reasons, do not qualify for the maximum relief available under

the Plan. They argue that the Department of Education promulgated the Plan without following mandatory procedures known as (1) negotiated rulemaking and (2) notice and comment. The District Court held in favor of respondents, and we granted certiorari before judgment to consider this case alongside *Biden* v. *Nebraska*, No. 22–506, which presents a similar challenge to the Plan.

Ultimately, however, we do not resolve respondents' procedural claim because we conclude that they lack standing to bring it. Accordingly, we vacate the judgment of the United States District Court for the Northern District of Texas and remand with instructions to dismiss. We simultaneously deny as moot the Department's application for a stay pending appeal.

I

A

The Court's opinion in *Biden* v. *Nebraska*, \_\_\_ U. S. \_\_\_ (2023), recounts the relevant background of the HEROES Act, so only a brief summary is provided here. The Act authorizes the Secretary of Education "to waive or modify any provision" applicable to federal "student financial assistance" programs "as may be necessary to ensure that . . . recipients of student financial assistance" who live or work in a declared disaster area, or suffer direct economic hardship as a result of a national emergency, "are not placed in a worse position financially in relation to that financial assistance because" of the disaster or emergency. 20 U. S. C. §§1098bb(a)(1), (a)(2)(A), 1098ee(2)(C)–(D).

In addition to this substantive grant of authority, the HEROES Act dispenses with certain procedural rules for actions taken pursuant to it.

First, the HEROES Act permits the Secretary to implement any "waivers and modifications authorized or required" by the Act without engaging in the "negotiated rulemaking" that is typically required before proposing

Cite as: 600 U. S. ____ (2023)           3

Opinion of the Court

regulations relating to student financial assistance. §1098bb(d). Negotiated rulemaking is a lengthy deliberative process involving many stakeholders. Pursuant to this process, the Secretary must first obtain "advice of and recommendations" from a long list of sources, including "individuals and representatives" of groups "such as students, legal assistance organizations that represent students, institutions of higher education, State student grant agencies, guaranty agencies, lenders, secondary markets, loan servicers, guaranty agency servicers, and collection agencies." §1098a(a)(1). Then, informed by this consultation, the Secretary must submit draft regulations for consideration in a negotiation process involving participants who are "chosen by the Secretary from individuals nominated by" such groups. §1098a(b)(1). Only after taking these steps may the Secretary "publis[h] proposed regulations in the Federal Register," *ibid.*, accompanied by a summary of the information the Secretary received throughout the process, §1098a(a)(2). The HEROES Act, however, permits the Secretary to bypass this onerous process. §1098bb(d).

The HEROES Act also authorizes the Secretary to bypass notice-and-comment procedures that the Administrative Procedure Act (APA) would otherwise demand. The APA typically requires agencies to give the public "[g]eneral notice of [a] proposed rule making" by publication in the Federal Register, and then to provide "interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments" regarding the proposed rule. 5 U. S. C. §§553(b), (c). The agency may promulgate a final rule only after providing notice and opportunity for comment. §553(c). But the HEROES Act instead permits the Secretary to implement the waivers and modifications he "deems necessary to achieve the purposes of" the Act merely by "publish[ing]" "notice in the Federal Register." 20 U. S. C. §1098bb(b)(1).

B

On September 27, 2022, Secretary of Education Miguel Cardona, invoking authority under the HEROES Act, directed the issuance of waivers and modifications that would bring about the forgiveness of a substantial amount of student-loan debt. In particular, he purported to effect the discharge of (1) $10,000 of eligible, federally held student-loan debt for any individual borrower with 2020 or 2021 income under $125,000 (or household income under $250,000), and (2) an additional $10,000 (making a total of $20,000) for any such borrower who had ever received a Pell Grant. Pell Grants are Government-funded grants to help defray the cost of postsecondary education; eligibility for these grants turns principally on the income of a student's family when the student applies to and is enrolled in the relevant educational program (almost always undergraduate study). See §§1070a(b)(2), 1087mm(a), 1091; see also 34 CFR §690.6(c) (2022) (limited eligibility for students in a qualifying "postbaccalaureate program"). Secretary Cardona directed that these actions be taken via a publication in the Federal Register, see App. 262; all agree that he did not observe the generally applicable negotiated-rulemaking or notice-and-comment processes in devising and announcing the Plan.

Notwithstanding the Plan's scope and expense, not all student-loan borrowers were pleased with it. Myra Brown and Alexander Taylor, plaintiffs in this case, are two such dissatisfied borrowers, albeit for different reasons. Brown's loans are "commercially held," *id.*, at 171, Complaint ¶10, meaning that her creditor is an entity other than the Federal Government. The Plan, however, applies only to borrowers whose loans fall into one or more categories of loans "held by the Department." 87 Fed. Reg. 61513 (2022). Consequently, Brown is not entitled to any loan forgiveness under the Plan.

Cite as: 600 U. S. ____ (2023) 5

Opinion of the Court

Taylor, on the other hand, is eligible for loan forgiveness—but only $10,000, rather than the maximum $20,000. That is because, despite now having an annual income of less than $25,000, he never received a Pell Grant. See App. 183, Complaint ¶61. Thus, individuals with annual income up to five times greater than his are eligible for twice as much loan forgiveness as he is if they ever received a Pell Grant.

Accordingly, both Brown and Taylor object to certain elements of the Plan—Brown to its limitation to federally held loans, and Taylor to the additional relief it doles out based on prior Pell Grants, with no regard for current income. Because the Department did not engage in negotiated rulemaking or notice and comment, however, Brown and Taylor had no formal opportunity to voice their views on the Plan prior to its adoption.

Alleging that the law entitles them to such an opportunity, Brown and Taylor brought this action in the U. S. District Court for the Northern District of Texas. Their one-count complaint claims that the Plan is unlawful because the Department promulgated it without observing the requirements of negotiated rulemaking and notice and comment. As a result, they claim, we should "[v]acate and set aside the" Plan under 5 U. S. C. §706(2)(D). App. 186.

Brown and Taylor recognize that the HEROES Act supplies exemptions from these procedural requirements. They argue, however, that an action of the Secretary falls within these exemptions only if it is substantively authorized by the Act; the Secretary, in their view, cannot merely invoke the "HEROES Act" to bypass negotiated rulemaking and notice and comment. According to Brown and Taylor, the Act does not substantively authorize the Plan, and so the Secretary was required to follow these procedures.

The District Court agreed with Brown and Taylor—in part. It rebuffed their central argument that the HEROES

6   DEPARTMENT OF EDUCATION *v.* BROWN

Opinion of the Court

Act exempts from procedural requirements only those actions that the Act substantively authorizes. But the District Court nonetheless held that the Plan exceeds the Secretary's authority under the HEROES Act and therefore entered judgment vacating it. ___ F. Supp. 3d ___, ___, 2022 WL 16858525, *15 (ND Tex., Nov. 10, 2022).

After the Fifth Circuit denied the Department's motion for a stay pending appeal, the Department applied to this Court for such a stay. The Department advised in the alternative that we could treat its application as a petition for certiorari before judgment. We did just that, granting the Department's petition for certiorari before judgment and deferring consideration of its application for a stay. 598 U. S. ___ (2022). We now review the judgment in No. 22–535 and dispose of the pending application in No. 22A489.

II

We ultimately do not address Brown and Taylor's argument that the Department failed to observe proper procedures in promulgating the Plan. "We have 'an obligation to assure ourselves' of litigants' standing under Article III" before proceeding to the merits of a case. *DaimlerChrysler Corp.* v. *Cuno*, 547 U. S. 332, 340 (2006) (quoting *Friends of the Earth, Inc.* v. *Laidlaw Environmental Services (TOC), Inc.*, 528 U. S. 167, 180 (2000)). And because we conclude that Brown and Taylor lack standing, "[t]his case begins and ends with standing." *Carney* v. *Adams*, 592 U. S. ___, ___ (2020) (slip op., at 4). In particular, we hold that Brown and Taylor fail to establish that any injury they suffer from not having their loans forgiven is fairly traceable to the Plan.

A

Our authority under the Constitution is limited to resolving "Cases" or "Controversies." Art. III, §2. "The doctrine of standing," among others, "implements this" limit on our

authority. *Carney*, 592 U. S., at ___ (slip op., at 4). Our jurisprudence has "established that the irreducible constitutional minimum of standing contains three elements" that a plaintiff must plead and—ultimately—prove. *Lujan* v. *Defenders of Wildlife*, 504 U. S. 555, 560 (1992). "First, the plaintiff must have suffered an 'injury in fact'" that is both "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Ibid.* (some internal quotation marks omitted). Second, the plaintiff's injury must be "fairly traceable to the challenged action of the defendant," meaning that "there must be a causal connection between the injury and the conduct complained of." *Ibid.* (internal quotation marks and alterations omitted). "Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be redressed by a favorable decision." *Id.*, at 561 (some internal quotation marks omitted).

We have found, however, that when a statute affords a litigant "a procedural right to protect his concrete interests," the litigant may establish Article III jurisdiction without meeting the usual "standards for redressability and immediacy." *Id.*, at 572, n. 7. For example, we hypothesized a person "living adjacent to the site for proposed construction of a federally licensed dam" and explained that this person "has standing to challenge the licensing agency's failure to prepare an environmental impact statement, even though he cannot establish with any certainty that the statement will cause the license to be withheld or altered." *Ibid.* In this context, the fact that the defendant might well come to the same decision after abiding by the contested procedural requirement does not deprive a plaintiff of standing.

Regardless of the redressability showing we have tolerated in the procedural-rights context, we have never held a litigant who asserts such a right is excused from demonstrating that it has a "concrete interest that is affected by the deprivation" of the claimed right. *Summers* v. *Earth*

8	DEPARTMENT OF EDUCATION *v.* BROWN

Opinion of the Court

*Island Institute*, 555 U. S. 488, 496–497 (2009).

We emphasized this requirement in *Summers*, where we were asked to review U. S. Forest Service regulations exempting certain minor land-management decisions from the typical notice-and-comment process. *Id.*, at 490–491. The plaintiffs in that case did not have any "concrete plans to observe nature in [a] specific area" affected by actions the Service took pursuant to this exemption, *id.*, at 497, and we therefore held that they lacked standing, *id.*, at 494–497. As we put it, the "deprivation of a procedural right without some concrete interest that is affected by the deprivation— a procedural right *in vacuo*—is insufficient to create Article III standing." *Id.*, at 496.

B

Before applying this framework, we pause to explain both respondents' theory of standing and the substance of their claim, which have not always been readily ascertainable— or consistently described—during this litigation.

Upon initial inspection, respondents' merits theory appears to be in tension with the possibility that the Department could redress their injury. Respondents argue simultaneously (1) that the Department might have treated them more generously if it had solicited their input in developing the Plan and (2) that the Department lacks substantive authority to promulgate broad-based loan forgiveness under the HEROES Act. It would be quite odd for Brown and Taylor to complain about being unable to seek an increase in the scope of an administrative action that they think the Department cannot lawfully take.

Respondents belatedly attempted to address this strange feature of their argument. Their complaint does not say a word about standing. But in their reply supporting their motion in the District Court for an injunction against the Plan, they ventured a brief attempt to explain their position on this threshold issue. They insisted that the Department

cannot adopt the Plan under the HEROES Act regardless of the procedures it follows. Reply in No. 4:22–cv–908 (ND Tex., Oct. 20, 2022), ECF Doc. 26, pp. 3–4. But they observed that the Department has claimed it also has authority to forgive loans under a different statute, the Higher Education Act of 1965 (HEA), which authorizes the Secretary to "compromise, waive, or release any right, title, claim, lien, or demand." 20 U. S. C. §1082(a)(6). Thus, respondents argued, there is a chance that vacating the Plan would prompt the Department to pursue loan relief under the HEA instead. In this Court, Brown and Taylor discuss the HEA at length for the first time in this litigation. See Brief for Respondents 28–32.

Having recounted this history, we now understand respondents' claim and theory of standing as follows. First, because the HEROES Act does not substantively authorize the Plan, the Department was obligated to follow the typical negotiated-rulemaking and notice-and-comment requirements. Second, if the Department had observed those procedures, respondents might have used those opportunities to convince the Department (1) that proceeding under the HEROES Act is unlawful or otherwise undesirable, and (2) that it should adopt a different loan-forgiveness plan under the HEA instead, one that is more generous to them than the HEROES Act plan that they allege is unlawful. They assert there is at least a chance that this series of events will come to pass *now* if we vacate the Plan. *Id.*, at 19.

C

Describing respondents' claim illustrates how unusual it is. They claim they are injured because the Government has not adopted a lawful benefits program under which they would qualify for assistance. But the same could be said of anyone who might benefit from a benefits program that the Government has not chosen to adopt. It is difficult

10 DEPARTMENT OF EDUCATION *v.* BROWN

Opinion of the Court

to see how such an injury could be particular (since all people suffer it) or concrete (since an as-yet-uncreated benefits plan is necessarily "'abstract'" and not "'real'").[1] *Spokeo, Inc.* v. *Robins*, 578 U. S. 330, 340 (2016); see also *Allen* v. *Wright*, 468 U. S. 737, 755–756 (1984) (rejecting a theory that would "extend [standing] nationwide"). Nor have we ever accepted that an injury is redressable when the prospect of redress turns on the Government's wholly discretionary decision to create a new regulatory or benefits program.

Nonetheless, we think the deficiencies of respondents' claim are clearest with respect to traceability. They cannot show that their purported injury of not receiving loan relief under the HEA is fairly traceable to the Department's (allegedly unlawful) decision to grant loan relief under the HEROES Act.

1

At the outset, we reiterate what respondents' claim is not. Respondents are not claiming that they are injured by not being included *in the Plan* (or, in Taylor's case, by being remunerated by the Plan less generously than he thinks himself entitled to). After all, they think the Plan is substantively unlawful, a merits contention that "we accept as valid" for purposes of analyzing standing. *Federal Election Comm'n* v. *Ted Cruz for Senate*, 596 U. S. \_\_\_, \_\_\_ (2022) (slip op., at 6). It would be quite strange to think that a party experiences an Article III injury by *not* being affected by an unlawful action (in Brown's case) or not being *more* affected by such action (in Taylor's).

Instead, respondents seek relief under a separate statutory source. They name the HEA as that potential source, but presumably they would be pleased for the Department

---

[1] In contrast, a claim of unlawful exclusion from an existing benefits program can be fit for judicial resolution. See, *e.g.*, *Trinity Lutheran Church of Columbia, Inc.* v. *Comer*, 582 U. S. 449, 462 (2017).

to invoke any other lawful source (if one exists) as grounds for granting them loan relief. Their interest is in obtaining loan forgiveness in general.

The Plan, however, is independent of any student-loan relief the Department might craft under the HEA (or any other statute). A decision by this Court that the Plan is lawful would have no effect on the Department's ability to forgive respondents' loans under the HEA.[2] Thus, the Plan poses no legal obstacle to the Department's choosing to find other ways to remedy the harm respondents experience from not having their loans forgiven.

Put differently, the Department's decision to give *other* people relief under a *different* statutory scheme did not *cause* respondents not to obtain the benefits they want. The cause of their supposed injury is far more pedestrian than that: The Department has simply *chosen* not to give them the relief they want. Ordinarily, a party's recourse to induce an agency to take a desired action is to file not a lawsuit, but a "petition for the issuance, amendment, or repeal of a rule." 5 U. S. C. §553(e). The denial of such a petition "must be justified by a statement of reasons," which in turn "can be appealed to the courts" if the litigant has standing to maintain such a suit. *Auer* v. *Robbins*, 519 U. S. 452, 459 (1997). Contesting a separate benefits program based on a theory that it crowds out the desired one, however, is an approach for which we have been unable to find any precedent.

It is true that in procedural-standing cases, we tolerate uncertainty over whether observing certain procedures would have led to (caused) a different substantive outcome, as with *Lujan*'s example of the dam and the bypassed environmental impact statement. See 504 U. S., at 572, n. 7. In

---

[2] We do not opine on the substantive lawfulness of any action the Department might take under the HEA or add anything to our construction of the HEROES Act as set forth in today's opinion in *Nebraska*.

this case, however, the causal uncertainty is not merely over whether observing certain procedures would have led to a different substantive outcome. Instead, the uncertainty concerns whether the *substantive* decisions the Department has made regarding the Plan under the HEROES Act have a causal relationship with other *substantive* decisions respondents want the Department to make under the HEA. There is no precedent for tolerating this sort of causal uncertainty.

Our other procedural-standing cases demonstrate the point. In the example posited in *Lujan*, proceeding with building the dam as planned and simultaneously sparing the adjacent landowner from the negative effects of the dam are mutually exclusive options. See *ibid.* While it might be uncertain whether undertaking an environmental impact statement would prevent the dam from being built, it is clear that building the dam would directly injure the landowner.

Similarly, in a case like *Summers*, it might be uncertain whether public comment would alter any particular land-management decision the Forest Service makes. There would be no uncertainty, however, that a plaintiff with concrete plans to observe nature in a particular area "would be harmed if the [land-management project] went forward without incorporation of the ideas he would have suggested" in his comments. 555 U. S., at 494.[3]

Accordingly, Brown and Taylor need not allege that observing negotiated rulemaking and notice and comment would "'force'" the Department to reach substantive results more favorable to them than those embodied in the Plan.

---

[3] Although no plaintiff in *Summers* had standing because none had alleged specific plans to observe nature in one of the areas at issue in the case, see 555 U. S., at 500, the point remains that, in an equivalent case featuring those specific plans, environmental damage to such a plaintiff's esthetic interests could fairly be traced to the Service's land-management choices.

Cite as: 600 U. S. ____ (2023) 13

Opinion of the Court

*Lemon* v. *Geren*, 514 F. 3d 1312, 1314–1315 (CADC 2008). But they must still show—pursuant to our customary traceability standards—that the Plan's substance causes their injury by impairing loan relief under the HEA.

Brown and Taylor cannot meet this standard. "It is purely speculative whether the denia[l]" of HEA loan relief—their ostensible injury—"fairly can be traced to" the Department's decision to grant loan relief in the Plan. *Simon* v. *Eastern Ky. Welfare Rights Organization*, 426 U. S. 26, 42–43 (1976); see also *Warth* v. *Seldin*, 422 U. S. 490, 503–504 (1975).

As noted above, HEROES Act loan relief and HEA loan relief function independently of each other. If the Department may lawfully grant loan relief under both the HEROES Act and the HEA, it is entitled to choose to do both, neither, or only one (provided that it sufficiently explains its reasoning, see 5 U. S. C. §706(2)(A)). There is little reason to think that its discretionary decision to pursue one mechanism of loan relief has anything to do with its discretionary decision to pursue (or not pursue) another. "The line of causation between" the Department's promulgation of the Plan and respondents' lack of benefits under the HEA "is attenuated at best," *Allen*, 468 U. S., at 757, and all too dependent on "'conjecture,'" *Summers*, 555 U. S., at 496.

2

Respondents' attempts to tie the Plan to potential HEA relief are unavailing. They point to a handful of documents related to the Plan that say that the Department is providing "one-time" student-loan relief. See, *e.g.*, App. 215, 221, 225. Such statements, Brown and Taylor argue, show that the decision to grant loan relief under the HEROES Act foreclosed HEA relief.

This is insufficient. The Plan itself—the action under review here—contains no reference to "one-time" relief. See

87 Fed. Reg. 61512–61514.  And to the extent that the Department's decision to adopt the Plan under the HEROES Act might have some incidental effect on the likelihood that the Department will undertake a separate loan-forgiveness program under a different statute, the relationship is not sufficiently close to persuade us that the latter is fairly traceable to the former.  See, *e.g.*, *Simon*, 426 U. S., at 42–43 (accepting that certain tax rules might "'encourag[e]'" or "'discourage'" particular behavior, but nonetheless holding that connection to be insufficient to establish standing where it was "just as plausible" that actors would "forgo favorable tax treatment").  Moreover, no one argues that the existing references to one-time relief are legally binding.  To whatever extent the Department has determined that the Plan crowds out other efforts to forgive student loans, that, too, is a discretionary and independent decision that respondents may ask it to reconsider with a §553(e) petition.

Finally, Brown and Taylor also argue that they have demonstrated causation because the Secretary's failure to observe the requisite procedural rules cost them a "'chance'" to "obtain debt forgiveness."  Brief for Respondents 28.  But referring in the abstract to a "chance" of obtaining "debt forgiveness" does not solve their problem.  They do not want debt forgiveness under the HEROES Act, which they claim is unlawful.  They want debt forgiveness under the HEA.  Nothing the Secretary has done deprives them of a "chance" to seek that result.

Because respondents cannot meaningfully connect the absence of loan relief under the HEA to the adoption of the Plan, they have failed to show that their injury is fairly traceable to the Plan.

\*   \*   \*

For these reasons, respondents lack standing, and we therefore vacate the judgment of the District Court and remand the case with instructions to dismiss.  By vacating

Cite as: 600 U. S. ____ (2023) 15

Opinion of the Court

the District Court's judgment, we obviate the need to grant the interim relief the Department requests in its application in No. 22A489. We therefore deny the application as moot.

*It is so ordered.*