**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| SHANIECE MATHEWS, as guardian *ad, litem* and on behalf of her son D. W., | |
| Plaintiff, | Case No. 18-cv-6675 |
| v. | |
| The State of Illinois et al., | The Honorable Judge Joan B. Gottschall |
| Defendants. | |

## **PLAINTIFF'S RESPONSE REGARDING STANDING**

## Introduction

*United States v. Texas*, No. 22-58 (June 23, 2023), and *Department of Education v. Brown*, No. 22-535 (June 30, 2023), deny standing based on the specific facts of those cases. However, they both use a framework that confirms standing in this case. Plaintiff addresses the relevance of each case below.

**I. Unlike the State of Texas, Plaintiff has a recognized cause of action under Section 504 of the Rehabilitation Act and the Illinois Civil Rights Act of 2003, which expressly authorizes judicial relief for an agency action wrongfully withheld.**

In *United States v. Texas*, the Court rejected Texas' and Louisiana's attempts, absent a statutory cause of action or recognized legal interest, to force the United States to arrest and criminally prosecute more non-citizens. The states had no "recognized legal interest" at stake and the complaint was not of the kind "traditionally thought to be capable of resolution through the judicial process." *United States v. Texas*, 2023 U.S. LEXIS 2639, *2. The Court's majority opinion emphasized the novelty of the case in criminal law prosecutions while distinguishing the standing of states, even absent cause of action, to seek review of an administrative action wrongfully withheld. There are two important distinctions between the opinion in *Texas* and this case.

First, the *Texas* Court was reluctant to grant standing to states as sovereign actors to challenge federal officer discretion. *See, Texas, supra*, at *15, n.3. Second, the Court noted it has granted standing even for a state to challenge, as Plaintiff does here, a lack of an administrative rule or regulation. Plaintiff here challenges a total failure of the Illinois State Police ("ISP") even to require dealers to use responsible business practices. Compare *Texas, supra*, *73, n.6; *see, Massachusetts v. EPA*, 549 U.S. 497, 520 (2007). Plaintiff also challenges the failure to collect guns from those whose Firearm Owners Identification ("FOID") cards have been or should be revoked—not a discretionary decision, but a statutory duty.

Second, unlike *Texas*, or even *Massachusetts v. EPA*, where the states had no cause of action,

1

Plaintiff Mathews has an express statutory cause of action to require agency action unlawfully withheld under laws prohibiting discrimination. Under Section 504 of the Rehabilitation Act, 29 U.S.C. §794 and the Illinois Civil Rights Act ("ICRA"), 740 ILCS 23/5(a)(2), she has a "legally cognizable" interest and an express statutory remedy. Section 504 authorizes a legal challenge to any "program or activity" that fails to provide a "reasonable accommodation" to the needs of disabled individuals. Under both Section 504 and Section 5(a)(2) of ICRA, Plaintiff has standing to seek a modification of any program that subjects her child to discrimination because of race or disability. It is akin to judicial review of any arbitrary abuse of discretion, in disregard of the relevant law, such as a plaintiff might bring against a federal agency under 5 U.S.C. §706 of the Administrative Procedure Act ("APA"). While the APA applies to unlawful actions by federal agencies, Section 504 and ICRA authorize even more stringent judicial review of any abuse of discretion that results in unlawful discrimination.

In Counts I and II, Plaintiff alleges such an abuse of discretion: the failure to provide a "reasonable accommodation" to the children covered in this suit by withholding the use of a clear grant of authority intended to help them. Defendants admit there is a public health crisis in the neighborhoods where these children live. Under the Firearm Dealer License Certification Act ("FDLCA"), 430 ILCS 68/5-60, the Illinois General Assembly expected that the ISP would train and require dealers to follow business practices to curb the straw purchasing that pours crime guns into neighborhoods like Garfield Park. Defendants have required no responsible business practices to address this situation, in disregard of that law's clear intent. Defendants even fail to train the relevant gun dealers in the most responsible business practices, and the training they do provide is cursory and plainly inadequate to address the serious problem here. Of course, requiring nothing of the gun dealers, Defendants also do not hold them accountable.

2

Plaintiff seeks a reasonable accommodation here for Defendants to undertake an activity the statute envisioned. In *Texas*, which involved arrests and prosecutions, the Supreme Court explained that its holding was narrow and that it could change if the Executive Branch "wholly abandoned its statutory responsibilities." Indeed, even under the restrictive standards of review for agency actions under the Administrative Procedures Act, standing can arise where "an agency 'has consciously and expressly adopted a general policy that is so extreme as to amount to an abdication of its statutory responsibilities.'" *Texas*, at *17 (quoting *Heckler v. Chaney,* 470 U.S. 821, 833 n. 4 (1985)). A conscious and express policy of abdication by the State is what has happened here.

Nevertheless, Defendants bemoan what they describe as an attempt at unwarranted judicial intrusion and a violation of the Constitutional separation of powers. But that argument is one that Defendants should make to Congress and the Illinois General Assembly. This case is proceeding under statutory causes of action enacted by the legislative bodies. And this Court has the authority to issue appropriate relief without undue judicial supervision. For example, this Court could validly bar the ISP from renewing the license of any Cook County dealer that cannot document that it follows responsible business practices. Such relief would not be to order an arrest, prosecution, or a fine of any dealer, but, instead, require a condition for renewal of a license. Likewise, for the FOID Act, 430 ILCS 65, the Court could require a work plan for reducing the backlog of the guns that must be recovered from those whose 19,000 individuals whose FOID cards have been or should have been revoked.

Aside from being a "reasonable accommodation" to the needs of the Plaintiff and other children, this relief is also required under Section 5(a)(2) of ICRA as set out in the Third Amended Complaint ("TAC"). Defendants have subjected the children of this lawsuit to racial discrimination by using "the narrowest possible definition of their authority in order to placate largely white

3

political groups and citizens who do not face and whose children do not face repeated exposure to gun violence from illegal trafficking in guns." TAC ¶110. In doing so, and in violation of the specific language of Section 5(a)(2), Defendants have used "criteria or methods of administration" that ignore the special needs of children in racially isolated high-risk neighborhoods with the effect of racial discrimination. 740 ILCS 23/5(a)(2). Under both Counts I and II, Plaintiff has filed a civil rights case. Such a case is an action "traditionally thought to be capable of resolution through the judicial process," *Texas, supra,* and it has been so at least since the Civil War in the case of race and for 50 years in the case of disability. It also meets the standard of (1) injury in fact, (2) causation, and (3) redressability. In one sense, any order to stop unlawful discrimination will lift the *stigma* of discrimination, and effectively redress at least that injury. But the relief sought here will result in a meaningful benefit to the mental health of these children.

    **II. Unlike *Brown*, Plaintiff has suffered an injury directly traceable to the ISP's breach of its duty to accommodate the special needs of the disabled children.**

The reasonable accommodation sought by Plaintiff is simply an order for the ISP to carry out laws that would restrict the availability of illegal guns. This will reduce the level of violence to which Plaintiff and the proposed class are exposed, which would be of real benefit over time to their mental health. In contrast to *Brown*, where the Department of Education had total discretion to act as it pleased, the failure to provide that benefit is a breach of a legal duty that Defendants owe to these children. In the *Brown* case, the Supreme Court rejected a claim for a rule-making procedure that might give the parties a "chance" for inclusion in a debt relief program that the U.S. Department of Education had no duty to provide, either under the HEROES Act or the HEA Act. *Dep't of Educ. v. Brown*, 2023 U.S. LEXIS 2792, *4. The Court held that, for purpose of standing, a "chance" to persuade the Government through rulemaking was insufficient. The Court stated that the Department of Education was not required to forgive debt or grant relief to anyone under the

4

HEROES or the HEA Act. But Defendants do not have similar discretion just to abandon wholesale their duty to enforce the gun laws or key parts of those laws. In enforcing these laws, the Defendants owe a duty to provide "reasonable accommodation" to the needs of the disabled children. Likewise, as set out in 5(a)(2) of ICRA, Defendants may not use "criteria or methods of administration" that have so severe a racial impact. It is this failure to enforce the law that has appreciably increased the violence to which Plaintiff and other children are exposed.

*Brown* otherwise simply restates the standing analysis in *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). The well-known three requirements for standing in that landmark case are: injury in fact, causation or traceability to an opposing party, and redressability. Plaintiff meets all three requirements here. *See, Powell*, 2019 U.S. Dist. LEXIS 168209, at *26-27. The ISP's breach of duty has caused Plaintiff an injury, traceable to the ISP, and is redressable by an order to the ISP to provide the very accommodation it has so far denied. It is not speculative that Plaintiff and the class will benefit from good faith enforcement of the State's gun laws. To the contrary, it is highly likely. As Plaintiff has alleged, there is a substantial factual basis to conclude that the enforcement of the FDLCA and FOID Act will lead to: (1) fewer illegal guns available, which in turn will lead to (2) lower levels of violence where the children live, which in turn will lead to (3) fewer incidents of violence and gunfire that re-traumatize the children.

Plaintiff develops this chain as follows. Enforcing Illinois gun laws will mean fewer illegal guns available. Aside from being an empirical fact, it is also the statutory presumption behind these two laws. It is an implicit legislative finding that Defendants may not question, especially at the pleading stage. It is also an accepted premise of the United States Bureau of Alcohol Firearms and Tobacco, in developing protocols for dealers known as "Don't Lie for the Other Guy." Plaintiff has also submitted the checklist developed by the Brady Center to be filled out by dealers at the

5

point of sale. *See*, Exhibit B, TAC ¶62. As to the enforcement of the FOID Act, the reduction in the availability of illegal guns is self-evident. Once collected, these illegal guns are not available, and individuals likely to engage in gun violence are at least temporarily disarmed. Plaintiff has previously filed with the Court news articles that describe testimony last summer before the Illinois House Public Safety and Violence Prevented Task Force (Dkt. 160-1). At least 19,000 revoked FOID cards in Cook County alone had still not been revoked at the time of the hearings and the guns had not been picked up by ISP. The equivalent of a legion of illegal gun users are armed and at large in the neighborhoods where the children live.

Next, as Plaintiff can also show, reducing the availability of illegal guns will reduce the level of violence to which children in the putative class are exposed. There have been major studies demonstrating that the greater availability of illegal guns in high-risk neighborhoods leads or corresponds to higher rates of violence.

> "Our analyses suggest that the presence of <u>any</u> firearm in the [high-risk component in a network of co-offenders] is associated with increased individual risk of gunshot victimization, but that illegally trafficked firearms presented an even greater risk… Our research suggests that interventions aimed at curtailing illegal transfers of firearms could be used to reduce gun availability to criminals and decrease gun violence victimization…. Reducing firearms trafficking could also reduce the trauma experienced by these individuals and other residents of disadvantaged neighborhoods that are particularly vulnerable to persistent gun violence problems. The case for a *supply*-side approach to gun violence as suggested above is well supported by the empirical evidence on illegal gun market dynamics (Braga et al., 2012, 2002)." (emphasis in original). Alexandra M. Ciomek, Anthony A. Braga, Andrew V. Papachristos, *The influence of firearms trafficking on gunshot injuries in a co-offending network*, SOCIAL SCIENCE & MEDICINE, Volume 259, 2020, https://doi.org/10.1016/j.socscimed.2020.113114.

In the book *Reducing Gun Violence in America: Informing Policy with Evidence and Analysis*, Daniel Webster, et al. (2013) (John Hopkins Press), the authors present a case study showing how weakened gun regulation led to an increase in violence, and diversion of guns to criminals. The diversion of guns to illegal users from just one gun shop jumped by 200 percent after one year.

6

Plaintiff cites additional scholarly evidence in the complaint. TAC ¶79.

As the final step in the analysis, reducing the violence to which the children are exposed will reduce the daily events that are likely to re-traumatize them. Defendants can hardly dispute the connection between levels of violence and mental health. In the Press Release of the Governor's Reimagine Public Safety Initiative in 2021 (Dkt. 164-1), the Defendants said that an increase in gun license revocation by ISP by itself would reduce the level of violence.

Scholarly literature produced since this case was filed reflects an increasing interest in comparing the mental health of these children to soldiers in war. *See*, James Garbarino, Ph.D., *The War-Zone Mentality—Mental Health Effects of Gun Violence in U.S. Children and Adolescents,* September 29, 2022, N. ENGL. J. MED., 2022: 1149-1152. A single traumatic incident may resolve in a year, but repeated exposure re-traumatizes these children, just as it does for soldiers at war.

## Conclusion

The Governor's Reimagine Public Safety Initiative is a program to spend millions of dollars on mental health treatment for the damage already done to children in the putative class from exposure to gun violence. At the very least, consistent with that program, the ISP should use its full authority to limit the exposure of these children to gun violence in the future.

Respectfully submitted,

Dated: July 19, 2023　　　　　　　　　　　　By: /s/ *Thomas H. Geoghegan*
　　　　　　　　　　　　　　　　　　　　　　　　One of Plaintiff's Attorneys

Shira Lauren Feldman　　　　　　　　　　　Thomas H. Geoghegan
**Brady Center to Prevent Gun Violence**　　**Despres, Schwartz, & Geoghegan, Ltd.**
840 First Street NE, Suite 400　　　　　　77 West Washington Street, Suite 711
Washington, DC 20002　　　　　　　　　　Chicago, Illinois 60602
(202) 370-8100　　　　　　　　　　　　　　(312) 372-2511
sfeldman@bradyunited.org　　　　　　　　tgeoghegan@dsgchicago.com