IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Shanice Mathews, as guardian *ad litem* and on behalf of her son D.W., | ) ) ) | |
| Plaintiff, | ) ) | Case No. 18-cv-6675 |
| v. | ) ) | Judge Joan B. Gottschall |
| The State of Illinois, et al., | ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION AND ORDER

Shanice Mathews brings this proposed class action against the State of Illinois, its governor, the Illinois Department of State Police ("ISP"), and its director under section 504 of the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 794, and the Illinois Civil Rights Act of 2003 ("ICRA"), 740 Ill. Comp. Stat. § 23/5(a)(2), on behalf of her son, D.W., an African-American youth (aged 11 when the live, third amended complaint ("TAC") was filed). *See* TAC ¶¶ 19–25, 104–11, ECF No. 139; Fed. R. Civ. P. 17(c). Mathews and D.W. live in Chicago's Garfield Park neighborhood, where hearing gunshots is a weekly, and sometimes daily, part of life. TAC ¶ 19. The TAC describes the epidemic of gun violence in the City of Chicago as a "public health emergency" that is disproportionately concentrated in predominately African-American neighborhoods. *See* TAC ¶¶ 28–31. Citing studies conducted by the University of Chicago, the Chicago Police Department ("CPD"), and others, Mathews alleges that D.W. and other children who live in these neighborhoods suffer from posttraumatic stress disorder ("PTSD") and other trauma-related disabilities as a result of their exposure to gun violence. *See* TAC ¶¶ 28–31. As a reasonable accommodation, the TAC requests declaratory and injunctive relief compelling defendants to use the full extent of their regulatory authority over firearms dealers licensed in Illinois to reduce the flow of guns into Chicago, thereby reducing the exposure of children in the proposed class to future incidents of gun violence. *See* TAC ¶¶ 8–10, 81–89.

Two motions are before the court.  Defendants move to dismiss the TAC for lack of standing under Article III of the Constitution and for failure to state a claim upon which relief can be granted.  *See* Fed. R. Civ. P. 12(b)(1), 12(b)(6).  Mathews moves to certify a class of African-American children who live in Chicago or used to live in Chicago and who, as a result of their exposure to gun violence, are either disabled or at risk of becoming disabled.  *See* TAC ¶ 20; Fed. R. Civ. P. 23(a)–(b).  Applying the Supreme Court's June 23, 2023, decision in *United States v. Texas*, 143 S. Ct. 1964, the court dismisses the third amended complaint for lack of Article III standing.

## I.  Procedural Background

Due primarily to an extended stay pending mediation in the Seventh Circuit, this case has not proceeded beyond the complaint stage.  *See Mathews v. Illinois*, No. 18-cv-6675, order at 3–4 (N.D. Ill. June 10, 2023).  The original complaint named three individual plaintiffs, including Mathews, each of whom sued as the guardian of an African-American minor child who lived, or formerly lived, in a Chicago neighborhood with a high rate of gun violence.  *See* Compl. ¶¶ 4–6, ECF No. 1.  The original complaint traced each child's PTSD diagnosis to exposure to gun violence.  *Id.*  Many of the original complaint's factual allegations are similar to the TAC's, but the disability-related claims in the original complaint were pleaded under Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., rather than the Rehabilitation Act.  *See* Compl. 26–27.  Defendants moved to dismiss the original complaint for lack of standing and for failure to state a claim.  ECF No. 24.  Like the TAC, the original complaint requested only declaratory and prospective injunctive relief intended to reduce the flow of crime guns into Chicago.  *See* Compl. 26, 27, 28–29.

On September 30, 2019, the court granted defendants' motion to dismiss the original complaint in part, in an opinion captioned in the name of the former lead plaintiff, Demetria Powell ("Powell").  *Powell v. Illinois*, 2019 WL 4750265 (N.D. Ill. Sept. 30, 2019), *reconsideration denied*, 2019 WL 10349403 (Dec. 18, 2019).  The court dismissed two of the three named plaintiffs for lack of standing, leaving only Powell, the guardian of her minor son

D.P. *Id*. at *7–8.  When the complaint was filed, D.P. lived in Chicago's Austin neighborhood, but the children represented by the two dismissed plaintiffs lived in nearby suburbs.  *Id.* at *8; *see* Compl. ¶¶ 4–6.  Because there was no indication that the two children living outside Chicago intended to return, neither faced "a reasonably likely ongoing threat of experiencing the harm alleged in the complaint—exposure to gun violence in Chicago."  *Powell*, 2019 WL 4750265, at *8 (footnote and citations omitted).  On the other hand, the court ruled that D.P., represented by Powell, had standing to sue for declaratory and forward-looking injunctive relief.  *Id*. at *6–11.

On the merits, the court denied defendants' motion to dismiss Powell's claims.  *See id*. at *11–17.  Among other things, the court held that the Eleventh Amendment did not bar the original complaint's claims under Title II of the ADA.  *Id.* at *14–15 & nn.8 & 9.  Defendants moved for reconsideration, which was denied.  2019 WL 10349403 (Dec. 18, 2019).

Defendants noticed an interlocutory appeal of the portion of the court's decision denying their motion to dismiss Powell's ADA claims on Eleventh Amendment grounds.  Not. of Appeal 1, ECF No. 45.  By agreement of the parties, this case was stayed for approximately 21 months while they attempted mediation in the Seventh Circuit.  *See* Minute Entry, June 16, 2020, ECF No. 78; Status Reports on Mediation, ECF Nos. 80, 82, 84, 86, 88, 90, 92.  In July 2021, Powell indicated that she wished to restart litigation in the district court.  She obtained leave to file an amended complaint in July 2021, adding Mathews as a second plaintiff.  Pl.'s Unopp. Mot. for Leave to File First Am. Compl., ECF No. 94; *see also* First Am. Compl., ECF No. 97.  The first amended complaint also removed the ADA claims and substituted a Rehabilitation Act claim.  *See* First Am. Compl. 33–34.  Based on the filing of the amended complaint, defendants moved to dismiss their interlocutory appeal as moot.  Appellants' Mot. to Dismiss Appeal & Vacate Decision Below, *Powell v. Illinois, et al*., No. 19-3144 (7th Cir. Aug. 6, 2022).  The Seventh Circuit granted the motion and dismissed the appeal as moot.  Order, *Powell v. Illinois, et al.*, No. 19-3144 (7th Cir. Aug. 6, 2022).

Next, defendants moved in this court to dismiss the first amended complaint. ECF No. 105. In lieu of responding, the then-plaintiffs filed a motion for leave to file a second amended complaint correcting an error in the first. *See* Pls.' Unopp. Mot. to File Corrected Compl. 1–2, ECF No. 113; Second Am. Compl., ECF No. 115. Defendants refiled their motion to dismiss, this time aimed at the second amended complaint. ECF No. 116. The parties have fully briefed this motion. *See* ECF Nos. 120 and 125. After the motion to dismiss the second amended complaint was fully briefed, plaintiffs moved without opposition to file a third amended complaint dropping Powell because she and D.P. had moved to Milwaukee, Wisconsin, and were no longer members of the proposed class. Mot. for Leave to Voluntarily Withdraw Powell as Pl. 1, ECF No. 135. The third amended complaint names Mathews as the sole plaintiff. ECF No. 139 ¶ 19. The parties agree that defendants' motion to dismiss the second amended complaint applies to the third amended complaint without rebriefing. *See* Mot. for Leave to Voluntarily Withdraw Powell as Pl. 1.

After the motion to dismiss the TAC was fully briefed, Mathews moved for leave to conduct discovery. ECF No. 126. The court denied this motion as unnecessary because "the pendency of [a] motion to dismiss does not automatically stay discovery." Powell v. Illinois, No. 18-cv-6675, order at 2 (N.D. Ill. Apr. 5, 2022). Defendants subsequently moved to stay discovery pending a ruling on their motion to dismiss. ECF No. 134; *see also* Resp. and Reply Briefs, ECF Nos. 140 and 141. The court granted defendants' motion to stay discovery in part because Mathews "provide[d] no specifics on the discovery she propose[d] to take," and she did not "request any discovery in order to pursue her arguments for class certification." *Mathews v. Illinois*, No. 18-cv-6675, order at 3 (N.D. Ill. June 10, 2022). Mathews then filed her pending motion for class certification, ECF No. 151, which is fully briefed. *See* Resp. and Reply Briefs, ECF Nos. 160 and 163.

## II. The Third Amended Complaint

Defendants attack the sufficiency of the third amended complaint in their pending motion to dismiss. For purposes of defendants' motion, the court must accept the TAC's well-pleaded

4

factual allegations as true and draw all reasonable inferences from them in the light most favorable to Mathews. *See Hernandez v. Ill. Inst. of Tech.*, 63 F.4th 661, 666 (7th Cir. 2023) (citing *Crescent Plaza Hotel Owner, L.P. v. Zurich Am. Ins. Co.*, 20 F.4th 303, 308 (7th Cir. 2021)) (failure to state a claim); *Bria Health Servs., LLC v. Eagleson*, 950 F.3d 378, 381–82 (7th Cir. 2020) (citing *Remijas v. Neiman Marcus Grp., LLC*, 794 F.3d 688, 691 (7th Cir. 2015)) (lack of subject matter jurisdiction).

### A. Prevalence and Distribution of Gun Violence in Chicago

Chicago's "endemic problem of gun violence" has existed for decades. *See United States v. Gonzalez*, 3 F.4th 963, 967 (7th Cir. 2021); *see also* TAC ¶¶ 1–11, 28–31. Indeed, Chicago's gun violence problem is so well-known that the Seventh Circuit has held that a court may consider how a particular crime affects Chicago's gun violence problem as one factor when sentencing a criminal defendant. *Gonzalez*, 3 F.4th at 967; *United States v. Hatch*, 909 F.3d 872, 874–75 (7th Cir. 2018) (per curiam).

"The Chicago Police Department and University of Chicago Crime Lab studies document that from January 1, 2015, through June 30, 2018, more than 2,000 people in Chicago were murdered. Ninety percent of these murders were by gun. Chicago has more gun-related homicides than any other major U.S. city." TAC ¶ 28. By way of illustration, the national homicide rate increased by 8% in 2016. Chicago was responsible for 20% of that increase. *Hatch*, 909 F.3d at 874. Over the first weekend of June 2021, more than 60 shootings occurred in the Chicago neighborhoods in which members of the proposed class live. TAC ¶ 11. More recently, press reports indicated that 53 shootings occurred over the weekend of Memorial Day 2023, resulting in 11 fatalities. Bill Hutchinson, *Memorial Day Weekend Mayhem Leaves 53 Shot, 11 Fatally, in Chicago*, ABC NEWS (May 30, 2023, 6:30 PM), https://abcnews.go.com/US/53-people-shot-11-fatally-violent-memorial-day/story?id=99691001.

As of June 2021, more than 120 Chicago children under age 18 had been shot in that year. TAC ¶¶ 2, 28. By year's end, that number had grown to at least 276 children (under age 16, not 18), according to press reports based on data obtained from the City of Chicago.

Steven Graves and Chris Hacker, *MAP: At Least 267 Kids 16 And Younger Have Been Shot in Chicago Since 2021*, CBS CHICAGO (Jan. 24, 2022, 6:23 PM), https://www.cbsnews.com/chicago/news/map-at-least-276-kids-16-and-younger-have-been-shot-in-chicago-since-2021. In all, the CPD reported 2,674 Chicago shootings in 2022, resulting in 637 deaths. Matt Masterson, *Chicago Tops 630 Homicides, 2,600 Shootings in 2022: Police*, WTTW (Dec. 1, 2022, 12:33 PM), https://news.wttw.com/2022/12/01/chicago-tops-630-homicides-2600-shootings-2022-police.

The TAC alleges that gun violence is disproportionately concentrated in predominately African-American neighborhoods:

29. This gun violence is a public health emergency which afflicts various Black neighborhoods in Chicago, and particularly: Austin, Englewood, West Englewood, New City and Grand Crossing ("the communities of concentrated gun violence"). In 2015–2016, according to the University of Chicago Crime Lab, 80 percent of Chicago homicide victims were Black, though Black people comprise only about one-third of the city's population. Eighty percent (80%) of homicide victims continue to be Black when one looks only at killings during the first seven months of 2018. Black men aged 15 to 34 made up more than one-half of the city's homicide victims during this same period, while accounting for just four percent (4%) of the city's population. Despite having only nine percent (9%) of Chicago's population, the Black neighborhoods of Austin, Englewood, West Englewood, New City and Grand Crossing, accounted for almost one-third of homicides in 2016, and this pattern has continued. The national homicide rate is about 5 per 100,000 persons across the whole country. In the Austin neighborhood of Chicago, in 2016, the homicide rate was 87.3 per 100,000 persons, according to the University of Chicago Crime Lab. In Englewood, the homicide rate was 179.5 per 100,000 persons; in West Englewood, it was 105 per 100,000 persons; in New City, it was 98.6 per 100,000 persons and in Grand Crossing it was 103.5 per 100,000. These five neighborhoods have the most death by gun violence of any neighborhoods in Chicago. They are Black neighborhoods. Five of the next six deadliest neighborhoods are also predominantly Black.

30. By comparison, the white Chicago neighborhoods of Lincoln Park, North Center, Edison Park, Forest Glen, North Park, Hegewisch, Beverly and Mount Greenwood had no homicides in 2015 or 2016, and the white neighborhoods of Lake View, Lincoln Square, Jefferson Park, Calumet Heights, Edgewater, Montclare, O'Hare, Dunning, and Norwood Park had two or fewer murders during this two-year period, with a zero or negligible homicide rate. This disparate impact of gun violence has continued through to the present day.

31. Fatalities are only one aspect of a broader public health emergency that the plaintiff and other members of the class are experiencing. The plaintiff and other class members are suffering from traumatic exposure to this violence in a way that has created serious disabilities and limits on their life activities. The plaintiff and other Black children hear gunfire most nights, while in their homes and walking the

streets, and these numerous firings can recreate or lead the children to experience prior traumatic exposures to gun violence, from loss of a family member, parent, sister, brother, cousin, or schoolmate.

TAC ¶¶ 29–31.

### B. Effects of Exposure to Gun Violence

The TAC cites a host of research documenting the effects of exposure to gun violence on communities and children who live in them. *See* TAC ¶¶ 80–81, 85–89. For instance, Mathews summarizes the findings of a researcher affiliated with the University of California at Davis's Gun Violence Research Center as follows:

> [G]un trafficking and pervasive gun violence's repercussions stretch well beyond those directly hit with a bullet, reverberating within entire communities for decades through depressed home prices, reduction in growth of new retail and services, lack of economic or career opportunities in the immediate vicinity, and lack of access to healthcare, healthy food, or social opportunities.

TAC ¶ 80.

Decades of relentless exposure to gun violence have inflicted physical and emotional wounds upon thousands of children living in Chicago's communities of concentrated gun violence, causing them to become disabled within the meaning of the Rehabilitation Act. *See* TAC ¶¶ 80, 83–84. These effects are well understood by educators, physicians, and trauma specialists and have been documented in studies published in reputable, peer-reviewed journals. *See* TAC ¶¶ 85–89. Children exposed to community violence (most frequently gun violence) often develop posttraumatic stress disorder; common symptoms include anxiety, fear, disrupted sleep, difficulty concentrating, memory impairment, and significant cognitive impairments. TAC ¶¶ 84–85. As explained in the TAC:

> [W]hen a child, particularly a young child, is exposed to gun violence, there is a dramatic and lasting impairment of the child's basic life activities. This includes deficits in the child's ability to care for himself or herself, the child's sleep, reading abilities, learning capacity, concentration, thinking and communication.
>
> . . . Exposure to gun violence floods a child's body with stress hormones (adrenaline and cortisol) which independently undermine cognitive performance by compromising the function of the prefrontal cortex of the brain (the area of the brain that is most rapidly developing in adolescence). This portion of the brain is responsible for reflective self-regulation and sustained attention, thus inhibiting the child's memory, ability to sustain concentration and brain development. The child's analytical capacities (or executive function) tend to disintegrate, leaving the child

disorganized cognitively and emotionally, and thus prone to react in school with extreme helplessness, confusion, withdrawal, or rage. The more directly the child experiences gun violence and the more often it happens, the more enduring and permanent are his or her deficits. This literature is summarized in many places, including by the Violence Policy Center, "The Relationship Between Community Violence and Trauma: How Violence Affects Learning, Health and Behavior," (July, 2017), www.vpc.org; by Sharkey, "The Long Reach of Violence: A Broader Perspective on Data, Theory, and Evidence on the Prevalence and Consequences of Exposure to Violence," Annual Review of Criminology, Vol. l:85–102 (January, 2018); and by Cook, et al. "Complex Trauma in Children and Adolescents," Psychiatric Annals, Vol. 35(5): 390–398 (2005).

For twenty years, research has shown that exposure to gun violence negatively affects a range of developmental outcomes across social-emotional, behavioral, and cognitive domains. *See, e.g.*, Bingenheimer, et al., "Firearm Violence Exposure and Serious Violent Behavior," Science, Vol. 308:1323–26 (2005); and Osofsky, "The Impact of Violence on Children," Future of Children, Vol. 9:33–49 (1999). It has also consistently shown that exposure to gun violence and other forms of violence are [sic] associated with lower performance on assessments of reading, cognitive skills, grade point average, and school attendance. *See, e.g.*, Bowen, et al., "Effects of Crime and Violence in Neighborhoods and Schools on the Social Behavior and Performance of Adolescents," Journal of Adolescent Research, Vol. 14:319–42 (1999) and Delaney-Black, et al., "Violence Exposure, Trauma and IQ and/or Reading Deficits among Urban Children," Archives of Pediatrics and Adolescent Medicine, Vol. 156: 280–85 (2002).

TAC ¶¶ 84–86 (paragraph numbers omitted).

The harmful effects of gun violence on children living in Chicago have been documented in at least three studies cited in the TAC. *See* TAC ¶¶ 87–89. In 2010, Patrick Sharkey used data from the Project on Human Development in Chicago neighborhoods to study the effect of a recent homicide incident near a child's home on that child's performance on standard tests of vocabulary and reading skills. *See* TAC ¶ 87 (citing Patrick Sharkey, *The Acute Effect of Local Homicides on Children's Cognitive Performance*, 107(26) PROC. OF THE NAT'L ACAD. OF SCIS. 11733, 11733–38 (2010)). He found that, on average, an African-American child's performance on these assessments fell by 0.5 of a standard deviation when a homicide had occurred on the block on which the child lived within the last week (0.66 of a standard deviation when the homicide occurred within the past four days). *See id*.; Sharkey, *supra*, at 11736.

In a longer-term study, Dana Charles McCoy led a study of 602 children living in Chicago neighborhoods; the researchers interviewed the children in 2004 and 2005 and followed up six years later. TAC ¶ 88 (citing Dana Charles McCoy et al., *Children's Cognitive*

*Performance and Selective Attention Following Recent Community Violence*, 56(1) J. OF HEALTH AND SOC. BEHAV. 19, 19–36 (2015)).  They found "a direct relationship" between a child's exposure to gun violence in the last week and diminished performance on neuropsychological tests measuring cognitive performance and selective attention.  *Id*.; *see* McCoy et al., at 29, 31–32.  This relationship existed whether or not the violence was witnessed by the child.  TAC ¶ 88; *see* McCoy et al., at 29, 31–32.

Finally, Julia Burdick-Will followed five groups of Chicago Public Schools students to measure the relationship between the level of violence experienced in the school (as reflected in Chicago police crime data) and survey tools, and students' performance on standardized testing. *See* TAC ¶ 88 (citing Julia Burdick-Will, *Neighborhood Violence, Peer Effects, and Academic Achievement in Chicago*, 91(3) SOC. OF EDUC. 205, 205–23 (2018)).  "One standard deviation increase in classmates' exposure to neighborhood violence was related to a 0.3 standard deviation decline in both reading and math scores—which represents ten percent (10%) of normal student annual growth."  TAC ¶ 89 (citation omitted).

### C.  D.W.'s Experience and Trauma-Related Disability

D.W., an African-American child aged 11 when the TAC was filed, grew up in Chicago's North Lawndale neighborhood.  *See* TAC ¶¶ 19, 92.  When the TAC was filed, he had lived for three years with his mother, sister, and his sister's children in Garfield Park, where "gun violence is just a normal part of life."  *See* TAC ¶¶ 19, 90, 100, 102.  Like most children in his neighborhood, D.W. hears gun shots most evenings as he is trying to fall asleep.  *See* TAC ¶¶ 31, 100.  There have been at least 10 shootings within four blocks of D.W.'s home in the three years he has lived in Garfield Park.  TAC ¶ 100.  In the same period, D.W. and his elementary school classmates have had to delay leaving school because gunshots were heard on a nearby block. TAC ¶ 100.

D.W. was spending a quiet evening with his family on October 18, 2018, until someone pounded on the door with the news that D.W.'s cousin had been shot and killed while walking home from a high school football game.  *See* TAC ¶ 92. The murder remains unsolved.  TAC

¶ 93.  D.W.'s mother, Mathews, shielded him from seeing his cousin's bleeding body, but he accompanied his family to the coroner's office to identify the body.  TAC ¶ 93.  Overcome with grief, nine-year-old D.W. decided not to leave the car.  TAC ¶ 93.  Approximately a month and a half after his cousin's murder, another of D.W.'s cousins committed suicide (the reason is unknown) by shooting himself in the head.  TAC ¶ 99.  The family had "little money and no counseling resources available" to help D.W. cope with these traumas.  TAC ¶ 94.

According to the TAC, "The loss of D.W.'s cousin at the hands of gun violence forever altered D.W.'s life."  TAC ¶ 94.  D.W.'s sister described him as an "inquisitive, mild-mannered, and thoughtful child" before the shooting.  TAC ¶ 95.  He liked, and still enjoys, space, soccer, and Greek mythology.  TAC ¶ 95.  Since his cousin's murder, D.W. has had trouble sleeping; he often reports dreaming about his dead cousin.  TAC ¶ 100.  D.W. chose to attend a Chicago public school in the nearby Austin neighborhood because his sister works at that school.  TAC ¶ 91.  Her presence makes him feel safer.  TAC ¶ 91.

After his cousin's murder, D.W. began "having severe emotional swings manifesting in massive angry outbursts seemingly triggered by small discomforts."  TAC ¶ 96.  He shakes uncontrollably for long periods of time.  TAC ¶ 96.  These outbursts disrupted D.W.'s classes.  TAC ¶¶ 96, 97.  D.W. has become acutely aware of gun violence and the risk it poses to him and his family.  TAC ¶ 98.  He refuses to play outdoors unless his mother is supervising.  TAC ¶ 98.  He has developed a habit of calling his mother and each of his siblings every afternoon and every night to check that they are safe.  TAC ¶ 98.

D.W.'s learning has also suffered since his cousin's murder.  TAC ¶ 97.  He has fallen behind in school, despite having perfect attendance, arriving early, and staying late.  *See* TAC ¶ 102.  As a result of his exposure to gun violence, D.W. has difficulty reading, listening, communicating, and focusing.  TAC ¶¶ 97, 102.  He was being evaluated for attention-deficit/hyperactivity disorder and an Individualized Education Plan for a student with a disability as of the TAC's filing date.  TAC ¶ 97.  The TAC alleges that D.W. has a disability as that term is used in the ADA and in the Rehabilitation Act.  *See* TAC ¶ 101.

### D. *Sources of Crime Guns in Chicago*

Chicago has no licensed firearms dealers. TAC ¶ 34. Yet Chicago police recover more than 10,000 crime guns each year. TAC ¶ 32. The phrase "crime gun" refers to a gun recovered by Chicago police in connection with a crime. *See* TAC ¶ 7.

More than 40% of crime guns recovered in Chicago have been traced to sales conducted by licensed Illinois firearms dealers. TAC ¶¶ 7, 34. Seven of the stores associated with the largest number of crime guns recovered in connection with shootings in Chicago are located in Chicago's suburbs; the other dealers are located nearby in Indiana. TAC ¶¶ 34, 36. "Large numbers of guns purchased from these dealers were recovered in connection with crimes within one year of their purchase. ATF[, the federal Bureau of Alcohol, Tobacco, Firearms and Explosives,] and other law enforcement entities recognize a short 'time-to-crime' as an indicator of illegal trafficking." TAC ¶ 35. The TAC does not make clear what percentage of crime guns recovered in Chicago can be traced to the seven stores referenced above. *See* TAC ¶¶ 34–36.

Mathews alleges that some of Illinois's gun dealers "fail to implement reasonable business practices that prevent gun traffickers from acquiring firearms through unlawful transfers, including theft or straw sales." TAC ¶ 32. A straw sale or straw purchase refers to a transaction in which a person buys a gun for someone else and falsely claims to be buying it for himself. *Abramski v. United States*, 573 U.S. 169, 171–72 (2014) (construing 18 U.S.C. § 922(a)(6)). In 2013–16, Illinois gun dealers (statewide) reported more than 1,200 guns lost or stolen before they were sold. TAC ¶ 37. "ATF has found that these stolen guns are almost assuredly destined for criminal use in the immediate area of the theft." TAC ¶ 37.

### E. *Claims and Relief Requested*

Mathews contends that existing Illinois law gives the Illinois State Police the power and "a mandate to issue regulations that would require these dealers to implement business practices that ATF and the gun industry's own trade association agree will curb the diversion of legal guns to the illegal market through theft, loss, or straw sales." TAC ¶ 8. The TAC asserts that exercising the ISP's regulatory power in this way "would be a reasonable accommodation" of the

class members' disabilities.  TAC ¶ 10.  Indeed, in light of alleged gaps in federal and state regulations of firearms (*see* TAC ¶¶ 38–51), the "only effective way to limit the flow of 'crime guns' from Illinois gun dealers into Chicago is for the defendants, State, and the ISP to exercise the full regulatory authority the state legislature has provided."  TAC ¶ 51.  Specifically, the TAC cites Illinois's Firearm Owners Identification Card Act ("FOID Card Act"), 430 Ill. Comp. Stat. § 65/1 et seq.; Firearm Dealer License Certification Act, 430 Ill. Comp. Stat. § 68/1-1 et seq.; and Gun Trafficking Information Act, 5 Ill. Comp. Stat. § 830/10-1 et seq.  TAC ¶¶ 8, 59.

The TAC alleges that, under these statutes, defendants have the power to require Illinois firearms dealers as a condition of licensure to adopt business practices that would reduce straw purchases.  *See* TAC ¶¶ 52–65.  The TAC cites several specific examples of steps Mathews seeks to compel defendants to take.  *See* TAC ¶¶ 61–77.  The TAC pleads that requiring firearms dealers in Illinois to adopt these policies and practices "would substantially reduce straw purchases and dramatically reduce the gun violence to which the plaintiff and other class members are now exposed."  TAC ¶ 63.  And the TAC cites several studies, by way of example, that Mathews contends support the proposition that "meaningful regulation of the primary and secondary gun markets," as defined in the TAC, "will reduce the number of guns available in cities like Chicago, and thereby reduce the number of Black children killed or shot, and most importantly reduce the debilitating level of gun violence that has led to the disability of [D.W.] and similarly situated children."  TAC ¶ 79 (citing Daniel W. Webster et al., *Temporal Association between Federal Gun Laws and the Diversion of Guns to Criminals in Milwaukee*, 89 J. OF URB. HEALTH 87, 87–97 (2012); Nathan Irvin, MD, MS, et al., *Evaluating the Effect of State Regulation of Federally Licensed Firearm Dealers on Firearm Homicide*, 104(8) AM. J. OF PUB. HEALTH 1384, 1384–86 (2014); and City of Chicago, *Gun Trace Report 2017* (2017), https://www.chicago.gov/content/dam/city/depts/mayor/Press%20Room/Press%20Releases/2017 /October/GTR2017.pdf).  The specific measures described in the TAC are summarized in the following paragraphs.

Mathews first points to policies and practices recommended as part of a campaign dubbed "Don't Lie for the Other Guy" developed by the ATF and a gun industry trade association. TAC ¶ 62; *see also* TAC Ex. B, ECF No. 115-1 (checklist of questions for dealers to ask regarding alleged common indicators of a straw purchase). Consistent with these recommended policies and practices, ISP allegedly could require dealers to be trained and to refuse sale when indicators of a possible straw purchase are present. TAC ¶ 64. Such indicators include a person buying multiple, similar guns at one time (or within a short timeframe) and the fact that a previous gun bought by the potential purchaser was recovered at a crime scene and not reported lost or stolen. *Id.*

Mathews also pleads that the ISP has not created "a single or central gun trace database that is truly comprehensive and able to determine straw purchasing patterns." TAC ¶ 67. Mathews asserts that ISP should dedicate resources to this project and that "[w]here the local police departments are small and lack the capacity to do so, ISP can provide appropriate financial assistance to ensure such officers are in place." *Id*.

Finally, Mathews alleges that the ISP has not used its full authority to prevent the issuance of firearm owner's identification cards ("FOID cards") to ineligible persons. TAC ¶ 71. The ISP has not required "the fingerprinting of all applicants" for a FOID card, "which is the only sure way to determine identity, and the only way to stop the current criminal activity." *Id*. The ISP also allegedly has not made "meaningful efforts" to collect over 36,000 guns from persons holding invalid FOID cards. *See* TAC ¶¶ 72–75.

Mathews seeks declaratory and injunctive relief, as well as her reasonable attorneys' fees. *See* TAC at 28–30. She requests a judicial declaration that, "by failing to use the full regulatory authority to prevent illegal gun trafficking and straw sales . . ., the defendants have used methods of administration that have subjected the plaintiff and other Black children to discrimination based upon race." TAC at 29–30. The TAC also requests an "injunction requiring the defendants to use their full regulatory authority to prevent exposure of the plaintiff and other Black children to the violence that is resulting from illegal gun trafficking and straw sales." TAC at 30.

The legislative and regulatory landscape has changed since the second and third amended complaints were filed. For instance, the Illinois legislature passed a bill in 2022 restricting the possession of weapons defined as assault weapons and high-capacity magazines. *See Calkins v. Pritzker*, 2023 IL 129453, ¶¶ 7–11 (Aug. 11, 2023) (describing the Protect Illinois Communities Act, Pub. Act 102-1116 (eff. Jan. 10, 2023)). After the pending motion to dismiss was fully briefed, defendants moved the court to take judicial notice of a press release from the Illinois Attorney General dated June 29, 2022, announcing a database called Crime Guns Connect. *See* Defs.' Mot. to Take Jud. Not., ECF No. 156; Press Release, ECF No. 156-1. The court denied that motion because, "while Crime Gun Connect's existence does not appear to be disputed, facts relevant to whether it is a comprehensive statewide firearms tracking system, as well as the appropriate inferences to be drawn from those facts, are the subject of a reasonable dispute." *Mathews v. Illinois*, No. 18-cv-6675, order at 2 (N.D. Ill. Aug. 16, 2022); *see also id.* at 3 (giving defendants an opportunity, which they declined, to request that the court consider the press release and convert their motion to dismiss to one for summary judgment). The parties have not briefed the statutory and regulatory changes made since the filing of the second and third amended complaints, and the court implies no view on them.

### III. Standing Principles

Article III of the Constitution limits the jurisdiction of the federal courts to "cases" or "controversies." U.S. CONST. art. III, § 2, cl. 1. The doctrine of standing enforces this case or controversy requirement. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559–62 (1992); *see also Winkler v. Gates*, 481 F.3d 977, 979–80 (7th Cir. 2007) (discussing differences between Article III and prudential standing). Article III standing doctrine developed to "ensure that federal courts do not exceed their authority as it has been traditionally understood" and "serves to prevent the judicial process from being used to usurp the powers of the political branches." *Spokeo*, 578 U.S. at 338 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S 398, 408 (2013); other citations omitted). Because Article III standing is a necessary ingredient of subject matter jurisdiction, standing must be established before the court

can reach merits issues, including defendants' motion to dismiss the complaint for failure to state a claim. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101–02 (1992); *Bazile v. Fin. Sys. of Green Bay, Inc*., 983 F.3d 274, 277–78 (7th Cir. 2020) (citing *Warth v. Seldin*, 422 U.S. 490, 498 (1975)).

Mathews must establish three elements that together comprise "the irreducible constitutional minimum of standing." *Lujan*, 504 U.S. at 560. These elements are: (i) that the plaintiff "suffered an injury in fact that is concrete, particularized, and actual or imminent;" (ii) "that the injury was likely caused by the defendant;" and (iii) "that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021) (citing *Lujan*, 504 U.S. at 560–61).

How strong must a plaintiff's showing of the elements of Article III standing be? "[E]ach element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561 (citations omitted). Later in the case, at the summary judgment stage for example, the plaintiff must demonstrate standing by "'set[ting] forth by affidavit or other evidence specific facts' that, taken as true, support each element of standing." *Spuhler v. State Collection Serv., Inc.*, 983 F.3d 282, 285 (7th Cir. 2020) (brackets in original) (quoting *Lujan*, 504 U.S. at 561); *see also TransUnion*, 141 S. Ct. at 2208; *Bazile*, 983 F.3d at 278. But this case remains at the pleading stage, despite its age. No discovery has been taken. And defendants have filed a Federal Rule of Civil Procedure 12(b)(1) motion to dismiss the third amended complaint for lack of subject matter jurisdiction. Defs.' Mem. Supp. Mot. to Dismiss 7–14, ECF No. 117.

A Rule 12(b)(1) motion raises either a facial or factual challenge to subject matter jurisdiction. *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015) (citing *Apex Digit., Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443 (7th Cir. 2009)). Significant differences exist between the standards that apply to facial and factual challenges. *See Boim v. Am. Muslims for Palestine*, 9 F.4th 545, 557–58 (7th Cir. 2021). A facial challenge claims that the complaint's, or another

pleading's, allegations are insufficient, while "[a] factual challenge contends that 'there is in fact no subject matter jurisdiction,' even if the pleadings are formally sufficient." *Silha*, 807 F.3d at 173 (emphasis omitted) (quoting *Apex Digit.*, 572 F.3d at 444). Defendants do not contest any of the facts underpinning the TAC's standing allegations. *See* Defs.' Mem. Supp. Mot. to Dismiss 7–14. So defendants raise a facial attack on the TAC (as they did with the original complaint). *See Boim*, 9 F.4th at 557–58; *Bazile*, 983 F.3d at 279.

To survive a facial attack, a "plaintiff may demonstrate standing by clearly pleading allegations [in her complaint] that 'plausibly suggest' each element of standing when all reasonable inferences are drawn in the plaintiff's favor." *Spuhler*, 983 F.3d at 285 (quoting *Silha*, 807 F.3d at 173–74; other citations omitted). The court "must accept as true all material allegations of the complaint, drawing all reasonable inferences therefrom in the plaintiff's favor.'" *Remijas v. Neiman Marcus Grp., LLC*, 794 F.3d 688, 691 (7th Cir. 2015) (quoting *Reid L. v. Ill. State Bd. of Educ.*, 358 F.3d 511, 515 (7th Cir. 2004)); *see also Lujan*, 504 U.S. at 561. Applying these principles to the case at bar, the court's task at this procedural stage is to determine whether the TAC demonstrates standing by clearly pleading allegations that plausibly suggest each element of Article III standing when all reasonable inferences are drawn in plaintiff's favor.

Standing "is not dispensed in gross;" it must be shown "for each claim . . . and for each form of relief [sought] (for example, injunctive relief and damages)." *TransUnion*, 141 S. Ct. at 2208 (citing *Davis v. Fed. Election Comm'n,* 554 U.S. 724, 734 (2008); other citation omitted). Mathews seeks declaratory relief and prospective injunctive relief; she does not request money damages. TAC at 29–30. Standing to obtain declaratory relief requires "at a minimum" that "the dispute must 'be real and substantial and admit of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.'" *California v. Texas*, 141 S. Ct. 2104, 2115–16 (2021) (quoting *MedImmune,*

*Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007)).  In the circumstances of this case,[1] the court "must look elsewhere [beyond the declaratory relief sought], to find a remedy that will redress the individual [plaintiff's] injuries."  *Id*. at 2116; *see Roe v. Dettelbach*, 59 F.4th 255, 260 (7th Cir. 2023).  So the focus turns to the injunctive relief Mathews seeks.  To demonstrate standing to seek prospective injunctive relief, a plaintiff must show: (1) that she "is under an actual or imminent threat of suffering a concrete and particularized injury-in-fact;" (2) "that this injury is fairly traceable to the defendant's conduct;" and (3) "that it is likely that a favorable judicial decision will prevent or redress the injury."  *Cook Cnty. v. Wolf*, 962 F.3d 208, 218 (7th Cir. 2020) (citing *Summers v. Earth Island Inst*., 555 U.S. 488, 493 (2009)); *accord Goldhamer v. Nagode*, 621 F.3d 581, 585 (7th Cir. 2010).

## IV.  Analysis

At the court's instance, the parties submitted supplemental briefing on two recent standing decisions issued by the Supreme Court.  The parties devote the bulk of their supplemental briefing to *United States v. Texas*, 143 S. Ct. 1964 (2023).  The court begins by summarizing the opinion in *Texas* and then applies that decision to the case at hand.

### A.  *The Supreme Court's Decision in* United States v. Texas

The states of Texas and Louisiana filed suit challenging prosecutorial guidelines issued by the Biden administration prioritizing the arrest and removal of non-citizens "who are suspected terrorists or dangerous criminals, or who have unlawfully entered the country only recently."  *Texas*, 143 S. Ct. at 1968.  The states contended that these guidelines violated two federal statutes creating, in their view, a mandatory arrest requirement which disallowed such prioritizing.  *See id*. at 1968–69.  For example, the states cited 8 U.S.C. § 1231(a)(2), which

---

1    The TAC seeks a judicial declaration "that by failing to use the full regulatory authority to prevent illegal gun trafficking and straw sales as described above [in the TAC], the defendants have used methods of administration that have subjected the plaintiff and other Black children to discrimination based upon race in violation of 740 ILCS 23/5(a)(2)."  TAC at 29–30.  Mathews does not argue that such a declaration would redress her or the proposed class's alleged injuries without the injunctive relief she is seeking.

provides in part that the Department of Homeland Security "'shall' arrest and detain certain noncitizens for 90 days after entry of a final order of removal." *Id*. (quoting § 1231(a)(2)).

The Supreme Court held that the states did not have Article III standing to sue, explaining that the Court's "precedents and longstanding historical practice establish that the States' suit here is not the kind redressable by a federal court." *Id*. at 1971; *see id*. at 1970–75. The Court identified the "leading precedent" as its holding in *Linda R. S. v. Richard D*., 410 U. S. 614, 619 (1973), that "a citizen lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution." *Texas*, 143 S. Ct. at 1970 (quoting *Linda R. S.*, 410 U.S. at 619). The Court held that *Linda R. S.*'s rule "applies to challenges to the Executive Branch's exercise of enforcement discretion over whether to arrest or prosecute," including the states' challenge to the Biden administration's policy. *Id*. (citing *Linda R. S.*, 410 U.S. at 617, 619).

The Court provided three rationales for its ruling. *See id*. at 1971–72. The first is that the decision not to arrest or prosecute someone else does not directly implicate the plaintiff's liberty or property interests. *Id*. at 1971 (citing *Lujan*, 504 U.S. at 561–62). "When 'a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of someone else, much more is needed' to establish standing." *Id*. (quoting *Lujan*, 504 U.S. at 562). Second, separation of powers concerns counseled against finding standing. *See id*. at 1971–72. The Court reasoned, "[L]awsuits alleging that the Executive Branch has made an insufficient number of arrests or brought an insufficient number of prosecutions run up against the Executive's Article II authority to enforce federal law." *Id*. at 1971. Finally, the Court explained that courts "generally lack meaningful standards for assessing the propriety of enforcement choices in this area. . . . because the Executive Branch (i) invariably lacks the resources to arrest and prosecute every violator of every law and (ii) must constantly react and adjust to the ever-shifting public-safety and public-welfare needs of the American people." *Id*. at 1972. "Therefore, in both Article III cases and Administrative Procedure Act cases, this Court has consistently recognized that federal courts are generally not the proper forum for resolving

claims that the Executive Branch should make more arrests or bring more prosecutions." *Id*. (citations omitted). The opinion included the following dicta: "If the Court green-lighted this suit, we could anticipate complaints in future years about alleged Executive Branch under-enforcement of any similarly worded laws—whether they be drug laws, gun laws, obstruction of justice laws, or the like. We decline to start the Federal Judiciary down that uncharted path." *Id*. at 1973.

The discussion above is based on Parts II.A and II.B of the opinion in *Texas*. In Part II.C, the Court delineated the scope of its holding: "In holding that Texas and Louisiana lack standing, we do not suggest that federal courts may never entertain cases involving the Executive Branch's alleged failure to make more arrests or bring more prosecutions." *Id*. The Court enumerated five categories of cases involving prosecutorial decisions in which standing may be present. *See id*. at 1973–74. Nothing in the opinion suggests that this list is intended to be exhaustive. *See id*. The categories identified in *Texas* are (1) "selective-prosecution claims under the Equal Protection Clause" (typically involving a party seeking to prevent his or her own prosecution); (2) "Congress might (i) specifically authorize suits against the Executive Branch by a defined set of plaintiffs who have suffered concrete harms from executive under-enforcement and (ii) specifically authorize the Judiciary to enter appropriate orders requiring additional arrests or prosecutions by the Executive Branch;" (3) "the standing calculus might change if the Executive Branch wholly abandoned its statutory responsibilities to make arrests or bring prosecutions;" (4) "a challenge to an Executive Branch policy that involves both the Executive Branch's arrest or prosecution priorities *and* the Executive Branch's provision of legal benefits or legal status could lead to a different standing analysis. . . . because the challenged policy might implicate more than simply the Executive's traditional enforcement discretion;" and (5) "policies governing the continued detention of noncitizens who have already been arrested arguably might raise a different standing question than arrest or prosecution policies." *Id*. at 1973–74 (emphasis in original; internal citations and quotations omitted).

### B. Texas*'s Standing Rule Applies to Claims Against State Officials*

Because *Texas* was a case about a federal statute enforced by the Executive Branch of the federal government, the Court's opinion speaks in terms of the separation of powers among the Executive, Legislative, and Judicial Branches of the federal government. *E.g.*, 143 S. Ct. at 1969, 1973. Indeed, Justice Kavanaugh's majority opinion describes the question presented in separation of powers terms: "[T]his case raises only the narrow Article III standing question of whether the Federal Judiciary may in effect order the Executive Branch to take enforcement actions against violators of federal law." *Id.* at 1975. The *Texas* Court also noted that the case arose in "the immigration context, where the Court has stressed that the Executive's enforcement discretion implicates not only 'normal domestic law enforcement priorities' but also 'foreign-policy objectives.'" *Id.* at 1971–72 (quoting *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 490–91 (1999)). With this emphasis on federal separation of powers principles, it would be reasonable to ask whether *Texas*'s holding and reasoning apply in this case against state officials charged with enforcing state laws.

The answer can be found in *Texas*'s identification of *Linda R. S.* as the "leading precedent." *Texas*, 143 S. Ct. at 1970. The plaintiff in *Linda R. S.* sued a state official, a district attorney, under 42 U.S.C. § 1983. The district attorney had a policy, based on state courts' interpretation of state law, not to prosecute criminally parents for failing to meet child support obligations if the child was born out of wedlock; parents of children born to a married couple were prosecuted. *See Linda R. S.*, 410 U.S. at 615–16. The plaintiff, the mother of a child born out of wedlock, argued that the district attorney's enforcement policy violated the Equal Protection Clause and effectively sought to have the child's father prosecuted. *See id.* at 614–16. The Court held that the plaintiff lacked standing. *Id.* at 618–19.

The Court in *Texas* described its decision as an extension of *Linda R. S.*'s holding that "in 'American jurisprudence at least,' a party 'lacks a judicially cognizable interest in the prosecution . . . of another.'" *Texas*, 143 S. Ct. at 1970 (alteration in original) (quoting *Linda R. S.*, 410 U.S. at 619). The Court stated that its decision merely "maintains the

longstanding jurisprudential status quo." *Id*. at 1975 (citing *Linda R. S.*, 410 U.S. at 619). Thus, *Texas* did not disturb *Linda R. S.*'s rule in suits against state officials. Rather, the Court expressly extended *Linda R. S.*'s holding into the federal realm. *See id*. at 1971. Accordingly, the court must apply the holding of *Linda R. S.*, as explicated in *Texas*, to the TAC's claims against the State of Illinois and its officials. *See Pratt v. Helms*, 73 F.4th 592, 594–95 (8th Cir. 2023) (applying *Texas* to dismiss suit against state officials).

### C. *Judicially Cognizable Injury in Fact*

This court acknowledged the basic rule of *Texas* and *Linda R. S.* in its opinion on defendants' motion to dismiss the original complaint. *See Powell*, 2019 WL 4750265, at *10 (quoting *Children's Healthcare is a Legal Duty, Inc. v. Deters*, 92 F.3d 1412, 1424 (6th Cir. 1996)). This court analyzed this rule as a component of the redressability element of standing. *See id.* (citation omitted).

In *Texas*, the Court clarified that the analysis in a case like this one focuses on the injury in fact component of standing doctrine rather than redressability. *See Texas*, 143 S. Ct. at 1970. (Three justices concurred in the judgment in *Texas* but would have resolved the case on redressability grounds. *See id*. at 1976–86 (Gorsuch, J., concurring in the judgment, joined by Thomas and Barrett, JJ.); *id*. at 1986–89 (Barrett, J., concurring in the judgment).)

The injury in fact component of standing was not at issue when this court analyzed the original complaint. Defendants

> concede[d] that the [original] complaint adequately allege[d] an injury in fact: 'there is no question the complaint adequately alleges the psychological trauma to children who hear and are frightened by the sounds of gunshots, who personally see victims of violence dead or dying at crime scenes, and who have to cope on a frequent basis with the news of friends or loved ones killed or injured from gun violence.

*Powell*, 2019 WL 4750265, at *6 (quoting Defs.' Mem. Supp. Mot. to Dismiss Orig. Compl. 6, ECF No. 25). The court had "little trouble concluding that [this injury] is discrete and particularized." *Id*. at *7 (relying on, among other cases, *Bank of Am. Corp. v. City of Miami*, 581 U.S. 189 (2017)). The TAC alleges a comparable ongoing injury to D.W. and members of

the potential class. *See, e.g.*, TAC ¶¶ 28–31, 80–82. These injuries would ordinarily suffice to satisfy the injury in fact requirement for standing. *See Powell*, 2019 WL 4750265, at *6–7.

After *Texas*, however, the ongoing injuries alleged in the TAC remain essential but not necessarily sufficient to confer standing. *See Texas*, 143 S. Ct. at 1970 (majority opinion). While the Court recognized that the *Texas* plaintiffs alleged pocketbook injuries (the district court in *Texas* found as a fact that the plaintiff states were incurring financial costs as a result of the challenged prosecutorial policy), it characterized the specific dispute before it as being centrally focused on enforcement priorities, and it found that *that* dispute was not one traditionally cognizable in a federal court. *See Texas*, 143 S. Ct. at 1970–71. Thus, the Court looked not simply at the traditional injuries alleged by the plaintiffs (pocketbook injuries in *Texas,* physical and emotional injuries in the case at bar) but at the action of the defendant alleged to be unlawful, which it referred to variously as an injury or an interest. *See id.* This court accordingly asks whether the ongoing injuries alleged in the TAC are judicially cognizable under *Texas*.

In the original complaint, the then-plaintiffs "list[ed] 12 specific regulations defendants could enact" to stem the flow of guns into Chicago. *See id.* at *5 (citing and discussing Compl. ¶ 28). Based on this requested relief, the court determined that this case did "not involve a claimed interest in forcing a state actor to prosecute someone for a crime." *Id.* at *10. Rather, the original plaintiffs "want[ed] defendants to enact regulations" listed in the original complaint. *Id.*

The third amended complaint seeks broader injunctive relief. Mathews alleges that the ISP "has failed to use obvious express or implied regulatory power to stop even criminal activities by dealers with respect to straw sales or to collect guns already in the possession of felons and other illegal FOID card holders." TAC ¶ 76. The broad requests for injunctive relief following each count of the TAC parallel this allegation. *See* TAC at 28, 29–30. Mathews seeks "an injunction requiring the defendants to use their full regulatory authority to prevent exposure

of the plaintiff and other Black children to the violence that is resulting from illegal gun trafficking and straw sales."  TAC at 30.

Mathews adds content and definition to her request for injunctive relief by pleading several specific alleged failures on the part of the ISP to use its "full regulatory authority."  *See* TAC ¶¶ 53–79.  Mathews groups these alleged failures—and therefore the changes she wants the court to order defendants to make—into two broad categories.[2]  *See* TAC ¶¶ 53–79; Pl.'s Suppl. Mem. Re Jurisdiction 2–3, ECF No. 172 (describing injunctive relief requested).  Each is analyzed below.

### 1.  Failure to Collect Guns

Mathews alleges that the ISP generally "has failed to perform its core obligation under the FOID [Card] Act—to collect [at least 36,000] guns from persons whose FOID cards are invalid."  TAC ¶ 72; *see also* Pl.'s Suppl. Mem. Re Jurisdiction 3.  This alleged failure is framed explicitly as a failure to devote sufficient manpower and money to enforcing state statutes requiring guns to be collected when a FOID card expires.  *See* TAC ¶¶ 73–74.  Mathews provides an estimate of what it would cost to "begin meaningful enforcement of [the] FOID [Card Act] in Cook County alone" as "$3 million a year for 28 additional committed law enforcement positions."  TAC ¶ 74.  The TAC compares this estimated cost to the amount of money and other resources allocated to respond to the outbreak of the virus that causes COVID-19 and asserts that "ISP has ample authority to reallocate resources to meet the plaintiff class' life and death emergency needs, as well as its obligations under the FOID [Card] Act, but has refused to do so."  TAC ¶ 75.

The relief Mathews requests implicates the ISP's enforcement of Illinois criminal statutes.  *See* 430 Ill. Comp. Stat. §§ 65/2(a), 65/9.5, 65/14 (Westlaw through Pub. Act No. 103-

---

2   Mathews also contends that defendants have failed to collect and publish information on firearms dealers as required by Illinois law.  *See* TAC ¶¶ 66–70.  She does not argue in her supplemental briefing that this requested relief supports her claim of standing.  *See* ECF No. 172.  And she does not explain how collecting and publishing this information would be likely to redress the ongoing harm to D.W. and the proposed class.

169).  If a gun owner's FOID card is revoked, the FOID Card Act provides that the former cardholder must within 48 hours of receiving notice of revocation "surrender his or her Firearm Owner's Identification Card to the local enforcement agency where the person resides or to the Illinois State Police" and "complete a Firearm Disposition Record . . . and place his or her firearms in the location or with the person reported in the Firearm Disposition Record." § 65/9.5(a)(1)–(2).  Failure to comply with these requirements "is a Class A misdemeanor." § 65/9.5(d).  The FOID Card Act authorizes search warrants and provides arrest authority for violations of these provisions.  *See* § 65/9.5(c), (e); *Robinson v. Cook Cnty.*, 2021 WL 365770, at *3 n.3 (N.D. Ill. Feb. 3, 2021).  The Illinois appellate court has held that the crime of "the failure to surrender a revoked [FOID] card and complete a disposition record" has a separate and distinct purpose from the crime defined elsewhere in the FOID Card Act (§ 65/14) of possessing a firearm after a FOID card has been revoked.  *People v. Wold*, 2023 Ill. App. (2d) 220121-U, ¶ 25.  Thus, Mathews's request for an injunction requiring defendants to prioritize and divert at least 28 law enforcement officers to collecting guns from more than 36,000 people with invalid FOID cards invites the court to review how Illinois's Executive Branch allocates manpower and money to this and other criminal enforcement priorities.  *See* TAC ¶¶ 72–76.

Mathews contends that, consistent with *Texas*, the "Court could require a work plan for reducing the backlog of the guns that must be recovered from those 19,000 individuals whose FOID cards have been or should have been revoked."  Pl.'s Suppl. Mem. Re Jurisdiction 3.  She suggests no way that such a plan could be formulated without diverting ISP money and manpower from other law enforcement activities.  *See id*.  But which ones?  The court would be called upon to review and alter law enforcement priorities set by the Executive Branch of the Illinois government.  Federal "courts generally lack meaningful standards for assessing the propriety of enforcement choices in this area."  *Texas*, 143 S. Ct. at 1972.  "That is because the Executive Branch (i) invariably lacks the resources to arrest and prosecute every violator of every law and (ii) must constantly react and adjust to the ever-shifting public-safety and public-

24

welfare needs of the American people." *Id*. *Texas* makes clear that what Mathews requests is not judicially cognizable and, accordingly, Mathews lacks standing to pursue this relief.

### 2. Exceptions Inapplicable

Resisting this conclusion, Mathews maintains that two of *Texas*'s exceptions in which standing may be present apply. *See Texas*, 143 S. Ct. at 1973–74; Pl.'s Suppl. Mem. Re Jurisdiction 1–3. The first stems from the Court's dictum that "the standing calculus might change if the Executive Branch wholly abandoned its statutory responsibilities to make arrests or bring prosecutions." *Texas*, 143 S. Ct. at 1973. Mathews argues abandonment has occurred here because she "challenges a total failure of the Illinois State Police ('ISP') even to require dealers to use responsible business practices." Pl.'s Suppl. Mem. Re Jurisdiction 1.

Though phrased artfully in terms of a complete failure to enforce, this is in substance an underenforcement claim. Mathews describes this aspect of her contentions as follows in her supplemental jurisdictional memorandum: "Defendants even fail to train the relevant gun dealers in the most responsible business practices, and *the training they do provide* is cursory and plainly inadequate to address the serious problem here. Of course, requiring nothing of the gun dealers, Defendants also do not hold them accountable." Pl.'s Suppl. Mem. Re Jurisdiction 2 (emphasis added). Mathews acknowledges that defendants provide training and impose licensure requirements, but she wants this court to order defendants to adopt additional training and licensure requirements. *See* TAC ¶¶ 59–65, 104. Thus, *Texas*'s wholesale abandonment exception does not confer standing on Mathews because she is not alleging that defendants are completely failing to enforce an existing legal requirement. Cf. *Texas*, 143 S. Ct. at 1974.

To show standing under the second exception she invokes, Mathews must satisfy a two-part test: Congress must have "(i) specifically authorize[d] suits against the Executive Branch by a defined set of plaintiffs who have suffered concrete harms from executive under-enforcement and (ii) specifically authorize[d] the Judiciary to enter appropriate orders requiring additional arrests or prosecutions by the Executive Branch." *Texas*, 143 S. Ct. at 1973. The Court in *Texas* found that a statute stating that the Executive "'shall' arrest" certain individuals did not include

the required specific authorization. *Id.* (quoting 8 U.S.C. §§ 1226(c), 1231(a)(2)). The statutes under which Mathews sues, the Rehabilitation Act and the Illinois Civil Rights Act, contain broad anti-discrimination language but do not specifically reference arrests or prosecutions by the Executive. *See* 29 U.S.C. § 794(a); 740 Ill. Comp. Stat. 23/5(a)(2). Mathews cites no language in either statute "specifically authorizing" a court to issue orders requiring additional arrests or prosecutions by the Executive Branch or any case finding Article III standing to seek such relief under either statute.[3] *See* Pl.'s Suppl. Mem. Re Jurisdiction 1–3; *see also Linda R. S.*, 410 US at 618–19 (finding an equal protection claim nonjusticiable). Therefore, Mathews has not carried her burden to show that she has standing under this potential exception discussed in *Texas*.

### 3. Failure to Require Gun Dealers to Adopt "Responsible Business Practices" as a Condition of Licensure

Defining the second category of injunctive relief Mathews seeks requires one to read the third amended complaint as a whole. Mathews pleads that defendants have not exercised their authority under state law to require firearms dealers, as a condition of licensure and as part of their mandatory training, to adopt "responsible business practices" that "would substantially reduce straw purchases and dramatically reduce the gun violence to which the plaintiff and other class members are now exposed." TAC ¶ 63; *see* TAC ¶¶ 59–65. She submits a checklist of indicators of a potential straw purchase and questions a gun dealer should ask to identify a potential straw purchase; Mathews asserts that dealers should be trained to refuse sales when indications of a straw purchase are present. *See* TAC ¶ 63; TAC Ex. B, ECF No. 115-1 (checklist). Example indicators of a straw purchase include someone buying several identical handguns and a purchaser buying a handgun after another gun bought by the same person was

---

3   In *Central Austin Neighborhood Association v. City of Chicago*, 2013 IL App (1st) 123041, ¶¶ 17–28, the Illinois appellate court held that, under Illinois law, the political question doctrine did not bar the Illinois Human Rights Act claims of a group of plaintiffs who brought a disparate impact claim seeking to change how Chicago dispatched police to respond to 911 calls. This decision does not affect the Article III analysis because the fact that Illinois courts would find a claim justiciable "in state court is irrelevant to the Article III inquiry." *Protect Our Parks, Inc. v. Chi. Park Dist.*, 971 F.3d 722, 732 (7th Cir. 2020).

recovered at a crime scene. TAC ¶ 64. The TAC seeks injunctive relief compelling defendants to pass regulations "[r]equiring dealers to follow the practices or protocols set out in [the checklist] as a condition for certification of a dealer license." TAC ¶ 63. Mathews also wants Illinois firearms dealers to require someone buying ammunition to present a valid FOID card. TAC ¶ 65.

This aspect of Mathews's requested injunctive relief has features of a challenge to defendants' failure to enact licensure requirements for gun dealers and of a claim that the court should order defendants to fine, suspend, and discipline gun dealers for violations of extant state law. Concerning the latter category of relief, Mathews pleads, "Dealers should be trained not to sell under these circumstances and [be] held accountable or disciplined by ISP if they do." TAC ¶ 64. Paragraph 60 of the TAC identifies defendants' disciplinary options, alleging that defendants have the authority "to fine or suspend or deny certification of [gun dealers'] licenses if the dealers fail to" follow the responsible business practices they propose adopting and fail to document their compliance with those practices. TAC ¶ 60. As Mathews appears to recognize in her supplemental briefing, under *Texas* she lacks standing to pursue injunctive relief forcing defendants to fine and discipline gun dealers for violations of existing state law. *See* Pl.'s Suppl. Mem. Re Jurisdiction 3.

Mathews therefore narrows this aspect of her requested injunctive relief in her supplemental memorandum. Pl.'s Suppl. Mem. Re Jurisdiction 2–3. She contends that, consistent with *Texas*, "this Court could validly bar the ISP from renewing the license of any Cook County dealer that cannot document that it follows responsible business practices." *Id.* at 3. The ongoing injury alleged in support of this portion of Mathews's claim stems from a failure to regulate, as contrasted with a failure to arrest or prosecute, gun dealers. So long as the ordinary requirements for standing are established, a claim premised upon a government actor's

failure to regulate a third party is cognizable under Article III, though the bar for traceability and redressability is high:

> When, however, as in this case, a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else*, much more is needed. In that circumstance, causation and redressability ordinarily hinge on the response of the regulated (or regulable) third party to the government action or inaction—and perhaps on the response of others as well.

*Lujan, supra*, 504 U.S. at 562 (emphasis in original) (citing *ASARCO Inc. v. Kadish*, 490 U.S. 605, 615 (1989) (opinion of Kennedy, J.); other citation omitted).

The rule from *Lujan* just quoted applies to private-party plaintiffs. *See, e.g.*, *Summers v. Earth Island Inst.*, 555 U.S. 488, 495, 496–97 (2009); *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 44–46 (1976); *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 152–53 (1970); *Tex. Indep. Producers & Royalty Owners Ass'n v. E.P.A.*, 410 F.3d 964, 971 (7th Cir. 2005); *Reverse Mortg. Sols., Inc. v. U.S. Dep't of Hous. & Urb. Dev.*, 365 F. Supp. 3d 931, 942–44 (N.D. Ill. 2019). The *Texas* Court did not purport to alter this rule. In fact, the Court distinguished a case in which the plaintiffs were held to have standing to challenge a federal agency's failure to issue regulations, *Massachusetts v. EPA*, 549 U.S. 497 (2007). *Texas*, 143 S. Ct. at 1975 n.6. The Court explained that there are "key differences between a denial of a petition for rulemaking and an agency's decision not to initiate an enforcement action." *Id*. (quoting *Massachusetts*, 549 U.S. at 527). Insofar as Mathews seeks an injunction requiring a prospective change to Illinois's requirements for renewing a gun dealer's license, *Texas*'s holding does not deprive Mathews of standing. *Texas*, 143 S. Ct. at 1975; *see also id*. at 1974 n.5.

### D. *Traceability and Redressability*

The relief Mathews has standing to seek has been narrowed significantly by *Texas*. The court therefore revisits the traceability and redressability requirements as they apply to the specific relief remaining in the TAC. When deciding whether a complaint establishes standing, the court "asks whether the complaint 'clearly . . . allege[s] facts demonstrating each element'" of standing. *Larkin v. Fin. Sys. of Green Bay, Inc.*, 982 F.3d 1060, 1064 (7th Cir. 2020) (alterations in original) (quoting *Spokeo, supra*, 578 U.S. at 338). To establish redressability,

Mathews must show that it is "likely, as opposed to merely speculative, that" the ongoing concrete injury alleged in the TAC—the continuing exposure of D.W. and other African-American children to gun violence in certain Chicago neighborhoods—"will be redressed by a favorable decision." *Dept. of Educ. v. Brown*, 143 S. Ct. 2343, 2351 (2023) (quoting *Lujan*, 504 U.S. at 561). As it pertains to the injunctive relief requested here, this means that it must be likely, not speculative, that the injunction will "prevent" the ongoing injury. *Goldhamer, supra*, 621 F.3d at 585 (quoting *Summers, supra*, 555 U.S. at 493; other citations omitted). Now that the relief that Mathews has standing to pursue has been narrowed to altering the requirements for renewing gun dealers' licenses, the TAC must clearly allege non-speculative facts showing that adopting the responsible business practices described in the TAC be will likely to abate the class's exposure to future gun violence. *See Powell*, 2019 WL 4750265, at *9–10.

The original complaint adequately pleaded redressability because, under the law before it was clarified in *Texas*, the then-plaintiffs alleged an injury in fact as to all of the relief they were seeking, and the complaint cited research supporting the proposition that all of the relief requested "could appreciably abate" gun violence in Chicago. *Powell*, 2019 WL 4750265, at *9. The TAC makes similar allegations about the injunctive relief requested: "Many studies have concluded that meaningful regulation of the primary and secondary gun markets, as set forth in the above paragraphs [of the TAC], will reduce the number of guns available in cities like Chicago." TAC ¶ 79. The TAC cites three supporting studies. *Id*.

The problem is that the TAC's non-conclusory traceability and redressability allegations, including the reports cited, do not shed light on the potential efficacy of the regulatory changes Mathews has standing to pursue after *Texas*. *See* TAC ¶ 79. The first of the three reports cited in the TAC is a 2017 City of Chicago study documenting the sources of crime guns found in Chicago. City of Chicago, *Gun Trace Report 2017* (2017), https://www.chicago.gov/content/dam/city/depts/mayor/Press%20Room/Press%20Releases/2017 /October/GTR2017.pdf. This report proposes reforms intended to decrease the rate of gun violence in Chicago, including suggested legislation, but requiring gun dealers to ask questions

similar to those in Mathews's proposed checklist does not number among the proposed reforms. *See id*. The other two cited studies document (i) the effects of amendments to federal law on Wisconsin gun sales and (ii) the effects of certain differences in the 50 states' gun laws on homicide, and other crime, rates. *See* Nathan Irvin et al., *Evaluating the Effect of State Regulation of Federally Licensed Firearm Dealers on Firearm Homicide*, 104(8) AM. J. OF PUB. HEALTH 1384, 1384–86 (2014); Daniel W. Webster et al., *Recent Federal Gun Laws, Gun Dealer Accountability and the Diversion of Guns to Criminals in Milwaukee*, 89 J. OF URB. HEALTH 87, 87–97 (2012). The three studies cited support Mathews's claimed standing to pursue the injunctive relief foreclosed by *Texas*. But none of the cited studies provides any information on how, if at all, requiring gun dealers to adopt the business practices listed in the TAC would be likely to affect straw purchase rates and downstream gun violence in Chicago. As a result, the TAC lacks allegations clearly showing that requiring Illinois gun dealers to adopt the business practices listed (*see* TAC Ex. B) will "appreciably abate" gun violence in Chicago's predominately African-American communities of concentrated gun violence. Accordingly, the TAC does not clearly allege that the injunctive relief potentially available after *Texas* is likely to redress D.W.'s ongoing injuries as defined in the TAC.

## V. Conclusion

All parties here accept what is common knowledge—Chicago has a long-standing problem of "endemic gun violence." *E.g.*, *United States v. Hatch*, 909 F.3d 872, 874–75 (7th Cir. 2018) (per curiam). As the TAC alleges, the effects of gun violence are concentrated in predominately African-American Chicago communities. *See* TAC ¶¶ 28–30, 80–89. Children in these neighborhoods grow up hearing gunshots at night, fearing for their safety when they go out to play, and are traumatized by seeing relatives and friends killed on the streets. *See, e.g.*, TAC ¶¶ 92–100.

To address these conditions, the TAC seeks two categories of relief: (1) an order requiring Illinois officials to enforce more vigorously existing laws governing gun dealers; and (2) an order compelling defendants to alter gun dealer licensure rules to require dealers to use

"responsible business practices" intended to detect straw purchasers. *See* TAC ¶¶ 59–65. For the reasons stated, the Supreme Court's recent decision in *United States v. Texas* deprives plaintiff of standing to seek the first form of relief, and the TAC contains insufficient allegations supporting redressability with respect to the second form of relief. That is, the allegations fail to demonstrate that it is likely, as opposed to speculative, that a regulation requiring responsible business practices as described in the TAC will redress the ongoing injuries to the proposed class and appreciably abate the daily gun violence that afflicts their communities.

Accordingly, the third amended complaint is dismissed for want of Article III standing. Because the third amended complaint was filed before the Supreme Court handed down its decision in *Texas*, plaintiff has 28 days, until and including October 3, 2023, to file a fourth amended complaint if she wishes to do so. Plaintiff's motion for class certification is denied without prejudice and with leave to reinstate in the event that the complaint is refiled and an adequate basis for Article III standing is alleged.

Dated: September 5, 2023            /s/ Joan B. Gottschall
                                    United States District Judge