**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| SHANICE MATHEWS as guardian *ad litem* on behalf of her son, D.W. as well as on behalf of a class of similarly situated children, | ) ) ) ) ) | |
| Plaintiff, | ) ) | No. 18-cv-6675 |
| | ) | Judge Joan B. Gottschall |
| v. | ) ) | |
| THE STATE OF ILLINOIS; THE ILLINOIS DEPARTMENT OF STATE POLICE; J.B. PRITZKER, Governor of the State of Illinois; and BRENDAN KELLY, Director of the Illinois Department of State Police, | ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**<u>FOURTH AMENDED CLASS ACTION COMPLAINT</u>**

**INTRODUCTION**

1.    Every day, Black children in the highest crime Chicago neighborhoods endure the worst of the nation's illegal gun violence.

2.    The number of children like Plaintiff D.W. who are repeatedly traumatized from daily exposure to illegal gun violence is far greater than the number of children who are directly wounded or murdered, though that number of physical casualties is horrific enough. For example, in the first five months of 2021, more than 120 children under the age of 18 were shot in Chicago. In addition to that number, hundreds more suffer trauma or renewed trauma as family members, friends, classmates, and neighbors are gunned down or hit with a stray bullet, sometimes right in front of them.

3.    Defendants—the State of Illinois and the Illinois State Police, and the individual Defendants—have the legal authority and duty to take actions that are likely to reduce the number of illegal crime guns in circulation in these high crime Chicago neighborhoods. As Plaintiff will show in this Fourth Amended Complaint, respected academic research and empirical evidence demonstrates that if Defendants require Illinois firearm dealers to follow responsible business practices designed to prevent straw sales and illegal racketeering, it is likely to reduce the number of illegal crime guns circulating in the high crime neighborhoods where Plaintiff D.W. and other children live. That, in turn, is likely to reduce the level of gun violence to which these children are exposed daily and that acts to cause trauma or to re-enforce or aggravate further the debilitating trauma from which these children already suffer.

4.    Specifically, this lawsuit seeks to require the Defendant Illinois State Police ("ISP"), in concert with the Defendant States and the individual Defendants, to condition renewal of licenses of Illinois firearm dealers on their documented compliance with responsible business practices designed to prevent sales to persons when there are indications of straw purchasing. As set forth

below, Defendant ISP has such authority under the Firearm Dealer License Certification Act, 430 ILCS 68/1, *et seq*.

5.  Like all illegal guns, the guns trafficked into Chicago originate from the legal firearms market. The federal Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) has reported for decades that the legal inventories of retail firearms dealers are a dominant source of weapons for illegal traffickers, who acquire firearms through theft or straw purchases.

6.  Accordingly, the retail sale of firearms is the first line of defense in preventing the diversion of legal guns to the illegal market, and the business practices of licensed dealers play a critical role in trafficking prevention.

7.  Licensed gun dealers operating in Illinois were responsible for selling forty (40) percent of Chicago's "crime guns"—or guns recovered by law enforcement in connection with crime. The majority of these guns stem from licensed dealers operating in suburbs near Chicago, with only seven dealers responsible for selling the majority of Chicago's crime guns attributed to Illinois dealers.

8.  The failure of Defendant ISP, in concert with the other Defendants, to take action that is likely to reduce the level of illegal gun violence from straw purchasing and illegal trafficking is an unlawful denial of a reasonable accommodation to the needs of Plaintiff D.W. and other traumatized children. This failure to accommodate Plaintiff D.W. and these children denies them the benefits of federally assisted law enforcement and is a prohibited form of discrimination under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C § 794.

9.  That same failure to accommodate the needs of Plaintiff D.W. and other such children is also illegal under Section 5(a)(2) of the Illinois Civil Rights Act of 2003 ("ICRA"), 740 ILCS 23/5(a)(2). In violation of that Act, the Defendants State of Illinois and ISP are using "criteria or

methods of administration" that serve no valid public purpose and, in effect, subject Black children like Plaintiff D.W. to discrimination based on race.

10. As shown during the COVID-19 pandemic, the State and Governor take an extremely broad view of their regulatory authority when the public health of the white population is also at risk. Here, by contrast, in the case of Black children, and in a genuine public health emergency, the Defendants fail to use broad regulatory authority that would be used if the children were white. Defendants have failed to use regulatory authority to protect Black children's emotional and physical health, instead deferring to a disproportionately white population of gun dealers by favoring their apparent interests above all else.

11. In deferring to such interests and failing to use their full regulatory authority to protect Black children under the Firearm Dealer Licensing Certification Act, 430 ILCS 68/1, *et seq.* the defendants subject Black children to discrimination based on race, in violation of Section 5(a)(2) of ICRA.

## THE PARTIES

### The Plaintiff

12. Shanice Mathews is a forty-eight-year-old resident of the Garfield Park neighborhood in Chicago. She has spent more than twenty years as a case manager for Senior Helpers, an organization primarily involved with in-home care for chronically ill seniors. She has four children, including the plaintiff D.W, who is now 14 years old. D.W.'s cousin was shot and killed in the North Lawndale neighborhood of Chicago on October 8, 2018. D.W., then in the fourth grade, was just blocks away from the shooting at the time. Just a month and a half after the murder of D.W.'s cousin, another one of D.W.'s cousins shot and killed himself with a handgun. In the five years D.W. has lived in West Garfield Park following the murder of his cousin, there have been more than ten shootings within a four-block radius of his home. Hearing gunshots is a weekly

and sometimes daily occurrence in D.W.'s life. D.W. is an "individual with a disability" within the meaning of 29 U.S.C. § 705 (20)(B), which includes any individual who has a disability within the meaning of 42 U.S.C. § 12102. Shanice Mathews brings this case on behalf of her son D.W. as guardian *ad litem* under Fed. R. Civ. P. 17(c).

13. Pursuant to Fed. R. Civ. Proc. 23(b)(2), Plaintiff Mathews also brings this action for declaratory and injunctive relief both on behalf of her minor child and on behalf of a class of similarly situated children. The class is defined as individuals under age 18 who suffer mental disability within the meaning of 42 U.S.C. §12102 from exposure to high levels of illegal gun violence resulting from straw purchases and illegal trafficking of guns and who currently live in one of the 15 highest gun crime community areas as determined by the City of Chicago. The proposed class for declaratory and injunctive relief meets the four prerequisites for class certification under Rule 23 of the Federal Rules of Civil Procedure.

## The Defendants

14. The defendant State of Illinois is a "State" operating programs receiving federal assistance within the meaning of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §§ 794(b)(1)(A) and (B). It is also a "State" within the meaning of Section 5 of the Illinois Civil Rights Act of 2003, 740 ILCS § 23/5.

15. The defendant Illinois Department of State Police ("ISP") is also a "department, agency or… other instrumentality of a State" receiving federal assistance and all of whose operations constitute a "program or activity" within the meaning of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §§ 794(b)(1)(A) and (B). The ISP is also a unit of the State within the meaning of Section 5 of the Illinois Civil Rights Act of 2003, 740 ILCS § 23/5.

16. The Defendant J.B. Pritzker is the Governor of the State of Illinois and responsible for the policies implemented by the defendant State of Illinois.

17.   The Defendant Brendan Kelly is the Director of the Illinois Department of State Police and, under the direction of Defendant Pritzker, is responsible for the policies implemented by the State Police.

## JURISDICTION AND VENUE

18.   This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343 and because of its supplemental jurisdiction under 28 U.S.C. § 1367 over the related state law claim.

19.   Venue is proper in the Northern District of Illinois, as the Plaintiff and Defendants are either residents or conduct activities in Northern District of Illinois, and the events and omissions giving rise to the harm alleged by Plaintiff occurred in the Northern District of Illinois.

## FACTUAL ALLEGATIONS

### The Public Health Emergency in Chicago

20.   Plaintiff Mathews' son D.W. and other Black children in the proposed class have experienced unremitting gun violence in the neighborhoods where they live or lived. The Chicago Police Department and University of Chicago Crime Lab studies document that from January 1, 2015, through June 30, 2018, more than 2,000 people in Chicago were murdered. Ninety percent of these murders were by gun. Chicago has more gun-related homicides than any other major U.S. city. From January 1, 2015, through July 31, 2018, nearly 8,000 people were shot in Chicago— about one shooting victim every 2.5 hours. Nearly 20 percent of Chicago's homicide victims are teenagers or younger. Law enforcement reported that during the first five months of 2021, 108 children were shot and 16 killed by guns in Chicago.

21.   This gun violence is a public health emergency that afflicts various Black neighborhoods in Chicago, particularly: Austin, Englewood, West Englewood, New City,  and Grand Crossing ("the communities of concentrated gun violence"). In 2015-2016, according to the University of Chicago Crime Lab, 80 percent of Chicago homicide victims were Black, though Black people

comprise only about one-third of the city's population. Eighty percent (80%) of homicide victims continue to be Black when one looks only at killings during the first seven months of 2018. Black men aged 15 to 34 made up more than one-half of the city's homicide victims during this same period while accounting for just four percent (4%) of the city's population. Despite having only nine percent (9%) of Chicago's population, the Black neighborhoods of Austin, Englewood, West Englewood, New City, and Grand Crossing accounted for almost one-third of homicides in 2016, and this pattern has continued. The national homicide rate is about 5 per 100,000 persons across the whole country. In the Austin neighborhood of Chicago, in 2016, the homicide rate was 87.3 per 100,000 persons, according to the University of Chicago Crime Lab. In Englewood, the homicide rate was 179.5 per 100,000 persons; in West Englewood, it was 105 per 100,000 persons; in New City, it was 98.6 per 100,000 persons and in Grand Crossing, it was 103.5 per 100,000. These five neighborhoods have the most deaths by gun violence of any neighborhoods in Chicago. They are Black neighborhoods. Five of the next six deadliest neighborhoods are also predominantly Black.

22. By comparison, the white Chicago neighborhoods of Lincoln Park, North Center, Edison Park, Forest Glen, North Park, Hegewisch, Beverly and Mount Greenwood had no homicides in 2015 or 2016, and the white neighborhoods of Lake View, Lincoln Square, Jefferson Park, Calumet Heights, Edgewater, Montclare, O'Hare, Dunning, and Norwood Park had two or fewer murders during this two-year period, meaning a zero or negligible homicide rate. This disparate impact of gun violence has continued through to the present day.

23. Fatalities are only one aspect of a broader public health emergency that the plaintiff and other members of the class are experiencing. The Plaintiff and other class members are suffering from traumatic exposure to this violence in a way that has created serious disabilities and limits on

their life activities. The Plaintiff and other Black children hear gunfire most nights while in their homes and walking the streets, and these numerous firings can recreate prior traumatic exposures to gun violence, from the loss of a family member, parent, sister, brother, cousin, or schoolmate.

24. Chicago police are currently recovering over 10,000 crime guns a year. Yet, many of these crime guns were purchased in the first instance from a federally licensed gun dealer that Illinois law requires the Defendant ISP to certify to legally operate within Illinois. Some of these dealers violate the law or fail to implement reasonable business practices that prevent gun traffickers from acquiring firearms through unlawful transfers, including theft or straw sales.

25. An increasing number of these guns are 9-millimeter or .40 caliber handguns that have larger capacity magazines for ammunition and are more powerful than the .22 caliber handguns that were the principal handguns in the past.

### A Substantial Number of the "Crime Guns" Used in Chicago Come from Chicago Area Gun Dealers

26. Chicago has no licensed gun dealers, but according to the Chicago Police Department, 40.4 percent of the "crime guns" recovered on Chicago streets every year from 2009 through 2016 were purchased from federally licensed gun dealers operating in Illinois. This figure has not changed materially in the 2017 Gun Trace Report issued by the City. There has been no further or updated Gun Trace Report by the City since 2017, though on information and belief, the City, in partnership with the University of Chicago Crime Lab, is preparing a follow-up study that will be available in 2024. Seven of the stores selling the most crime guns recovered in Chicago shootings, as set out in these Reports, are located in Illinois (with the remainder located nearby in Indiana). These Illinois gun dealers are:

> Chuck's Gun Shop in Riverdale, IL
>
> Midwest Sporting Goods in Lyons, IL

Shore Galleries in Lincolnwood, IL

GAT Guns in East Dundee, IL

Suburban Sporting Goods in Melrose Park, IL

Pelcher's Shooter Supply in Lansing, IL

Sporting Arms & Supply in Posen, IL

27.   Large numbers of guns purchased from these dealers were recovered in connection with crimes within one year of their purchase. ATF and other law enforcement entities recognize a short "time-to-crime" as an indicator of illegal trafficking.

28.   Suburban Sporting Goods in Melrose Park, IL, sold 85 guns recovered as "crime guns" in Chicago in 2016 alone, and 46 percent of these guns were sold less than a year before their recovery. Sixty-eight percent (68%) of the "crime guns" sold were recovered within three years of retail sale. Chuck's Gun Shop in Riverdale, IL, sold 997 "crime guns" during the period 2013-2016, 21 percent (21%) of which were recovered within one year of retail sale. Ninety-two percent (92%) of the "crime guns" sold by these stores are handguns.

29.   During the 2013-2016 period, federally licensed gun dealers in Illinois reported that 1,200 guns were lost or stolen from these dealers prior to any sale. This includes burglaries, robberies, and off-the-books sales. Thefts and burglaries, in particular, are increasing at an alarming rate. Burglaries at these stores tripled between 2015 and 2016. ATF has found that these stolen guns are almost assuredly destined for criminal use in the immediate area of the theft. Chuck's Gun Shop alone reported 43 guns stolen between 2013 and 2016.

**The State of Illinois Has Failed to Implement Meaningful Gun Trafficking Prevention Regulation in Illinois, Despite Ample Authority to Do So**

30.   The single most effective way to reduce the flow of illegal "crime guns" circulating in the neighborhoods where children like Plaintiff D.W. live is for the Defendants to require licensed Illinois dealers to follow and use responsible business practices with each sale and refuse to sell

guns to persons when indicators of a straw purchase are present. This does not require the Defendants to fine, penalize, or take any criminal prosecution of any such dealers but only to condition the renewal of the dealers' licenses on documentation that the dealers are following the practices in which they are supposed to be trained with respect to each sale.

31. Defendant ISP has multiple statutory sources for the exercise of such authority. First, it is illegal in Illinois under federal and state law for either the gun dealer or the transferee to engage in a straw sale if either party *knew or should have known* the transfer was a straw sale. See 18 U.S.C. § 922(a)(6); 27 CFR § 478.128; 430 ILCS 68/5-85(a).

32. Second, the organic statute creating the Defendant ISP vests ISP with the authority to "promulgate rules and regulations *necessary* for the administration and enforcement of its powers and duties, *wherever granted and imposed*, pursuant to the Illinois Administrative Procedure Act." 20 ILCS 2605-15 (emphasis supplied).

33. Additionally, under the Firearm Dealer Licensing Certification Act 430 ILCSD 68/5-60 , the Defendant ISP has both the power and duty to require responsible business practices, which include a requirement that dealers not sell to persons when there are indicators of a straw purchase in connection with a specific sale.

34. In 2018, the General Assembly adopted the Firearm Dealer Licensing Certification Act, 430 ILCS 68/5-60, for the purpose of stopping illegal gun trafficking by requiring dealers to adopt practices that would reduce the diversion of legal firearms to the illegal market through theft, loss, or straw sales. In addition to robust security and inventory management requirements, section 430 ILCS 68/5-60 of the Dealer Licensing Act states: "[t]he Illinois State Police shall develop and implement by rule statewide training standards for assisting certified licensees in recognizing indicators *that would lead a reasonable dealer to refuse sale of a firearm, including, but not limited*

*to, indicators of a straw purchase.*" (emphasis supplied). Under 430 ILCS 68/5-30 of the same Act, the Defendant ISP also has broad regulatory authority to require training in responsible business practices to be determined by the Defendant ISP.

35. Necessarily, the Defendant ISP has the authority to require dealers to follow those responsible business practices and to fine or suspend or deny certification of their licenses if the dealers fail to do so. Under 430 ILCS 68/5-85 of the Firearm Dealer Licensing Certification Act, the Defendant ISP has the power to "refuse to renew… any licensee… for each violation for… (2) a pattern of practice… which demonstrates… incapacity or incompetency to practice under the Act." Such a pattern or practice of incapacity or incompetency is acknowledged by Defendant ISP to include incapacity to stop straw purchases and illegal gun trafficking through these dealers.

36. Since Defendant ISP is authorized by law to require dealers not to engage in straw sales and illegal trafficking and follow business practices, and even to discipline dealers who show incapacity or incompetence to practice under 430 ILCS 68/5-85, Defendant ISP necessarily has the regulatory authority by administrative rule to condition renewal of dealer licenses on documentation that the dealers are following responsible business practices, and refusing to engage in sales when indicators of a straw purchasing and illegal trafficking are present.

37. The federal ATF and the National Shooting Sports Foundation (NSSF), the gun industry's trade association, have developed resources that instruct gun dealers to engage potential purchasers in conversation to ferret out indicators that the customer is a straw purchaser through the "Don't Lie for the Other Guy" campaign.

38. Requiring dealers to follow the practices or protocols as a condition for certification of a dealer license under 430 ILCS 68/5-85 would substantially reduce straw purchases and

dramatically reduce the gun violence to which the Plaintiff and other class members are now exposed.

39.  For example, as part of the responsible business practices to be followed, the Defendant ISP can require dealers to refuse sales when customers are (1) buying multiples of the same handgun in the same transaction or within a short period of time or (2) seeking the purchase of a handgun when a gun previously bought by the same purchaser was recovered at a crime scene and not reported lost or stolen.

40.  Likewise, as a responsible business practice, dealers should be trained to require valid Firearm Owner Identification Cards ("FOID") cards from persons purchasing ammunition, as failure to do so is effectively facilitating gun use by persons without valid FOID cards.

41.  Defendant ISP has also failed to perform its responsibility under the Illinois Gun Trafficking Information Act, 5 ILCS 830/10-5, to produce reports to determine patterns of straw purchasing by specific dealers and to develop a state-wide firearms trace system to do so.

42.  Defendant ISP has also failed to provide transparency or disclose its own actions in enforcing state gun laws, including the FOID Act and the Firearm Dealer Licensing Certification Act, in violation of the Gun Trafficking Information Act, 5 ILCS 830/10-5.

43.  Defendant ISP can and should disclose properly redacted summaries of its inspections of dealers and other enforcement activities and "use all reasonable efforts… in making publicly available, on a regular and going basis, key information related to firearms used in the commission of crimes in this State," including the identity of the "Federal Firearms Licensee that sold the firearm…." 5 ILCS 830/10-5(a).

44.  Defendant ISP is also supposed to "study, on a regular and ongoing basis, and compile reports… to determine firearms trafficking and straw purchase patterns," but has produced no such reports even at this late date. 5 ILCS 830/10-5(b).

45.  By refusing to make use of Defendant ISP's authority to hold dealers accountable for straw purchasing and trafficking, Defendants permit new illegal guns to circulate in the high crime neighborhoods even as the Chicago Police Department ("CPD") collects thousands of guns previously bought from many of these problem dealers.

**The Pervasive Gun Violence in Chicago's Black Neighborhoods Has Caused Thousands of Black Children to Become Disabled Under the ADA**

46.  The continuing gun violence in Chicago has left thousands of the city's Black residents, including children in the plaintiff class, dead or with physical and emotional wounds. As Dr. Shani Buggs from the University of California at Davis Gun Violence Research Center notes, gun trafficking and pervasive gun violence's repercussions stretch well beyond those directly hit with a bullet, reverberating within entire communities for decades through depressed home prices, reduction in the growth of new retail and services, lack of economic or career opportunities in the immediate vicinity, and lack of access to healthcare, healthy food, or social opportunities.

47.  Pervasive gun violence and the constant trauma and fear that it produces has had an acute and dramatic effect on the social and emotional health and educational opportunities of the children exposed to such violence who have not been shot, like the plaintiff and other class members in this case. A Chicago mother interviewed by a local author, Alex Kotlowitz, in his book "An American Summer" captured it best: "It's like Russian roulette every time they walk out the door."

48.  The number of children who are traumatized by living under that daily fear when deciding whether to play with friends, get fresh air, or go to school are far larger in number than those who have been killed and maimed.

49.  Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, protects an "individual with a disability" under 29 U.S.C. § 705(20)(B), which adopts the definition of a "disability" under 42 U.S.C. § 12102 of the Americans with Disabilities Act ("ADA") as "a physical or mental impairment that substantially limits one or more major life activities of such individual", 42 U.S.C. §12102(1)(A). Major life activities under this section "include, but are not limited to, *caring for oneself*, performing manual tasks, seeing, hearing, eating, *sleeping*, walking, standing, lifting, bending, speaking, breathing, *learning, reading, concentrating, thinking, communicating,* and working" (emphasis supplied).

50.  It is well-established among physicians, trauma specialists, and educators, as well as in the scientific, peer-reviewed literature, that when a child, particularly a young child, is exposed to gun violence, there is a dramatic and lasting impairment of the child's basic life activities. This includes deficits in the child's ability to care for himself or herself, the child's sleep, reading abilities, learning capacity, concentration, thinking, and communication. As a result of these deficits, gun violence directly undermines the child's academic performance and his or her educational opportunities.

51.  Many studies have found that children directly or indirectly exposed to community violence, most often gun violence, develop acute or post-traumatic stress disorder, including disrupted sleep, anxiety, and fear, as well as reduced awareness and difficulty with concentration, thinking, and memory, all of which impair cognitive functioning. Exposure to gun violence floods a child's body with stress hormones (adrenaline and cortisol) that independently undermine cognitive performance by compromising the function of the prefrontal cortex of the brain (the area of the brain that is most rapidly developing in adolescence). This portion of the brain is responsible for reflective self-regulation and sustained attention, thus inhibiting the child's memory, ability to

13

sustain concentration and brain development. The child's analytical capacities (or executive function) tend to disintegrate, leaving the child disorganized cognitively and emotionally, and thus prone to react in school with extreme helplessness, confusion, withdrawal, or rage. The more directly the child experiences gun violence and the more often it happens, the more enduring and permanent are his or her deficits. This literature is summarized in many places, including by the Violence Policy Center, "The Relationship Between Community Violence and Trauma: How Violence Affects Learning, Health and Behavior," (July 2017), www.vpc.org; by Sharkey, "The Long Reach of Violence: A Broader Perspective on Data, Theory, and Evidence on the Prevalence and Consequences of Exposure to Violence," Annual Review of Criminology, Vol. l:85-102 (January 2018); and by Cook, *et al.*, "Complex Trauma in Children and Adolescents," Psychiatric Annals, Vol. 35(5): 390-398 (2005).

52.   For over twenty years, research has shown that exposure to gun violence negatively affects a range of developmental outcomes across social-emotional, behavioral, and cognitive domains. *See, e.g.*, Bingenheimer, et al., "Firearm Violence Exposure and Serious Violent Behavior," Science, Vol. 308:1323-26 (2005); and Osofsky, "The Impact of Violence on Children," Future of Children, Vol. 9:33-49 (1999). It has also consistently shown that exposure to gun violence and other forms of violence is associated with lower performance on assessments of reading, cognitive skills, grade point average, and school attendance. *See, e.g.*, Bowen, *et al*., "Effects of Crime and Violence in Neighborhoods and Schools on the Social Behavior and Performance of Adolescents," Journal of Adolescent Research, Vol. 14: 319-42 (1999) and Delaney-Black, *et al.*, "Violence Exposure, Trauma, and IQ and/or Reading Deficits among Urban Children," Archives of Pediatrics and Adolescent Medicine, Vol. 156: 280-85 (2002).

53.  In Chicago, there have been many studies linking exposure to gun violence directly to deficits in academic performance by Black children. In 2010, Dr. Patrick Sharkey used Chicago homicide data and cognitive assessment data on hundreds of children aged 5 to 17 from the Project on Human Development in Chicago Neighborhoods to assess the effect of a single homicide incident located near a student's home on that student's vocabulary and reading skills, using sub-tests of the Wechsler Intelligence Scale for Children and the Wide Range Achievement Test. For Black children, a homicide located on their block within one week of cognitive assessment testing showed (on average) a reduction in performance of 0.5 standard deviations relative to other Black children living in the same neighborhood who had not been exposed to a homicide. The children lost .65 standard deviations in their reading scores when tested within four days of a homicide occurring on their block (whether the child saw the homicide or not). A separate study of Chicago data referenced by Dr. Sharkey, and used for comparison, found that a homicide within a child's census tract occurring within four days of cognitive assessment found a loss of a full 1.0 in standard deviation on a letter-word test, as compared with other children from the same neighborhood. Sharkey, "The Acute Effect of Local Homicides on Children's Cognitive Performance," Proceedings of the National Academy of Sciences, Vol. 107(26): l 1733-38 (2010). Dr. Sharkey has demonstrated the same causal effect between exposure to gun violence and deficits in standardized test scores administered in the schools of New York City (using time and location), see Sharkey, et al., "High Stakes in the Classroom, High Stakes on the Street: The Effects of Community Violence on Students' Standardized Test Performance," Sociological Science, Vol. l (3): 199-220 (2014); see also, Lacoe, et al., "Too Scared to Learn? The Academic Consequences of Feeling Unsafe in the Classroom," Urban Education, https://doi.org/10.I 177/0042085916674059 (October 2016), (tracking 340,000 New York City public school students

over successive academic years to find that in years when students reported feeling unsafe, their standardized test scores declined significantly).

54. Dr. Dana Charles McCoy and colleagues studied 602 Chicago children from high-crime Chicago neighborhoods in 2004 and 2005 and then followed up with them in 2010 and 2011 to study the relationship between their exposure to violent crime (taking place within a half mile of their home (which they may or may not have witnessed) and within seven days of testing) and their performance on a neuropsychological assessment which measured their cognitive performance and selective attention. These researchers found a direct relationship between exposure to violence and a deficit in neuropsychological functioning as a result of the children's exposure to gun violence. McCoy, *et al*., "Children's Cognitive Performance and Selective Attention Following Recent Community Violence," Journal of Health and Social Behavior, Vol. 56(l): 19-36 (2015).

55. Gun violence affects everyone in school, even those not exposed. This was demonstrated by Dr. Julia Burdick-Will, who took five cohorts of Chicago Public School students (from 2002 to 2010) and examined the relationship between performance on standardized tests and the level of violence experienced in the school (as determined by Chicago police locational crime data and survey tools). Many students did not experience gun violence, but the whole school felt less safe. One standard deviation increase in classmates' exposure to neighborhood violence was related to a 0.3 standard deviation decline in both reading and math scores—which represents ten percent (10%) of normal student annual growth. Burdick-Will, "Neighborhood Violence, Peer Effects, and Academic Achievement in Chicago," Sociology of Education, Vol. 91(3): 205-223 (2018).

**Plaintiff's Exposure to Gun Violence Has Left Him Disabled Within the Meaning of Section 504 of the Rehabilitation Act**

56.  D.W. is now 14 years old. He lives with his mother, his sister Ashley, and Ashley's two children. D.W.'s mother works for Senior Helpers as a case manager in charge of coordinating in-home care for chronically ill seniors.

57.  On the night of October 8, 2018, D.W. and his mother were spending quality time with their family in the neighborhood where D.W. was raised, North Lawndale. That same night, Marquise Willingham, D.W.'s cousin, was returning home from a high school football game at Collins Academy High School. Just blocks away from where D.W. and his family were having a quiet night with their relatives, a car pulled up next to Marquise on his walk home from the game. A gunman got out of the car and shot Marquise twice in the shoulder and once in the head. Ms. Mathews heard a banging on the door and answered. It was a family friend in tears screaming that Marquise had been murdered.

58.  D.W., just nine years old at the time, heard the news from the other room of the house. D.W. was shielded from seeing his cousin's bleeding body by his mother. He would later accompany his family to the coroner's office to identify the body. D.W., overcome with grief, decided to stay in the car. The police have labeled Marquise's death a homicide. The case remains unsolved.

59.  The loss of D.W.'s cousin at the hands of gun violence forever altered D.W.'s life. With little money and no counseling resources available to the family, D.W. was left with very little to deal with so much trauma.

60.  After the killing of his cousin, D.W. began having severe emotional swings manifesting in massive angry outbursts seemingly triggered by small discomforts. These outbursts disrupted class, caused D.W. to shake uncontrollably, and lasted long periods of time.

61.   D.W.'s learning has also suffered. For the first time in his school career, he started manifesting symptoms of attention deficit hyperactivity disorder, often requiring fidget spinners and other gadgets to keep him in his seat. Much more than was the case prior to the murder, D.W. now experiences difficulties in focusing, reading, communicating, and listening.

62.   D.W.'s exposure to gun violence has caused D.W. to seem more stressed. He is acutely aware of the dangers guns pose to him and his family. D.W. has ongoing fear for his own life and the lives of his family members.

63.   On November 23, 2018, just a month and a half after his cousin's murder, another one of D.W.'s cousins died by suicide by shooting himself in the head. D.W. was with his family mourning the recent death of another cousin from cancer. As the family huddled together in D.W.'s living room after returning from the hospital, D.W.'s aunt received the heart wrenching phone call concerning her son's suicide. D.W., like the rest of his family, broke down in tears as the news was shared throughout the house. Neither D.W. nor Ms. Mathews knows why Keyonte killed himself.

64.   Not only has gun violence touched D.W.'s family directly, but it remains a consistent part of his life. On more than a handful of occasions, D.W. and his classmates have been held back during dismissal because gunshots were heard on an adjacent block. In the five years since D.W. has lived in Garfield Park, at least ten shootings have occurred within a four-block radius of D.W.'s home. D.W. and his mother regularly hear gunshots at night while going to sleep. Since the murder of his cousin, D.W. has had trouble sleeping, often reporting dreams about his cousin to his mother.

65.   D.W. is an individual with a disability under 29 U.S.C.§ 705 (20)(B) of Section 504 of the Rehabilitation Act because D.W. has a disability within the meaning of 42 USC 12102 of the Americans with Disabilities Act. He suffers from a trauma-induced mental impairment that

substantially limits his abilities to sleep, learn, read, concentrate, think, communicate, and participate fully in school.

66. D.W. continues to live in the Garfield Park neighborhood of Chicago, where gun violence is just a normal part of life.

67. D.W.'s past and continued exposure to gun violence has impaired his basic life activities and threatens to make his condition more severe.

## CLAIMS

### COUNT I – VIOLATION OF SECTION 504 OF THE REHABILITATION ACT: FAILURE TO REQUIRE DEALERS TO FOLLOW RESPONSIBLE BUSINESS PRACTICES

68. Under the Firearm Dealer Licensing Act 430 ILCS 68/5-60 defendant ISP is directed to train dealers in "responsible business practices."

69. The Act states: "[t]he Illinois State Police shall develop and implement by rule statewide training standards for assisting certified licensees in recognizing indicators *that would lead a reasonable dealer to refuse sale of a firearm, including, but not limited to, indicators of a straw purchase*" (emphasis supplied).

70. Defendant ISP has not complied with this provision because Defendant ISP does nothing more than request the dealers to review the PowerPoint slideshow attached as Exhibit A and submit a declaration that they viewed the video found on the ISP's website at https://isp.illinois.gov/foid/fdlc/training/trainingVideo. Defendant ISP makes no effort to require dealers to use responsible business practices identified by these materials to refuse sales of a firearm when there are indications of the straw purchase at 430 ILCS 68/5-60 intends.

71.  Defendant ISP has full authority to require dealers to follow these responsible business practices, as set forth in the training materials and publicized in the national campaign known as "Don't Lie for the Other Guy," sponsored by ATF and NSSF.

72.  Under Section 10 of the Firearm Dealer Licensing Certification Act, 430 ILCS 68/5-85, the Defendant ISP has the power to "refuse to renew… any licensee… for each violation for… (2) a pattern of practice… which demonstrates… incapacity or incompetency to practice under the Act," and can condition renewal of a license on documentation that dealers are following responsible business practices with respect to each gun sale. Defendant ISP fails to use that authority.

73.  Requiring such practices is one of the essential means to stop the spread of guns through straw sales. The Illinois Attorney General, Kwame Raoul, writing on behalf of seventeen other state attorney generals, filed an amicus brief in *National Shooting Sports Foundation, Inc. v. Letitia James*, 22-1374, (2d Cir. Jan 13, 2023) ("Raoul Amicus"), in which he stated "empirical evidence supports the determination" that practices that "guard against the sales of qualified purchases straw purchasers . . . will stem the flow of firearms into the illegal market." Raoul Amicus at 7. Indeed, the Illinois Attorney General cited evidence that two firearms stores "accounted for ten percent of all crime guns recovered [in Chicago] during the period between 2013 and 2016." *Id.* at 8 (citing City of Chicago, Gun Trace Report, 2017, at 4, bit.ly/3ItoLS2).

74.  He also cited to authoritative studies such as Philip J. Cook et al., *Some Source of Crime Guns in Chicago: Dirty Dealers, Straw Purchasers, and Illegal Traffickers*, Journal of Criminal Law & Criminology, Vol. 104(4): 717, 723 (2015), and stated:

> It is also well-documented that gun dealers contribute to the harm caused by firearms entering the illegal market when they engage in unlawful or irresponsible business practices, such as by selling firearms to known straw purchasers (that is, someone purchasing on behalf of another person) or to

individuals who do not provide appropriate documentation. As to the former, studies confirm that most dealers are confronted at one time or another with individuals whom they believe may be a straw purchaser: In 2011, for example, two-thirds of surveyed gun dealers admitted that they had been approached by possible straw purchasers. While the vast majority of dealers do not sell firearms to such individuals, one study concluded that one in five dealers would sell a firearm to an individual whom they suspected was purchasing it on behalf of someone else, including for those who may not legally be allowed to buy it. One consequence of this conduct in the aggregate is that a large number of firearms enter the illegal market; indeed, by some estimates, nearly half of all guns that are trafficked the secondary market began as straw purchases. But studies show that when gun dealers either are held accountable for their sales to straw purchasers or choose to engage in more responsible business practices that prevent such sales, there is a significant decrease in the flow of firearms into the illegal market.

Raoul Amicus at 9-10 (citations omitted).

75. The scholarly evidence, consistent with the Illinois Attorney General's Amicus Brief, supports a finding that requiring dealers to follow responsible business practices is likely or even certain to reduce both straw purchasing and illegal gun trafficking, for which a small handful of dealers who refuse these practices are responsible.

76. Professor Daniel Webster, SCD, MPH, is a tenured professor at Johns Hopkins and nationally recognized as an authority on firearm violence and strategies to reduce such violence (and also cited in footnote 11 in support of enforcing good practices for gun sellers in the Raoul Amicus Brief). Like the Illinois Attorney General, he also filed an amicus brief in *National Shooting Sports Foundation, Inc. v. Letitia James*, on January 13, 2023 ("Webster Amicus").

77. The Webster Amicus, which set outs Professor Webster's expert opinion, is attached as Exhibit B and incorporated herein to show that requiring Cook County dealers to follow responsible business practices is likely to reduce the level of violence to which Plaintiff D.W. and other children in the proposed class are exposed.

78. As set forth in the Webster Amicus, it is Professor Webster's opinion that a broad consensus supports responsible business practices, and most dealers are knowledgeable as to such practices and comply with them by refusing to sell to persons who are straw purchasers (persons passing background checks but illegally buying guns for others) and gun trafficking (people buying guns to illegal resell without a license). Professor Webster states: "… it is well documented that the industry knows what constitutes—and can implement—lawful and reasonable sales practices." Exhibit B at page 4.

79. As noted by Professor Webster, as well as the Brady Campaign and Brady Center to Prevent Gun Violence Report, "The Truth About Gun Dealers in America, Stopping the Small Number of 'Bad Apples' That Supply Virtually Every Crime Gun in the U.S." ("Exhibit C," hereto), only a few dealers are the problem. Just *five percent* of dealers supply 90 percent of crime guns. They do so without following responsible business practices such as those identified in Exhibit A hereto, while 86 percent of dealers sell no crime guns in a given year. Exhibit C at 2.

80. In the case of the City of Chicago, according to the Gun Trace Reports by the City in 2014 and 2017, which is also cited in the Raoul Amicus Brief, *infra* at 7, approximately 40 percent of the crime guns recovered can be traced to seven suburban gun stores in Cook County, just beyond the jurisdiction of the City of Chicago.

81. These include Chuck's Gun Shop, Midwest Sales, and five others, which Defendant ISP has left free to engage in straw purchases by refusing to require that they engage in well-known responsible business practices.

82. Under the authority of the Firearm Dealer License Certification Act, by administrative rulemaking, Defendant ISP can refuse to renew licenses of dealers who fail to follow the responsible business practices set out by Defendant ISP itself in Exhibit A.

83. Defendant ISP can identify such dealers or deter them from irresponsible practices by requiring that dealers supply records showing that the dealers have looked for indicators of straw purchasing with each such sale and refused sales when such indicators are present.

84. Plaintiff has attached as Exhibit D, hereto, a checklist that was developed by the Brady Center. It is one set of criteria that may be sufficient documentation for renewal of the license, but other forms of record keeping could be used, along with videotaping of sales.

85. As Professor Webster has concluded, it is likely that requiring business practices by these errant dealers will reduce the level of criminal gun violence in urban areas like Chicago. "Illegal sales by licensed dealers are the largest source of guns for criminals; such sales 'account for more guns diverted into the illegally market any other trafficking channel.'" Exhibit B, quoting Webster, *et al.*, *Effects of Undercover Police Stings of Gun Dealers on the Supply of New Guns to Criminals*, Injury Prevention, Vol. 12: 225 (2006). This is especially true because illegally diverted guns are much more likely to be used in crimes. *See,* U.S. Dep't of Justice, Firearm Violence, 1993-2011 at 13 (2013)." *See also*, Exhibit B at 9.

86. In Chicago, the Chicago Police Department engaged in a series of undercover stings at stores suspected of making illegal firearms sales, including straw purchases, and those stings were followed by civil lawsuits against dealers for facilitating such sales.

87. Professor Webster testified with respect to the Chicago stings reporting, "Within one year following the stings, civil lawsuits and criminal indictments, the number of new guns used in crimes [guns recovered less than one year after they were sold] by individuals who were not the criminal gun possessors (a proxy for illegal straw purchases) fell by 61.8 % and the overall number of guns diverted for criminal use decreased by 46.4%." *See,* Webster et al., Undercover Police Singes, *supra*, at 229.

23

88.  Likewise, in Milwaukee shutting down just one dealer (Badger Guns) that was responsible for the majority of guns recovered by police within a year of sale led to a 44 percent reduction in new crime guns citywide.

89.  Similarly, in New York City, sting operations against out-of-state dealers resulted in agreements to follow responsible business practices, which in turn reduced the crime guns traced to dealers who signed those agreements by 84.2 percent.

90.  Requiring dealers to follow responsible business practice by an administrative regulation for licensee renewal is a cost-effective way of achieving a similar or equally meaningful reduction of illegal crime guns as one-time sting operations against the dealers described above. It is also likely to be less dangerous than an undercover operation, and the effect is likely to be continuing and longer lasting. The reduction in the number of illegal guns and illegal gun violence following such stings is convincing evidence that a similar meaningful reduction will follow administrative regulation of the kind sought here.

91.  Furthermore, other studies have documented that a decrease in the number of illegal firearms in high-crime neighborhoods, such as the ten neighborhoods identified above, is correlated with a reduction in gun violence in those neighborhoods.

92.  One such study concludes:

"the presence of any firearm in the LC [high risk network of co-offenders'] is associated with increased individual risk of gunshot victimization, that illegally trafficked firearms presented an even greater risk… Our research suggests that interventions aimed at curtailing illegal transfers of firearms could be used to reduce gun availability to criminals and decrease gun violence victimization. In turn, fewer guns on the street could increase the life expectancy of young Black men who are most likely to suffer serious injury and victimization by those who criminally misuse guns. *Reducing firearm trafficking could also reduce the trauma experienced by these individual and other residents of disadvantaged neighborhoods that are particularly vulnerable to persistent gun violence problems*. The case for a supply side approach to gun violence as suggest above is *well supported* by the empirical evidence on illegal

gun market dynamics (Braga et al., 2012, 2002)" (emphasis supplied, original emphasis omitted).

Ciomek, *et al.*, *The Influence of firearms trafficking on gunshot injuries in a co-offending network*, Social Science & Medicine, Vol. 259 2020 https//doi.org/10.1016/socscimed2020.113114. Additional studies include Webster, Vernick, Bulzacchelli & Vittes, *Recent Federal Gun Laws, Gun Dealer Accountability and the Diversion of Guns to Criminals in Milwaukee*, Journal of Urban Health, Vol. 89:87-97; and Irvin, Rhodes, Cheney & Wiebe, *Evaluating the Effect of State Regulation of Federally Licensed Firearm Dealers on Firearm Homicide*, Am. Journal of Public Health Vol. 104(8)."

93. There is a strong correlation between the level of violence and the continued traumatization of Plaintiff and other disabled children living in Chicago's 15 highest crime neighborhoods. Any such reduction in the level of firearm violence will reduce the number of incidents that re-traumatize or re-enforce the trauma from which they already suffer.

94. Defendant ISP has refused to follow other actions directed by law to reduce straw purchasing. Defendant ISP has failed to produce reports required by the Gun Trafficking Information Act, 5 ILCS 830/10-5, that would determine which dealers are responsible for straw purchasing. The Defendant ISP's failure to collect such information identifying specific bad dealers has the effect of protecting these dealers. Defendant ISP also allows dealers to sell ammunition without requiring the dealers to check if the purchasers have valid FOID cards.

95. Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, protects an individual with a disability and adopts the definition of a disability under 42 U.S.C.§ 2102(1)(A), which includes any limitation on caring for oneself, sleeping, learning, reading, concentrating, thinking and communicating.

96.  Plaintiff and other children continually exposed to gun violence directly or indirectly have developed these limitations on the activities described in the Americans with Disabilities Act and are disabled within the meaning of 42 U.S.C. §2102.

97.  In violation of Section 504 of the Rehabilitation Act, 29 U.S.C.§ 794, and by the acts set forth above, including the refusal to require dealers to follow responsible business practices that would lead to a reduction in the levels of gun violence to which Plaintiff and other children in the high crime neighborhoods, the Defendant ISP and other Defendants have denied Plaintiff and the proposed class a reasonable accommodation to the mental health needs of these children and prevented them from obtaining the benefits which they would otherwise receive from Defendant ISP's federally assisted law enforcement programs and activities, including firearm dealer training and oversight if properly accommodated to meet their needs.

WHEREFORE, Plaintiff prays this Court to:

A.    Certify under Fed R. Civ. P. Rule 23(b)(2), the class of children under age 18 who currently live in the fifteen highest crime neighborhoods as determined by the City of Chicago and who have experienced and continue to experience disabling trauma within the meaning of the ADA from continued exposure to illegal gun violence.

B.    Declare that by refusing to require dealers to follow responsible business practices likely to reduce the violence to which Plaintiff D.W. and other class members are exposed, the Defendant ISP and other Defendants have denied a reasonable accommodation to Plaintiff D.W. and the proposed class due to them because of such disabling trauma and disability, and prevented them from obtaining the benefits which they would otherwise receive or enjoy from Defendants' federally

assisted law enforcement programs and activities, including firearm dealer training and oversight, if properly accommodated to meet their needs.

C.      Direct that Defendant ISP and other Defendants comply with the Firearm Dealer License Certification Act 430 ILCS 68/5-1, *et seq*., and require Illinois firearm dealers to use and document their use of responsible business practices with respect to straw purchasing as a condition for renewal of their licenses.

D.      Direct that Defendant ISP and other Defendants take the other measures to deter straw purchasing set forth in Count I above, such as requiring FOID cards to obtain ammunition.

E.      Grant Plaintiff D.W. nominal damages for violation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, for which Plaintiff D.W. demands a jury.

F.      Grant Plaintiff such other relief, including legal fees and costs, as may be appropriate.

**COUNT II – Violation of Section 5 of the Illinois Civil Rights Act:**
**Refusal to Require Dealers to Follow Responsible Business Practices**

98.   Plaintiff incorporates by this reference the numbered paragraphs under Count I above.

99.   The acts set forth above have had a disparate adverse effect on Plaintiff D.W. and other Black children who live disproportionately in high crime neighborhoods.

100.  Section 5(a)(2) of the Illinois Civil Rights Act, 740 ILCS 23/5 prohibits the Defendant State and Defendant ISP from using "criteria or methods of administration" that have the effect of discriminating against Plaintiff and other Black children because of their race and allowing a level of violence which Defendants would not tolerate if the children in the proposed class were white.

101.  By such acts set out above, and by refusal to require dealers to follow responsible business practices likely to reduce the level of violence to which Plaintiff and other Black children are now

exposed, Defendant ISP in concert with the other Defendants has used "criteria or methods of administration" that have had the effect of discriminating against them because of their race.

WHEREFORE, Plaintiff prays this Court to:

G.   Certify under Fed R. Civ. P. Rule 23(b)(2), the class of children who live in the fifteen highest crime neighborhoods as determined by the City of Chicago and who are exposed to high levels of gun violence due in part to straw purchasing and gun trafficking through licensed dealers.

H.   Declare that by refusing to require licensed dealers to follow responsible business practices pursuant to the Firearm Dealer Licensing Certification Act, the Defendants State and ISP have used criteria and methods of administration that have discriminated against Plaintiff and other Black children because of their race, in violation of Section 5(a)(2) of the Illinois Civil Rights Act, 740 ILCS 5.

I.   Direct that Defendant ISP and other Defendants use their authority under the Firearm Dealer Licensing, 430 ILCS 68-5/60 and require dealers to follow and document that they are following responsible business practices as a condition for renewal of the dealer licenses.

J.   Direct that Defendants State and ISP take the other measures to deter straw purchasing set forth in Count I and incorporated herein by reference.

K.   Grant Plaintiff nominal damages for violation of Section 5(a)(2) of the Illinois Civil Rights Act, for which Plaintiff seeks a jury determination.

L.   Grant Plaintiff such other relief, including legal fees and costs, to which she is entitled.

Dated: October 24, 2023

Respectfully submitted,

By: /s/ *Thomas  H. Geoghegan*
    One of Plaintiff's Attorneys

Shira Lauren Feldman
**Brady Center to Prevent Gun Violence**
840 First Street NE, Suite 400
Washington, DC 20002
(202) 370-8100
sfeldman@bradyunited.org

Thomas H. Geoghegan
**Despres, Schwartz & Geoghegan, Ltd.**
77 West Washington Street, Suite 711
Chicago, Illinois 60602
(312) 372-2511
tgeoghegan@dsgchicago.com

Patrick V. Dahlstrom
**Pomerantz, LLP**
10 S. LaSalle St., Suite 3505
Chicago, IL 60603
(312) 377-1181
pdahlstrom@pomlaw.com

Attorneys for the Plaintiff