**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| SHANICE MATHEWS, as guardian ad litem and on behalf of her son D.W., <br><br>          Plaintiffs, <br><br>    v. <br><br> STATE OF ILLINOIS; ILLINOIS DEPARTMENT OF STATE POLICE; JB PRITZKER, in his official capacity as Governor of the state of Illinois; and BRENDAN F. KELLY, in his official capacity as Director of the Illinois Department of State Police, <br><br>          Defendants. | No. 1:18-cv-06675 <br><br> Judge Joan B. Gottschall |

**DEFENDANTS' MEMORANDUM OF LAW
<u>IN SUPPORT OF THEIR MOTION TO DISMISS</u>**

Date: December 15, 2023

KWAME RAOUL
Attorney General of Illinois

R. Douglas Rees
Sarah A. Hunger
Michael T. Dierkes
John R. Milligan
Office of the Illinois Attorney General
100 W. Randolph Street
Chicago, Illinois 60601

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................................... ii

INTRODUCTION ...................................................................................................................... 1

BACKGROUND ......................................................................................................................... 2

    A.    Illinois Regulation of Firearms Dealers ................................................................. 2

    B.    Procedural History ................................................................................................... 4

LEGAL STANDARD ................................................................................................................. 7

ARGUMENT .............................................................................................................................. 7

I.    Plaintiff Lacks Standing .................................................................................................... 7

    A.    Plaintiff's fourth amended complaint fails to cure the traceability and redressability deficiencies identified by the Court's recent dismissal order .......... 8

    B.    Plaintiff fails to allege an injury-in-fact under *United States v. Texas*. ................ 13

II.    Plaintiff Fails To Plead A Plausible Section 504 Claim. .................................................. 15

    A.    Plaintiff fails to plead the existence of a "program or activity" to which her child has been denied access. ........................................................................................ 17

    B.    Plaintiff fails to plead that defendants have discriminated against her child "solely by reason of" his disability. ................................................................................... 18

CONCLUSION .......................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. City of Indianapolis*,
742 F.3d 720 (7th Cir. 2014) ..........................................................................22, 24

*Alexander v. Choate*,
469 U.S. 287 (1985)...........................................................................17, 18, 20, 21

*Alexander v. Sandoval*,
532 U.S. 275 (2001).............................................................................................22

*Cary v. N.E. Ill. Reg'l Commuter R.R. Corp.*,
No. 19-cv-3014, 2020 WL 1330654 (N.D. Ill. March 22, 2020)............................22

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983)................................................................................................13

*Coalition for Safe Chicago Communities v. Village of Riverdale*,
No. 2015-CH-10390, 2016 WL 1077293 (Ill. Cir. Ct. Feb. 25, 2016) ...................23

*Combs v. Grand Victoria Casino & Resort*,
No. 8-cv-414, 2008 WL 4452460 (S.D. Ind. Sept. 30, 2008) ...............................22

*Conners v. Wilkie*,
984 F.3d 1255 (7th Cir. 2021) .............................................................................18

*Davis v. Echo Valley Condo. Ass'n*,
945 F.3d 483 (6th Cir. 2019) ...............................................................................21

*Dept. of Educ. v. Brown*,
143 S. Ct. 2343 (2023)...........................................................................................8

*Eason v. Pritzker*,
No. 18-cv-2553, 2020 WL 6781794 (N.D. Ill. Nov. 18, 2020) ..............................16

*EEOC v. Chicago Miniature Lamp Works*,
947 F.2d 292 (7th Cir. 1991) ..........................................................................23, 24

*EEOC v. Concentra Health Servs., Inc.*,
496 F.3d 773 (7th Cir. 2007) .................................................................................7

*EEOC v. Warshawsky & Co.*,
No. 90-cv-1352, 1993 WL 303097 (N.D. Ill. Apr. 15, 1993) .................................24

*Goldhamer v. Nagode,*
621 F.3d 581 (7th Cir. 2010) ....................................................................8

*Good Shepherd Manor Found., Inc. v. City of Momence,*
323 F.3d 557 (7th Cir. 2003) ..................................................................18

*Hearne v. Bd. of Educ.,*
185 F.3d 770 (7th Cir. 1999) .................................................................16

*Hemisphere Bldg. Co. v. Vill. of Richton Park,*
171 F.3d 437 (7th Cir. 1999) ..................................................................18

*Husted v. A. Philip Randolph Inst.,*
138 S. Ct. 1833 (2018)............................................................................18

*Ill. Native Am. Bar Ass'n v. Univ. of Ill.,*
856 N.E.2d 460 (2006)............................................................................22

*Jackson v. Birmingham Bd. of Educ.,*
544 U.S. 167 (2005)..........................................................................19, 20

*James v. City of Evanston,*
No. 20-cv-551, 2021 WL 4459508 (N.D. Ill. Sept. 29, 2021)................22

*Lujan v. Defenders of Wildlife,*
504 U.S. 555 (1992)..................................................................................8

*NSSF v. James,*
No. 22-1374 (2d Cir.) .............................................................................11

*Pedrote-Salinas v. Johnson,*
No. 17-cv-5093, 2018 WL 2320934 (N.D. Ill. May 22, 2018) ..............22

*RWJ Mgmt. Co. v. BP Prods. N.A.,*
672 F.3d 476 (7th Cir. 2012) ............................................................21, 22

*School Bd. of Nassau Cty., Fla. v. Arline,*
480 U.S. 273 (1987)................................................................................20

*Smith v. City of Jackson,*
544 U.S. 228 (2005) ...............................................................................22

*Southeastern Cmty. Coll. v. Davis,*
442 U.S. 397 (1979)................................................................................20

*Tobey v. Chibucos,*
890 F.3d 634 (7th Cir. 2018) ...................................................................7

*United States v. Texas*,
    143 S. Ct. 1964 (2023) ................................................................. *passim*

*Wagoner v. Lemmon*,
    778 F.3d 586 (7th Cir. 2015) .............................................................17

*Weiler v. Vill. of Oak Lawn*,
    86 F.Supp.3d 874 (N.D. Ill. 2015) ......................................................22

*Williams v. County of Cook*,
    969 F. Supp. 2d 1068 (N.D. Ill. 2013) .................................................16

*Wis. Cmty. Servs. v. City of Milwaukee*,
    465 F.3d 737 (7th Cir. 2006) .........................................................18, 19

**Statutes and Regulations**

29 U.S.C. § 794 .............................................................................4, 16, 18

42 U.S.C. § 12131 ...............................................................................17

5 ILCS 830/10-5 ..................................................................................11

430 ILCS
    68/5 .........................................................................................1, 2
    68/5-10 ........................................................................................2
    68/5-15 .....................................................................................3, 14
    68/5-30 ........................................................................................2
    68/5-40 ....................................................................................2, 10
    68/5-45 ........................................................................................3
    68/5-50 ........................................................................................2
    68/5-55 ........................................................................................2
    68/5-60 .................................................................................2, 10, 14
    68/5-65 ........................................................................................2
    68/5-85 .................................................................................3, 10, 14

740 ILCS 23/5(a)(2) .........................................................................21, 23

815 ILCS
    505/ 3-7 ...................................................................................4, 10
    505/ 3-10 ..................................................................................4, 10
    505/ 3-10a .................................................................................4, 10

Ill. Pub. Act 102-0237 ...........................................................................1

Ill. Pub. Act 102-1116 ...........................................................................1

Ill. Pub. Act 103-0559 .........................................................................1, 4

20 Ill. Admin. Code 1232.90 ........................................................................................3, 10

**Other Authorities**

Illinois State Police, Gun Trafficking Information Act, https://bit.ly/3NoWb66 .........................11

Illinois State Police, Training, https://bit.ly/3TgNluH.............................................................3, 12

## INTRODUCTION

In 2018, three individual plaintiffs brought a sweeping action against the State of Illinois, Governor Pritzker, the Illinois State Police ("ISP"), and ISP Director Kelly, alleging that their failure to use the State's full regulatory authority to prevent gun violence in the City of Chicago violated their rights under federal and state law. Plaintiffs sought an order requiring defendants to promulgate 12 specific regulations that, in plaintiffs' view, would reduce gun violence in the Chicago neighborhoods where they lived. As the Court recognized in its recent order dismissing plaintiff's third amended complaint, however, much has changed in the five years since plaintiffs initially brought suit. From a regulatory perspective, the State has made great strides in its efforts to combat gun violence, including by enacting legislation that: creates a new regulatory regime to license and oversee firearms dealers, *see* 430 ILCS 68/5 *et seq.*; increases funding for and comprehensively overhauls the system for issuing Firearm Owner's Identification ("FOID") cards, *see* Ill. Pub. Act 102-0237; restricts the sale, manufacture, and possession of assault weapons and large capacity ammunition feeding devices, *see* Ill. Pub. Act 102-1116; and holds firearms dealers accountable for their own unlawful conduct related to the sale and marketing of firearm-related products, Ill. Pub. Act 103-0559. At the same time, the Supreme Court has clarified that as a matter of Article III standing, claims "centrally focused on [the] enforcement priorities" of the Executive Branch are not cognizable in federal court. ECF 175 at 22 (citing *United States v. Texas*, 143 S. Ct. 1964, 1970–71 (2023)).

As a result of these developments, plaintiff has narrowed her claims substantially, now seeking only a single form of relief: an order directing ISP to promulgate a rule requiring firearms dealers to comply with "responsible business practices" as a condition for licensure. *E.g.*, ECF 178 ¶ 3 (fourth amended complaint). But for many of the same reasons identified in the Court's order dismissing her third amended complaint, plaintiff lacks standing to seek this relief too. Perhaps

1

most importantly, plaintiff has not sufficiently alleged that her requested relief would "appreciably abate" gun violence beyond the measures the State is currently undertaking. ECF 175 at 31. On the contrary, the materials plaintiff cites in her fourth amended complaint confirm that the most effective measures to reduce straw purchases and, in turn, gun violence, are those that the State has already enacted. Furthermore, plaintiff has not alleged a judicially cognizable injury; rather, she seeks an order that would require ISP to reorder its enforcement priorities by promulgating a rule that, in any event, would not be authorized by statute. Finally, even if plaintiff had Article III standing, her claims should be dismissed under Rule 12(b)(6) for failure to state a claim.

## BACKGROUND

### A. Illinois Regulation of Firearms Dealers

The State of Illinois regulates firearms dealers in a number of ways. As plaintiff recognizes, the State recently enacted the Firearm Dealer License Certification Act, 430 ILCS 68/5 *et seq.*, which imposes a licensure requirement on firearms dealers in Illinois. The Act enumerates conditions for initial licensure and renewal, 430 ILCS 68/5-40(a), and imposes requirements on licensed dealers, such as installing video recording systems, *id.* 68/5-50(a), and implementing an electronic recordkeeping system to track inventory, *id.* 68/5-65.

Certain subsections of the Act authorize ISP to implement the statutory requirements via rulemaking. *E.g.*, 68/5-10, 5-55 (authorizing rules for checking the validity of a license and the adequacy of a safe storage plan). For example, the Act directs ISP to promulgate rules relating to training: "The Illinois State Police shall develop and implement by rule statewide training standards for assisting certified licensees in recognizing indicators that would lead a reasonable dealer to refuse sale of a firearm, including, but not limited to, indicators of a straw purchase." *Id.* 68/5-60; *see also id.* 68/5-30 ("The Illinois State Police may adopt rules regarding continuing education for certified licensees related to legal requirements and responsible business practices

regarding the sale or transfer of firearms."). No subsection directs ISP to promulgate rules adopting additional substantive conditions of licensure.

Consistent with these procedures and the Act's directive, ISP has promulgated rules requiring firearms dealers (and their employees) to complete annual training, which is made available on ISP's website. 20 Ill. Admin. Code 1232.90. The mandatory training materials cover a wide range of topics, including a written guide on identifying and preventing straw purchasers and a "Don't Lie for the Other Guy" video developed by the National Shooting Sports Foundation and ATF. *See* Illinois State Police, Training, https://bit.ly/3TgNluH.

The Firearm Dealer License Certification Act also authorizes ISP to investigate, discipline, and impose penalties on individuals and entities that violate the Act. 430 ILCS 68/5-15, 45, 85. Individuals who operate an unlicensed firearms dealership may be criminally charged and assessed a civil penalty. *Id.* 68/5-15(d). For all other violations of the Act, ISP has the discretion to issue disciplinary sanctions—specifically, ISP "may refuse to renew or restore, or may reprimand, place on probation, suspend, revoke, or take other disciplinary or non-disciplinary action against any licensee, and may impose a fine commensurate with the severity of the violation  . . . ." *Id.* 68/5-85(a). A dealer can become subject to such discipline for various reasons, including by violating the "Act, or any law applicable to the sale or transfer of firearms," *id.* 68/5-85(a)(1); engaging in a "pattern or practice or other behavior which demonstrates incapacity or incompetency to practice under this Act," *id.* 68/5-85(a)(2); and "[r]eceiving, directly or indirectly, compensation for any firearms sold or transferred illegally," *id.* 68/5-85(a)(7).

In addition to creating a gun dealer licensing regime under the Firearm Dealer License Certification Act, Illinois recently enacted the Firearm Industry Responsibility Act ("FIRA"),

which amends the Illinois Consumer Fraud and Deceptive Business Practices Act. *See* Public Act 103-0559, https://bit.ly/3uxBD4T. Among other things, FIRA makes it "unlawful" for a firearms dealer, "through the sale, manufacturing, importing, or marketing of a firearm-related product," to "[k]nowingly create, maintain, or contribute to a condition in Illinois that endangers the safety or health of the public by conduct either unlawful in itself or unreasonable under all circumstances." FIRA, Section (b)(1). A dealer violates FIRA by "failing to establish or utilize reasonable controls," which include "reasonable procedures, safeguards, and business practices that are designed to . . . prevent the sale or distribution of a firearm-related product to a straw purchaser" and to "prevent the loss or theft of a firearm-related product from the firearm industry member." FIRA, Section (b)(1)(A)-(B). As part of Section 2 of the Consumer Fraud Act, FIRA may be enforced by the Attorney General, State's Attorneys, and private plaintiffs. 815 ILCS 505/ 3-7, 10, 10a.

### B. Procedural History

In October 2018, three Chicago residents brought this action seeking declaratory and injunctive relief for alleged violations of the Americans with Disabilities Act and the Illinois Civil Rights Act ("ICRA"). ECF 1. Defendants moved to dismiss, ECF 24, and the Court granted and denied in part that motion, ECF 37. Defendants filed an interlocutory appeal, ECF 45, which was ultimately mooted when plaintiffs amended their complaint in June 2021. ECF 94, 96.

In their second amended complaint, which was filed in November 2021, plaintiffs alleged claims under Section 504 of the Rehabilitation Act and ICRA. ECF 115 ¶¶ 114-23. Specifically, plaintiffs alleged that Illinois law obligates ISP to "issue regulations" that would "curb the diversion of legal guns to the illegal market," and that ISP's failure to issue regulations of this kind constitutes "discrimination against children whose daily exposure to gun violence aggravates their mental and emotional disabilities" in violation of Section 504. *Id.* ¶¶ 8, 13. Plaintiffs sought

4

declaratory and injunctive relief against defendants in the form of an order directing ISP to "require gun dealers to comply" with a set of "responsible business practices" that plaintiffs separately lodged with the Court. *Id.* ¶¶ 114, 116. Plaintiffs also asked the Court to reallocate resources to "enforce the FOID Act in Cook County" and to direct ISP to investigate "patterns of straw purchase sales" and to "revoke the licenses" of gun dealers. *Id.*

Defendants moved to dismiss, arguing that plaintiffs lacked Article III standing to pursue their claims and, alternatively, that they failed to state a claim under the Rehabilitation Act and ICRA. ECF 116. Shortly thereafter, plaintiffs amended their complaint to reflect the removal of a plaintiff, and the court construed the pending motion to dismiss the second amended complaint to apply to the third amended complaint. ECF 137, 139. While the motion was pending, the Court ordered the parties to file supplemental briefing discussing "how, if at all, the Supreme Court's decisions in *United States v. Texas*, No. 22-58 (June 23, 2023), and *Department of Education v. Brown*, No. 22-535 (June 30, 2023), affect the standing questions raised in defendants' pending motion to dismiss the third amended complaint." ECF 170.

On September 5, 2023, the Court granted defendants' motion to dismiss the third amended complaint for lack of Article III standing. ECF 175. The Court first considered the effect of *United States v. Texas*, which held that disputes "centrally focused on enforcement priorities" are not "traditionally cognizable in a federal court" because they fail to satisfy the Article III injury-in-fact requirement. *Id.* at 22. The Court then applied *Texas* to the two forms of injunctive relief requested by plaintiff in the third amended complaint: (1) an injunction requiring ISP to seize firearms from individuals who no longer possess valid FOID cards, *id.* at 22-23, and (2) an order requiring ISP to promulgate a rule that would "require firearms dealers, as a condition of licensure and as part of their mandatory training, to adopt 'responsible business practices'" to reduce straw

5

purchases, *id.* at 26. The Court concluded that the first request was not cognizable under *Texas* because it would require it to "review and alter law enforcement priorities set by the Executive Branch of the Illinois government." *Id.* at 24. The second request, however, was cognizable because "there are 'key differences between a denial of a petition for rulemaking and an agency's decision not to initiate an enforcement action.'" *Id.* at 28 (quoting *Texas*, 143 S. Ct. at 175 n.6). And because the requested injunction seeks a "prospective change to Illinois's requirements for renewing a gun dealer's license, *Texas*'s holding does not deprive [plaintiff] of standing." *Id.*

The Court next considered the remaining components of Article III standing—traceability and redressability—as applied to the requested rulemaking. *Id.* To satisfy these requirements, plaintiff was required to "clearly allege non-speculative facts showing that adopting the responsible business practices described [in the complaint will be] likely to abate the class's exposure to future gun violence." *Id.* at 29. Plaintiff failed to do so, however, because the complaint's "non-conclusory traceability and redressability allegations . . . do not shed light on the potential efficacy" of their requested regulatory changes. *Id.* In particular, none of the studies cited in the complaint "provides any information on how, if at all, requiring gun dealers to adopt the business practices listed in [the complaint] would be likely to affect straw purchase rates and downstream gun violence in Chicago." *Id.* at 30. Accordingly, the Court ultimately determined that plaintiff lacked standing to seek an injunction requiring ISP to promulgate a rule relating to responsible business practices. *Id.* But because "the third amended complaint was filed before the Supreme Court handed down its decision in *Texas*," the court granted plaintiff leave to file a fourth amended complaint. *Id.* at 31.

On October 24, plaintiff filed a fourth amended complaint, again seeking relief under the Rehabilitation Act and ICRA. ECF 178. In this complaint, however, plaintiff seeks a single form

of relief: an order requiring ISP "to condition renewal of licenses of Illinois firearm dealers on their documented compliance with responsible business practices designed to prevent sales to persons when there are indications of straw purchasing." *Id.* ¶ 4. According to plaintiff, "[t]he single most effective way to reduce the flow of illegal 'crime guns' circulating in neighborhoods where children like Plaintiff D.W. live is for the Defendants to require licensed Illinois dealers to follow and use responsible business practices with each sale and refuse to sell guns to persons when indicators of a straw purchase are present." *Id.* ¶ 30. As support, plaintiff relies primarily on material included in amicus briefs filed by the Illinois Attorney General and Professor Daniel Webster in a case addressing the validity of a New York statute that, like FIRA, requires dealers to follow responsible business practices. *Id.* ¶¶ 73–82, 85–89.

## LEGAL STANDARD

Defendants seek dismissal under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Tobey v. Chibucos*, 890 F.3d 634, 639 (7th Cir. 2018) (cleaned up). A plaintiff must plead sufficient facts to give a defendant fair notice of the claim and the grounds upon which it rests; those facts, if true, must plausibly suggest that the plaintiff is entitled to relief, "raising that possibility above a speculative level." *EEOC v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (cleaned up).

## ARGUMENT

### I.    Plaintiff Lacks Standing

At the outset, plaintiff's suit should be dismissed under Rule 12(b)(1) because she lacks standing. Article III of the Constitution "limits the jurisdiction of the federal courts to actual 'Cases' and 'Controversies.'" *Goldhamer v. Nagode*, 621 F.3d 581, 584 (7th Cir. 2010). To establish standing to seek prospective relief, plaintiffs must show that "(1) they are under threat of

an actual and imminent injury in fact; (2) there is a causal relation between that injury and the conduct to be enjoined; and (3) it is likely, rather than speculative or hypothetical, that a favorable judicial decision will prevent or redress that injury." *Id.* at 585. And where, as here, plaintiffs allege that defendants have failed to regulate private parties not before the Court, standing is "'substantially more difficult' to establish." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562 (1992) (quoting *Allen v. Wright*, 468 U.S. 737, 758 (1984)).

Plaintiff has failed to satisfy this standard for at least two reasons. First, the fourth amended complaint does not overcome the traceability and redressability deficiencies identified by the Court in its order dismissing the third amended complaint. Second, plaintiff has not sufficiently alleged a judicially cognizable injury-in-fact under the standard articulated in *United States v. Texas*.

### A. Plaintiff's fourth amended complaint fails to cure the traceability and redressability deficiencies identified by the Court's recent dismissal order.

The Court should dismiss plaintiff's fourth amended complaint for the threshold reason that she has failed to cure the deficiencies the Court identified in its decision dismissing plaintiff's third amended complaint. There, the Court explained that to establish traceability and redressability, plaintiff was required to "show that it is 'likely, as opposed to merely speculative, that' the ongoing concrete injury alleged [by plaintiff]—the continuing exposure of D.W. and other African-American children to gun violence in certain Chicago neighborhoods—'will be redressed by a favorable decision.'" ECF 175 at 29 (quoting *Dept. of Educ. v. Brown*, 143 S. Ct. 2343, 2351 (2023)). In other words, plaintiff must allege "non-speculative facts showing that adopting the responsible business practices described in the [complaint will be] likely to abate the class's exposure to future gun violence." *Id.* Plaintiff failed to meet that burden because her "nonconclusory traceability and redressability allegations, including the reports cited, do not shed light on the potential efficacy of the regulatory changes" that she sought in her third amended

8

complaint. *Id.* Although plaintiff has attempted to supplement these allegations in her fourth amended complaint, she still fails to show that her requested relief will "appreciably abate gun violence in Chicago's predominantly African-American communities of concentrated gun violence." *Id.* at 30 (internal quotations omitted). Accordingly, her complaint should be dismissed.

Plaintiff's primary contention in the fourth amended complaint is that "if Defendants require Illinois firearm dealers to follow responsible business practices designed to prevent straw sales and illegal racketeering, it is likely to reduce the number of illegal crime guns circulating in the high crime neighborhoods where Plaintiff D.W. and other children live" which, in turn, will "reduce the level of gun violence to which these children are exposed daily and that acts to cause trauma or to re-enforce or aggravate further the debilitating trauma from which these children already suffer." ECF 178 ¶ 3. Plaintiff thus seeks an order requiring ISP "to condition renewal of licenses of Illinois firearm dealers on their documented compliance with responsible business practices designed to prevent sales to persons when there are indications of straw purchasing." *Id.* ¶ 4. There are several reasons why plaintiff's requested relief will not redress that injury.

Perhaps most importantly, the State already takes a number of actions designed to prevent straw purchasing, theft, and gun trafficking. Plaintiff has not explained why her proposed measure would abate gun violence in a more appreciable way than those chosen by the State. Among other measures, the State recently enacted FIRA, which makes it "unlawful" for firearms dealers to "[k]nowingly create, maintain, or contribute to a condition in Illinois that endangers the safety or health of the public by conduct either unlawful in itself or unreasonable under all circumstances, including failing to establish or utilize reasonable controls." FIRA, Section (b)(1). Relevant here, reasonable controls include "business practices that are designed to . . . prevent the sale or distribution of a firearm-related product to a straw purchaser" and to "prevent the loss or theft of

a firearm-related product from the firearm industry member." FIRA, Section (b)(1)(A)-(B). These practices also include complying with all applicable provisions of law and not otherwise "promot[ing] the unlawful manufacture, sale, possession, marketing, or use of a firearm-related product." FIRA, Section (b)(1)(C). FIRA may be enforced by the Attorney General, State's Attorneys, and private plaintiffs. 815 ILCS 505/ 3-7, 10, 10a.

Furthermore, ISP has the authority to discipline dealers that do not follow responsible business practices. Specifically, ISP may take action against dealers that violate any law applicable to the sale of firearms (which includes FIRA), engage in a "pattern or practice or other behavior which demonstrates incapacity or incompetency to practice under this Act," or "receive[ ], directly or indirectly, compensation for any firearms sold or transferred illegally." 430 ILCS 68/5-85(a)(1). The Act authorizes a wide range of penalties commensurate with the violation, including imposing a fine, issuing a reprimand, and suspending, revoking, or refusing to renew a license. *Id.* 68/5-85(a). ISP has also used its authority under the Act to develop training materials for dealers to assist them "in recognizing indicators that would lead a reasonable dealer to refuse sale of a firearm, including, but not limited to, indicators of a straw purchase." *Id.* 68/5-60; *see also* 20 Ill. Admin. Code 1232.90. This training provides written guidance on identifying and preventing straw purchasers and requires licensees to watch a "Don't Lie for the Other Guy" video developed by the National Shooting Sports Foundation and ATF. *See* Illinois State Police, Training, https://bit.ly/3TgNluH. Each dealer (and its employees) must complete this training annually; if the training is not complete, then the dealer cannot renew its license. 430 ILCS 68/5-40(a). And finally, contrary to plaintiff's allegations otherwise, ECF 178 ¶ 94, ISP has used its authority under the Gun Trafficking Information Act, 5 ILCS 803/10-5, to create a Gun Trafficking Information

Act Dashboard to track incidents where firearms were seized or used in the commission of a criminal offense. Illinois State Police, Gun Trafficking Information Act, https://bit.ly/3NoWb66.

Plaintiff has not made any non-conclusory allegations explaining why her requested relief—requiring ISP to condition licensure upon documented compliance with "responsible business practices"—would redress her son's injuries in a way that these combined measures do not. In fact, plaintiff does not even acknowledge the existence of FIRA, which appears to provide plaintiff with the very relief that she claims will redress his injuries: a mechanism to hold gun dealers responsible when their own conduct, including failing to adhere to responsible business practices to prevent straw purchases, off-the-record sales, and thefts, creates a condition that harms the public. *E.g.*, ECF 178 ¶¶ 3–4, 29–30, 97. If plaintiff knows dealers who have not complied with laws in ways that harmed her, then she may sue the dealer. Where the General Assembly has already provided a remedy, this Court need not invent another.

Instead of including facts that establish redressability, plaintiff points to amicus briefs filed by the Illinois Attorney General and Professor Webster in *NSSF v. James*, as well as studies cited therein. ECF 178 ¶¶ 73–93. But these briefs do not aid plaintiff in satisfying redressability in this case. On the contrary, amici filed the briefs in support of N.Y. Gen. Bus. Law §§ 898-a–e, which, like FIRA, makes it unlawful for firearms dealers to fail to institute business practices that would prevent straw purchases, theft, and trafficking. *See NSSF v. James*, No. 22-1374 (2d Cir.). And those briefs show that enacting such laws will have the effect of reducing gun violence because, as plaintiff alleges, "requiring dealers to follow responsible business practices is likely or even certain to reduce both straw purchasing and illegal gun trafficking, for which a small handful of dealers who refuse these practices are responsible." ECF 178 ¶ 75. The briefs do not, however, speak to dealer licensure or the type of condition that plaintiff seeks to impose here. In other words,

11

all that plaintiff can show by citing those briefs is that the measures *already enacted by Illinois* are likely to redress gun violence.

The content of the studies further bears this out. For example, the Brady Center's report on "bad apple" firearms dealers recommends that States and localities "[e]stablish licensing of dealers at the municipal or state level and stronger requirements for better recordkeeping, security practices, and employee background checks" and enact legislation that would hold those dealers liable for their misconduct. ECF 178, Ex. C at 2, 23–24. As explained, Illinois has undertaken these measures. Likewise, Professor Webster's testimony that a combination of undercover stings, civil lawsuits, and criminal indictments has historically caused a decrease in straw purchases is consistent with the approach taken by the State through its regulatory and enforcement authority. *Id.* ¶¶ 86–87. And though plaintiff views her proposal to be "a cost-effective way of achieving a similar or equally meaningful reduction in illegal crime guns as one-time sting operations against the dealers described," she offers no support for that allegation. *Id.* ¶ 90.

Finally, there is no merit to plaintiff's repeated assertion that the State allows dealers to sell ammunition to individuals who do not present a valid FOID card. *Id.* ¶¶ 40, 94, 97. On the contrary, Illinois law (and the training materials developed by ISP) makes clear that individuals must possess a FOID card to purchase ammunition. 430 ILCS 65/2(b); Illinois State Police, Training PowerPoint at 18–19, https://bit.ly/3TgNluH.

All told, plaintiff has not shown that her requested relief—requiring ISP to condition licensure on dealers following responsible business practices—will "appreciably abate" gun violence in Chicago, let alone her own asserted injury—i.e. that her son will encounter gun violence in the future, triggering his traumatic stress disorder. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983). The fourth amended complaint should be dismissed on this ground alone.

**B.     Plaintiff fails to allege an injury-in-fact under *United States v. Texas*.**

Alternatively, the fourth amended complaint should be dismissed because it fails to allege a judicially cognizable injury-in-fact under the Supreme Court's decision in *United States v. Texas*. There, the Supreme Court instructed courts to consider whether the dispute identified in the complaint is one that is "traditionally cognizable in a federal court." ECF 175 at 22. As relevant here, disputes are not judicially cognizable when they are "centrally focused on enforcement priorities." *Id.* That is so because "'a citizen lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution.'" *Id.* at 18 (quoting *Texas*, 143 S. Ct. at 1970). If federal courts were to resolve such disputes—which implicate no individual liberty or property interests—they would encounter separation of powers concerns by "run[ning] up against the Executive's Article II authority to enforce federal law." *Id.* at 18 (internal quotations omitted). Furthermore, federal "courts generally lack meaningful standards for assessing the propriety of enforcement choices in this area." *Id.* In short, the Court recognized, "federal courts are generally not the proper forum for resolving claims that the Executive Branch should make more arrests or bring more prosecutions." *Id.* at 18–19 (internal quotations omitted).

Plaintiff's fourth amended complaint—which seeks a court order "requir[ing] Illinois firearm dealers to use and document their use of responsible business practices with respect to straw purchasing as a condition for renewal of their licenses," ECF 178 ¶ 97(C)—falls within the category of disputes that are not judicially cognizable under *Texas*. Indeed, although plaintiff characterizes her requested relief a regulatory measure that is consistent with the authority granted to ISP under the Act, it is, in substance, an extra-statutory request to reorder the State's enforcement priorities.

As explained, *see supra* p. 3, the Act confers to ISP the authority to issue "disciplinary sanctions" to dealers that violate its provisions or commit other enumerated forms of misconduct. 430 ILCS 68/5-85. Other than a narrow exception for individuals operating unlicensed dealerships, *id.* 68/5-15(d), the Act provides ISP with discretion to tailor the sanction to the individual circumstances presented in each case. Indeed, the Act makes clear that "[f]or violations of the Act not penalized under Section 5-15 [(operating unlicensed dealerships)], the Illinois State Police *may* refuse to renew or restore, or may reprimand, place on probation, suspend, revoke, or take other disciplinary or non-disciplinary action against any licensee, and may impose a fine commensurate with the severity of the violation . . . ." *Id.* 68/5-85(a) (emphasis added). Plaintiff's proposed regulation, however, would have the Court eliminate that discretion for an entire category of violations and require ISP to revoke the license of any dealer that does not comply with the reasonable business practices that she has set forth. Because this request attempts to restructure an agency's enforcement priorities, it is not judicially cognizable under *Texas*.

In any event, plaintiff's request incorrectly assumes that ISP has the authority to impose such a condition on licensees via rulemaking. As primary support for this allegation, plaintiff points to section 60 of the Act, ECF 178 ¶¶ 33, 69, which authorizes ISP to develop statewide training materials via rulemaking: "The Illinois State Police shall develop and implement by rule statewide training standards for assisting certified licensees in recognizing indicators that would lead a reasonable dealer to refuse sale of a firearm, including, but not limited to, indicators of a straw purchase," 430 ILCS 68/5-60. According to plaintiff, section 60 also bestows ISP with the authority "to require dealers to follow" the training standards as a condition of licensure. ECF 178 ¶ 35. But this is incorrect under the plain text of this provision: plaintiff conflates the power to develop educational materials, which is contemplated by section 60 of the Act, with the power to

14

require compliance with the lessons from that training as a condition for licensure, which is not. In fact, no provision of the Act authorizes ISP to supplement the conditions of licensure enumerated by statute via rulemaking.

Plaintiff also relies on ISP's enforcement authority under section 85 of the Act, claiming that ISP's authority to refuse to renew licenses when the licensee has engaged in "a pattern of practice which demonstrates incapacity or incompetency to practice under the Act" supports her request to require ISP to "condition renewal of a license on documentation that dealers are following responsible business practices with respect to each gun sale." ECF 178 ¶ 72. Plaintiff offers no explanation, however, as to how a statutory provision authorizing ISP to make individualized sanctions determinations (following a hearing) about a dealer's pattern of practice would allow ISP to impose a blanket condition on all licensees. And she certainly has not explained how such a request, were it authorized by statute, would not be considered a realignment of ISP's enforcement priorities, and thus not judicially cognizable under *Texas*.

To be sure, the Court in its earlier decision determined that plaintiff could assert a claim based on "a failure to regulate, as contrasted with a failure to arrest or prosecute, gun dealers." ECF 175 at 27. As explained, however, the allegations in the fourth amended complaint, coupled with the statutory provisions governing ISP's authority, confirm that plaintiff is in fact requesting relief that is not judicially cognizable under *Texas*. Her complaint should thus be dismissed.

## II.  Plaintiff Fails To Plead A Plausible Section 504 Claim.

If the Court determines that plaintiff has alleged Article III standing, it should nevertheless dismiss plaintiff's Rehabilitation Act claim under Rule 12(b)(6) because plaintiff has failed to state a plausible claim. As an initial matter, although plaintiff has identified the State, Governor Pritzker, ISP, and Director Kelly as defendants, she makes no specific allegations—under the Rehabilitation

Act or ICRA—against any defendant other than ISP, and so her claims should be construed solely as against ISP. Indeed, plaintiff's claims against the Governor are premised on a single generic allegation that he is "responsible for the policies implemented" by the State of Illinois. ECF 178 ¶ 16. Similarly, plaintiff makes no distinct allegations about Director Kelly or the State of Illinois. These are insufficient to state a claim. *See, e.g.*, *Williams v. County of Cook*, 969 F. Supp. 2d 1068, 1074 n.2 (N.D. Ill. 2013) (collecting cases dismissing official capacity claims as "redundant and unnecessary" where the state agency is named as a defendant); *Eason v. Pritzker*, No. 18-cv-2553, 2020 WL 6781794, at *9 (N.D. Ill. Nov. 18, 2020) (dismissing claim for injunctive relief against Governor based on allegation that he has "oversight responsibility" over state agencies and employees), *citing Hearne v. Bd. of Educ.*, 185 F.3d 770, 777 (7th Cir. 1999) (claim against Governor was improper due to plaintiffs' "inability to show that he bears any legal responsibility for the flaws they perceive in the system").

In any event, plaintiff fails to state a claim against any defendant. Section 504 provides that "[n]o otherwise qualified individual" may "be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance" if any such adverse action occurs "solely by reason of his or her disability." 29 U.S.C. § 794(a). Plaintiff asserts that ISP's failure to regulate firearms dealers constitutes disability discrimination because exposure to gun violence can cause children to "develop acute or post-traumatic stress disorder," ECF 178 ¶ 51, rendering them disabled within the meaning of Section 504. *Accord* p. 17 (alleging that plaintiff's "exposure to gun violence has left him disabled within the meaning of Section 504"). These allegations fail on multiple levels.

16

### A. Plaintiff fails to plead the existence of a "program or activity" to which her child has been denied access.

First, plaintiff has failed to plead the existence of a "program or activity" to which her child has been denied access. A plaintiff bringing a Rehabilitation Act claim must allege that the defendant "denied him access to a program or activity because of his disability." *Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015). Here, plaintiff alleges that ISP has discriminated against her child by failing to promulgate a rule requiring dealers to follow responsible business practices. ECF 178 ¶ 97. But plaintiff does not allege that ISP's alleged failure to adopt her preferred administrative rule has denied her son access to any recognized service, program, or activity.

The Court read plaintiff's original complaint to allege discrimination in "the FOID firearms identification program," ECF 37 at 26, but that basis cannot sustain plaintiff's present complaint. For one, the current focus of plaintiff's complaint is ISP's regulation of firearms dealers, and not the FOID program. Furthermore, firearm dealer licensure is not a program in which plaintiff, as a member of the public, participates in any meaningful way. The key purpose of Section 504, as the Supreme Court has explained, is to ensure that people with disabilities are given "meaningful access" to a "program or benefit." *Alexander v. Choate*, 469 U.S. 287, 301 (1985); *see also* 42 U.S.C. § 12131(2) (defining disabled individuals as those who are eligible "for the receipt of services or the participation in programs or activities provided by a public entity"). But here, plaintiff does not allege that she and her child have been denied meaningful access to *any* program or benefit to which they are personally entitled. She simply alleges that defendants' administration of programs and services in which they do *not* participate has a collateral effect on them. That argument does not state a Section 504 claim.

**B.    Plaintiff fails to plead that defendants have discriminated against her child "solely by reason of" his disability.**

Plaintiff also fails to make a plausible showing that defendants have discriminated against her child "solely by reason of" his disability. 29 U.S.C. § 794(a). Section 504 has a "stricter causation requirement" than the ADA: "[T]he plaintiff's disability must be the sole reason for the alleged discriminatory action." *Conners v. Wilkie*, 984 F.3d 1255, 1260 (7th Cir. 2021). "Solely by reason of" means that a defendant must have acted "for no reason other" than the plaintiff's disability. *Husted v. A. Philip Randolph Inst.*, 138 S. Ct. 1833, 1842 (2018). Plaintiff cannot plausibly meet this demanding standard.

At the outset, plaintiff cannot show that defendants have *intentionally* declined to adopt her proposed regulation because of her child's disability. Indeed, plaintiff does not genuinely attempt to make such a showing. Nor could she. Defendants have not declined to adopt plaintiff's preferred regulation out of discriminatory animus against plaintiff, other disabled individuals, or, for that matter, anyone else. Plaintiff's claim, instead, appears to be that defendants have discriminated against her child by failing to accommodate his disability. *Id.* ¶ 97. As the Seventh Circuit has explained, the "Supreme Court has located a duty to accommodate" within Section 504, *Wis. Cmty. Servs. v. City of Milwaukee*, 465 F.3d 737, 747 (7th Cir. 2006) (en banc), under which public entities must "assure meaningful access" to covered programs and services, *Choate*, 469 U.S. at 301. But even assuming plaintiff has identified any covered program or service to which her child has been denied access (which she has not), plaintiff has not alleged a failure to accommodate that is actionable under Section 504.

To start, plaintiff has not plausibly alleged that defendants have failed to accommodate her child by removing some barrier to program access that affects him *because he is disabled*—the only "accommodation" defendants are required to make under Section 504. In a series of cases

building on *Choate*, the Seventh Circuit has explained that "the Rehabilitation Act helps disabled individuals obtain access to benefits only when they would have difficulty obtaining those benefits 'by reason of' their disabilities, and not because of some quality that they share generally with the public." *Wis. Cmty. Servs.*, 465 F.3d at 748; *accord Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 562 (7th Cir. 2003) (ADA); *Hemisphere Bldg. Co. v. Vill. of Richton Park*, 171 F.3d 437, 440 (7th Cir. 1999) (FHAA). These cases reject the argument that a defendant is obligated to provide a reasonable accommodation to disabled people simply because a practice that "adversely affects [everyone's] ability" to access a program or service "also affects disabled [people's] access." *Good Shepherd*, 323 F.3d at 562. But that is essentially plaintiff's argument.

Indeed, plaintiff's claim does not show discrimination on the basis of disability at all. Plaintiff does not allege any facts to make a plausible showing that defendants have treated plaintiff's child differently because he is disabled. *See Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174 (2005) (explaining that "the normal definition of discrimination is differential treatment"). Plaintiff's claim does not even appear to be that defendants have taken facially neutral action that has a differential *effect* on her child because he is disabled—i.e., a disparate-impact claim. Instead, plaintiff asserts that defendants have taken a facially neutral action that has caused her child, and similarly situated individuals, to *become* disabled. *See* ECF 178 ¶ 13 (defining the proposed class as children "who suffer mental disability . . . from exposure to high level of illegal gun violence resulting from straw purchases"); *id.* p. 51 (alleging that plaintiff's child's "exposure to gun violence has left him disabled within the meaning of Section 504"). But that is not a claim that is actionable under Section 504, because it is simply not a discrimination claim at all. Plaintiff's reading of Section 504 would give that statute an outsized mandate, transforming any

and all state action that could plausibly be viewed to cause injury into actionable discrimination. Plaintiff identifies no reason to read Section 504 in such an expansive manner.

Plaintiff's reasonable-accommodation claim finally fails for one additional reason:  None of the relief plaintiff requests could plausibly be viewed as a reasonable accommodation. As the Supreme Court has explained, although a recipient of federal funding may be required in certain circumstances to make a "reasonable" accommodation to ensure "meaningful access" to a program or service, the recipient is not required to "make 'fundamental' or 'substantial' modifications" to programs in order to do so. *Choate*, 469 U.S. at 300–01; *Se. Cmty. Coll. v. Davis*, 442 U.S. 397, 412–13 (1979). Section 504, in other words, does not intrude upon "the States' longstanding discretion" to enact generally applicable programs and policies, *Choate*, 469 U.S. at 307; it simply requires States to make "individualized" exceptions to those polices where doing so is necessary to ensure access for disabled people, *Sch. Bd. of Nassau Cty., Fla. v. Arline*, 480 U.S. 273, 287 (1987); *see Davis v. Echo Valley Condo. Ass'n*, 945 F.3d 483, 491 (6th Cir. 2019) ("A request works a fundamental change if it turns the challenged policy into something else entirely.").

Plaintiff's requested relief plainly crosses this line. Plaintiff seeks to add a new condition to licensure, which would alter the basic terms and conditions of the gun dealer licensing regime, all on the theory that doing so is necessary to ameliorate discrimination against children who do not participate in those programs. This is not an "accommodation," let alone a "reasonable" one. *See Echo Valley*, 945 F.3d at 490 ("In this context, the word 'accommodation' means 'adjustment.'"). Rather, plaintiff seeks across-the-board change for all state residents. Indeed, she describes gun violence as a "public health emergency" affecting all Chicago residents, ECF 178 ¶¶ 10, 21, 23, one that she believes the State could ameliorate if it simply exercised its regulatory authority in the manner she prefers. But Section 504 preserves States' "longstanding discretion"

to make policy decisions of this kind, *see Choate*, 469 U.S. at 307, and plaintiff has identified no "reasonable accommodation" that the State has failed to make that could rise to the level of discrimination. Plaintiff's claims should be dismissed on this basis as well.

## III.  Plaintiff Fails to Plead a Plausible Illinois Civil Rights Act Claim

Plaintiff also asserts a state-law claim under the Illinois Civil Rights Act, 740 ILCS 23/5(a)(2). ECF 178 ¶¶ 98–101. But if this Court dismisses plaintiff's Section 504 claim, as it should, then the Court should decline to exercise supplemental jurisdiction over the ICRA claim. 28 U.S.C. § 1367(c)(3). When all federal claims have been dismissed before trial, "the presumption is that the court will relinquish federal jurisdiction over any supplemental state law claims." *RWJ Mgmt. Co. v. BP Prods. N.A.*, 672 F.3d 476, 479 (7th Cir. 2012). This presumption "should not be lightly abandoned, as it is based on a legitimate and substantial concern with minimizing federal intrusion into areas of purely state law." *Id.* Here, relinquishing jurisdiction over plaintiff's ICRA claim is appropriate because the Court has not yet committed substantial judicial resources to addressing the claim, and also because the claim is novel. *Id.* at 481; *see also James v. City of Evanston*, No. 20-cv-551, 2021 WL 4459508, at *15 (N.D. Ill. Sept. 29, 2021) (declining to exercise supplemental jurisdiction over ICRA claim); *Pedrote-Salinas v. Johnson*, No. 17-cv-5093, 2018 WL 2320934, at *6 (N.D. Ill. May 22, 2018) (same).

To the extent that the Court addresses the ICRA claim, it should be dismissed because it does not state a valid claim. After the Supreme Court limited the scope of disparate impact claims brought under Title VI of the Federal Civil Rights Act in *Alexander v. Sandoval,* 532 U.S. 275 (2001), the Illinois legislature passed ICRA, which in effect preserved the Title VI cause of action in Illinois law, but was not intended to create new rights beyond what had been previously recognized in federal law. *See Ill. Native Am. Bar Ass'n v. Univ. of Ill.,* 856 N.E.2d 460, 467

(2006); *Weiler v. Vill. of Oak Lawn,* 86 F.Supp.3d 874, 889 (N.D. Ill. 2015). Thus, in interpreting ICRA, courts look to federal civil rights cases for guidance. *Weiler*, 86 F.Supp.3d at 889.

Under federal law, plaintiffs asserting a disparate impact claim must isolate and identify the "specific practice" responsible for the alleged disparity. *Smith v. City of Jackson*, 544 U.S. 228, 241 (2005) (noting that it is "not enough" for plaintiffs to "point to a generalized policy that leads to such an impact"); *Combs v. Grand Victoria Casino & Resort*, No. 8-cv-414, 2008 WL 4452460, at * 3 (S.D. Ind. Sept. 30, 2008) (dismissing ADEA disparate impact claim at pleading stage for failure to challenge specific employment practice). Then, once a specific practice is identified, plaintiffs must allege some facts tending to show that the practice caused a relevant and statistically significant disparity. *See Adams v. City of Indianapolis*, 742 F.3d 720, 733 (7th Cir. 2014) (affirming dismissal of disparate impact claim). Similarly, to state an ICRA claim, plaintiffs must adequately allege that the defendant (1) utilizes "criteria or methods of administration" that (2) "have the effect of subjecting individuals to discrimination because of their race, color, rational origin, or gender." 740 ILCS 23/5(a)(2).

Here, plaintiff's ICRA claim fails at the outset because she is not challenging specific "criteria or methods of administration." Indeed, while plaintiff asserts that ISP should take an additional regulatory measure, she does not point to any policy currently in force, or any practice currently in use, that she claims disparately impacts minorities. Plaintiff's failure to identify a specific policy or practice warrants dismissal of her claim. *Cary v. N.E. Ill. Reg'l Commuter R.R. Corp.*, No. 19-cv-3014, 2020 WL 1330654, at *4 (N.D. Ill. March 22, 2020) (dismissing ICRA claim because plaintiff failed to identify specific practice that caused alleged disparate impact).

Both state and federal case law confirm that plaintiff has not stated a viable ICRA claim. In *Coalition for Safe Chicago Communities v. Village of Riverdale*, the plaintiffs sued two villages,

alleging that they violated ICRA by failing to adequately regulate and license firearms, thus causing a disparate impact on minorities. No. 2015-CH-10390, 2016 WL 1077293, at *1 (Ill. Cir. Ct. Feb. 25, 2016). The court dismissed the claim, holding that plaintiffs had not identified specific "criteria or methods of administration" that could support an ICRA claim. *Id.* at *13. The Court held that the plaintiffs "impermissibly rely upon Defendants' lack of identifiable policies, practices, criteria or methods of administration to support their claim under ICRA." *Id.* The same is true here; plaintiff's theory that ISP could do more to regulate gun dealers does not challenge an existing state policy, and therefore does not state a claim.

Seventh Circuit precedent similarly holds that disparate impact claims require some affirmative act on the part of the defendant. In *EEOC v. Chicago Miniature Lamp Works*, 947 F.2d 292 (7th Cir. 1991), the trial court found that an employer's reliance on word-of-mouth recruiting disparately impacted minorities in violation of Title VII. *Id.* at 304. The Seventh Circuit reversed, holding that the trial court "erred in considering passive reliance on employee word-of-mouth recruiting as a particular employment practice for purposes of disparate impact." *Id.* at 305. The Seventh Circuit noted that the EEOC did not identify a "specific, affirmative employment practice" that caused the disparity, as required. *Id*; *see also EEOC v. Warshawsky & Co.*, No. 90-cv-1352, 1993 WL 303097, at *15 (N.D. Ill. Apr. 15, 1993) ("Disparate impact cannot be found, however, where there is not at least some affirmative act on the part of the employer."). In other words, the employer's failure to take additional measures to recruit and hire minorities, such as advertising or using of the State's unemployment referral service, *id.* at 295, did not subject it to liability under a disparate impact theory. Likewise, plaintiff's allegations that ISP and the State could do more to combat gun violence do not suffice.

Even if not adopting plaintiff's preferred regulations were considered a "criteria or method of administration" within the meaning of ICRA (again, it is not), plaintiff has not adequately alleged causation. According to plaintiff, ISP's "refusal to require dealers to follow responsible business practices likely to reduce the level of violence to which Plaintiff and other Black children are now exposed," it has "used criteria or methods of administration that have had the effect of discriminating against them because of their race." ECF 178 ¶ 101. But as explained, *supra* Section I.A., plaintiff has not made any non-conclusory allegations supporting her theory that the failure to regulate affects the levels of gun violence experienced by plaintiff. Her ICRA claim should be dismissed for this reason as well. *See Adams*, 742 F.3d at 733 (affirming dismissal of disparate impact claim where complaint included no factual allegations tending to show causation).

At bottom, plaintiff's interpretation of ICRA is untenable. If accepted, it would expose state agencies to vast areas of liability, clearly beyond the scope of the federal laws on which it is based, and certainly beyond anything the General Assembly intended. State agencies have finite budgets and must decide how to best to allocate their limited resources among competing programs and initiatives. Defendants are aware of no case holding that plaintiff can state an ICRA claim, not by identifying a specific agency policy that disparately impacts minorities, but rather by claiming that the agency could "do more" to address issues affecting minorities and must fine-tune its regulatory scheme by enacting certain regulations that plaintiff supports. Plaintiff has not adequately alleged a violation of ICRA, and her claim should be dismissed.

## CONCLUSION

For these reasons, plaintiff's claims should be dismissed under either Rule 12(b)(1) or Rule

12(b)(6).

Dated: December 15, 2023           Respectfully submitted,

                                     KWAME RAOUL
                                     Illinois Attorney General

                    By:     */s/ Michael T. Dierkes*
                                     Michael T. Dierkes

R. Douglas Rees                           Office of the Illinois Attorney General
Sarah A. Hunger                        100 W. Randolph Street, 12th Floor
John R. Milligan                       Chicago, Illinois 60601
Office of the Illinois Attorney General     (312) 814-3672
100 W. Randolph Street               michael.dierkes@ilag.gov
Chicago, Illinois 60601